## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JPMORGAN CHASE BANK, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHARLIE JAVICE, OLIVIER AMAR, | ) | |
| CHARLIE JAVICE, in her capacity as Trustee | ) | |
| of CHARLIE JAVICE 2021 IRREVOCABLE | ) | C.A. No. _____ |
| TRUST #1, CHARLIE JAVICE, in her capacity | ) | |
| as Trustee of CHARLIE JAVICE 2021 | ) | |
| IRREVOCABLE TRUST #2, and CHARLIE | ) | |
| JAVICE in her capacity as Trustee of CHARLIE | ) | |
| JAVICE 2021 IRREVOCABLE TRUST #3, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff JPMorgan Chase Bank, N.A. ("JPMC"), by its undersigned counsel, alleges for its Complaint against Charlie Javice, in her individual capacity and in her capacity as Trustee of Charlie Javice 2021 Irrevocable Trust #1, Charlie Javice 2021 Irrevocable Trust #2, and Charlie Javice 2021 Irrevocable Trust #3, and Olivier Amar ("Defendants") as follows:

## NATURE OF THE ACTION

1.      Defendant Charlie Javice founded a small start-up business known as Frank that seemingly had the potential to grow and become a successful enterprise in the future, and appeared to have had had early proven success.[1] But to cash in, Javice decided to lie, including lying about Frank's success, Frank's size, and the depth of Frank's market penetration in order to induce JPMC to purchase Frank for $175 million. Specifically, Javice represented in documents placed in the acquisition data room, in pitch materials, and through verbal presentations that

---

[1]      "Frank" is a trade name; the legal name of the corporation at the time of acquisition described below was TAPD, Inc.

more than 4.25 million students had created Frank accounts to begin applying for federal student aid using Frank's application tool.  Then, when JPMC specifically requested proof of that claim during due diligence, Javice used "synthetic data" techniques to create a list of 4.265 million fake customers – a list of names, addresses, dates of birth, and other personal information for 4.265 million "students" who did not actually exist.  In reality, Frank was nearly 4 million short of its representations to JPMC.

**Background**

2.      In 2017, Javice started Frank, a for-profit company that aimed to help students navigate the college financial aid process.  Frank offered students a tool to expedite completion of the Free Application for Federal Student Aid (the "FAFSA Tool"), a time-consuming task required of students seeking federal grants and loans.  Frank also provided students with information on scholarships, financial aid appeals, and college courses.  To tout Frank's success, Javice publicly claimed that Frank had helped <u>millions</u> of students obtain <u>billions</u> of dollars in student aid by early 2021.

3.      Javice approached JPMC in the summer of 2021.  After reviewing the opportunity, JPMC agreed to explore a potential acquisition.  At an initial July 2021 meeting, Javice told JPMC that Frank had significant engagement with college-aged students, a market segment that JPMC wanted to grow.  Javice stated that Frank had 4.25 million users, expressly defining a "user" as an individual who created a Frank account by entering a first name, last name, email, and phone number on Frank's website.  She distinguished "users" from "website

visitors," representing to the JPMC diligence team that, since 2017, Frank had more than 35 million visitors to its website.[2]

4.     The materials Javice posted in the acquisition data room repeated Javice's representations.  She included in the data room a spreadsheet with a column labeled "FAFSA In Process" showing that 4.265 million students had started a FAFSA form with Frank (which required creating an online Frank account), with more than 2.1 million students fully completing the FAFSA through Frank.  Javice posted a different spreadsheet showing more than 34 million visitors to Frank's website through 2020 alone.

5.     Based on the July 21 meeting and the data room materials, JPMC confirmed Frank's definition of its customers base, namely, customers are users who created a Frank account.  Thereafter, as part of due diligence on Javice's 4.265 million customer account claim, JPMC made an unambiguous request to Javice for a list of Frank's customer accounts that included important data, such as first names, last names, dates of birth, phone numbers, mailing addresses, and email addresses.  JPMC asked Javice the key questions in writing:

> a.     "How many customer accounts have 100% of the below data?";
>
> b.     "How many customer accounts have partial information?"; and
>
> c.     "Of partial records, what [percent] include each data field below?"

6.     JPMC made clear to Javice that these were "critical confirmatory due diligence requests" it required to proceed with an acquisition of Frank.  JPMC believed that this diligence on current customers would confirm JPMC's investment thesis.  Specifically, JPMC sought to confirm its thesis that Frank's acquisition of 4.265 million customer accounts demonstrated that

---

[2]     JPMC was not interested in Frank's website visit numbers because website visits do not reliably indicate whether a student had an established relationship with Frank.  Instead, and as described in this Complaint, JPMC focused on customer accounts.

Frank had created momentum, growth, and scale by developing meaningful relationships with millions of students.  That momentum, growth, and scale, JPMC believed, indicated that Frank was a proven acquisition machine for college-aged students and would continue – and even increase – its customer account base once Frank merged with and into JPMC.  If Frank's customer base existed, JPMC could proceed with the deal.

**The Fake Customer List**

7.      JPMC's diligence request was problematic for Javice and Frank:  Frank did not have 4.265 million customer accounts.  At the time of JPMC's request, Frank was almost 4 million customer accounts short of its representations to JPMC.  Rather than reveal the truth, Javice first pushed back on JPMC's request, arguing that she could not share her customer list due to privacy concerns.  After JPMC insisted, Javice chose to invent several million Frank customer accounts out of whole cloth.

8.      Javice, along with her Chief Growth Officer Olivier Amar, first asked Frank's Director of Engineering to create fake customer details using "synthetic data" techniques.  In plain English, "synthetic data" is fake information typically created by computer algorithms.  Not comfortable, the engineer asked Javice and Amar whether the request was legal.  In response, Javice sought to assure the engineer that she was not requesting that the engineer engage in illegal conduct.  The Frank engineer was not persuaded and declined to participate in the scheme, and instead said that he only would provide Javice with Frank's actual list of customer accounts: fewer than 300,000 customer accounts as of July 31, 2021.

9.      Javice then turned to a data science professor at a New York City area college (the "Data Science Professor") who advertised his "creative solutions" to data problems.  Javice provided the Data Science Professor a list of 293,192 individuals who had started or submitted a FAFSA application through Frank.  She then directed the Data Science Professor to use

"synthetic data" techniques to create 4.265 million customer names, email addresses, birthdays, and other personal information based on the list Javice supplied.

10.     Emails between Javice and the Data Science Professor make clear that the customer list consisted of fake data.  For example:

a.     The Data Science Professor wrote Javice to confirm that "[f]or names, our plan was to sample first name and last name independently and then ensure none of the sampled names are real."

b.     Regarding creating physical addresses, the Data Science Professor wrote to Javice, "I can't seem to find addresses in my raw files . . . .  Should I attempt to fabricate them?"  Javice responded "I just wouldn't want the street to not exist in the state."  Later, the Data Science Professor determined that "'real addresses' may not be doable," and Javice responded "If we can't do real addresses what[']s the best we can do for that?"

c.     When reviewing the fake data, the Data Science Professor noted that many entries confusingly had customers living, attending high school, and attending college in the same town and state, and concluded that the list "would look fishy to [him] if [he] were to audit it."

d.     Javice was particularly concerned with the email addresses, asking the Data Science Professor "will the fake emails look real with an eye check or better to use unique ID?"  He responded "[t]hey will look fake," at which point Javice agreed to use a "unique ID" instead.

e.      When the Data Science Professor struggled to add certain college names to the list, Javice indicated that the "perfect" solution was to "<u>draw a school at random in the same state</u>" as the college that could not be added.

f.      And when the Data Science Professor informed Javice that the data she provided contained the same phone number appearing for 676 individuals, Javice instructed him to "<u>double check the duplication rate isn't more than 5%-7%</u>" for the synthetic data, despite the fact Javice knew that JPMC was asking for a list of "<u>unique customer accounts.</u>"

11.     Ultimately, the Data Science Professor created a list of 4.265 million fake customer accounts (the "Fake Customer List") as Javice had requested and submitted it to a third-party vendor for validation as Javice directed.

12.     At the exact same time Javice was working with the Data Science Professor on the Fake Customer List, Amar separately reached out to ASL Marketing, Inc. ("ASL"), a marketing firm that purports to have "the most comprehensive, accurate and responsive data of high school students, college students and young adults available anywhere." Amar caused Frank to purchase a list of 4.5 million students from ASL for a cost of $105,000 (the "ASL List") on the same day Javice transferred the Fake Customer List to the third-party vendor for validation. While the ASL List arrived too late for Javice and the Data Science Professor to use in creating the Fake Customer List, Javice and Amar later used the ASL List to further deceive JPMC and cover their tracks after the Frank acquisition closed, again providing JPMC data for Frank customers who did not exist.

**<u>The Cover-Up</u>**

13.     The cover-up of Frank's fake customer data began immediately after the third-party vendor completed its validation process. Within <u>four minutes</u> of receiving the analysis,

6

Javice directed the vendor to destroy the Fake Customer List and not share "additional background" with JPMC.

14.     Next, the Data Science Professor sent Javice a $13,300 invoice for his work, which included line items for each of the fake data fields he had created.  Javice immediately directed the Data Science Professor to resend the invoice with only one generic line item for "data analysis" and to increase the invoice amount to $18,000.  The Data Science Professor complied and revised the invoice.

15.     Relying on the Fake Customer List, and the representations and warranties that Javice and Amar caused Frank to make as part of the acquisition, JPMC entered into the Agreement and Plan of Merger dated as of August 8, 2021 (the "Merger Agreement") with Finland Merger Sub, Inc., Frank, and Shareholder Representative Services LLC.  Pursuant to the Merger Agreement, JPMC acquired Frank for a purchase price of $175 million (the "Merger"), with the Merger closing on September 14, 2021 and Javice, Amar, and other Frank employees joining JPMC as employees.

16.     Soon after the third-party vendor completed its validation process and Frank entered into the Merger Agreement, Javice again engaged the Data Science Professor to work with another third-party vendor, Enformion, LLC ("Enformion"), to obtain additional email addresses to add-on to the individuals in the ASL List.  Javice decided to purchase the additional email address data because she knew that JPMC always intended to market its products and services to both Frank's existing users and the student accounts Frank would acquire in the future and therefore that, at some point after closing, JPMC would ask for the Frank customer data file containing 4.265 million accounts.

17.     In January 2022, to test the quality of Frank's customer list and the receptiveness of these customers to JPMC's products and services, JPMC requested that Frank send Frank's list of 4.265 million customers to a JPMC marketing team.  Javice and Amar, however, knew that list did not exist.

18.     So Javice and Amar first provided JPMC's marketing team with a list of individuals sourced from ASL.  Later, Javice provided JPMC's marketing team with a list that consisted of individuals from the ASL List augmented with emails addresses from Enformion.  Said differently, the email addresses that Javice and Amar sent to the JPMC marketing team, which Javice and Amar knew JPMC planned to use to conduct a marketing campaign, were derived from data purchased from ASL and Enformion.

19.     Unsurprisingly, the results of the marketing test campaign were disastrous.  Specifically, JPMC sent marketing test emails to what it believed were 400,000 unique Frank customers.  Of the individuals contacted, only 28% of emails were delivered, compared to a 99% delivery rate JPMC usually sees with similar campaigns.  Just 1.1% of the delivered emails were opened, compared to 30% for a typical JPMC campaign.

**The Cover-Up Fails**

20.     After the unusually poor returns from the marketing campaign, JPMC reviewed various aspects of Frank's business.

21.     As a result of its review, JPMC discovered the Fake Customer List and the ASL List.  JPMC has compared those lists to Frank's actual customer list, and examined emails, messages, and chats among Javice, the Data Science Professor, and Amar.  Those documents leave no doubt – the Fake Customer List and the ASL List did not contain the first name, last name, address, and phone number for actual Frank customers.  Frank's files and data do not

include any list or database of 4.265 million real students who actually used Frank to start a FAFSA. That list does not exist.

22.     In every aspect of her interactions with JPMC, Javice had a choice between (i) revealing the truth about her startup and accepting Frank's actual value and (ii) lying to inflate Frank's value and reaping the rewards from that inflation. Javice chose each time to lie, and the evidence shows that time and again she layered fraud upon fraud to deceive JPMC.

23.     Javice and Amar used the Fake Customer List and other knowingly false Merger Agreement representations to fraudulently induce JPMC to enter into the Merger. JPMC paid $175 million for what it believed was a business deeply engaged with the college-aged market segment with 4.265 million customers; instead, it received a business with fewer than 300,000 customers. Javice and Amar's fraud materially damaged JPMC in an amount to be proven at trial, but not less than $175 million.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, 15 U.S.C. § 78aa, and 28 U.S.C. § 1367.

25.     Venue is proper in this judicial district pursuant to Section 9.10(a) of the Merger Agreement, which provides for exclusive jurisdiction in the courts of the State of Delaware.[3]

---

[3]     Section 9.10(a) of the Merger Agreement provides that "the parties hereto hereby irrevocably submit to the exclusive jurisdiction of the Court of Chancery of the State of Delaware (or, if the Court of Chancery of the State of Delaware declines to accept jurisdiction over a particular matter, any federal court within the State of Delaware, or, if no federal court in the State of Delaware accepts jurisdiction, any state court within the State of Delaware) over all Related Claims, and each party hereby irrevocably agrees that all Related Claims may be heard and determined in such courts." JPMC's claim for violation of § 10(b) of the Securities Exchange Act is subject to exclusive federal court jurisdiction, meaning that an initial filing in the Court of Chancery of the State of Delaware would be futile and contrary to law, and therefore not required by the forum selection clause. See Merger Agreement, § 9.5 ("Whenever possible,

26.     Personal jurisdiction exists over Defendants based on Section 9.10(a) of the Merger Agreement, pursuant to which Defendants Javice and Amar caused Frank to consent to the jurisdiction of the Delaware courts.

## PARTIES

27.     Plaintiff JPMorgan Chase Bank, N.A. is a national bank whose main office is located in Columbus, Ohio, as designated in its Articles of Association.

28.     Defendant Charlie Javice is an individual who resides in Miami Beach, Florida. Javice is the founder of Frank and was the Chief Executive Officer of Frank prior to the Merger. Javice signed the Merger Agreement on behalf of Frank and received approximately $9.7 million in proceeds from the Merger.  After the Merger closed, Javice became a JPMC employee.  In her employment agreement, Javice bargained for an additional $20 million retention bonus that was payable if Javice remained employed with JPMC through the vesting dates and complied with JPMC's Code of Conduct.  On November 4, 2022 JPMC terminated Javice's employment for cause (including failure to comply with the Code of Conduct) when JPMC discovered the facts alleged in this Complaint.

29.     Javice also is the trustee of three trusts that received proceeds from the Merger:

a.      Charlie Javice 2021 Irrevocable Trust #1 ("Javice Trust 1") is a trust that was created for the benefit of Javice.  Javice Trust 1 received approximately $4.7 million in proceeds from the Merger.

b.      Charlie Javice 2021 Irrevocable Trust #2 ("Javice Trust 2"), a trust that was created for the benefit of Javice.  Javice Trust 2 received approximately $7 million in proceeds from the Merger.

---

each provision of this Agreement and the Related Documents shall be interpreted in such manner as to be effective and valid under applicable Law . . . .").

c.   Charlie Javice 2021 Irrevocable Trust #3 ("Javice Trust 3" and, together with Javice Trust 1 and Javice Trust 2, the "Javice Trusts") is a trust that was created for the benefit of Javice.  The approximately $7.13 million in proceeds from the Merger due to Javice Trust 3 were withheld pursuant to the terms of the Merger.

30.   Defendant Olivier Amar is an individual who resides in Sands Point, New York.  Amar was Chief Growth Officer of Frank prior to the Merger.  Amar received approximately $5 million in proceeds from the Merger.  After the Merger closed, Amar became a JPMC employee.  In his employment agreement, Amar bargained for a retention bonus of $3 million that was payable if Amar remained employed with JPMC through the vesting dates and complied with JPMC's Code of Conduct.  On October 26, 2022 JPMC terminated Amar's employment for cause (including failure to comply with the Code of Conduct) when JPMC discovered the facts alleged in this Complaint.

31.   Together, Javice and Amar controlled all aspects of Frank's business and decision-making.

## FACTUAL BACKGROUND

### Frank's Business and Operations Pre-Merger

32.   Javice founded Frank in 2017.  Frank's mission was to become a "trusted financial coach for students, helping navigate finances from A-Z."

33.   Frank's original offering for prospective college students and their families was the FAFSA Tool, which, as noted above, expedited completion of the FAFSA.  Frank claimed that its FAFSA Tool allowed students to fill out the FAFSA in just seven minutes, while the process typically took several hours to complete when students manually entered the required data.

34. Javice claimed publicly that, since 2017, Frank had served "over 4.25 million students."  For example, Javice has tweeted this and similar numbers on multiple occasions:

    a.    <u>January 17, 2021</u>:  "We put students first and over 4.25 million students trust @with_frank for financial aid help."

    b.    <u>February 1, 2021</u>:  "We're working on it at @with_frank.  4.25 million students down… 10M more to go."

    c.    <u>February 2, 2021</u>:  "cuz schools don't teach it, we've engaged over 4 million students on how to pay for college . . . ."

    d.    <u>February 10, 2021</u>:  "Fill out your FAFSA® for free from your phone in an avg. of 5 minutes.  Over 4 million students trust Frank to help navigate financial aid."

    e.    <u>February 16, 2021</u>:  When academics tell us @with_frank is not the answer… all good, 4M+ students think we are."

    f.    <u>May 8, 2021</u>:  "Super proud of the team @with_frank and thankful for the 5 million+ families who trust us everyday."

    g.    <u>June 21, 2021</u>:  "Should have it up and running for the 6M+ families we serve for next FAFSA® opening."

35. Similarly, archived versions of Frank's website from July 8, July 26, July 31, August 11, and August 13, 2021 advertised "Why 4.25 million students chose Frank":

    a.    "Quick & Easy:  Apply for aid in under 7 minutes"

    b.    "Safe & Secure:  Bank level security"

    c.    "Human Support:  Happy people always"

36.    In an interview published on bumble.com on July 20, 2017, Javice stated that Frank was helping "12,000 people daily" with the FAFSA.[4]

**Frank Pursues JPMC in Early 2021**

37.    In March 2021, a principal of one of Frank's largest investors sent an article touting Frank's alleged success to an executive at JPMC's Corporate & Investment Bank.  The investor's email noted that Frank was "getting real inbound interest and [I] thought someone at JPM should have a look."

38.    The executive forwarded the investor's email to JPMC's Head of Corporate Development and another executive at JPMC.  The Head of Corporate Development responded that she would be happy to meet with Frank, adding that "depending on their angle – there could be something we would consider on a programmatic basis . . . ."

39.    JPMC considered whether partnering with or acquiring Frank would complement JPMC's focus on the student segment, an area where JPMC was hoping to grow its market share. After conducting several meetings with Javice to learn about Frank's business, JPMC initially opted not to pursue a transaction.

40.    In July 2021, following renewed contacts from Frank and its investment bank LionTree Advisors, LLC ("LionTree"), JPMC decided to consider a potential acquisition of Frank.

**JPMC Engages in Due Diligence**

41.    Following conversations with LionTree, JPMC commenced due diligence.

---

[4]      https://bumble.com/en/the-buzz/working-title.

42.     On July 6, 2021, Frank opened its data room (the "Acquisition Data Room") to JPMC.  After reviewing the material in the Acquisition Data Room, JPMC conducted several due diligence calls with Frank, all of which were led by Javice.

43.     On July 12, 2021, JPMC met with Frank at JPMC's offices located at 390 Madison Avenue in New York to conduct a full-day due diligence session related to Frank's FAFSA Tool, other technology, accounting, finances, and tax issues.  Numerous representatives of JPMC, Frank, and LionTree attended this diligence meeting, including Javice and Amar.

44.     The following day, on July 13, 2021, JPMC and Frank met again at JPMC's offices located at 390 Madison Avenue in New York to conduct additional due diligence related to legal issues, risk, compliance, and Frank's controls and operations.  Again, the due diligence session lasted the entire day, with representatives from JPMC, Frank, and LionTree present.

45.     Between July 12 and July 13, JPMC participated in at least 18 hours of due diligence meetings.

46.     During both day-long diligence meetings, Javice did nearly all the talking on behalf of Frank.  Regardless of the topics of the questions, Javice provided most of the answers.

47.     Following these diligence sessions, on July 14, 2021, JPMC submitted a non-binding indication of interest to acquire Frank for $175 million, subject to further confirmatory due diligence.

48.     On July 16, 2021, Frank agreed to grant JPMC exclusivity for a period of 14 days. During this exclusivity period, JPMC continued to conduct diligence on Frank, including two additional days of meetings on July 19 and July 20, 2021, with specific sessions on legal, risk compliance, controls, and product issues.

**Throughout Due Diligence, Javice Repeatedly Represented That Frank Had 4.25 Million or More Customer Accounts**

49.     During due diligence, Javice represented on numerous occasions, in oral and written statements, and in materials posted to the Acquisition Data Room, that Frank had at least 4.25 million customers.

      **A.**      **Documents in the Acquisition Data Room State That Frank Had Over 4.25 Million Customer Accounts**

50.     Javice caused Frank to upload several documents concerning customer data to the Acquisition Data Room.  One such document was a spreadsheet that broke down the number of customers by the number acquired per month; how many customers were acquired through "paid" channels versus "non-paid;" how many customers were the result of an "organic" versus a "paid" search; and how many had begun using the FAFSA Tool.

51.     Another spreadsheet included a column labeled "FAFSA In Process" that showed 4,265,085 customers who had begun to use the FAFSA Tool – the **exact** number of entries on the Fake Customer List.  The same spreadsheet indicated that Frank had 2,100,184 customers who had completed the FAFSA.

52.     The "FAFSA In Process" spreadsheet thus indicated to JPMC that 4,265,085 individual students had opened accounts with Frank, started the process of completing the FAFSA, and provided Frank with important personal information (*e.g.*, name, address, date of birth, etc.).  It was this purported customer base that JPMC intended to (and did in fact) explore and thoroughly vet in the diligence process.

53.     JPMC's interpretation of the "FAFSA In Process" spreadsheet is reasonable and consistent with Javice's correspondence with Frank's investment bank.  In email correspondence with LionTree, Javice confirmed that the number listed in the "FAFSA In Process" column included customers where the "account [is] validated."  Javice further confirmed to LionTree

that, to determine how many FAFSAs Frank helped students submit, LionTree could multiply the number of customers listed in the "FAFSA In Process" column by the "completion rate" for each month.

54.     There was no misinterpreting what the "FAFSA In Process" spreadsheet represented (as confirmed in Javice's emails with LionTree).  But there was no list of 4.265 million students who had worked on the FAFSA with Frank at the time Javice uploaded the "FAFSA In Process" spreadsheet to the Acquisition Data Room.  That list did not exist.  Javice put the "FAFSA In Process" spreadsheet in the Acquisition Data Room for one reason – to fraudulently induce the sale of Frank.

55.     LionTree had previously discussed the accuracy of another Frank representation that Javice provided.  In July 2021, in connection with the diligence process for another bidder, LionTree asked Javice to clarify whether certain visitor information was unique visitors or "impressions" (*i.e.*, total non-unique visits to the website) after the bidder asked for "unique web visitor figures."  Javice initially ignored the question, but ultimately directed LionTree to a specific diligence spreadsheet.  Before providing additional information to the bidder, LionTree asked Javice for clarification of whether the data in that spreadsheet was "unique visitors" or "total visitors" and how to explain the data to the bidder.  Ultimately, Javice admitted she did not "think there is a good way [to explain].  It was mislabeled data and represents <u>impressions</u>.  I would not touch this point and leave open as there is enough marketing data provided."

56.     LionTree responded "[i]f it was mislabeled data lets just tell them that and be direct.  Better now than later."  Javice responded that she did not want to "chang[e] #s around and [do] new pulls right before a presentation," but LionTree told Javice she must tell the bidder

16

that the number in the diligence spreadsheet was "impressions from Google search console," not "visitors [or] unique visitors which is not actively tracked."

57.     Less than 24 hours after receiving that corrected information, the bidder declined to submit a second-round bid to acquire Frank.

**B.     Javice Made Statements During Due Diligence Meetings That Frank Had 4.25 Million Customer Accounts**

58.     An individual from JPMC took detailed notes during the July 12 and 13 diligence meetings.  The notes from the July 12 meeting reflect that Javice affirmatively represented to JPMC, among other things, that, between 2017 and 2021, Frank had amassed 4.25 million "users," which she specifically defined at that meeting as an individual who provides Frank with his or her first name, last name, email and phone number.

59.     The management presentation that Javice gave during the July 12 meeting also stated that Frank had 4.25 million customer accounts.  Indeed, Javice's management presentation referenced the number 4.25 million no fewer than seven times, including two charts that show cumulative users of 4.25 million from 2017 to 2020:



17



60.     The notes also indicate that Javice separately represented to the JPMC diligence team that, since 2017, Frank had 35 million visitors to its website.  JPMC was not interested in Frank's website visit numbers; website visits do not reliably indicate whether a student had an established relationship with Frank.  And during the July 12 meeting, Javice drew a clear difference between a website visitor and a user who provided Frank with account-opening information.  Documents placed in the Acquisition Data Room by Frank confirm this distinction: the documents reflect that Frank had 35 million visitors to its website in 2020, and an additional 19 million in the first six months of 2021.[5]

61.     With respect to 2020 specifically, the most recent full-year data available at the time of the July 12 diligence meeting, Javice claimed that Frank <u>filed</u> well over 100,000 FAFSAs on behalf of its student-customers and acquired approximately 1.4 million new customers in that year alone.  For the same period, documents in the Acquisition Data Room show an even higher number:  <u>410,994</u> FAFSAs filed by Frank on behalf of its customers.

---

[5]     Although Frank stated during due diligence that it had 35 million website visitors, this, too, was a lie.  Google Analytics shows that Frank had only 4.25 million visits.

62.     In other words, through Javice's statements and the documents she provided, she specifically represented to JPMC that website visitors and "users," as she had previously defined that term, had very different meanings.  Those statements and detailed (but false) documents formed the very foundation of the Merger.  And JPMC relied on Javice's statements and the documents she provided in deciding to continue discussions with Frank and in entering into the Merger.

**JPMC Seeks to Validate Frank's 4.25 Million Purported Customer Accounts**

63.     JPMC determined that, in order to proceed with the transaction, it needed to confirm Javice's representations regarding Frank's 4.25 million customer accounts.

64.     On August 1, 2021, JPMC's Head of Corporate Development sent an email to Javice outlining JPMC's diligence requests for Frank's customer data.  The Head of Corporate Development wrote "[a]s we discussed, we have two critical confirmatory due diligence requests related to Data . . . ."  The email asked three questions about "customer accounts":

      a.     "How many customer accounts have 100% of the below data?"

      b.     "How many customer accounts have partial information?"

      c.     "Of partial records, what [percent] include each data field below?"

65.     These three unambiguous questions were followed by a series of requested data fields, including first name; last name; date of birth; phone number; address; and email address.

66.     The email request specified that JPMC sought to "[v]alidate the integrity of each of the variables to the degree reasonable (*e.g.*, data and email fields are captured in the appropriate formats)."  JPMC believed that this due diligence of Frank's customer accounts would confirm JPMC's investment thesis:  that Frank's acquisition of 4.265 million customer accounts demonstrated that Frank had created momentum, growth, and scale by developing meaningful relationships with millions of students.  Based on that momentum, growth, and scale,

JPMC believed that Frank had built a proven acquisition machine for college-aged students and would continue that momentum and growth once Frank merged with and into JPMC.  If Frank's representations were confirmed, it would allow JPMC to proceed with the deal.

67.     JPMC's unambiguous request for customer accounts is also shown in the template report that JPMC and Javice created.  That template stated the primary inquiry prominently at the top:  "How many UNIQUE customer accounts exist?" (emphasis in original).

68.     Javice agreed to provide in the template actual customer data for <u>all fields</u> except email and home street addresses; those she agreed to provide as a "unique ID" due to alleged privacy concerns.  A "unique ID" is a randomly generated identifier that is substituted for actual data.  For example, instead of providing a customer's name ("John Smith"), a unique ID ("A1B2") would be assigned to the information associated with John Smith.  A unique ID can have a legitimate use in protecting sensitive customer information.  At no point, however, did Javice indicate to JPMC that the unique IDs would not be tied to real email addresses provided to Frank by real customers.  In other words, JPMC understood that if a customer did not provide an email address, the cell would be empty and not contain a unique ID.

69.     Javice also cited privacy concerns in sharing Frank's customer data directly with JPMC.  After numerous internal conversations, and in order to allay Javice's concerns, JPMC agreed to use a third-party data management vendor, Acxiom, to validate Frank's customer information rather than providing the personal identifying information directly to JPMC.

70.     JPMC agreed to these privacy protections because it believed, at the time, that the third-party diligence protocol would permit Frank to provide its list of actual customer accounts to Acxiom – with the data fields JPMC requested – but protect the personal identifying information of actual Frank customer accounts, thereby avoiding the purported privacy issues

that Javice had raised.  That, unfortunately, turned out not to be the case; Javice's "privacy" concerns were just a cover for her attempts to conceal her fraud from JPMC.

71.    On August 5, 2021, Frank provided a data file to Acxiom for validation.  The data file contained 4,265,085 million rows of data, purportedly representing the 4,265,085 million unique customer accounts that Frank claimed to possess.

72.    Prior to sending Acxiom the file, Javice provided JPMC with a preliminary version of the template report that Javice prepared.  That report noted that only email and home street address were provided as "unique IDs."  On August 5, Javice provided a copy of the same report to Acxiom as an attachment to the limited services agreement Frank and Acxiom executed.

**Javice and the Data Science Professor Create Fake Customers**

73.    Frank, however, did not have 4,265,085 unique customer accounts.  So Javice decided to make them up.  Javice decided to use "synthetic data" techniques to fabricate a customer account list with 4,265,085 "individuals" for the Acxiom validation.

74.    In response to JPMC's request to review Frank's customer data, on August 2, 2021, Javice first looked for internal support.  She sent Frank's Director of Engineering an email with a link to an article entitled "Generating Tabular Synthetic Data Using GANs."[6]  The article notes that "[t]he goal is to generate synthetic data that is similar to the actual data in terms of statistics and demographics."  The article suggests that "it[']s fairly simpl[e] to use GANs to generate synthetic data where the actual data is sensitive in nature and can't be shared publicly."

75.    Javice, Amar, and the Director of Engineering then had a Zoom meeting during which Javice and Amar asked the Director of Engineering to help them create a synthetic list of

_____

[6]    A "GAN" is a "Generative Adversarial Network," a type of algorithmic architecture.

customer data.  She asked the Director of Engineering if he could help her take a known set of

FAFSA application data and use it to artificially augment a much larger set of anonymous data

that her systems had collected over time.  The Director of Engineering questioned whether

creating and using such a data set was legal, but Javice tried to assure the engineer by claiming

that this was perfectly acceptable in an investment situation and she did not believe that anyone

would end up in an "orange jumpsuit" over this project.

76.     The Director of Engineering was not persuaded and told Javice and Amar that he

would not perform the task and only would send them the file containing Frank's actual users,

which amounted to approximately 293,000 individuals at that time.

77.     After her internal effort failed, Javice sought help from external sources.

78.     First, Javice contacted the Data Science Professor.  At 12:46 p.m. on August 3,

2021, Javice sent the Data Science Professor an invitation for a Zoom meeting set for 2:15 p.m.

Based on subsequent communications between Javice and the Data Science Professor, the call

occurred as scheduled.

79.     The Data Science Professor advertised his use of "creative solutions" based on his

background in mathematics and statistics.  The Data Science Professor received A Master's

degree and a Ph.D. in Statistics from a highly respected university.  Javice instructed the Data

Professor to  apply his "creative solutions" to generate customer data, which she intended to use

to induce JPMC to buy Frank for an inflated purchase price.

80.     After the August 3, 2021 Zoom meeting, the Data Science Professor returned a

signed version of Frank's NDA.  The Data Science Professor's usual hourly rate was $300.

Javice unilaterally doubled the Data Science Professor's rate to $600.

81.     After the Data Science Professor signed the NDA, Javice shared a link with the Data Science Professor on August 3, 2021, which provided access to Frank's AWS Management Console, a data cloud storage service, so that the Data Science Professor could access certain Frank data.  On August 4, at Javice's direction, the Data Science Professor began to work to create "synthetic data" that Javice then used to deceive JPMC into believing that Frank had the 4 million plus customers that Javice had touted.

82.     "Synthetic data," in plain English, is fake information:  information that is artificially generated rather than produced by real-world events and typically created using algorithms.  Essentially, Javice hired the Data Science Professor to create synthetic data from what she told him was a sample of Frank users that mimicked a larger, real data list of 4.265 million Frank customers.  In reality, he was creating fake data for Javice to "mimic" customers that did not exist.

83.     The Data Science Professor analyzed a list of 293,193 customer accounts, which Javice characterized as a representative sample of Frank's actual 4.265 million customers (even though that customer population did not exist).  The Data Science Professor then used algorithms and other synthetic data techniques to create the Fake Customer List, which purported to contain data for 4.265 million Frank customers.

84.     One of the Data Science Professor's first tasks was to create home addresses for fake customers.  Early on, however, in an email to Javice at 11:39 a.m. on August 4, 2021, the Data Science Professor noted an issue with Javice's proposed approach to creating home address data.  Per the Data Science Professor's email, Javice's instructions would cause the city, state, and zip code for each customer's data entry to be the same.  In other words, Javice's proposed

approach would make it appear that each student lived in, attended high school in, and attended college in the same city, state, and zip code.

85.     Javice responded via email at 11:43 a.m., less than four minutes later.  In her email, Javice did not abandon the idea of generating fake data for the students' addresses, but doubled down, stating that she was "happy to randomize the state[] for college or play with neighboring states."

86.     The Data Science Professor responded to Javice's new proposal via email at 11:48 a.m., five minutes later, concluding that "'real addresses' may not be doable."

87.     Two minutes later, at 11:50 a.m., Javice emailed the Data Science Professor, "[i]f we can't do real addresses whats the best we can do for that?  Worse comes to wors[t] we can try a unique ID."

88.     Javice's August 4, 2021 email from 11:50 a.m. proposed to use a unique ID because Frank did not have "real" home address information for its purported customers.  Javice proposed this illegitimate use of a unique ID for the purpose of misrepresenting Frank's customer base and defrauding JPMC, while she misrepresented to JPMC that the purpose of the unique ID was to protect the personal identifying information.

89.     To aid the Data Science Professor, at 12:15 p.m. the same day, Javice emailed the Data Science Professor a copy of the template that JPMC and Javice had worked together to develop.  That template reflects the fields that JPMC wished to have validated.  The template included approximately 30 fields in total, including key information such as:

       a.     first name;

       b.     last name;

       c.     phone number;

    d.      date of birth;

    e.      year of school;

    f.      city of high school;

    g.      home address; and

    h.      email address.

90.     The Data Science Professor responded to Javice's 12:15 p.m. email at 12:36 p.m., telling Javice that he is "wasting too much time on the address thing.  Just loading the whitepages database for even part of the USA (16gb) is proving to be a tremendous time sink since there are missing characters throughout the file.  So I think we'll have to use unique IDs" instead of real data.  In a 12:39 p.m. response, Javice agreed to "put address aside for now."

91.     Next, the Data Science Professor moved on to email addresses.  In an email at 12:56 p.m., the Data Science Professor, referring to the template Javice sent an hour earlier, asked Javice:  "You have the student email marked as 'provided as unique ID' but didn't we agree to make fake ones a la 'asdugnsdf@gmail.com'?  Or do you want unique ID after all?"

92.     In a response sent six minutes later at 1:02 p.m., Javice asked, "will the fake emails look real with an eye check or better to use unique ID?"  At 1:37 p.m., the Data Science Professor confirmed "[t]hey will look fake.  So let's use unique ID."

93.     The conversation between Javice and the Data Science Professor carried on into the evening as the two discussed how to create additional fake information for the requested data fields.  With respect to identifying schools to which students have submitted FAFSAs, the Data Science Professor noted in an email sent at 9:10 p.m. to Javice that "[t]here are 395 unique school codes not in the database you sent me."  To solve the problem, the Data Science Professor proposed to "draw a school at random in the same state[.]"  At 9:21 p.m., Javice responded to the

Data Science Professor's suggestion that "draw[ing] a school at random in the same state" was "[p]erfect."

94.     By 11:30 p.m., the Data Science Professor had moved on to "working on the phone numbers comporting with the random address."  In working on creating phone numbers, the Data Science Professor noted to Javice in an 11:33 p.m. email that "[f]or example, in the raw data [one particular phone number] appears 676 [times] across many different names and addresses."  Javice responded three minutes later at 11:36 p.m., telling the Data Science Professor to "double check the duplication rate isn't more than 5%-7%."

95.     The phone number the Data Science Professor identifies as having "appear[ed] 676 times" across many names and addresses belongs to a Frank employee whose job was to test the Frank FAFSA Tool, including by entering his information into the account creation screen.

96.     The communications in paragraphs 73 through 95 demonstrate that Javice directed the Data Science Professor to create fake customer data that was provided to a third-party verification service as evidence of 4.265 million actual Frank customers, and to induce JPMC to purchase Frank.

97.     Upon information and belief, Javice did not inform LionTree that she was providing a list of 4.265 million fake customers to JPMC.

98.     The Fake Customer List had no value as diligence information.  It did not tell JPMC anything about Frank, its business, or the students who supposedly started filling out FAFSAs.  Javice instructed the Data Science Professor to extrapolate a synthetic list of data from a small sample to mimic the "true" universe of Frank's 4.265 million users.  But in reality, there were not 4.265 million users to mimic.  Synthetic data that mimics false data is of no use whatsoever as diligence material or, later, as marketing material.

**Javice Rewards the Data Science Professor and Begins Her Cover-Up**

99.     As noted above in paragraph 80, Javice initially doubled the Data Science Professor's hourly rate to $600 instead of his usual $300 per hour.

100.     After the Data Science Professor submitted the Fake Customer List to Acxiom at her direction, Javice further compensated the Data Science Professor for his work in creating fake data and, in the process, also worked to conceal her fraud.

101.     Specifically, on August 5, 2021 at 11:05 a.m., the Data Science Professor provided Javice an invoice for $13,300, documenting 22.17 hours of work over just three days. The invoice entries show that the bulk of his time was spent on the main task that Javice retained the Data Science Professor to perform – making up customer data.  The Data Science Professor's invoice indicated that he performed "college major generation" and "generation of all features except for the financials" while creating "first names, last names, emails, phone numbers" and "looking into whitepages."

Services Rendered:

| Date | Time In | Time Out | # Hours | Type | Description |
|---|---|---|---|---|---|
| 8/3/2021 | 14:15 | 15:05 | 0.833 | Data Science Services | Orientation video meeting with Charlie |
| 8/3/2021 | 15:30 | 17:30 | 2.000 | Data Science Services | generating features for projects 2-5 |
| 8/3/2021 | 20:55 | 21:10 | 0.250 | Data Science Services | college major generation |
| 8/3/2021 | 21:45 | 0:20 | 2.583 | Data Science Services | generation of all features except for the financials, zip code lookup fillin |
| 8/4/2021 | 9:15 | 13:05 | 3.833 | Data Science Services | first names, last names, emails, phone numbers, looking into whitepages, unique IDs |
| 8/4/2021 | 13:30 | 19:15 | 5.750 | Data Science Services | group II variables (tax return, financials) + zoom meeting for checkin |
| 8/4/2021 | 19:45 | 1:10 | 5.417 | Data Science Services | college codes and filling in missing states, recoding variables, double checking spreadsheet, on zoom chat |
| 8/5/2021 | 8:30 | 10:00 | 1.500 | Data Science Services | meeting to check over file, phone number validation, file uploading |

| | |
|---|---|
| Total Hours: | 22.17 |
| Hourly Rate: | $600 |
| Wage Subtotal: | $13,300.00 |
| Expenses Incurred: | $0.00 |
| Grand Total: | **$13,300.00** |

I pledge that this invoice is accurate.

27

102.     In response to the initial invoice, Javice demanded that he remove all the details admitting to how they had created fake customers – and added a $4,700 bonus.  In an email to the Data Science Professor at 12:39 p.m. on August 5, 2021, Javice wrote:  "send the invoice back at $18k and just one line item for data analysis."  In total, Javice paid the Data Science Professor over $800 per hour for his work creating the Fake Customer List, which is 270% of his usual hourly rate.

103.     The Data Science Professor provided Javice the revised invoice via email seven minutes later at 12:46 p.m., commenting "Wow.  Thank you.  Here is the new invoice."

Services Rendered:

| Item Type | Description | Quantity | Unit Price | Amount | | |
|---|---|---|---|---|---|---|
| Service | Data science services | 22.17 | $ 811.91 | $ 18,000.00 | | |

Expenses Incurred:     $0.00

Amount Due:     **$ 18,000.00**

I pledge that this invoice is accurate.

104.     Following the Data Science Professor's original work, in September 2021 and again in January 2022, Javice discussed with the Data Science Professor a full-time position with JPMC and Frank post-Merger.  In other words, Javice offered to hire the Data Science Professor to the very company – JPMC – that Javice had defrauded.

**Javice Directs the Data Science Professor to Transfer the Fake Customer List to Acxiom**

105.     On August 5, 2021, at 10:08 a.m., Javice informed Acxiom that the Fake Customer List was uploaded to Acxiom via Acxiom's secure file transfer system.

106.     The data file that Javice directed the Data Science Professor to upload to Acxiom was the same Fake Customer List created by the Data Science Professor.

107.     Email correspondence following Javice's submission of data to Acxiom confirms that the Fake Customer List was the Data Science Professor's work.  At 11:05 a.m. on August 5,

the Data Science Professor sent an email to Javice asking whether "they got the deliverable," presumably referring to Acxiom. Javice responded to the Data Science Professor via email at 11:09 a.m. stating that "[t]hey got it! I'll let you know if they have questions. Will wire today :)". At 11:11 a.m., the Data Science Professor sent an email to Javice asking "when are they due to tell [Javice] the results of the audit?"

108.    In addition, the Data Science Professor's initial invoice to Javice reflects that, on August 5, 2021, he completed his work at 10:00 a.m., and that his final task was "file uploading." Javice informed Acxiom via email at 10:08 a.m. that the file had been uploaded, just eight minutes after the Data Science Professor's invoice shows he finished "file uploading."

**Acxiom Provides the Results of its Data Validation Exercise**

109.    On August 5, 2021, at 11:39 a.m., Acxiom confirmed that it was able to decrypt and unzip the Frank customer data file. The number of records that Frank provided to Acxiom was 4,265,086 (including the header row); that number matches the number of unique customer accounts that Frank represented to JPMC during due diligence.

110.    Shortly thereafter, Acxiom provided Javice with its "data validation report." The report is an Excel spreadsheet with two tabs.

111.    The first tab contains information that Javice provided to JPMC and to Acxiom in the form of the Data Validation Request.

112.    The second tab contained the results of Acxiom's validation of the population of source data fields.

113.    In an email on August 5, 2021 at 4:48 p.m., Javice authorized Acxiom to release the report to JPMC, instructed Acxiom "[p]lease do not share additional background," and, once the report went to JPMC, at 6:26 p.m., told Acxiom "[i]f you can delete the data that would be appreciated."

114.     Relying on the validation report that incorporated the Fake Customer List, the corroborating information in the Acquisition Data Room, and Javice's statements, JPMC concluded that Frank in fact had the number of customer accounts that Javice had represented during the diligence process and therefore that JPMC would proceed with the Merger.

115.     At the time JPMC agreed to proceed with the Merger, it had no knowledge that the Fake Customer List Frank provided to Acxiom consisted of synthetic data.  JPMC's understanding that Acxiom was validating actual customer account data, and reliance on the Fake Customer List as actual customer account data, was reasonable considering:

a.     Javice's reluctance to provide the data at all, citing purported privacy concerns;

b.     JPMC's and Javice's agreement to use Acxiom so that Frank would not need to send actual customer account data to JPMC prior to the closing of the Merger;

c.     Javice's execution of a non-disclosure agreement with Acxiom;

d.     Javice's insistence that Acxiom delete the Fake Customer List immediately after Acxiom provided the report to JPMC; and

e.     Javice's insistence on using a "unique ID" in lieu of email address and street address for the entries on the Fake Customer List.

**The Parties Sign and Consummate the Merger**

116.     On August 8, 2021, the parties executed the Merger Agreement.

117.     The Merger Agreement defines Frank's "Knowledge" as "the actual knowledge (after due and reasonable inquiry of their respective direct reports)" of Javice, Amar and the company's general counsel.

118.     In the Merger Agreement, Javice and Amar caused Frank to provide false representations and warranties concerning Frank's business.

119.    For example, Javice and Amar caused Frank to represent in Section 3.5(b) of the Merger Agreement that "[t]o the knowledge of [Frank], there has been no Fraud with respect to any member of the Company Group that involves any of the management or other employees of any member of the Company Group or any claim or allegation regarding any of the foregoing."

120.    Javice and Amar knew that this representation was false when made and false at closing because Javice and Amar were members of management, and Javice worked with the Data Science Professor to create the Fake Customer List described in paragraphs 73 through 98.

121.    Similarly, Javice and Amar caused Frank to represent and warrant in Section 3.6(a) of the Merger Agreement that Frank "has conducted its business and operated its properties in the ordinary course of business consistent with past practice."

122.    Javice and Amar knew that this representation was false and misleading at signing and closing.  Upon information and belief, during the pre-signing period Javice simply reviewed Frank's actual customer account list containing no more than 300,000 names when she monitored Frank's performance in her role as Chief Executive Officer.  Javice did not retain data science professors to create fake customers "in the ordinary course of business," nor did Javice and Amar purchase the names of customers with no prior relationship to Frank from marketing firms "in the ordinary course of business."

123.    In Section 3.6(b) of the Merger Agreement, Javice and Amar caused Frank to represent and warrant that "there has not occurred any action or event that, had it occurred after the Agreement Date and on or prior to the Closing, would have been prohibited by" the operating covenants in Section 5.1.  Those covenants include agreements that Frank shall:

a. "use its commercially reasonable efforts to carry on its business in all material respects in the ordinary course of business consistent with past practice" (Section 5.1(a)(i));

b. "use commercially reasonable efforts to maintain and preserve the . . . goodwill of the business" (Section 5.1(ii)); and

c. "comply in all material respects with all Laws applicable to the conduct of the business . . . and use of its assets and properties" (Section 5.1(iv)).

124.   Javice and Amar knew that the representations and warranties in Section 3.6(b) of the Merger Agreement (incorporating the Section 5.1 covenants) were false at signing and at closing because Javice personally retained the Data Science Professor to create the Fake Customer List while Amar simultaneously acquired the ASL List.  Creating fake customer data to induce a $175 million transaction is not "in the ordinary course," it is not "consistent with past practice," it is not a "commercially reasonable effort" to maintain "goodwill," and it is not in compliance with "all Laws applicable to the business."

125.   In Section 3.7 of the Merger Agreement, Javice and Amar caused Frank to represent that "during the past five (5) years [Frank] been, in material compliance with all Laws or Orders applicable to [Frank] or its business, properties or assets."

126.   The representation in Section 3.7 was knowingly false and misleading for the same reasons as the representation in Section 3.6(b) incorporating the covenant in Section 5.1(iv).

127.   In Section 3.13 of the Merger Agreement, Javice and Amar caused Frank to represent and warrant that it had disclosed all Material Contracts, defined to include "any

Contract requiring payments to the Company, or requiring payments by the Company, in either case in excess of $50,000."

128.    Javice and Amar knew that this representation was false at signing and closing because Frank did not disclose (a) its $105,000 agreement to purchase 4 million customer names from ASL, (b) its $70,000 agreement to purchase data matches from Enformion (as further described below); (c) its $18,000 agreement with the Data Science Professor to generate fake customer data to provide to JPMC; or (d) an open-ended contract with the Data Science Professor pursuant to which the Data Science Professor was paid no less than $20,000.  As discussed below in paragraphs 143 through 177, Javice again contracted with the Data Science Professor, with total payments to the Data Science Professor exceeding $50,000.  Moreover, the ASL and the Data Science Professor agreements were part of a single course of conduct – the creation of fake customer data Javice and Amar used to induce JPMC to buy the Company – and therefore the amounts should be added together such that both were required to be disclosed under Section 3.13.[7]

129.    Javice knowingly and intentionally caused Frank to fail to disclose the Data Science Professor, ASL, and Enformion agreements because such a disclosure would have revealed the truth behind the Fake Customer List.

130.    Finally, in Section 3.16(h) of the Merger Agreement, Javice and Amar caused Frank to represent and warrant that "[t]here has not been . . . a misuse or misappropriation of any Trade Secrets."  Frank's actual customer list is a Trade Secret within the meaning of the Merger Agreement.

---

[7]    Worse yet, Javice submitted the bill for her fraudulent activities to JPMC.  The $105,000 she caused Frank to pay ASL was charged to a Frank credit card and listed as closing indebtedness in the acquisition Final Pre-Closing Statement.  Pursuant to the Merger Agreement, JPMC paid all of Frank's closing indebtedness, including the payment to ASL Marketing for fake customers.

131.    Javice and Amar directed the Data Science Professor to create fake customer data that inflated Frank's actual customer list by a factor of nearly 15 in order to induce JPMC to buy Frank for $175 million.  This is a "misuse" of Frank's Trade Secrets and for that reason a knowing and intentional breach of Section 3.16(h).

132.    On September 14, 2021, the Merger closed.

**Javice and Amar Cover Up the Fraud**

      **A.**    **The Pre-Merger Cover-Up:  Amar Purchases Data from ASL**

133.    While Javice was working with the Data Science Professor in early August 2021, Amar contacted ASL to obtain the ASL List containing student data for 4.5 million college students.

134.    On August 2, 2021, Amar communicated orally his initial request to ASL.  In an email from ASL to Amar, ASL confirmed Amar's request:  "You expressed an interest i[n] having ASL append data elements to your house file."  Upon information and belief, "house file" refers to Frank's own internal customer list, which, on August 2, 2021, had no more than 300,000 customer accounts.

135.    Amar responded to ASL by email at 3:30 p.m. on August 2, 2021 with a new request:  "if we were looking at buying your list of students currently in college, how much would it cost?"

136.    Amar continued to correspond with ASL over the following days.  Through this additional correspondence, Amar learned that ASL could sell Frank a list of data for 4.5 million college students for a cost of $105,000.

137.    Amar and Javice would have had no reason to buy a list of 4.5 million college students if Frank actually had the number of customer accounts that Javice represented to JPMC and provided to Acxiom.

138.    Regardless, on the morning of August 5, 2021 – the same day that Javice and the Data Science Professor were finalizing their fake data for submission to Acxiom – Amar pressured ASL to provide him with the ASL List that day.  In an email sent at 10:57 a.m. from Amar to ASL, Amar agreed to a call, but asked, "can we make sure to close this today?  We're rushed on this, so if you can prepare the lists of 4.5m (2.8m with emails and 1.7m without) as well as confirm pricing . . . that would be great.  If we can't close this today, we will have to move forward with another vendor as we have limited time with this data scientist and time is ticking," referring to Javice's work with the Data Science Professor.

139.    ASL responded at 11:31 a.m. that the price for the data was a flat rate of $105,000 and that it was "working on getting this out to you today."  At 11:32 a.m., Amar approved the expense:  "The price is good.  The credit card authorization I sent you is for up to $150k so feel free to charge and make the FTP available after you do."

140.    At 11:58 a.m., ASL told Amar that "[t]he files are huge and will take a little while to process but we can definitely get them to you today."  ASL then informed Amar that the exact count of the data containing email addresses was less than anticipated:  "The exact count for the email addresses is 2,460,489 (short 339,511)[.]  Would you like us to increase the records for the postal addresses?"

141.    Amar responded at 12:00 p.m., confirming that he wanted to increase the records that contained postal addresses:  "I'd like the tots to be 4.5m so yes please."

142.    Amar received an "eDelivery Notification" from ASL on August 5, 2021 at 3:20 p.m. for each of the two requested files (email addresses and postal addresses).  The notifications provided instructions for Amar to download the files and confirmed that Amar was receiving 2,460,489 records with postal addresses and 2,039,511 records with postal addresses and email

addresses.  ASL confirmed that the notifications were sent in a separate email to Amar at 3:25 p.m.

**B.     To Cover Up the Fraud, Javice Instructs the Data Science Professor to Performs Additional Data Manipulation**

143.    When Javice provided the Fake Customer List to Acxiom to "validate" that the number of Frank customer accounts were 4,265,086, she knew the data she provided for the purported customers, including email addresses presented as unique ID placeholders, were entirely made-up and would be of no use to JPMC after the Merger closed.

144.    Javice also knew that Amar purchased the ASL List with 4.5 million real college students, albeit not Frank users.  The ASL List, however, only contained 2,039,511 records with email addresses.

145.    Javice knew at all relevant times that JPMC intended to market its products and services to both Frank's existing users and the student accounts Frank would acquire in the future and therefore that, at some point after closing of the Merger, JPMC would ask for the Frank customer data so that JPMC could begin marketing products and services to Frank users.

146.    Upon information and belief, in anticipation of JPMC requesting the Frank customer data, Javice decided to acquire more email addresses to add to the ASL List, hoping to obtain the 4.265 million email addresses she told JPMC that Frank had.

147.    Soon after submitting the Fake Customer List to Acxiom, Javice enlisted the Data Science Professor to aid with this second project.

148.    On August 6, 2021 at 11:02 a.m., the Data Science Professor wrote to Javice that although they "agreed not to start until Monday," he is "thinking about scope."  Javice responded to the Data Science Professor three minutes later, telling the Data Science Professor for the "# of names/addresses you wish to match to phone numbers," it would be "over 1M."

36

149.    Ultimately, Javice presented to the Data Science Professor the ASL List of 4.5 million college students and told him that she wanted to "augment" that list.  Upon information and belief, Javice represented to the Data Science Professor that the 4.5 million college students on the list were actual Frank accounts.  Javice directed the Data Science professor to find a company that could "augment" the list with additional information, including phone numbers, dates of birth, and email addresses.

150.    The Data Science Professor contacted at least two companies:  Acxiom, the company that conducted the due diligence on the Fake Customer List, and Enformion, a data technology and repository company.

151.    On August 9, 2021, the Data Science Professor updated Javice on his outreach to Acxiom and Enformion.  He stated that "I emailed Axciom [sic] customer support and they wrote back and wish to know what company I work for.  I imagine that's now 'JP Morgan'?"

152.    Six minutes later, Javice responded, telling the Data Science Professor that they "cannot use JPM (not closed yet – 30days)" and asking the Data Science Professor whether he has "an LLC for consulting."  The Data Science Professor responded that evening that he did not have an LLC, and so, the next day, Javice told the Data Science Professor that he can "try Frank or a Prof a[t] [a university] on a research project and see what happens."

153.    Also on August 10, 2021, the Data Science Professor spoke with a sales representative from Enformion, who told the Data Science Professor he could "upload a CSV of all 2 million names and addresses and they have 24hr turnaround."  The Data Science Professor told Javice that he was "between [Enformion] and Acxiom" in terms of who he would select as the vendor for the data.

154.    Later on August 10, the Data Science Professor informed Javice that, to proceed with Enformion, the Data Science Professor would need to fill out a "Data Test Order Form," noting that "[e]very legit company is going to want something like this.  And some sort of NDA or other legally protective document."

155.    Javice instructed the Data Science Professor to ask Enformion to "send an NDA back / something so that we know anything provided will be destroyed after."  The Data Science Professor relayed the request to Enformion and then reported back to Javice the same day:  "Now the salesman is asking for the purpose of our project in order to make a quote.  I can say 'we can't disclose, make a quote anyway' or I can say something plain like 'reconciliation of a customer database for due diligence.'"

156.    Minutes later, Javice directed the Data Science Professor to tell Enformion that "[d]ata augmentation – 'enrich your contacts' is the right one."

157.    Meanwhile, progress with Acxiom stalled.  The Data Science Professor updated Javice on August 11, 2021:  "So [Acxiom] wouldn't even talk to me because I couldn't answer questions about who I worked for or the intended purposes of the data."  Javice responded and suggested telling Acxiom "[w]e are augmenting our contacts to be able to merge our old data with new data."  The Data Science Professor relayed this information to Acxiom that same day, but reported to Javice, "[y]eah that didn't fly with them."  Javice then told the Data Science Professor to "start with [Enformion] and see if they can get us a new price for up to 5M records. We can do [Acxiom] as the back up."

158.    Javice executed an NDA with Enformion.  After lengthy discussions over pricing, on August 23, the Data Science Professor provided Enformion with data that Javice wished to

augment.  That data, however, was – again – not Frank's actual customer data.  It was the ASL List Amar previously purchased.

159.     The next day, the Data Science Professor updated Javice, explaining that Enformion could not "process the 4M record file because their system only handles 250,000 per batch.  I said that's fine just cut the file into 8 or 9 pieces and paste them together at the end.  They said they cannot do processing on their end and want me to do it.  So I'll do it tonight and send it back to them."  The Data Science Professor confirmed to Javice on August 25 that he "sent the files (all 17 of them)."

160.     After receiving the data, Enformion ran the ASL List through its databases in an attempt to find matching additional data, including email addresses.  Enformion then provided those matches to the Data Science Professor.

161.     Upon information and belief, Javice and the Data Science Professor's first request to Enformion was to provide email addresses based on the existing full names and addresses, but that provided a limited number of matches.  Upon information and belief, Javice decided to instruct Enformion to match against just last names and addresses, which could generate email addresses of siblings, parents, and other family members of the individual on the ASL List, even if the email affiliated with the exact individual on the ASL List could not be found.

162.     Ultimately, Javice and the Data Science Professor obtained at least one email address for approximately 1.9 million of the 4.5 million individuals on the ASL List from Enformion.

163.     Upon information and belief, Javice intended to use those additional email addresses for the anticipated JPMC request for Frank's customer data.

**C.     To Cover-Up the Fraud, Javice Provides JPMC with Additional Fake Data**

164.    In January 2022, after JPMC acquired Frank, JPMC began work on a marketing campaign to test the quality of Frank's customer account list and the receptiveness of these customers to JPMC's products and services.  To facilitate this marketing campaign, JPMC asked Javice and Amar to provide Frank's user list so that JPMC could send the marketing test by email.  JPMC sent the request on January 6 and requested that the list be transferred by January 10.

165.    This should have been a simple exercise.  JPMC assumed that Javice or Amar simply would upload the list previously provided to Acxiom, which Javice had represented contained Frank's 4.265 million unique customer accounts.  But Javice and Amar could not provide the Fake Customer List because the individuals on that list did not exist.

166.    Moreover, the Fake Customer List did not include actual email addresses, only a unique ID placeholder, because, per the Data Science Professor, creating fake email addresses would have looked obviously fake.  As a result, Javice and Amar could not turn over the Fake Customer List because they did not have any email addresses – and certainly not any real email addresses – for the "synthetic" customers on the Fake Customer List.

167.    Amar responded that he is "not sure we'll make Monday's deadline" owing to the fact that the engineering team was purportedly "bogged down in fixing a critical issue in processing financial aid applications."

168.    Later communications confirm that Amar lied and that the engineering team was not occupied fixing a critical issue.  A JPMC executive responsible for integrating Frank into JPMC forwarded Amar's email to a JPMC Executive Director of Digital Technology, at 11:17 a.m.  She wrote to the Executive Director, "Do you know what the tech issue is with Frank?  Is it reported somewhere?"  The Executive Director appeared unaware of any issue as he forwarded

the email request to a JPMC Software Engineer, at 11:23 a.m. asking, "Got insight for highlighted below?"  The Software Engineer also appears unaware, as he forwarded the email once again to Frank's Director of Engineering.

169.    Frank eventually transferred a user list on January 21, 2021, nearly <u>three weeks</u> after the original request.

170.    That list, however, did not contain <u>any</u> of Frank's actual customer accounts.  Not a <u>single</u> customer account.

171.    Instead, the list was a subset of data that Amar purchased from ASL on August 5, 2021, as discussed above in paragraphs 133 through 142.

172.    In other words, every entry on the list transferred to JPMC for its marketing campaign on January 21, 2022 was included on and taken from the ASL List Amar purchased in August 2021, a list that was not created from Frank customers.

173.    JPMC first noticed irregularities with the list when a JPMC employee observed that the list contained exactly 1,048,576 rows, the maximum permitted by Microsoft Excel.  That number also did not correspond to any number of customer accounts previously identified by Javice or others at Frank for any given time period.

174.    JPMC raised this issue with individuals at Frank.  A member of the marketing team at JPMC wrote an email to Javice and another Frank employee stating:  "I can also confirm that there are 1,048,575 records, plus the header row.  One observation – 1,048,576 (total including header) is the maximum # of rows allowed in Microsoft Excel – can we be sure that this is just a coincidence, or maybe there is some data truncation after that row?"

175.    On January 24, 2021, a Frank engineer responded to the Chase Retail Marketing team member, stating that "[w]e look[ed] into the issue with first file we sent.  The marketing

team wanted me to upload another file for you . . . .  From what I understand, this file is additive

to the previous file.  These are our FAFSA application specific users."  This "additive" file

contained the significantly smaller population data for approximately 135,000 individuals.

176.    Shortly after the second file was transferred, the Frank engineer who provided the

"additive" list raised issues internally with the source of the files.  The engineer noted that, while

the second file contained information from Frank's "FAFSA application database," the engineer

was "not sure about the source of the data" in the first file.

177.    Following receipt of the lists from Frank on January 21 and January 24, JPMC

continued to have concerns over the contents of the lists and continued to work with Frank

employees to understand the origin of those lists.  Ultimately, Frank provided JPMC yet another

list to use in the marketing campaign, but this list also contained no genuine Frank customers.

Instead, this list was a version of the modified ASL List uploaded on January 21 with email

addresses added from the data Frank purchased from Enformion.  As noted above, JPMC's

ability to market and sell its products and services to the Frank customer base was a key financial

driver of the transaction.

**The Test Marketing Campaign Fails**

178.    The marketing campaign was a disaster.  JPMC reached out via email to a random

sample of the list Frank provided – approximately 400,000 purported customers of Frank – with

offers to open Chase checking or savings accounts.  Of those 400,000, only 103 even clicked

through to Frank's website.

179.    That response rate is a markedly poor return for a typical JPMC marketing

campaign.  In hindsight, of course, these results are not surprising given that the data Frank

provided to JPMC was purchased data from ASL and Enformion, not genuine user data Frank

acquired from the customers who created accounts on its website.

**JPMC Discovers Javice's Fraudulent Scheme**

180.    In June 2022, JPMC initiated a comprehensive investigation into Frank and the Merger.  That investigation revealed the facts alleged in this Complaint.  JPMC has all the emails showing the fraud because Javice and Amar used Frank's email accounts to create the Fake Customer List and the email accounts now belong to JPMC following the Merger

181.    Based on that investigation, JPMC placed Javice and Amar on administrative leave and, after further investigation, terminated them for cause.

## DAMAGES

182.    JPMC paid $175 million to acquire Frank relying on: (a) Javice's repeated representations that Frank had more than 4.25 million customers; and (b) the representations and warranties in the Merger Agreement described in paragraphs 116 through 132 above.

183.    In JPMC's view, the 4.265 million purported customer accounts were the foundation for the deal:  those 4.265 million customer accounts demonstrated Frank's momentum, growth, the scale of what Frank had accomplished and what Frank would accomplish going forward in the college-student market segment.  Frank's list of actual customer accounts totaling 300,000 indicates that Frank's momentum, growth, and accomplishments were far smaller than JPMC had believed based on Frank's material representations about its purported 4.25 million customer accounts.  If JPMC had known that Frank had fewer than 300,000 customer accounts, it would not have acquired Frank.

184.    In addition, JPMC decided to enter into the Merger Agreement because it believed that, over the 10-year period following the closing, JPMC would be able to generate hundreds of millions of dollars in revenue by selling checking accounts, savings accounts, and credit cards to Frank's existing and future customer base.  A core component of that analysis, however, was the purported fact that Frank had 4.265 million existing customers at the time of

acquisition.  Given Frank's actual customer base was only a small fraction of 4.265 million, JPMC will not be able to market its products and services to those individuals, and the bargained-for revenue stream will not materialize.

185.    As a result, JPMC was damaged by reason of Javice's, Amar's, and Frank's misrepresentations.

## CAUSES OF ACTION

### COUNT I
### (Securities Fraud under Section 10(b) and Rule 10b-5)

186.    JPMC hereby incorporates paragraphs 1 through 185 by reference, as if set forth fully herein.

187.    Section 10(b) of the Securities Exchange Act of 1934 provides that it "shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

188.    Rule 10b-5 adopted by the U.S. Securities and Exchange Commission provides that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading,

or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, [all] in connection with the purchase or sale of any security."

189.    Javice created or directed the creation of the Fake Customer List and used it to induce JPMC to purchase Frank for $175 million, caused Frank to make knowingly false representations and warranties in the Merger Agreement, and used the modified ASL List to conceal her fraudulent misconduct.

190.    Amar caused Frank to acquire the ASL List with the intent of using it directly or indirectly either as a fake customer list to provide to JPMC to cover-up that Frank did not have over 4 million customer for JPMC to market its products and services to, or to induce JPMC to purchase Frank for $175 million.

191.    Through the conduct alleged herein, Javice and Amar, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, and engaged and participated in a continuous course of conduct to fraudulently create and/or conceal material information.

192.    Through the conduct alleged herein, Javice and Amar:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon JPMC, all in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

193.    The misconduct by Javice and Amar was in connection with the purchase or sale of securities because JPMC directly or indirectly acquired ownership of all of Frank's issued and outstanding stock as a result of the Merger Agreement.  The transaction was accomplished through a reverse triangular merger through which Finland Sub, Inc. merged into Frank (with

Frank as the surviving corporation) and shares of Finland Sub, Inc. were converted into shares of common stock of Frank, which were issued to Finland Sub's parent JPMC, which purchased securities of Frank through the merger.

194.    JPMC was deceived into paying $175 million for Frank by the devices, schemes or artifices to defraud that Javice and Amar deployed.

195.    In acquiring Frank, JPMC reasonably and justifiably relied on the knowingly false representations that Javice made in the diligence process and which Javice and Amar caused Frank to make in the Merger Agreement.

196.    The misconduct by Javice and Amar caused JPMC to pay an artificially inflated $175 million purchase price for Frank's stock and directly and proximately damaged JPMC in an amount to be determined at trial.

## COUNT II
### (Control Person Violation under Section 20(a))

197.    JPMC hereby incorporates paragraphs 1 through 196 by reference, as if set forth fully herein.

198.    Javice and Amar acted as controlling persons of Frank within the meaning of Section 20(a) of the Exchange Act.  Javice was the founder of the Company, Chief Executive Officer, a member of the Board of Directors, and substantial stockholder.  Amar was the Chief Growth Officer and the second-most senior executive at Frank.

199.    By and through their control positions, Javice and Amar caused Frank to make knowingly false representations and warranties to JPMC in the Merger Agreement including, but not limited to, the representations and warranties made in Sections 3.5(b), 3.6(a)-(b), 3.7, 3.13, and 3.16(h).  In doing so, Javice and Amar caused Frank to violate Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5.

200.    JPMC reasonably and justifiably relied on those false representations and warranties in entering into the Merger Agreement and in agreeing to pay $175 million to acquire Frank.

201.    As a direct and proximate result of Javice's and Amar's wrongful conduct, JPMC suffered damages in connection with its purchase of Frank in an amount to be determined at trial.

## COUNT III
### (Fraud Within the Contract)

202.    JPMC hereby incorporates paragraphs 1 through 201 by reference, as if set forth fully herein.

203.    As set forth above, each of Javice and Amar caused Frank to make numerous false representations and warranties in the Merger Agreement, including, but not limited to, the representations and warranties made in Sections 3.5(b), 3.6(a)-(b), 3.7, 3.13, and 3.16(h).

204.    Javice and Amar caused Frank to make these misrepresentations to JPMC with actual knowledge of their falsity.  Javice created or directed the creation of the Fake Customer List and used it to induce JPMC to purchase Frank for $175 million, caused Frank to make knowingly false representations and warranties in the Merger Agreement, and used the ASL List as modified to conceal her misconduct.  Amar caused Frank to acquire the ASL List with the intent of using it directly or indirectly to induce JPMC to purchase Frank for $175 million, caused Frank to make knowingly false representations and warranties in the Merger Agreement, and used the ASL List as modified to conceal his misconduct.

205.    Javice and Amar were the senior-most executives at Frank – Chief Executive Officer and Chief Growth Officer.  By virtue of their positions of authority and control, Javice and Amar had the ability to, and did in fact, control the contents of the Merger Agreement, including in particular the contents of the representations and warranties made by Frank.

206.    Javice's and Amar's misrepresentations were made with the intent to, and did in fact, induce JPMC to buy Frank at an inflated price and on terms favorable to Frank and its investors, and so that Javice and Amar specifically would receive substantial personal compensation.

207.    JPMC reasonably and justifiably relied on the representations and warranties that Javice and Amar caused Frank to make in the Merger Agreement.

208.    As a result of this reliance, JPMC sustained losses and seeks rescission, restitution, or damages in an amount to be determined at trial.

## COUNT IV
### (Fraudulent Concealment)

209.    JPMC hereby incorporates paragraphs 1 through 208 by reference, as if set forth fully herein.

210.    During the diligence process, JPMC attempted to determine the actual number of Frank's customer accounts.

211.    Rather than provide JPMC with Frank's actual customer account list, Javice and Amar took steps to hide and conceal the actual customer account list.

212.    Javice provided JPMC with the Fake Customer List in response to JPMC's request for Frank's actual customer account list.

213.    Javice used "synthetic data" techniques to create the Fake Customer List and make it look like Frank's actual customer account list.

214.    The ASL List was acquired by Amar and later modified with additional email addresses from Enformion, and provided to JPMC by Javice to prevent JPMC from discovering that it had been induced to buy Frank for $175 million based on the Fake Customer List.

215.    Had JPMC been provided with the true customer account list, it would not have signed and closed the transaction and/or it would have paid a substantially lower purchase price.

216.    As a result of this reliance, JPMC sustained losses and seeks rescission, restitution, or damages in an amount to be determined at trial.

### COUNT V
### (Conspiracy to Commit Fraud)

217.    JPMC hereby incorporates paragraphs 1 through 216 by reference, as if set forth fully herein.

218.    Javice and Amar agreed to and did in fact work together to defraud JPMC into signing and closing the Merger and acquire Frank for a purchase price that did not reflect its real or actual value.

219.    Javice and Amar committed the overt acts described above in furtherance of their conspiracy.

220.    As a result of Javice's and Amar's conduct, JPMC sustained losses and seeks rescission, restitution, or damages in an amount to be determined at trial.

### COUNT VI
### (Aiding and Abetting Fraud)

221.    JPM hereby incorporates paragraphs 1 through 220 by reference, as if set forth fully herein.

222.    As set forth above, Javice and Amar aided and abetted one another and Frank in making intentionally and knowingly false representations and warranties concerning Frank and its business.

223.    Javice and Amar engaged in this conduct with actual knowledge that the representations that they made and caused Frank to make to JPMC were false and misleading.

224.     Javice's and Amar's conduct was intended to, and did in fact, induce JPMC to buy Frank at an inflated price and on terms favorable to Frank's investors, including Javice and Amar.  Each of Javice and Amar provided substantial assistance in furtherance of the scheme to defraud JPMC, including by misrepresenting and concealing Frank's actual customer account list.

225.     JPMC reasonably and justifiably relied on the information Javice and Amar provided and the misrepresentations they caused Frank to make when JPMC purchased Frank at an inflated price not supported by Frank's actual performance and customer base.

226.     As a result of this reliance, JPMC sustained losses and seeks rescission, restitution, or damages in an amount to be determined at trial.

## COUNT VII
### (Unjust Enrichment)

227.     JPMC hereby incorporates paragraphs 1 through 226 by reference, as if set forth fully herein.

228.     As set forth above, Javice and Amar made and caused Frank to make numerous false representations and warranties concerning Frank's actual customer account list and other business operations.

229.     Javice and Amar made these misrepresentations and caused Frank to make these misrepresentations to JPMC with knowledge of their falsity, with the intent to induce JPMC to buy Frank at an inflated price and on terms favorable to Frank's investors, including Javice and Amar.

230.     JPMC reasonably and justifiably relied on the information Javice and Amar provided and the misrepresentations Javice and Amar made when JPMC purchased the Company for the artificially inflated purchase price of $175 million.

231.   Javice and Amar were each unjustly enriched by receiving proceeds of the sale, directly or indirectly, that JPMC was induced to enter through fraud and misconduct.  Together, Javice and Amar received a total of approximately $26 million (account for the approximately $7.1 million that was held back from payment to Javice Trust 3 pursuant to the terms of the merger)  they would not have received but for their misconduct.

232.   Javice directed that portions of the merger proceeds that would have been payable directly to her instead be paid to the Javice Trusts for tax planning reasons.  The Javice Trusts are alter egos of Javice and, on information and belief, do not serve any purpose other than to hold merger proceeds derived from Javice's fraud.

233.   As a result of Defendants' conduct, JPMC suffered losses and seeks rescission, restitution, or damages in an amount to be determined at trial.

**WHEREFORE**, JPMC prays for an order:

a.   Declaring that Javice and Amar defrauded JPMC and/or caused Frank to defraud JPMC;

b.   Declaring that Javice and Amar conspired to defraud JPMC;

c.   Declaring that Javice and Amar aided and abetted Frank and one another in defrauding JPMC;

d.   Declaring that Javice and Amar defrauded JPMC by fraudulently concealing material facts;

e.   Declaring that Javice and Amar were unjustly enriched;

f.   Awarding JPMC compensatory damages in an amount to be determined at trial;

g.   Awarding JPMC punitive damages;

      h.      Awarding JPMC interest, attorney's fees, and costs; and

      i.      Awarding such other and further relief as the Court deems just, equitable

and proper.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By: */s/ Michael A. Pittenger*

William M. Regan                      Peter J. Walsh, Jr. (#2437)
Allison M. Wuertz                     Michael A. Pittenger (#3212)
HOGAN LOVELLS US LLP            Jonathan A. Choa (#5319)
390 Madison Avenue                  Carla M. Jones (#6046)
New York, NY 10017                  Hercules Plaza
(212) 918-3000                       P.O. Box 951
                                   Wilmington, DE  19899
                                   (302) 984-6000
                                   mpittenger@potteranderson.com
                                   pwalsh@potteranderson.com
                                   jchoa@potteranderson.com
Dated: December 22, 2022            cjones@potteranderson.com

*Attorneys for JPMorgan Chase Bank, N.A.*