**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| JPMORGAN CHASE BANK, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-01621-MN |
| | ) | |
| CHARLIE JAVICE, OLIVIER AMAR, | ) | |
| CHARLIE JAVICE, in her capacity as Trustee | ) | DEMAND FOR JURY TRIAL |
| of CHARLIE JAVICE 2021 IRREVOCABLE | ) | |
| TRUST #1, CHARLIE JAVICE, in her capacity as | ) | |
| Trustee of CHARLIE JAVICE 2021 | ) | |
| IRREVOCABLE TRUST #2, and CHARLIE | ) | |
| JAVICE in her capacity as Trustee of CHARLIE | ) | |
| JAVICE 2021 IRREVOCABLE TRUST #3, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT/COUNTERCLAIM-PLAINTIFF CHARLIE JAVICE'S
ANSWER, DEFENSES, COUNTERCLAIMS TO PLAINTIFF /
COUNTERCLAIM-DEFENDANT JPMORGAN CHASE BANK, N.A.'S COMPLAINT**

Defendant/Counterclaim-Plaintiff Charlie Javice ("Ms. Javice"), by her undersigned counsel, hereby respectfully submits her Answer, Defenses and Counterclaims to the Complaint by JPMorgan Chase Bank, N.A. ("Plaintiff" or "JPMC") (D.I. 1) as follows.

**GENERAL DENIAL**

Except as otherwise expressly admitted herein, Ms. Javice denies each and every allegation set forth in the Complaint and specifically denies any liability to Plaintiff. Pursuant to Rule 8(b) of the Federal Rules of Civil Procedure, allegations in the Complaint to which no responsive pleading is required shall be deemed denied. Ms. Javice further denies that she is a trustee of the Charlie Javice 2021 Irrevocable Trust #1, the Charlie Javice 2021 Irrevocable Trust #2, and the Charlie Javice 2021 Irrevocable Trust #3, as asserted in the caption of this action. Ms. Javice

expressly reserves the right to seek to amend and/or supplement her Answer as necessary, including the right to assert and rely upon additional defenses as may be discovered.

## NATURE OF THE ACTION

1.      Defendant Charlie Javice founded a small start-up business known as Frank that seemingly had the potential to grow and become a successful enterprise in the future, and appeared to have had had early proven success.[1]  But to cash in, Javice decided to lie, including lying about Frank's success, Frank's size, and the depth of Frank's market penetration in order to induce JPMC to purchase Frank for $175 million. Specifically, Javice represented in documents placed in the acquisition data room, in pitch materials, and through verbal presentations that more than 4.25 million students had created Frank accounts to begin applying for federal student aid using Frank's application tool. Then, when JPMC specifically requested proof of that claim during due diligence, Javice used "synthetic data" techniques to create a list of 4.265 million fake customers – a list of names, addresses, dates of birth, and other personal information for 4.265 million "students" who did not actually exist. In reality, Frank was nearly 4 million short of its representations to JPMC.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 1 of the Complaint, except she admits the allegations in footnote 1 and that she, Charlie Javice, founded a startup business known as Frank, which was the trade name for TAPD, Inc.  For the portions of paragraph 1 that state a legal conclusion, no response is required.

2.      In 2017, Javice started Frank, a for-profit company that aimed to help students navigate the college financial aid process. Frank offered students a tool to expedite completion of the Free Application for Federal Student Aid (the "FAFSA Tool"), a time-consuming task required of students seeking federal grants and loans. Frank also provided students with information on scholarships, financial aid appeals, and college courses. To tout Frank's success, Javice publicly claimed that Frank had helped <u>millions</u> of students obtain <u>billions</u> of dollars in student aid by early 2021.

**ANSWER:**  Ms. Javice admits the allegations in the first three sentences in paragraph 2 of the Complaint.  She denies the characterizations and allegations in the fourth sentence in paragraph 2 of the Complaint, except she admits that Frank publicly represented that it had helped more than 300,000 students obtain billions of dollars in financial aid.

---

[1]   "Frank" is a trade name; the legal name of the corporation at the time of acquisition described below was TAPD, Inc.

3.      Javice approached JPMC in the summer of 2021. After reviewing the opportunity, JPMC agreed to explore a potential acquisition. At an initial July 2021 meeting, Javice told JPMC that Frank had significant engagement with college-aged students, a market segment that JPMC wanted to grow. Javice stated that Frank had 4.25 million users, expressly defining a "user" as an individual who created a Frank account by entering a first name, last name, email, and phone number on Frank's website. She distinguished "users" from "website visitors," representing to the JPMC diligence team that, since 2017, Frank had more than 35 million visitors to its website.[2]

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 3 and footnote 2

of the Complaint, except she admits that in the summer of 2021 she and JPMC discussed a potential

acquisition, and the parties had an initial July 2021 meeting.  Ms. Javice admits that she told JPMC

that Frank had significant engagement with college-aged students, a market segment that JPMC

wanted to grow.

4.      The materials Javice posted in the acquisition data room repeated Javice's representations. She included in the data room a spreadsheet with a column labeled "FAFSA In Process" showing that 4.265 million students had started a FAFSA form with Frank (which required creating an online Frank account), with more than 2.1 million students fully completing the FAFSA through Frank. Javice posted a different spreadsheet showing more than 34 million visitors to Frank's website through 2020 alone.

**ANSWER:**  Ms. Javice denies the allegations and characterizations of paragraph 4 of the

Complaint.

5.      Based on the July 21 meeting and the data room materials, JPMC confirmed Frank's definition of its customers base, namely, customers are users who created a Frank account. Thereafter, as part of due diligence on Javice's 4.265 million customer account claim, JPMC made an unambiguous request to Javice for a list of Frank's underline customer accounts that included important data, such as first names, last names, dates of birth, phone numbers, mailing addresses, and email addresses. JPMC asked Javice the key questions in writing:

      a.      "How many customer accounts have 100% of the below data?";

      b.      "How many customer accounts have partial information?"; and

      c.      "Of partial records, what [percent] include each data field below?"

---

[2]  JPMC was not interested in Frank's website visit numbers because website visits do not reliably indicate whether a student had an established relationship with Frank. Instead, and as described in this Complaint, JPMC focused on customer accounts.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 5 of the Complaint, except she admits that Plaintiff was in contact with Ms. Javice following the meeting between Frank and Plaintiff.  Paragraph 5 of the Complaint purports to characterize the contents of written documents, which speak for themselves.

6.     JPMC made clear to Javice that these were "critical confirmatory due diligence requests" it required to proceed with an acquisition of Frank. JPMC believed that this diligence on current customers would confirm JPMC's investment thesis. Specifically, JPMC sought to confirm its thesis that Frank's acquisition of 4.265 million customer accounts demonstrated that Frank had created momentum, growth, and scale by developing meaningful relationships with millions of students. That momentum, growth, and scale, JPMC believed, indicated that Frank was a proven acquisition machine for college-aged students and would continue – and even increase – its customer account base once Frank merged with and into JPMC. If Frank's customer base existed, JPMC could proceed with the deal.

**ANSWER:**   Ms. Javice denies the allegations and characterizations of paragraph 6 of the Complaint, except she admits that JPMC made due diligence requests that were purportedly "critical."

7.     JPMC's diligence request was problematic for Javice and Frank: Frank did not have 4.265 million customer accounts. At the time of JPMC's request, Frank was almost 4 million customer accounts short of its representations to JPMC. Rather than reveal the truth, Javice first pushed back on JPMC's request, arguing that she could not share her customer list due to privacy concerns. After JPMC insisted, Javice chose to invent several million Frank customer accounts out of whole cloth.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 7 of the Complaint.

8.     Javice, along with her Chief Growth Officer Olivier Amar, first asked Frank's Director of Engineering to create fake customer details using "synthetic data" techniques. In plain English, "synthetic data" is fake information typically created by computer algorithms. Not comfortable, the engineer asked Javice and Amar whether the request was legal. In response, Javice sought to assure the engineer that she was not requesting that the engineer engage in illegal conduct. The Frank engineer was not persuaded and declined to participate in the scheme, and instead said that he only would provide Javice with Frank's actual list of customer accounts: fewer than 300,000 customer accounts as of July 31, 2021.

**ANSWER:** Ms. Javice denies the allegations and characterizations in paragraph 9 of the Complaint, except she admits that Olivier Amar was Frank's Chief Growth Officer prior the acquisition and that she asked Frank's director of engineering to assist with a data project.

9.    Javice then turned to a data science professor at a New York City area college (the "Data Science Professor") who advertised his "creative solutions" to data problems. Javice provided the Data Science Professor a list of 293,192 individuals who had started or submitted a FAFSA application through Frank. She then directed the Data Science Professor to use "synthetic data" techniques to create 4.265 million customer names, email addresses, birthdays, and other personal information based on the list Javice supplied.

**ANSWER:** Ms. Javice denies the allegations and characterizations in paragraph 9 of the Complaint, except she admits that Frank engaged a data science professor at a New York City area college to assist with a data project.

10.    Emails between Javice and the Data Science Professor make clear that the customer list consisted of fake data. For example:

    a.    The Data Science Professor wrote Javice to confirm that "[f]or names, our plan was to sample first name and last name independently and then ensure none of the sampled names are real."

    b.    Regarding creating physical addresses, the Data Science Professor wrote to Javice, "I can't seem to find addresses in my raw files    Should I attempt to fabricate them?" Javice responded "I just wouldn't want the street to not exist in the state." Later, the Data Science Professor determined that "'real addresses' may not be doable," and Javice responded "If we can't do real addresses what[']s the best we can do for that?"

    c.    When reviewing the fake data, the Data Science Professor noted that many entries confusingly had customers living, attending high school, and attending college in the same town and state, and concluded that the list "would look fishy to [him] if [he] were to audit it."

    d.    Javice was particularly concerned with the email addresses, asking the Data Science Professor "will the fake emails look real with an eye check or better to use unique ID?" He responded "[t]hey will look fake," at which point Javice agreed to use a "unique ID" instead.

    e.    When the Data Science Professor struggled to add certain college names to the list, Javice indicated that the "perfect" solution was to "draw a school at random in the same state" as the college that could not be added.

   f.  And when the Data Science Professor informed Javice that the data she provided contained the same phone number appearing for 676 individuals, Javice instructed him to "<u>double check the duplication rate isn't more than 5%-7%</u>" for the synthetic data, despite the fact Javice knew that JPMC was asking for a list of "<u>unique</u> customer accounts."

**<u>ANSWER:</u>** Ms. Javice denies the allegations or characterizations in paragraph 10 of the Complaint.  Portions of paragraph 10 of the Complaint purport to characterize the contents of written emails, which speak for themselves.

   11.  Ultimately, the Data Science Professor created a list of 4.265 million fake customer accounts (the "Fake Customer List") as Javice had requested and submitted it to a third-party vendor for validation as Javice directed.

**<u>ANSWER:</u>** Ms. Javice denies the allegations and characterizations of paragraph 11 of the Complaint, except she admits that, with the help of the professor, Frank provided a data file to the third party vendor Acxiom.

   12.  At the exact same time Javice was working with the Data Science Professor on the Fake Customer List, Amar separately reached out to ASL Marketing, Inc. ("ASL"), a marketing firm that purports to have "the most comprehensive, accurate and responsive data of high school students, college students and young adults available anywhere." Amar caused Frank to purchase a list of 4.5 million students from ASL for a cost of $105,000 (the "ASL List") on the same day Javice transferred the Fake Customer List to the third-party vendor for validation. While the ASL List arrived too late for Javice and the Data Science Professor to use in creating the Fake Customer List, Javice and Amar later used the ASL List to further deceive JPMC and cover their tracks after the Frank acquisition closed, again providing JPMC data for Frank customers who did not exist.

**<u>ANSWER:</u>** Ms. Javice denies the allegations and characterizations in paragraph 12 of the Complaint, except she admits that Frank contacted ASL Marketing, Inc. to purchase a student marketing list for $105,000.

   13.  The cover-up of Frank's fake customer data began immediately after the third-party vendor completed its validation process. Within <u>four minutes</u> of receiving the analysis, Javice directed the vendor to destroy the Fake Customer List and not share "additional background" with JPMC.

**ANSWER:** Ms. Javice denies the allegations and characterizations in paragraph 13 of the

Complaint, except admits that the vendor confirmed to Frank that it destroyed the data after the

vendor completed the project, pursuant to the requirements of the contract, which JPMC drafted.

14. Next, the Data Science Professor sent Javice a $13,300 invoice for his work, which included line items for each of the fake data fields he had created. Javice immediately directed the Data Science Professor to resend the invoice with only one generic line item for "data analysis" and to increase the invoice amount to $18,000. The Data Science Professor complied and revised the invoice.

**ANSWER:** Ms. Javice admits the allegations in paragraph 14 of the Complaint, except to the

extent the paragraph contains Plaintiff's own characterizations of actions and events, which she

denies.

15. Relying on the Fake Customer List, and the representations and warranties that Javice and Amar caused Frank to make as part of the acquisition, JPMC entered into the Agreement and Plan of Merger dated as of August 8, 2021 (the "Merger Agreement") with Finland Merger Sub, Inc., Frank, and Shareholder Representative Services LLC. Pursuant to the Merger Agreement, JPMC acquired Frank for a purchase price of $175 million (the "Merger"), with the Merger closing on September 14, 2021 and Javice, Amar, and other Frank employees joining JPMC as employees.

**ANSWER:** Ms. Javice denies the allegations and characterizations in paragraph 15 of the

Complaint, except she admits that Plaintiff entered into the Agreement and Plan of Merger, dated

as of August 8, 2021 (the "Merger Agreement") with Finland Merger Sub, Inc., Frank, and

Shareholder Representative Services LLC, pursuant to which JPMC acquired Frank for a purchase

price of $175 million (the "Merger"), with the Merger closing on September 14, 2021 and Javice,

Amar, and other Frank employees joining JPMC as employees.

16. Soon after the third-party vendor completed its validation process and Frank entered into the Merger Agreement, Javice again engaged the Data Science Professor to work with another third-party vendor, Enformion, LLC ("Enformion"), to obtain additional email addresses to add-on to the individuals in the ASL List. Javice decided to purchase the additional email address data because she knew that JPMC always intended to market its products and services to both Frank's existing users and the student accounts Frank would acquire in the future and therefore that, at some point after closing, JPMC would ask for the Frank customer data file containing 4.265 million accounts.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 16 of the

Complaint.

17.      In January 2022, to test the quality of Frank's customer list and the receptiveness of these customers to JPMC's products and services, JPMC requested that Frank send Frank's list of 4.265 million customers to a JPMC marketing team. Javice and Amar, however, knew that list did not exist.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 17 of the

Complaint.

18.      So Javice and Amar first provided JPMC's marketing team with a list of individuals sourced from ASL. Later, Javice provided JPMC's marketing team with a list that consisted of individuals from the ASL List augmented with emails addresses from Enformion. Said differently, the email addresses that Javice and Amar sent to the JPMC marketing team, which Javice and Amar knew JPMC planned to use to conduct a marketing campaign, were derived from data purchased from ASL and Enformion.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 18 of the

Complaint.

19.      Unsurprisingly, the results of the marketing test campaign were disastrous. Specifically, JPMC sent marketing test emails to what it believed were 400,000 unique Frank customers. Of the individuals contacted, only 28% of emails were delivered, compared to a 99% delivery rate JPMC usually sees with similar campaigns. Just 1.1% of the delivered emails were opened, compared to 30% for a typical JPMC campaign.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the

truth of the allegations and characterizations in paragraph 19 of the Complaint and therefore denies

them.

20.      After the unusually poor returns from the marketing campaign, JPMC reviewed various aspects of Frank's business.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the

truth of the allegations and characterizations in paragraph 20 of the Complaint and therefore denies

them.

21.      As a result of its review, JPMC discovered the Fake Customer List and the ASL List. JPMC has compared those lists to Frank's actual customer list, and examined emails,

messages, and chats among Javice, the Data Science Professor, and Amar. Those documents leave no doubt – the Fake Customer List and the ASL List did not contain the first name, last name, address, and phone number for actual Frank customers. Frank's files and data do not include <u>any</u> list or database of 4.265 million real students who actually used Frank to start a FAFSA. That list does not exist.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 21 of the

Complaint, except she admits that no list exists of 4.265 million students who used Frank to create

a FAFSA account.

22.     In every aspect of her interactions with JPMC, Javice had a choice between (i) revealing the truth about her startup and accepting Frank's actual value and (ii) lying to inflate Frank's value and reaping the rewards from that inflation. Javice chose each time to lie, and the evidence shows that time and again she layered fraud upon fraud to deceive JPMC.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 22 of the

Complaint.

23.     Javice and Amar used the Fake Customer List and other knowingly false Merger Agreement representations to fraudulently induce JPMC to enter into the Merger. JPMC paid $175 million for what it believed was a business deeply engaged with the college-aged market segment with 4.265 million customers; instead, it received a business with fewer than 300,000 customers. Javice and Amar's fraud materially damaged JPMC in an amount to be proven at trial, but not less than $175 million.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 23 of the

Complaint.  Portions of paragraph 23 of the Complaint contain legal conclusions to which no

response is required.

## <u>JURISDICTION AND VENUE</u>

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, 15 U.S.C. § 78aa, and 28 U.S.C. § 1367.

**ANSWER:**   Ms. Javice does not challenge that this Court has jurisdiction over the subject matter

of this action.

25.     Venue is proper in this judicial district pursuant to Section 9.10(a) of the Merger Agreement, which provides for exclusive jurisdiction in the courts of the State of Delaware.[3]

**ANSWER:**  Ms. Javice does not challenge the propriety of venue for purposes of this action.

Footnote 3 purports to characterize provisions of the Merger Agreement, which speaks for itself.

26.     Personal jurisdiction exists over Defendants based on Section 9.10(a) of the Merger Agreement, pursuant to which Defendants Javice and Amar caused Frank to consent to the jurisdiction of the Delaware courts.

**ANSWER:**  Ms. Javice will not challenge personal jurisdiction over her by this Court for purposes of this action.  Ms. Javice otherwise denies the allegations and characterizations in paragraph 26 of the Complaint concerning what Ms. Javice and Mr. Amar caused Frank to do.

## PARTIES

27.     Plaintiff JPMorgan Chase Bank, N.A. is a national bank whose main office is located in Columbus, Ohio, as designated in its Articles of Association.

**ANSWER:**  Ms. Javice does not contest the allegations in paragraph 27 of the Complaint.

28.     Defendant Charlie Javice is an individual who resides in Miami Beach, Florida. Javice is the founder of Frank and was the Chief Executive Officer of Frank prior to the Merger. Javice signed the Merger Agreement on behalf of Frank and received approximately $9.7 million in proceeds from the Merger. After the Merger closed, Javice became a JPMC employee. In her employment agreement, Javice bargained for an additional $20 million retention bonus that was payable if Javice remained employed with JPMC through the vesting dates and complied with JPMC's Code of Conduct. On November 4, 2022 JPMC terminated Javice's employment for cause (including failure to comply with the Code of Conduct) when JPMC discovered the facts alleged in this Complaint.

---

[3]     Section 9.10(a) of the Merger Agreement provides that "the parties hereto hereby irrevocably submit to the exclusive jurisdiction of the Court of Chancery of the State of Delaware (or, if the Court of Chancery of the State of Delaware declines to accept jurisdiction over a particular matter, any federal court within the State of Delaware, or, if no federal court in the State of Delaware accepts jurisdiction, any state court within the State of Delaware) over all Related Claims, and each party hereby irrevocably agrees that all Related Claims may be heard and determined in such courts." JPMC's claim for violation of § 10(b) of the Securities Exchange Act is subject to exclusive federal court jurisdiction, meaning that an initial filing in the Court of Chancery of the State of Delaware would be futile and contrary to law, and therefore not required by the forum selection clause. *See* Merger Agreement, § 9.5 ("Whenever possible, each provision of this Agreement and the Related Documents shall be interpreted in such manner as to be effective and valid under applicable Law . . . ").

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 28, except she admits that: (1) Javice is an individual who resides in Miami Beach, Florida; (ii) Javice is the founder of Frank and was the Chief Executive Officer of Frank prior to the Merger; (iii) Javice signed the Merger Agreement as CEO on behalf of Frank and received proceeds from the Merger; (iii) after the Merger closed, Javice became a JPMC employee; (iv) in her employment agreement, Javice bargained for an additional $20 million retention bonus that was payable if Javice remained employed with JPMC through the vesting dates and complied with JPMC's Code of Conduct; (v) JPMC terminated Javice's employment.

29.     Javice also is the trustee of three trusts that received proceeds from the Merger:

   a.     Charlie Javice 2021 Irrevocable Trust #1 ("Javice Trust 1") is a trust that was created for the benefit of Javice. Javice Trust 1 received approximately $4.7 million in proceeds from the Merger.

   b.     Charlie Javice 2021 Irrevocable Trust #2 ("Javice Trust 2"), a trust that was created for the benefit of Javice. Javice Trust 2 received approximately $7 million in proceeds from the Merger.

   c.     Charlie Javice 2021 Irrevocable Trust #3 ("Javice Trust 3" and, together with Javice Trust 1 and Javice Trust 2, the "Javice Trusts") is a trust that was created for the benefit of Javice. The approximately $7.13 million in proceeds from the Merger due to Javice Trust 3 were withheld pursuant to the terms of the Merger.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 29 of the Complaint, except she admits that Charlie Javice 2021 Irrevocable Trust #1, Charlie Javice 2021 Irrevocable Trust #2, and Charlie Javice 2021 Irrevocable Trust #3 are trusts.

30.     Defendant Olivier Amar is an individual who resides in Sands Point, New York. Amar was Chief Growth Officer of Frank prior to the Merger. Amar received approximately $5 million in proceeds from the Merger. After the Merger closed, Amar became a JPMC employee. In his employment agreement, Amar bargained for a retention bonus of $3 million that was payable if Amar remained employed with JPMC through the vesting dates and complied with JPMC's Code of Conduct. On October 26, 2022 JPMC terminated Amar's employment for cause (including failure to comply with the Code of Conduct) when JPMC discovered the facts alleged in this Complaint.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations and characterizations in paragraph 30 of the Complaint and therefore denies them, except she admits that Mr. Amar was the Chief Growth Officer of Frank prior to the Merger, and that after the Merger he became a JPMC employee.

31.     Together, Javice and Amar controlled all aspects of Frank's business and decision-making.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 31 of the Complaint.

## FACTUAL BACKGROUND

32.     Javice founded Frank in 2017. Frank's mission was to become a "trusted financial coach for students, helping navigate finances from A-Z."

**ANSWER:**  Ms. Javice admits the allegations in paragraph 32 of the Complaint.

33.     Frank's original offering for prospective college students and their families was the FAFSA Tool, which, as noted above, expedited completion of the FAFSA. Frank claimed that its FAFSA Tool allowed students to fill out the FAFSA in just seven minutes, while the process typically took several hours to complete when students manually entered the required data.

**ANSWER:**  Ms. Javice admits the allegations in paragraph 33 of the Complaint.

34.     Javice claimed publicly that, since 2017, Frank had served "over 4.25 million students." For example, Javice has tweeted this and similar numbers on multiple occasions:

    a.    January 17, 2021: "We put students first and over 4.25 million students trust @with_frank for financial aid help."

    b.    February 1, 2021: "We're working on it at @with_frank. 4.25 million students down… 10M more to go."

    c.    February 2, 2021: "cuz schools don't teach it, we've engaged over 4 million students on how to pay for college . . . ."

    d.    February 10, 2021: "Fill out your FAFSA® for free from your phone in an avg. of 5 minutes. Over 4 million students trust Frank to help navigate financial aid."

    e.    February 16, 2021: When academics tell us @with_frank is not the answer… all good, 4M+ students think we are."

      f.     <u>May 8, 2021</u>: "Super proud of the team @with_frank and thankful for the 5 million+ families who trust us everyday."

      g.     <u>June 21, 2021</u>: "Should have it up and running for the 6M+ families we serve for next FAFSA® opening."

**ANSWER:** Paragraph 34 of the Complaint purports to characterize the contents of written documents, which speak for themselves.

35. Similarly, archived versions of Frank's website from July 8, July 26, July 31, August 11, and August 13, 2021 advertised "Why 4.25 million students chose Frank":

      a.     "Quick & Easy: Apply for aid in under 7 minutes"

      b.     "Safe & Secure: Bank level security"

      c.     "Human Support: Happy people always"

**ANSWER:** Paragraph 35 of the Complaint purports to characterize the contents of written documents, which speak for themselves.

36. In an interview published on bumble.com on July 20, 2017, Javice stated that Frank was helping "12,000 people daily" with the FAFSA.[4]

**ANSWER:** Paragraph 36 of the Complaint purports to characterize the contents of written documents, which speak for themselves.

37. In March 2021, a principal of one of Frank's largest investors sent an article touting Frank's alleged success to an executive at JPMC's Corporate & Investment Bank. The investor's email noted that Frank was "getting real inbound interest and [I] thought someone at JPM should have a look."

**ANSWER:** Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 37 of the Complaint and therefore denies them, except she admits that a principal investor emailed an executive at JPMC's Corporate & Investment Bank.

38. The executive forwarded the investor's email to JPMC's Head of Corporate Development and another executive at JPMC. The Head of Corporate Development responded

---

[4] https://bumble.com/en/the-buzz/working-title.

that she would be happy to meet with Frank, adding that "depending on their angle – there could be something we would consider on a programmatic basis . . ."

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 38 of the Complaint and therefore denies them.

39.    JPMC considered whether partnering with or acquiring Frank would complement JPMC's focus on the student segment, an area where JPMC was hoping to grow its market share. After conducting several meetings with Javice to learn about Frank's business, JPMC initially opted not to pursue a transaction.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 39 of the Complaint and therefore denies them.

40.    In July 2021, following renewed contacts from Frank and its investment bank LionTree Advisors, LLC ("LionTree"), JPMC decided to consider a potential acquisition of Frank.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 40 of the Complaint and therefore denies them.

41.    Following conversations with LionTree, JPMC commenced due diligence.

**ANSWER:**  Ms. Javice admits that Plaintiff commenced due diligence, but she is without

knowledge or information sufficient to form a belief as to when Plaintiff commenced its diligence.

42.    On July 6, 2021, Frank opened its data room (the "Acquisition Data Room") to JPMC. After reviewing the material in the Acquisition Data Room, JPMC conducted several due diligence calls with Frank, all of which were led by Javice.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 42 of the

Complaint, except she admits that as part of the acquisition process, there was an acquisition data

room opened up to Plaintiff and Plaintiff conducted due diligence calls with Frank.

43.    On July 12, 2021, JPMC met with Frank at JPMC's offices located at 390 Madison Avenue in New York to conduct a full-day due diligence session related to Frank's FAFSA Tool, other technology, accounting, finances, and tax issues. Numerous representatives of JPMC, Frank, and LionTree attended this diligence meeting, including Javice and Amar.

**ANSWER:**  Ms. Javice denies that JPMC and Frank met in person.  She admits the other

allegations in paragraph 43 of the Complaint.

44.     The following day, on July 13, 2021, JPMC and Frank met again at JPMC's offices located at 390 Madison Avenue in New York to conduct additional due diligence related to legal issues, risk, compliance, and Frank's controls and operations. Again, the due diligence session lasted the entire day, with representatives from JPMC, Frank, and LionTree present.

**ANSWER:**  Ms. Javice denies that JPMC and Frank met in person.  She admits the other

allegations in paragraph 44 of the Complaint.

45.     Between July 12 and July 13, JPMC participated in at least 18 hours of due diligence meetings.

**ANSWER:**  Ms. Javice admits the allegations in paragraph 45 of the Complaint.

46.     During both day-long diligence meetings, Javice did nearly all the talking on behalf of Frank. Regardless of the topics of the questions, Javice provided most of the answers.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 46 of the

Complaint.

47.     Following these diligence sessions, on July 14, 2021, JPMC submitted a non-binding indication of interest to acquire Frank for $175 million, subject to further confirmatory due diligence.

**ANSWER:**  To the extent that paragraph 47 of the Complaint states a legal conclusion, no response

is required.  To the  extent that paragraph 47 of the Complaint purports to characterize the contents

of written documents, such documents speak for themselves.  Ms. Javice admits that following

diligence sessions, Plaintiff submitted a letter of interest to acquire Frank.

48.     On July 16, 2021, Frank agreed to grant JPMC exclusivity for a period of 14 days. During this exclusivity period, JPMC continued to conduct diligence on Frank, including two additional days of meetings on July 19 and July 20, 2021, with specific sessions on legal, risk compliance, controls, and product issues.

**ANSWER:**  To the extent that paragraph 48 of the Complaint states a legal conclusion, no response

is required.  To the extent that paragraph 48 of the Complaint purports to characterize the contents

of written documents, such documents speak for themselves.  Ms. Javice admits that during July,

there were several hours of meetings, including two days of meetings on July 19 and July 20, 2021

with specific sessions on legal, risk compliance, controls, and product topics.

49.     During due diligence, Javice represented on numerous occasions, in oral and written statements, and in materials posted to the Acquisition Data Room, that Frank had at least 4.25 million customers.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 49 of the

Complaint, except she admits that during diligence she represented that Frank had engaged with

at least 4.25 million students.

50.     Javice caused Frank to upload several documents concerning customer data to the Acquisition Data Room. One such document was a spreadsheet that broke down the number of customers by the number acquired per month; how many customers were acquired through "paid" channels versus "non-paid;" how many customers were the result of an "organic" versus a "paid" search; and how many had begun using the FAFSA Tool.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 50 of the

Complaint, except she admits that LionTree uploaded documents to the data room, and such

documents speak for themselves.

51.     Another spreadsheet included a column labeled "FAFSA In Process" that showed 4,265,085 customers who had begun to use the FAFSA Tool – <u>the **exact** number of entries on the Fake Customer List</u>. The same spreadsheet indicated that Frank had 2,100,184 customers who had <u>completed</u> the FAFSA.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 51 of the

Complaint, except she admits that a spreadsheet had a column labeled "FAFSA In Process" that

listed 4,265,085 entries, and that there were 4,265,085 entries in the data file uploaded to Acxiom.

To the extent that paragraph 51 of the Complaint purports to characterize the contents of written

documents, such documents speak for themselves.

52.     The "FAFSA In Process" spreadsheet thus indicated to JPMC that 4,265,085 individual students had opened accounts with Frank, started the process of completing the FAFSA, and provided Frank with important personal information (*e.g.*, name, address, date of birth, etc.). It was this purported customer base that JPMC intended to (and did in fact) explore and thoroughly vet in the diligence process.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 52 of the

Complaint.

16

53.     JPMC's interpretation of the "FAFSA In Process" spreadsheet is reasonable and consistent with Javice's correspondence with Frank's investment bank. In email correspondence with LionTree, Javice confirmed that the number listed in the "FAFSA In Process" column included customers where the "account [is] validated." Javice further confirmed to LionTree that, to determine how many FAFSAs Frank helped students submit, LionTree could multiply the number of customers listed in the "FAFSA In Process" column by the "completion rate" for each month.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 53 of the

Complaint.

54.     There was no misinterpreting what the "FAFSA In Process" spreadsheet represented (as confirmed in Javice's emails with LionTree). But there was no list of 4.265 million students who had worked on the FAFSA with Frank at the time Javice uploaded the "FAFSA In Process" spreadsheet to the Acquisition Data Room. That list did not exist. Javice put the "FAFSA In Process" spreadsheet in the Acquisition Data Room for one reason – to fraudulently induce the sale of Frank.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 54 of the

Complaint.

55.     LionTree had previously discussed the accuracy of another Frank representation that Javice provided. In July 2021, in connection with the diligence process for another bidder, LionTree asked Javice to clarify whether certain visitor information was unique visitors or "impressions" (*i.e.*, total non-unique visits to the website) after the bidder asked for "unique web visitor figures." Javice initially ignored the question, but ultimately directed LionTree to a specific diligence spreadsheet. Before providing additional information to the bidder, LionTree asked Javice for clarification of whether the data in that spreadsheet was "unique visitors" or "total visitors" and how to explain the data to the bidder. Ultimately, Javice admitted she did not "think there is a good way [to explain]. It was mislabeled data and represents <u>impressions</u>. I would not touch this point and leave open as there is enough marketing data provided."

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 55 of the Complaint regarding the bidder's conversations with

LionTree and therefore denies them.  She denies the remaining allegations and characterizations

in paragraph 55 of the Complaint, except she admits that she emailed with LionTree regarding

impressions data.  Portions of paragraph 55 purport to characterize the contents of written

documents, which speak for themselves.

56.     LionTree responded "[i]f it was mislabeled data lets just tell them that and be direct. Better now than later." Javice responded that she did not want to "chang[e] #s around and [do] new pulls right before a presentation," but LionTree told Javice she must tell the bidder that the number in the diligence spreadsheet was "impressions from Google search console," not "visitors [or] unique visitors which is not actively tracked."

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 56 of the Complaint, except she admits that she emailed with LionTree regarding impressions data.  Portions of paragraph 56 purport to characterize the contents of written documents, which speak for themselves.

57.     Less than 24 hours after receiving that corrected information, the bidder declined to submit a second-round bid to acquire Frank.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 57 of the Complaint and therefore denies them.

58.     An individual from JPMC took detailed notes during the July 12 and 13 diligence meetings. The notes from the July 12 meeting reflect that Javice affirmatively represented to JPMC, among other things, that, between 2017 and 2021, Frank had amassed 4.25 million "users," which she specifically defined at that meeting as an individual who provides Frank with his or her first name, last name, email and phone number.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 58 of the Complaint and therefore denies them.

59.     The management presentation that Javice gave during the July 12 meeting also stated that Frank had 4.25 million customer accounts. Indeed, Javice's management presentation referenced the number 4.25 million no fewer than seven times, including two charts that show cumulative users of 4.25 million from 2017 to 2020:

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 59 of the Complaint, except she admits that the management presentation represented that Frank had "4.25 million" cumulative users.  Portions of paragraph 59 of the Complaint purport to characterize the contents of written documents, which speak for themselves.

18







60.     The notes also indicate that Javice separately represented to the JPMC diligence team that, since 2017, Frank had 35 million visitors to its website. JPMC was not interested in Frank's website visit numbers; website visits do not reliably indicate whether a student had an established relationship with Frank. And during the July 12 meeting, Javice drew a clear difference between a website visitor and a user who provided Frank with account-opening information. Documents placed in the Acquisition Data Room by Frank confirm this distinction: the documents reflect that Frank had 35 million visitors to its website in 2020, and an additional 19 million in the first six months of 2021.[5]

---

[5]  Although Frank stated during due diligence that it had 35 million website visitors, this, too, was a lie. Google Analytics shows that Frank had only 4.25 million visits.

**ANSWER:**  Ms. Javice denies the allegations and characterizations of  paragraph 60 and footnote 5 of the Complaint.  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of allegations regarding the existence or nature of notes by an "individual from JPMC" and therefore denies them.  To the extent paragraph 60 of the Complaint purports to characterize the contents of written documents, such documents speak for themselves.

61.     With respect to 2020 specifically, the most recent full-year data available at the time of the July 12 diligence meeting, Javice claimed that Frank <u>filed</u> well over 100,000 FAFSAs on behalf of its student-customers and acquired approximately 1.4 million new customers in that year alone. For the same period, documents in the Acquisition Data Room show an even higher number: <u>410,994</u> FAFSAs filed by Frank on behalf of its customers.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 61 of the Complaint.

62.     In other words, through Javice's statements and the documents she provided, she specifically represented to JPMC that website visitors and "users," as she had previously defined that term, had very different meanings. Those statements and detailed (but false) documents formed the very foundation of the Merger. And JPMC relied on Javice's statements and the documents she provided in deciding to continue discussions with Frank and in entering into the Merger.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 62 of the Complaint and therefore denies them.  Portions of paragraph 62 of the Complaint state a legal conclusion, for which no response is required.

63.     JPMC determined that, in order to proceed with the transaction, it needed to confirm Javice's representations regarding Frank's 4.25 million customer accounts.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 63 of the Complaint and therefore denies them.

64.     On August 1, 2021, JPMC's Head of Corporate Development sent an email to Javice outlining JPMC's diligence requests for Frank's customer data. The Head of Corporate Development wrote "[a]s we discussed, we have two critical confirmatory due diligence requests related to Data . . . ." The email asked three questions about "customer accounts":

    a.     "How many <u>customer accounts</u> have 100% of the below data?"

b.     "How many <u>customer accounts</u> have partial information?"

c.     "Of partial records, what [percent] include each data field below?"

**<u>ANSWER</u>:**   Paragraph 64 of the Complaint purports to characterize the contents of written

documents, which speak for themselves.

65.     These three unambiguous questions were followed by a series of requested data fields, including first name; last name; date of birth; phone number; address; and email address.

**<u>ANSWER</u>:**   Paragraph 65 of the Complaint purports to characterize the contents of written

documents, which speak for themselves.

66.     The email request specified that JPMC sought to "[v]alidate the integrity of each of the variables to the degree reasonable (*e.g.*, data and email fields are captured in the appropriate formats)." JPMC believed that this due diligence of Frank's customer accounts would confirm JPMC's investment thesis: that Frank's acquisition of 4.265 million customer accounts demonstrated that Frank had created momentum, growth, and scale by developing meaningful relationships with millions of students. Based on that momentum, growth, and scale, JPMC believed that Frank had built a proven acquisition machine for college-aged students and would continue that momentum and growth once Frank merged with and into JPMC. If Frank's representations were confirmed, it would allow JPMC to proceed with the deal.

**<u>ANSWER</u>:**   The first sentence of paragraph 66 of the Complaint purports to characterize the

contents of written documents, which speak for themselves.  Ms. Javice is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in paragraph 66

of the Complaint and therefore denies them.

67.     JPMC's unambiguous request for customer accounts is also shown in the template report that JPMC and Javice created. That template stated the primary inquiry prominently at the top: "How many UNIQUE customer accounts exist?" (emphasis in original).

**<u>ANSWER</u>:**   Paragraph 67 of the Complaint purports to characterize the contents of written

documents, which speak for themselves.

68.     Javice agreed to provide in the template actual customer data for <u>all fields</u> except email and home street addresses; those she agreed to provide as a "unique ID" due to alleged privacy concerns. A "unique ID" is a randomly generated identifier that is substituted for actual data. For example, instead of providing a customer's name ("John Smith"), a unique ID ("A1B2") would be assigned to the information associated with John Smith. A unique ID can have a legitimate use in protecting sensitive customer information. At no point, however, did Javice

indicate to JPMC that the unique IDs would not be tied to real email addresses provided to Frank by real customers. In other words, JPMC understood that if a customer did not provide an email address, the cell would be empty and not contain a unique ID.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 68 of the

Complaint, except she admits that a "unique ID" could have a legitimate use in protecting sensitive

customer information.

69.    Javice also cited privacy concerns in sharing Frank's customer data directly with JPMC. After numerous internal conversations, and in order to allay Javice's concerns, JPMC agreed to use a third-party data management vendor, Acxiom, to validate Frank's customer information rather than providing the personal identifying information directly to JPMC.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 69 of the

Complaint, except she admits that she cited privacy concerns in sharing Frank's customer data

directly with Plaintiff, which Frank's and Plaintiff's lawyers later discussed, and Plaintiff decided

to engage a third-party data management vendor, Acxiom, to assist with data validation.

70.    JPMC agreed to these privacy protections because it believed, at the time, that the third-party diligence protocol would permit Frank to provide its list of actual customer accounts to Acxiom – with the data fields JPMC requested – but protect the personal identifying information of actual Frank customer accounts, thereby avoiding the purported privacy issues that Javice had raised. That, unfortunately, turned out not to be the case; Javice's "privacy" concerns were just a cover for her attempts to conceal her fraud from JPMC.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the

truth of the allegations regarding what Plaintiff believed and therefore she denies them.  She denies

the remaining allegations and characterizations in paragraph 70 of the Complaint.

71.    On August 5, 2021, Frank provided a data file to Acxiom for validation. The data file contained 4,265,085 million rows of data, purportedly representing the 4,265,085 million unique customer accounts that Frank claimed to possess.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 71 of the

Complaint, except she admits that Frank provided Acxiom with a data file on August 5, 2021, and

that data file contained 4,265,085 million rows of data.

72.     Prior to sending Acxiom the file, Javice provided JPMC with a preliminary version of the template report that Javice prepared. That report noted that only email and home street address were provided as "unique IDs." On August 5, Javice provided a copy of the same report to Acxiom as an attachment to the limited services agreement Frank and Acxiom executed.

**ANSWER:**  Portions of paragraph 72 of the Complaint purport to characterize the contents of written documents, which speak for themselves.  Ms. Javice admits the remaining allegations in paragraph 72 of the Complaint.

73.     Frank, however, did not have 4,265,085 <u>unique customer accounts</u>. So Javice decided to make them up. Javice decided to use "synthetic data" techniques to fabricate a customer account list with 4,265,085 "individuals" for the Acxiom validation.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 73 of the Complaint.

74.     In response to JPMC's request to review Frank's customer data, on August 2, 2021, Javice first looked for internal support. She sent Frank's Director of Engineering an email with a link to an article entitled "Generating Tabular Synthetic Data Using GANs."[6] The article notes that "[t]he goal is to generate synthetic data that is <u>similar to the actual data</u> in terms of statistics and demographics." The article suggests that "it[']s fairly simpl[e] to use GANs to generate synthetic data <u>where the actual data is sensitive in nature and can't be shared publicly</u>."

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in footnote 6 and therefore denies them.  Portions of paragraph 74 of the Complaint purport to characterize the contents of written documents, which speak for themselves.

Ms. Javice admits that she sent the engineer an article regarding synthetic data.

75.     Javice, Amar, and the Director of Engineering then had a Zoom meeting during which Javice and Amar asked the Director of Engineering to help them create a synthetic list of customer data. She asked the Director of Engineering if he could help her take a known set of FAFSA application data and use it to artificially augment a much larger set of anonymous data that her systems had collected over time. The Director of Engineering questioned whether creating and using such a data set was legal, but Javice tried to assure the engineer by claiming that this was perfectly acceptable in an investment situation and she did not believe that anyone would end up in an "orange jumpsuit" over this project.

---

[6]  A "GAN" is a "Generative Adversarial Network," a type of algorithmic architecture.

**ANSWER:** Ms. Javice denies the allegations and characterizations of paragraph 75 of the Complaint, except she admits that she, Mr. Amar, and the engineer had a remote video meeting to discuss Plaintiff's synthetic data request.

76. The Director of Engineering was not persuaded and told Javice and Amar that he would not perform the task and only would send them the file containing Frank's actual users, which amounted to approximately 293,000 individuals at that time.

**ANSWER:** Ms. Javice denies the allegations and characterizations in paragraph 76 of the Complaint, except she admits that the engineer told her and Mr. Amar that he could not perform the task.

77. After her internal effort failed, Javice sought help from external sources.

**ANSWER:** Ms. Javice denies the allegations and characterizations in paragraph 77 of the Complaint.

78. First, Javice contacted the Data Science Professor. At 12:46 p.m. on August 3, 2021, Javice sent the Data Science Professor an invitation for a Zoom meeting set for 2:15 p.m. Based on subsequent communications between Javice and the Data Science Professor, the call occurred as scheduled.

**ANSWER:** Ms. Javice is without knowledge or information sufficient to form a belief as to whether the remote video meeting was on Zoom, but she admits the remaining allegations in paragraph 78 of the Complaint.

79. The Data Science Professor advertised his use of "creative solutions" based on his background in mathematics and statistics. The Data Science Professor received A Master's degree and a Ph.D. in Statistics from a highly respected university. Javice instructed the Data Professor to apply his "creative solutions" to generate customer data, which she intended to use to induce JPMC to buy Frank for an inflated purchase price.

**ANSWER:** Ms. Javice denies the allegations and characterizations in paragraph 79 of the Complaint, except she admits that the professor has advanced degrees from a highly respected university. Portions of paragraph 79 of the Complaint purport to characterize the contents of written documents, which speak for themselves.

80.     After the August 3, 2021 Zoom meeting, the Data Science Professor returned a signed version of Frank's NDA. The Data Science Professor's usual hourly rate was $300. Javice <u>unilaterally doubled</u> the Data Science Professor's rate to $600.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 80 of the Complaint, except she admits that the professor returned a signed version of Frank's NDA and she and the professor agreed to a rate of $600 per hour.

81.     After the Data Science Professor signed the NDA, Javice shared a link with the Data Science Professor on August 3, 2021, which provided access to Frank's AWS Management Console, a data cloud storage service, so that the Data Science Professor could access certain Frank data. On August 4, at Javice's direction, the Data Science Professor began to work to create "synthetic data" that Javice then used to deceive JPMC into believing that Frank had the 4 million plus customers that Javice had touted.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 81 of the Complaint, except she admits the first sentence of the paragraph.

82.     "Synthetic data," in plain English, is fake information: information that is artificially generated rather than produced by real-world events and typically created using algorithms. Essentially, Javice hired the Data Science Professor to create synthetic data from what she told him was a sample of Frank users that mimicked a larger, real data list of 4.265 million Frank customers. In reality, he was creating fake data for Javice to "mimic" customers that did not exist.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 82 of the Complaint.

83.     The Data Science Professor analyzed a list of 293,193 customer accounts, which Javice characterized as a representative sample of Frank's actual 4.265 million customers (even though that customer population did not exist). The Data Science Professor then used algorithms and other synthetic data techniques to create the Fake Customer List, which purported to contain data for 4.265 million Frank customers.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 83 of the Complaint.

84.     One of the Data Science Professor's first tasks was to create home addresses for fake customers. Early on, however, in an email to Javice at 11:39 a.m. on August 4, 2021, the Data Science Professor noted an issue with Javice's proposed approach to creating home address data. Per the Data Science Professor's email, Javice's instructions would cause the city, state, and zip code for each customer's data entry to be the same. In other words, Javice's proposed approach

would make it appear that each student lived in, attended high school in, and attended college in the same city, state, and zip code.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 84 of the

Complaint.  Paragraph 84 of the Complaint purports to characterize the contents of written

documents, which speak for themselves.

85.    Javice responded via email at 11:43 a.m., less than four minutes later. In her email, Javice did not abandon the idea of generating fake data for the students' addresses, but doubled down, stating that she was "happy to <u>randomize</u> the state[] for college or <u>play with</u> neighboring states."

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 85 of the

Complaint.  Paragraph 85 of the Complaint purports to characterize the contents of written

documents, which speak for themselves.

86.    The Data Science Professor responded to Javice's new proposal via email at 11:48 a.m., five minutes later, concluding that "'<u>real addresses' may not be doable</u>."

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 86 of the

Complaint.  Paragraph 86 of the Complaint purports to characterize the contents of written

documents, which speak for themselves.

87.    Two minutes later, at 11:50 a.m., Javice emailed the Data Science Professor, "<u>[i]f we can't do real addresses whats the best we can do for that?</u> Worse comes to wors[t] we can try a unique ID."

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 87 of the

Complaint.  Paragraph 87 of the Complaint purports to characterize the contents of written

documents, which speak for themselves.

88.    Javice's August 4, 2021 email from 11:50 a.m. proposed to use a unique ID because Frank did not have "real" home address information for its purported customers. Javice proposed this illegitimate use of a unique ID for the purpose of misrepresenting Frank's customer base and defrauding JPMC, while she misrepresented to JPMC that the purpose of the unique ID was to protect the personal identifying information.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 88 of the Complaint.  Portions of paragraph 88 of the Complaint purport to characterize the contents of written documents, which speak for themselves.

89.   To aid the Data Science Professor, at 12:15 p.m. the same day, Javice emailed the Data Science Professor a copy of the template that JPMC and Javice had worked together to develop. That template reflects the fields that JPMC wished to have validated. The template included approximately 30 fields in total, including key information such as:

    a.   first name;

    b.   last name;

    c.   phone number;

    d.   date of birth;

    e.   year of school;

    f.   city of high school;

    g.   home address; and

    h.   email address.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 89 of the Complaint, except she admits that she emailed the professor a template that Plaintiff and Javice worked together to develop.  Portions of paragraph 89 of the Complaint purport to characterize the contents of written documents, which speak for themselves.

90.   The Data Science Professor responded to Javice's 12:15 p.m. email at 12:36 p.m., telling Javice that he is "wasting too much time on the address thing. Just loading the whitepages database for even part of the USA (16gb) is proving to be a tremendous time sink since there are missing characters throughout the file. So I think we'll have to use unique IDs" instead of real data. In a 12:39 p.m. response, Javice agreed to "put address aside for now."

**ANSWER:**   Paragraph 90 of the Complaint purports to characterize the contents of written documents, which speak for themselves.

91.   Next, the Data Science Professor moved on to email addresses. In an email at 12:56 p.m., the Data Science Professor, referring to the template Javice sent an hour earlier, asked Javice:

"You have the student email marked as 'provided as unique ID' but <u>didn't we agree to make fake</u> <u>ones</u> a la 'asdugnsdf@gmail.com'? Or do you want unique ID after all?"

**ANSWER:**   Paragraph 91 of the Complaint purports to characterize the contents of written

documents, which speak for themselves.

92.     In a response sent six minutes later at 1:02 p.m., Javice asked, "will the <u>fake emails</u> <u>look real with an eye check or better to use unique ID</u>?" At 1:37 p.m., the Data Science Professor confirmed "<u>[t]hey will look fake.</u> So let's use unique ID."

**ANSWER:**   Paragraph 92 of the Complaint purports to characterize the contents of written

documents, which speak for themselves.

93.     The conversation between Javice and the Data Science Professor carried on into the evening as the two discussed how to create additional fake information for the requested data fields. With respect to identifying schools to which students have submitted FAFSAs, the Data Science Professor noted in an email sent at 9:10 p.m. to Javice that "[t]here are 395 unique school codes not in the database you sent me." To solve the problem, the Data Science Professor proposed to "<u>draw a school at random in the same state</u>[.]" At 9:21 p.m., Javice responded to the Data Science Professor's suggestion that "draw[ing] a school at random in the same state" was "[p]erfect."

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 93 of the

Complaint.  Portions of paragraph 93 of the Complaint purport to characterize the contents of

written documents, which speak for themselves.

94.     By 11:30 p.m., the Data Science Professor had moved on to "<u>working on the phone</u> <u>numbers comporting with the random address.</u>" In working on creating phone numbers, the Data Science Professor noted to Javice in an 11:33 p.m. email that "[f]or example, in the raw data [one particular phone number] appears 676 [times] across many different names and addresses." Javice responded three minutes later at 11:36 p.m., telling the Data Science Professor to "double check the duplication rate isn't more than 5%-7%."

**ANSWER:**   Paragraph 94 of the Complaint purports to characterize the contents of written

documents, which speak for themselves.

95.     The phone number the Data Science Professor identifies as having "appear[ed] 676 times" across many names and addresses belongs to a Frank employee whose job was to test the Frank FAFSA Tool, including by entering his information into the account creation screen.

**ANSWER:** Ms. Javice is without knowledge or information sufficient to form a belief as to the allegations in paragraph 95 of the Complaint and therefore denies them.

96.     The communications in paragraphs 73 through 95 demonstrate that Javice directed the Data Science Professor to create fake customer data that was provided to a third-party verification service as evidence of 4.265 million actual Frank customers, and to induce JPMC to purchase Frank.

**ANSWER:** Ms. Javice denies the allegations and characterizations in paragraph 96 of the Complaint.

97.     Upon information and belief, Javice did not inform LionTree that she was providing a list of 4.265 million fake customers to JPMC.

**ANSWER:** Ms. Javice is without knowledge or information sufficient to form a belief as to the allegations in paragraph 97 of the Complaint and therefore denies them.

98.     The Fake Customer List had no value as diligence information. It did not tell JPMC anything about Frank, its business, or the students who supposedly started filling out FAFSAs. Javice instructed the Data Science Professor to extrapolate a synthetic list of data from a small sample to mimic the "true" universe of Frank's 4.265 million users. But in reality, there were not 4.265 million users to mimic. Synthetic data that mimics false data is of no use whatsoever as diligence material or, later, as marketing material.

**ANSWER:** Ms. Javice denies the allegations and characterizations in paragraph 98 of the Complaint.

99.     As noted above in paragraph 80, Javice initially doubled the Data Science Professor's hourly rate to $600 instead of his usual $300 per hour.

**ANSWER:** Paragraph 99 of the Complaint contains no allegations to which a response is required. To the extent a response is required, Ms. Javice refers to her response to paragraph 80 of the Complaint.

100.     After the Data Science Professor submitted the Fake Customer List to Acxiom at her direction, Javice further compensated the Data Science Professor for his work in creating fake data and, in the process, also worked to conceal her fraud.

**ANSWER:** Ms. Javice denies the allegations and characterizations in paragraph 100 of the Complaint.

101.    Specifically, on August 5, 2021 at 11:05 a.m., the Data Science Professor provided Javice an invoice for $13,300, documenting 22.17 hours of work over just three days. The invoice entries show that the bulk of his time was spent on the main task that Javice retained the Data Science Professor to perform – making up customer data. The Data Science Professor's invoice indicated that he performed "college major generation" and "generation of all features except for the financials" while creating "first names, last names, emails, phone numbers" and "looking into whitepages."

Services Rendered:

| Date | Time In | Time Out | # Hours | Type | Description |
|---|---|---|---|---|---|
| 8/3/2021 | 14:15 | 15:05 | 0.833 | Data Science Services | Orientation video meeting with Charlie |
| 8/3/2021 | 15:30 | 17:30 | 2.000 | Data Science Services | generating features for projects 2-5 |
| 8/3/2021 | 20:55 | 21:10 | 0.250 | Data Science Services | college major generation |
| 8/3/2021 | 21:45 | 0:20 | 2.583 | Data Science Services | generation of all features except for the financials, zip code lookup fillin |
| 8/4/2021 | 9:15 | 13:05 | 3.833 | Data Science Services | first names, last names, emails, phone numbers, looking into whitepages, unique IDs |
| 8/4/2021 | 13:30 | 19:15 | 5.750 | Data Science Services | group II variables (tax return, financials) + zoom meeting for checkin |
| 8/4/2021 | 19:45 | 1:10 | 5.417 | Data Science Services | college codes and filling in missing states, recoding variables, double checking spreadsheet, on zoom chat |
| 8/5/2021 | 8:30 | 10:00 | 1.500 | Data Science Services | meeting to check over file, phone number validation, file uploading |

| | |
|---|---|
| Total Hours: | 22.17 |
| Hourly Rate: | $600 |
| Wage Subtotal: | $13,300.00 |
| Expenses Incurred: | $0.00 |
| Grand Total: | **$13,300.00** |

I pledge that this invoice is accurate.

**ANSWER:**  Paragraph 101 of the Complaint purports to characterize the contents of written documents, which speak for themselves.

102.    In response to the initial invoice, Javice demanded that he remove all the details admitting to how they had created fake customers – and added a $4,700 bonus. In an email to the Data Science Professor at 12:39 p.m. on August 5, 2021, Javice wrote: "send the invoice back at $18k and just one line item for data analysis." In total, Javice paid the Data Science Professor over $800 per hour for his work creating the Fake Customer List, which is 270% of his usual hourly rate.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 102 of the Complaint.  Portions of paragraph 102 of the Complaint purport to characterize the contents of written documents, which speak for themselves.

103.    The Data Science Professor provided Javice the revised invoice via email seven minutes later at 12:46 p.m., commenting "Wow. Thank you. Here is the new invoice."

Services Rendered:

| Item Type | Description | Quantity | Unit Price | Amount |  |
|---|---|---|---|---|---|
| Service | Data science services | 22.17 | $ 811.91 | $ 18,000.00 |  |

Expenses Incurred:       $0.00

Amount Due:       **$ 18,000.00**

I pledge that this invoice is accurate.

**ANSWER:**  Paragraph 103 of the Complaint purports to characterize the contents of written documents, which speak for themselves.

104.    Following the Data Science Professor's original work, in September 2021 and again in January 2022, Javice discussed with the Data Science Professor a full-time position with JPMC and Frank post-Merger. In other words, Javice offered to hire the Data Science Professor to the very company – JPMC – that Javice had defrauded.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 104 of the Complaint, except she admits that she discussed with the professor that he might pursue a full-time position with JPMC's data team.

105.    On August 5, 2021, at 10:08 a.m., Javice informed Acxiom that the Fake Customer List was uploaded to Acxiom via Acxiom's secure file transfer system.

**ANSWER**: Ms. Javice denies the allegations and characterizations in paragraph 105 of the Complaint.  Portions of paragraph 105 of the Complaint purport to characterize the contents of written documents, which speak for themselves.

106.    The data file that Javice directed the Data Science Professor to upload to Acxiom was the same Fake Customer List created by the Data Science Professor.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to who uploaded the file and therefore denies that allegation and the remaining allegations and characterizations in paragraph 106 of the Complaint.

107.    Email correspondence following Javice's submission of data to Acxiom confirms that the Fake Customer List was the Data Science Professor's work. At 11:05 a.m. on August 5, the Data Science Professor sent an email to Javice asking whether "they got the deliverable," presumably referring to Acxiom. Javice responded to the Data Science Professor via email at 11:09

a.m. stating that "[t]hey got it! I'll let you know if they have questions. Will wire today :)". At 11:11 a.m., the Data Science Professor sent an email to Javice asking "when are they due to tell [Javice] the results of the audit?"

**ANSWER:**  Paragraph 107 of the Complaint purports to characterize the contents of written documents, which speak for themselves.   "Fake Customer List" is Plaintiff's invented characterization, for which no response is required.

108.    In addition, the Data Science Professor's initial invoice to Javice reflects that, on August 5, 2021, he completed his work at 10:00 a.m., and that his final task was "file uploading." Javice informed Acxiom via email at 10:08 a.m. that the file had been uploaded, just eight minutes after the Data Science Professor's invoice shows he finished "file uploading."

**ANSWER:**  Paragraph 108 of the Complaint purports to characterize the contents of written documents, which speak for themselves.

109.    On August 5, 2021, at 11:39 a.m., Acxiom confirmed that it was able to decrypt and unzip the Frank customer data file. The number of records that Frank provided to Acxiom was 4,265,086 (including the header row); that number matches the number of unique customer accounts that Frank represented to JPMC during due diligence.

**ANSWER:**  Paragraph 109 of the Complaint purports to characterize the contents of written documents, which speak for themselves.

110.    Shortly thereafter, Acxiom provided Javice with its "data validation report." The report is an Excel spreadsheet with two tabs.

**ANSWER:**  Paragraph 110 of the Complaint purports to characterize the contents of written documents, which speak for themselves.

111.    The first tab contains information that Javice provided to JPMC and to Acxiom in the form of the Data Validation Request.

**ANSWER:**  Paragraph 111 of the Complaint purports to characterize the contents of written documents, which speak for themselves.

112.    The second tab contained the results of Acxiom's validation of the population of source data fields.

**ANSWER:**   Paragraph 112 of the Complaint purports to characterize the contents of written

documents, which speak for themselves.

113.   In an email on August 5, 2021 at 4:48 p.m., Javice authorized Acxiom to release
the report to JPMC, instructed Acxiom "[p]lease do not share additional background," and, once
the report went to JPMC, at 6:26 p.m., told Acxiom "[i]f you can delete the data that would be
appreciated."

**ANSWER:**   Paragraph 113 of the Complaint purports to characterize the contents of written

documents, which speak for themselves.

114.   Relying on the validation report that incorporated the Fake Customer List, the
corroborating information in the Acquisition Data Room, and Javice's statements, JPMC
concluded that Frank in fact had the number of customer accounts that Javice had represented
during the diligence process and therefore that JPMC would proceed with the Merger.

**ANSWER:**   Ms. Javice is without knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 114 of the Complaint and therefore denies them.

115.   At the time JPMC agreed to proceed with the Merger, it had no knowledge that the
Fake Customer List Frank provided to Acxiom consisted of synthetic data. JPMC's understanding
that Acxiom was validating actual customer account data, and reliance on the Fake Customer List
as actual customer account data, was reasonable considering:

   a.   Javice's reluctance to provide the data at all, citing purported privacy
        concerns;

   b.   JPMC's and Javice's agreement to use Acxiom so that Frank would not
        need to send actual customer account data to JPMC prior to the closing of
        the Merger;

   c.   Javice's execution of a non-disclosure agreement with Acxiom;

   d.   Javice's insistence that Acxiom delete the Fake Customer List immediately
        after Acxiom provided the report to JPMC; and

   e.   Javice's insistence on using a "unique ID" in lieu of email address and street
        address for the entries on the Fake Customer List.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 115 of the

Complaint.

116.   On August 8, 2021, the parties executed the Merger Agreement.

**ANSWER:**  Ms. Javice admits the allegations in paragraph 116 of the complaint.

117.    The Merger Agreement defines Frank's "Knowledge" as "the actual knowledge (after due and reasonable inquiry of their respective direct reports)" of Javice, Amar and the company's general counsel.

**ANSWER:**  Paragraph 117 of the Complaint purports to characterize the contents of written

documents, which speak for themselves.  To the extent that paragraph 117 states a legal conclusion,

no response is required.

118.    In the Merger Agreement, Javice and Amar caused Frank to provide false representations and warranties concerning Frank's business.

**ANSWER:**  Ms. Javice denies the allegations or characterizations in paragraph 118 of the

Complaint.

119.    For example, Javice and Amar caused Frank to represent in Section 3.5(b) of the Merger Agreement that "[t]o the knowledge of [Frank], there has been no Fraud with respect to any member of the Company Group that involves any of the management or other employees of any member of the Company Group or any claim or allegation regarding any of the foregoing."

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 119 of the

Complaint.  Portions of paragraph 119 of the Complaint contain a legal conclusion, for which no

response is required.  Portions of paragraph 119 of the Complaint purport to characterize the

contents of written documents, which speak for themselves.

120.    Javice and Amar knew that this representation was false when made and false at closing because Javice and Amar were members of management, and Javice worked with the Data Science Professor to create the Fake Customer List described in paragraphs 73 through 98.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 120 of the

Complaint.

121.    Similarly, Javice and Amar caused Frank to represent and warrant in Section 3.6(a) of the Merger Agreement that Frank "has conducted its business and operated its properties in the ordinary course of business consistent with past practice."

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 121 of the

Complaint.  Portions of paragraph 121 of the Complaint contain a legal conclusion, for which no

response is required.  Portions of paragraph 121 of the Complaint purport to characterize the contents of written documents, which speak for themselves.

122.    Javice and Amar knew that this representation was false and misleading at signing and closing. Upon information and belief, during the pre-signing period Javice simply reviewed Frank's actual customer account list containing no more than 300,000 names when she monitored Frank's performance in her role as Chief Executive Officer. Javice did not retain data science professors to create fake customers "in the ordinary course of business," nor did Javice and Amar purchase the names of customers with no prior relationship to Frank from marketing firms "in the ordinary course of business."

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 122 of the Complaint.  Portions of paragraph 122 contain a legal conclusion, for which no response is required.

123.    In Section 3.6(b) of the Merger Agreement, Javice and Amar caused Frank to represent and warrant that "there has not occurred any action or event that, had it occurred after the Agreement Date and on or prior to the Closing, would have been prohibited by" the operating covenants in Section 5.1. Those covenants include agreements that Frank shall:

   a.    "use its commercially reasonable efforts to carry on its business in all material respects in the ordinary course of business consistent with past practice" (Section 5.1(a)(i));

   b.    "use commercially reasonable efforts to maintain and preserve the . . . goodwill of the business" (Section 5.1(ii)); and

   c.    "comply in all material respects with all Laws applicable to the conduct of the business . . . and use of its assets and properties" (Section 5.1(iv)).

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 123 of the Complaint.  Portions of paragraph 123 of the Complaint contain a legal conclusion, for which no response is required.  Portions of paragraph 123 of the Complaint purport to characterize the contents of written documents, which speak for themselves.

124.    Javice and Amar knew that the representations and warranties in Section 3.6(b) of the Merger Agreement (incorporating the Section 5.1 covenants) were false at signing and at closing because Javice personally retained the Data Science Professor to create the Fake Customer List while Amar simultaneously acquired the ASL List. Creating fake customer data to induce a $175 million transaction is not "in the ordinary course," it is not "consistent with past practice," it

is not a "commercially reasonable effort" to maintain "goodwill," and it is not in compliance with "all Laws applicable to the business."

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 124 of the

Complaint.  The second sentence of this paragraph contains a legal conclusion, for which no

response is required.

125.    In Section 3.7 of the Merger Agreement, Javice and Amar caused Frank to represent that "during the past five (5) years [Frank] been, in material compliance with all Laws or Orders applicable to [Frank] or its business, properties or assets."

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 125 of the

Complaint.  For the portions of Paragraph 125 that state a legal conclusion, no response is required.

Paragraph 125 of the Complaint purports to characterize the contents of written documents, which

speak for themselves.

126.    The representation in Section 3.7 was knowingly false and misleading for the same reasons as the representation in Section 3.6(b) incorporating the covenant in Section 5.1(iv).

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 126 of the

Complaint.

127.    In Section 3.13 of the Merger Agreement, Javice and Amar caused Frank to represent and warrant that it had disclosed all Material Contracts, defined to include "any Contract requiring payments to the Company, or requiring payments by the Company, in either case in excess of $50,000."

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 127 of the

Complaint.  For the portions of Paragraph 127 that state a legal conclusion, no response is required.

Paragraph 127 of the Complaint purports to characterize the contents of written documents, which

speak for themselves.

128.    Javice and Amar knew that this representation was false at signing and closing because Frank did not disclose (a) its $105,000 agreement to purchase 4 million customer names from ASL, (b) its $70,000 agreement to purchase data matches from Enformion (as further described below); (c) its $18,000 agreement with the Data Science Professor to generate fake customer data to provide to JPMC; or (d) an open-ended contract with the Data Science Professor pursuant to which the Data Science Professor was paid no less than $20,000. As discussed below

36

in paragraphs 143 through 177, Javice again contracted with the Data Science Professor, with total payments to the Data Science Professor exceeding $50,000. Moreover, the ASL and the Data Science Professor agreements were part of a single course of conduct – the creation of fake customer data Javice and Amar used to induce JPMC to buy the Company – and therefore the amounts should be added together such that both were required to be disclosed under Section 3.13.[7]

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 128 and footnote

7 of the Complaint, except she admits that Frank agreed to pay $105,000 to ASL, $70,000 to

Enformion, and $18,000 to the data science professor for goods or services, and the $105,000 was

charged to a Frank credit card.

129.    Javice knowingly and intentionally caused Frank to fail to disclose the Data Science Professor, ASL, and Enformion agreements because such a disclosure would have revealed the truth behind the Fake Customer List.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 129 of the

Complaint.

130.    Finally, in Section 3.16(h) of the Merger Agreement, Javice and Amar caused Frank to represent and warrant that "[t]here has not been . . . a misuse or misappropriation of any Trade Secrets." Frank's actual customer list is a Trade Secret within the meaning of the Merger Agreement.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 130 of the

Complaint.  For the portions of Paragraph 130 that state a legal conclusion, no response is required.

Paragraph 130 of the Complaint purports to characterize the contents of written documents, which

speak for themselves.

131.    Javice and Amar directed the Data Science Professor to create fake customer data that inflated Frank's actual customer list by a factor of nearly 15 in order to induce JPMC to buy Frank for $175 million. This is a "misuse" of Frank's Trade Secrets and for that reason a knowing and intentional breach of Section 3.16(h).

---

[7]  Worse yet, Javice submitted the bill for her fraudulent activities to JPMC. The $105,000 she caused Frank to pay ASL was charged to a Frank credit card and listed as closing indebtedness in the acquisition Final Pre-Closing Statement. Pursuant to the Merger Agreement, JPMC paid all of Frank's closing indebtedness, including the payment to ASL Marketing for fake customers.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 131 of the Complaint.  For the portions of paragraph 131 that state a legal conclusion, no response is required.

132.    On September 14, 2021, the Merger closed.

**ANSWER:**  Ms. Javice admits the allegations in paragraph 132 of the Complaint.

133.    While Javice was working with the Data Science Professor in early August 2021, Amar contacted ASL to obtain the ASL List containing student data for 4.5 million college students.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the allegations in paragraph 133 of the Complaint and therefore denies them.

134.    On August 2, 2021, Amar communicated orally his initial request to ASL. In an email from ASL to Amar, ASL confirmed Amar's request: "You expressed an interest i[n] having ASL append data elements to your house file." Upon information and belief, "house file" refers to Frank's own internal customer list, which, on August 2, 2021, had no more than 300,000 customer accounts.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 134 of the Complaint and therefore denies them.  To the extent that paragraph 134 of the Complaint purports to characterize the contents of written documents, such documents speak for themselves.

135.    Amar responded to ASL by email at 3:30 p.m. on August 2, 2021 with a new request: "if we were looking at buying your list of students currently in college, how much would it cost?"

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 135 of the Complaint and therefore denies them.  To the extent that paragraph 135 of the Complaint purports to characterize the contents of written documents, such documents speak for themselves.

136.    Amar continued to correspond with ASL over the following days. Through this additional correspondence, Amar learned that ASL could sell Frank a list of data for 4.5 million college students for a cost of $105,000.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 136 of the Complaint and therefore denies them.  To the extent that paragraph 136 of the Complaint purports to characterize the contents of written documents, such documents speak for themselves.

137.    Amar and Javice would have had no reason to buy a list of 4.5 million college students if Frank actually <u>had</u> the number of customer accounts that Javice represented to JPMC and provided to Acxiom.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 137 of the Complaint.

138.    Regardless, on the morning of August 5, 2021 – the same day that Javice and the Data Science Professor were finalizing their fake data for submission to Acxiom – Amar pressured ASL to provide him with the ASL List that day. In an email sent at 10:57 a.m. from Amar to ASL, Amar agreed to a call, but asked, "can we make sure to close this today? We're rushed on this, so if you can prepare the lists of 4.5m (2.8m with emails and 1.7m without) as well as confirm pricing . . . that would be great. If we can't close this today, we will have to move forward with another vendor as we have limited time with this data scientist and time is ticking," referring to Javice's work with the Data Science Professor.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 138 of the Complaint and therefore denies them.  To the extent that paragraph 138 of the Complaint purports to characterize the contents of written documents, such documents speak for themselves.  To the extent that there are any remaining allegations and characterizations in this paragraph, Ms. Javice denies them.

139.    ASL responded at 11:31 a.m. that the price for the data was a flat rate of $105,000 and that it was "working on getting this out to you today." At 11:32 a.m., Amar approved the expense: "The price is good. The credit card authorization I sent you is for up to $150k so feel free to charge and make the FTP available after you do."

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 139 of the Complaint and therefore denies them.  To the extent that paragraph 139 of the Complaint purports to characterize the contents of written documents, such documents speak for themselves.

140.    At 11:58 a.m., ASL told Amar that "[t]he files are huge and will take a little while to process but we can definitely get them to you today." ASL then informed Amar that the exact count of the data containing email addresses was less than anticipated: "The exact count for the email addresses is 2,460,489 (short 339,511)[.] Would you like us to increase the records for the postal addresses?"

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 140 of the Complaint and therefore denies them.  To the extent that paragraph 140 of the Complaint purports to characterize the contents of written documents, such documents speak for themselves.

141.    Amar responded at 12:00 p.m., confirming that he wanted to increase the records that contained postal addresses: "I'd like the tots to be 4.5m so yes please."

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 141 of the Complaint and therefore denies them.  To the extent that paragraph 141 of the Complaint purports to characterize the contents of written documents, such documents speak for themselves.

142.    Amar received an "eDelivery Notification" from ASL on August 5, 2021 at 3:20 p.m. for each of the two requested files (email addresses and postal addresses). The notifications provided instructions for Amar to download the files and confirmed that Amar was receiving 2,460,489 records with postal addresses and 2,039,511 records with postal addresses and email addresses. ASL confirmed that the notifications were sent in a separate email to Amar at 3:25 p.m.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 142 of the Complaint and therefore denies them.  To the extent that paragraph 142 of the Complaint purports to characterize the contents of written documents, such documents speak for themselves.

143.    When Javice provided the Fake Customer List to Acxiom to "validate" that the number of Frank customer accounts were 4,265,086, she knew the data she provided for the purported customers, including email addresses presented as unique ID placeholders, were entirely made-up and would be of no use to JPMC after the Merger closed.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 143 of the Complaint.

144.    Javice also knew that Amar purchased the ASL List with 4.5 million real college students, albeit not Frank users. The ASL List, however, only contained 2,039,511 records with email addresses.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 144 of the Complaint.

145.    Javice knew at all relevant times that JPMC intended to market its products and services to both Frank's existing users and the student accounts Frank would acquire in the future and therefore that, at some point after closing of the Merger, JPMC would ask for the Frank customer data so that JPMC could begin marketing products and services to Frank users.

**ANSWER:**   Ms. Javice denies the allegations and characterizations of paragraph 145 of the Complaint.

146.    Upon information and belief, in anticipation of JPMC requesting the Frank customer data, Javice decided to acquire more email addresses to add to the ASL List, hoping to obtain the 4.265 million email addresses she told JPMC that Frank had.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 146 of the Complaint.

147.    Soon after submitting the Fake Customer List to Acxiom, Javice enlisted the Data Science Professor to aid with this second project.

**ANSWER:**   "Fake Customer List" is Plaintiff's invented characterization, for which no response is required.  Ms. Javice admits that she engaged the professor to work on a second data project. To the extent that there are any remaining allegations or characterizations in paragraph 147 of the Complaint, Ms. Javice denies them.

148.    On August 6, 2021 at 11:02 a.m., the Data Science Professor wrote to Javice that although they "agreed not to start until Monday," he is "thinking about scope." Javice responded to the Data Science Professor three minutes later, telling the Data Science Professor for the "# of names/addresses you wish to match to phone numbers," it would be "over 1M."

**ANSWER:**   Paragraph 148 of the Complaint purports to characterize the contents of written documents, which speak for themselves.

149.    Ultimately, Javice presented to the Data Science Professor the ASL List of 4.5 million college students and told him that she wanted to "augment" that list. Upon information and

41

belief, Javice represented to the Data Science Professor that the 4.5 million college students on the list were actual Frank accounts. Javice directed the Data Science professor to find a company that could "augment" the list with additional information, including phone numbers, dates of birth, and email addresses.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 149 of the

Complaint, except she admits that she asked the professor to append data to the ASL list.

150.    The Data Science Professor contacted at least two companies: Acxiom, the company that conducted the due diligence on the Fake Customer List, and Enformion, a data technology and repository company.

**ANSWER:**  "Fake Customer List" is Plaintiff's invented characterization, for which no response

is required.  Ms. Javice admits that, to the best of her knowledge and belief, the professor contacted

two companies.

151.    On August 9, 2021, the Data Science Professor updated Javice on his outreach to Acxiom and Enformion. He stated that "I emailed Axciom [sic] customer support and they wrote back and wish to know what company I work for. I imagine that's now 'JP Morgan'?"

**ANSWER:**  Paragraph 151 of the Complaint purports to characterize the contents of written

documents, which speak for themselves.

152.    Six minutes later, Javice responded, telling the Data Science Professor that they "cannot use JPM (not closed yet – 30days)" and asking the Data Science Professor whether he has "an LLC for consulting." The Data Science Professor responded that evening that he did not have an LLC, and so, the next day, Javice told the Data Science Professor that he can "try Frank or a Prof a[t] [a university] on a research project and see what happens."

**ANSWER:**  Paragraph 152 of the Complaint purports to characterize the contents of written

documents, which speak for themselves.

153.    Also on August 10, 2021, the Data Science Professor spoke with a sales representative from Enformion, who told the Data Science Professor he could "upload a CSV of all 2 million names and addresses and they have 24hr turnaround." The Data Science Professor told Javice that he was "between [Enformion] and Acxiom" in terms of who he would select as the vendor for the data.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the

truth of the allegations and characterizations in the first sentence of paragraph 153 of the Complaint

and therefore denies them.  The second sentence of the paragraph purports to characterize the contents of written documents, which speak for themselves.

154.    Later on August 10, the Data Science Professor informed Javice that, to proceed with Enformion, the Data Science Professor would need to fill out a "Data Test Order Form," noting that "[e]very legit company is going to want something like this. And some sort of NDA or other legally protective document."

**ANSWER:**  Paragraph 154 of the Complaint purports to characterize the contents of written documents, which speak for themselves.

155.    Javice instructed the Data Science Professor to ask Enformion to "send an NDA back / something so that we know anything provided will be destroyed after." The Data Science Professor relayed the request to Enformion and then reported back to Javice the same day: "Now the salesman is asking for the purpose of our project in order to make a quote. I can say 'we can't disclose, make a quote anyway' or I can say something plain like 'reconciliation of a customer database for due diligence.'"

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations and characterizations regarding the professor's communications with Enformion and therefore she denies them.  To the extent that paragraph 155 of the Complaint purports to characterize the contents of written documents, such documents speak for themselves.

156.    Minutes later, Javice directed the Data Science Professor to tell Enformion that "[d]ata augmentation – 'enrich your contacts' is the right one."

**ANSWER:**  Paragraph 156 of the Complaint purports to characterize the contents of written documents, which speak for themselves.

157.    Meanwhile, progress with Acxiom stalled. The Data Science Professor updated Javice on August 11, 2021: "So [Acxiom] wouldn't even talk to me because I couldn't answer questions about who I worked for or the intended purposes of the data." Javice responded and suggested telling Acxiom "[w]e are augmenting our contacts to be able to merge our old data with new data." The Data Science Professor relayed this information to Acxiom that same day, but reported to Javice, "[y]eah that didn't fly with them." Javice then told the Data Science Professor to "start with [Enformion] and see if they can get us a new price for up to 5M records. We can do [Acxiom] as the back up."

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations and characterizations regarding the Data Science Professor's

communications with Acxiom and therefore she denies them.  To the extent that paragraph 157 of the Complaint purports to characterize the contents of written documents, such documents speak for themselves.

158.    Javice executed an NDA with Enformion. After lengthy discussions over pricing, on August 23, the Data Science Professor provided Enformion with data that Javice wished to augment. That data, however, was – again – not Frank's actual customer data. It was the ASL List Amar previously purchased.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the first sentence of paragraph 158 of the Complaint and therefore she denies it.  She denies the remaining allegations in paragraph 158 of the Complaint, except she admits that the ASL list was augmented with data from Enformion.

159.    The next day, the Data Science Professor updated Javice, explaining that Enformion could not "process the 4M record file because their system only handles 250,000 per batch. I said that's fine just cut the file into 8 or 9 pieces and paste them together at the end. They said they cannot do processing on their end and want me to do it. So I'll do it tonight and send it back to them." The Data Science Professor confirmed to Javice on August 25 that he "sent the files (all 17 of them)."

**ANSWER:**  Paragraph 159 of the Complaint purports to characterize the contents of written documents, which speak for themselves.

160.    After receiving the data, Enformion ran the ASL List through its databases in an attempt to find matching additional data, including email addresses. Enformion then provided those matches to the Data Science Professor.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations and characterizations in paragraph 160 of the Complaint and therefore denies them.

161.    Upon information and belief, Javice and the Data Science Professor's first request to Enformion was to provide email addresses based on the existing full names and addresses, but that provided a limited number of matches. Upon information and belief, Javice decided to instruct Enformion to match against just last names and addresses, which could generate email addresses of siblings, parents, and other family members of the individual on the ASL List, even if the email affiliated with the exact individual on the ASL List could not be found.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in the first sentence of paragraph 161 of the Complaint.  She admits the allegations in the second sentence.

162.     Ultimately, Javice and the Data Science Professor obtained at least one email address for approximately 1.9 million of the 4.5 million individuals on the ASL List from Enformion.

**ANSWER:**   Ms. Javice is without knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 162 of the Complaint and therefore denies them.

163.     Upon information and belief, Javice intended to use those additional email addresses for the anticipated JPMC request for Frank's customer data.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 163 of the Complaint.

164.     In January 2022, after JPMC acquired Frank, JPMC began work on a marketing campaign to test the quality of Frank's customer account list and the receptiveness of these customers to JPMC's products and services. To facilitate this marketing campaign, JPMC asked Javice and Amar to provide Frank's user list so that JPMC could send the marketing test by email. JPMC sent the request on January 6 and requested that the list be transferred by January 10.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 164 of the Complaint, except she admits that on January 6 Plaintiff requested Frank transfer its user list..

165.     This should have been a simple exercise. JPMC assumed that Javice or Amar simply would upload the list previously provided to Acxiom, which Javice had represented contained Frank's 4.265 million unique customer accounts. But Javice and Amar could not provide the Fake Customer List because the individuals on that list did not exist.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 165 of the Complaint.  She is without knowledge or information sufficient to form a belief as to the truth of the allegations and characterizations regarding JPMC's assumptions and therefore denies them.

166.     Moreover, the Fake Customer List did not include actual email addresses, only a unique ID placeholder, because, per the Data Science Professor, creating fake email addresses would have looked obviously fake. As a result, Javice and Amar could not turn over the Fake Customer List because they did not have any email addresses – and certainly not any <u>real</u> email addresses – for the "synthetic" customers on the Fake Customer List.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 166 of the Complaint, except she admits that the synthetic data file that Frank provided to Plaintiff upon Plaintiff's request did not contain any email addresses, whether real or synthetic.

167.    Amar responded that he is "not sure we'll make Monday's deadline" owing to the fact that the engineering team was purportedly "bogged down in fixing a critical issue in processing financial aid applications."

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 167 of the Complaint and therefore denies them.  To the extent that paragraph 167 of the Complaint purports to characterize the contents of written documents, such documents speak for themselves.

168.    Later communications confirm that Amar lied and that the engineering team was not occupied fixing a critical issue. A JPMC executive responsible for integrating Frank into JPMC forwarded Amar's email to a JPMC Executive Director of Digital Technology, at 11:17 a.m. She wrote to the Executive Director, "Do you know what the tech issue is with Frank? Is it reported somewhere?" The Executive Director appeared unaware of any issue as he forwarded the email request to a JPMC Software Engineer, at 11:23 a.m. asking, "Got insight for highlighted below?" The Software Engineer also appears unaware, as he forwarded the email once again to Frank's Director of Engineering.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 168 of the Complaint and therefore denies them.

169.    Frank eventually transferred a user list on January 21, 2021, nearly <u>three weeks</u> after the original request.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 169 of the Complaint and therefore denies them.

170.    That list, however, did not contain <u>any</u> of Frank's actual customer accounts. Not a <u>single</u> customer account.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 170 of the Complaint and therefore denies them.

171.    Instead, the list was a subset of data that Amar purchased from ASL on August 5, 2021, as discussed above in paragraphs 133 through 142.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 171 of the Complaint.

172.    In other words, every entry on the list transferred to JPMC for its marketing campaign on January 21, 2022 was included on and taken from the ASL List Amar purchased in August 2021, a list that was not created from Frank customers.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 172 of the Complaint and therefore denies them.

173.    JPMC first noticed irregularities with the list when a JPMC employee observed that the list contained exactly 1,048,576 rows, the maximum permitted by Microsoft Excel. That number also did not correspond to any number of customer accounts previously identified by Javice or others at Frank for any given time period.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 173 of the Complaint and therefore denies them.

174.    JPMC raised this issue with individuals at Frank. A member of the marketing team at JPMC wrote an email to Javice and another Frank employee stating: "I can also confirm that there are 1,048,575 records, plus the header row. One observation – 1,048,576 (total including header) is the maximum # of rows allowed in Microsoft Excel – can we be sure that this is just a coincidence, or maybe there is some data truncation after that row?"

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 174 of the Complaint and therefore denies them.  Portions of paragraph 174 of the Complaint purport to characterize the contents of written documents, which speak for themselves.

175.    On January 24, 2021, a Frank engineer responded to the Chase Retail Marketing team member, stating that "[w]e look[ed] into the issue with first file we sent. The marketing team wanted me to upload another file for you     From what I understand, this file is additive to the previous file. These are our FAFSA application specific users." This "additive" file contained the significantly smaller population data for approximately 135,000 individuals.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 175 of the Complaint and therefore denies them.  Portions of

paragraph 175 of the Complaint purport to characterize the contents of written documents, which speak for themselves.

176.    Shortly after the second file was transferred, the Frank engineer who provided the "additive" list raised issues internally with the source of the files. The engineer noted that, while the second file contained information from Frank's "FAFSA application database," the engineer was "not sure about the source of the data" in the first file.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 176 of the Complaint and therefore denies them.  Portions of paragraph 176 of the Complaint purport to characterize the contents of written documents, which speak for themselves.

177.    Following receipt of the lists from Frank on January 21 and January 24, JPMC continued to have concerns over the contents of the lists and continued to work with Frank employees to understand the origin of those lists. Ultimately, Frank provided JPMC yet another list to use in the marketing campaign, but this list also contained no genuine Frank customers. Instead, this list was a version of the modified ASL List uploaded on January 21 with email addresses added from the data Frank purchased from Enformion. As noted above, JPMC's ability to market and sell its products and services to the Frank customer base was a key financial driver of the transaction.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 177 of the Complaint.  She is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph related to Plaintiff's beliefs or concerns and therefore denies them.

178.    The marketing campaign was a disaster. JPMC reached out via email to a random sample of the list Frank provided – approximately 400,000 purported customers of Frank – with offers to open Chase checking or savings accounts. Of those 400,000, only 103 even clicked through to Frank's website.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 178 of the Complaint and therefore denies them.

179.    That response rate is a markedly poor return for a typical JPMC marketing campaign. In hindsight, of course, these results are not surprising given that the data Frank provided to JPMC was purchased data from ASL and Enformion, not genuine user data Frank acquired from the customers who created accounts on its website.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 179 of the Complaint.  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph  179 of the Complaint related to Plaintiff's typical campaigns and therefore denies them.

180.    In June 2022, JPMC initiated a comprehensive investigation into Frank and the Merger. That investigation revealed the facts alleged in this Complaint. JPMC has all the emails showing the fraud because Javice and Amar used Frank's email accounts to create the Fake Customer List and the email accounts now belong to JPMC following the Merger

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 180 of the Complaint, except she admits that Plaintiff gained possession, custody or control of Frank's emails.

181.    Based on that investigation, JPMC placed Javice and Amar on administrative leave and, after further investigation, terminated them for cause.

**ANSWER:**   Ms. Javice denies that Plaintiff's actions against her were "based on" the investigation.  Ms. Javice admits that Plaintiff placed her on administrative leave and terminated her purportedly for cause.  To the best of her knowledge and belief, she admits that Plaintiff also placed Mr. Amar on administrative leave and terminated him purportedly for cause.

## DAMAGES

182.    JPMC paid $175 million to acquire Frank relying on: (a) Javice's repeated representations that Frank had more than 4.25 million customers; and (b) the representations and warranties in the Merger Agreement described in paragraphs 116 through 132 above.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 182 of the Complaint, except she admits that Plaintiff paid $175 million to acquire Frank.  Portions of paragraph 182 of the Complaint state a legal conclusion for which no response is required.  To the extent that paragraph 182 purports to characterize the contents of written documents, including the Merger Agreement, such documents speak for themselves.

183.    In JPMC's view, the 4.265 million purported customer accounts were the foundation for the deal: those 4.265 million customer accounts demonstrated Frank's momentum, growth, the scale of what Frank had accomplished and what Frank would accomplish going forward in the college-student market segment. Frank's list of actual customer accounts totaling 300,000 indicates that Frank's momentum, growth, and accomplishments were far smaller than JPMC had believed based on Frank's material representations about its purported 4.25 million customer accounts. If JPMC had known that Frank had fewer than 300,000 customer accounts, it would not have acquired Frank.

**ANSWER:**    Ms. Javice denies the allegations and characterizations in paragraph 183 of the

Complaint.  For the portions of Paragraph 183 that state a legal conclusion, no response is required.

184.    In addition, JPMC decided to enter into the Merger Agreement because it believed that, over the 10-year period following the closing, JPMC would be able to generate hundreds of millions of dollars in revenue by selling checking accounts, savings accounts, and credit cards to Frank's existing and future customer base. A core component of that analysis, however, was the purported fact that Frank had 4.265 million existing customers at the time of acquisition. Given Frank's actual customer base was only a small fraction of 4.265 million, JPMC will not be able to market its products and services to those individuals, and the bargained-for revenue stream will not materialize.

**ANSWER:**    Ms. Javice denies the allegations and characterizations in paragraph 184 of the

Complaint.  She is without knowledge or information sufficient to form a belief as to the truth of

the allegations regarding Plaintiff's decision to enter into the Merger Agreement and therefore

denies them.

185.    As a result, JPMC was damaged by reason of Javice's, Amar's, and Frank's misrepresentations.

**ANSWER:**    Ms. Javice denies the allegations and characterizations in paragraph 185 of the

Complaint.  For the portions of Paragraph 185 that state a legal conclusion, no response is required.

## CAUSES OF ACTION

### COUNT I
### (Securities Fraud under Section 10(b) and Rule 10b-5)

186.    JPMC hereby incorporates paragraphs 1 through 185 by reference, as if set forth fully herein.

**ANSWER:**  Ms. Javice repeats her responses to paragraphs 1 through 185 and incorporates them

herein by reference.

187.    Section 10(b) of the Securities Exchange Act of 1934 provides that it "shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

**ANSWER:**  For the portions of paragraph 187 of the Complaint that state a legal conclusion, no

response is required.  The text of the Securities Exchange Act of 1934 speaks for itself.

188.    Rule 10b-5 adopted by the U.S. Securities and Exchange Commission provides that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, [all] in connection with the purchase or sale of any security."

**ANSWER:**  For the portions of paragraph 188 of the Complaint that state a legal conclusion, no

response is required.  The text of the Securities Exchange Act of 1934 and Rule 10b-5 as adopted

by the U.S. Securities and Exchange Commission speak for themselves.

189.    Javice created or directed the creation of the Fake Customer List and used it to induce JPMC to purchase Frank for $175 million, caused Frank to make knowingly false representations and warranties in the Merger Agreement, and used the modified ASL List to conceal her fraudulent misconduct.

**ANSWER:**  Ms. Javice denies the allegations or characterizations in paragraph 189 of the

Complaint.  For the portions of paragraph 189 of the Complaint that state a legal conclusion, no

response is required.

190.    Amar caused Frank to acquire the ASL List with the intent of using it directly or indirectly either as a fake customer list to provide to JPMC to cover-up that Frank did not have over 4 million customer for JPMC to market its products and services to, or to induce JPMC to purchase Frank for $175 million.

**ANSWER:**  Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 190 of the Complaint and therefore denies them. For the portions of paragraph 190 of the Complaint that state a legal conclusion, no response is required.

191.    Through the conduct alleged herein, Javice and Amar, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, and engaged and participated in a continuous course of conduct to fraudulently create and/or conceal material information.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 191 of the Complaint.  For the portions of paragraph 191 that state a legal conclusion, no response is required.

192.    Through the conduct alleged herein, Javice and Amar: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon JPMC, all in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 192 of the Complaint.  For the portions of paragraph 192 of the Complaint that state a legal conclusion, no response is required.

193.    The misconduct by Javice and Amar was in connection with the purchase or sale of securities because JPMC directly or indirectly acquired ownership of all of Frank's issued and outstanding stock as a result of the Merger Agreement. The transaction was accomplished through a reverse triangular merger through which Finland Sub, Inc. merged into Frank (with Frank as the surviving corporation) and shares of Finland Sub, Inc. were converted into shares of common stock of Frank, which were issued to Finland Sub's parent JPMC, which purchased securities of Frank through the merger.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 193 of the Complaint.  For the portions of paragraph 193 of the Complaint that state a legal conclusion, no response is required.  The Merger Agreement and related documents speak for themselves.

194.    JPMC was deceived into paying $175 million for Frank by the devices, schemes or artifices to defraud that Javice and Amar deployed.

**ANSWER:** Ms. Javice denies the allegations and characterizations in paragraph 194 of the Complaint. For the portions of paragraph 194 of the Complaint that state a legal conclusion, no response is required.

195. In acquiring Frank, JPMC reasonably and justifiably relied on the knowingly false representations that Javice made in the diligence process and which Javice and Amar caused Frank to make in the Merger Agreement.

**ANSWER:** Ms. Javice denies the allegations and characterizations in paragraph 195 of the Complaint. For the portions of Paragraph 195 that state a legal conclusion, no response is required. The Merger Agreement and related documents speak for themselves.

196. The misconduct by Javice and Amar caused JPMC to pay an artificially inflated $175 million purchase price for Frank's stock and directly and proximately damaged JPMC in an amount to be determined at trial.

**ANSWER:** Ms. Javice denies the allegations and characterizations in paragraph 196 of the Complaint. For the portions of paragraph 196 that state a legal conclusion, no response is required.

### COUNT II
### (Control Person Violation under Section 20(a))

197. JPMC hereby incorporates paragraphs 1 through 196 by reference, as if set forth fully herein.

**ANSWER:** Ms. Javice repeats her responses to paragraphs 1 through 196 and incorporates them herein by reference.

198. Javice and Amar acted as controlling persons of Frank within the meaning of Section 20(a) of the Exchange Act. Javice was the founder of the Company, Chief Executive Officer, a member of the Board of Directors, and substantial stockholder. Amar was the Chief Growth Officer and the second-most senior executive at Frank.

**ANSWER:** For the portions of paragraph 198 of the Complaint that state a legal conclusion, no response is required. Ms. Javice admits that prior to the Merger she was the Chief Executive Officer of Frank, a member of the Board, and a stockholder, and Mr. Amar was the Chief Growth Officer at Frank.

199.    By and through their control positions, Javice and Amar caused Frank to make knowingly false representations and warranties to JPMC in the Merger Agreement including, but not limited to, the representations and warranties made in Sections 3.5(b), 3.6(a)-(b), 3.7, 3.13, and 3.16(h). In doing so, Javice and Amar caused Frank to violate Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 199 of the Complaint.  For the portions of paragraph 199 of the Complaint that state a legal conclusion, no response is required.  The Merger Agreement speaks for itself.

200.    JPMC reasonably and justifiably relied on those false representations and warranties in entering into the Merger Agreement and in agreeing to pay $175 million to acquire Frank.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 200 of the Complaint.  For the portions of paragraph 200 of the Complaint that state a legal conclusion, no response is required.  The Merger Agreement speaks for itself.

201.    As a direct and proximate result of Javice's and Amar's wrongful conduct, JPMC suffered damages in connection with its purchase of Frank in an amount to be determined at trial.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 201 of the Complaint.  For the portions of paragraph 201 of the Complaint that state a legal conclusion, no response is required.

## COUNT III
### (Fraud Within the Contract)

202.    JPMC hereby incorporates paragraphs 1 through 201 by reference, as if set forth fully herein.

**ANSWER:**  Ms. Javice repeats her responses to paragraphs 1 through 201 and incorporates them herein by reference.

203.    As set forth above, each of Javice and Amar caused Frank to make numerous false representations and warranties in the Merger Agreement, including, but not limited to, the representations and warranties made in Sections 3.5(b), 3.6(a)-(b), 3.7, 3.13, and 3.16(h).

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 203 of the

Complaint.  For the portions of paragraph 203 of the Complaint that state a legal conclusion, no

response is required.  The Merger Agreement speaks for itself.

204.     Javice and Amar caused Frank to make these misrepresentations to JPMC with actual knowledge of their falsity. Javice created or directed the creation of the Fake Customer List and used it to induce JPMC to purchase Frank for $175 million, caused Frank to make knowingly false representations and warranties in the Merger Agreement, and used the ASL List as modified to conceal her misconduct. Amar caused Frank to acquire the ASL List with the intent of using it directly or indirectly to induce JPMC to purchase Frank for $175 million, caused Frank to make knowingly false representations and warranties in the Merger Agreement, and used the ASL List as modified to conceal his misconduct.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 204 of the

Complaint.  For the portions of Paragraph 204 that state a legal conclusion, no response is required.

205.     Javice and Amar were the senior-most executives at Frank – Chief Executive Officer and Chief Growth Officer. By virtue of their positions of authority and control, Javice and Amar had the ability to, and did in fact, control the contents of the Merger Agreement, including in particular the contents of the representations and warranties made by Frank.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 205 of the

Complaint, except she admits that Ms. Javice and Mr. Amar held the titles of Chief Executive

Office and Chief Growth Officer, respectively.  For the portions of paragraph 205 of the Complaint

that state a legal conclusion, no response is required.

206.     Javice's and Amar's misrepresentations were made with the intent to, and did in fact, induce JPMC to buy Frank at an inflated price and on terms favorable to Frank and its investors, and so that Javice and Amar specifically would receive substantial personal compensation.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 206 of the

Complaint.  For the portions of paragraph 206 of the Complaint that state a legal conclusion, no

response is required.

207.     JPMC reasonably and justifiably relied on the representations and warranties that Javice and Amar caused Frank to make in the Merger Agreement.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 207 of the Complaint.  For the portions of paragraph 207 that state a legal conclusion, no response is required. The Merger Agreement speaks for itself.

208.    As a result of this reliance, JPMC sustained losses and seeks rescission, restitution, or damages in an amount to be determined at trial.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 208 of the Complaint.  For the portions of Paragraph 208 that state a legal conclusion, no response is required.

## COUNT IV
### (Fraudulent Concealment)

209.    JPMC hereby incorporates paragraphs 1 through 208 by reference, as if set forth fully herein.

**ANSWER:**   Ms. Javice repeats her responses to paragraphs 1 through 208 and incorporates them herein by reference.

210.    During the diligence process, JPMC attempted to determine the actual number of Frank's customer accounts.

**ANSWER:**   Ms. Javice is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 210 of the Complaint and therefore denies them.

211.    Rather than provide JPMC with Frank's actual customer account list, Javice and Amar took steps to hide and conceal the actual customer account list.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 211 of the Complaint.

212.    Javice provided JPMC with the Fake Customer List in response to JPMC's request for Frank's actual customer account list.

**ANSWER:**   Ms. Javice does not adopt Plaintiff's invented term "Fake Customer List," and otherwise denies the allegations and characterizations in paragraph 212 of the Complaint.

213.    Javice used "synthetic data" techniques to create the Fake Customer List and make it look like Frank's actual customer account list.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 213 of the Complaint, except she admits that Plaintiff requested synthetic data and Frank used "synthetic data" techniques to fulfill the request.

214.    The ASL List was acquired by Amar and later modified with additional email addresses from Enformion, and provided to JPMC by Javice to prevent JPMC from discovering that it had been induced to buy Frank for $175 million based on the Fake Customer List.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 214 of the Complaint, except she admits that, to the best of her knowledge and belief, Mr. Amar acquired a student marketing list from ASL that later had data appended from Enformion.

215.    Had JPMC been provided with the true customer account list, it would not have signed and closed the transaction and/or it would have paid a substantially lower purchase price.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 215 of the Complaint and therefore denies them.  For the portions of paragraph 215 of the Complaint that state a legal conclusion, no response is required.

216.    As a result of this reliance, JPMC sustained losses and seeks rescission, restitution, or damages in an amount to be determined at trial.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 216 of the Complaint.  For the portions of paragraph 216 of the Complaint that state a legal conclusion, no response is required.

**COUNT V**
**(Conspiracy to Commit Fraud)**

217.    JPMC hereby incorporates paragraphs 1 through 216 by reference, as if set forth fully herein.

**ANSWER:**  Ms. Javice repeats her responses to paragraphs 1 through 216 and incorporates them herein by reference.

218.    Javice and Amar agreed to and did in fact work together to defraud JPMC into signing and closing the Merger and acquire Frank for a purchase price that did not reflect its real or actual value.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 218 of the Complaint.  For the portions of paragraph 218 that state a legal conclusion, no response is required.

219.    Javice and Amar committed the overt acts described above in furtherance of their conspiracy.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 219 of the Complaint.  For the portions of paragraph 219 of the Complaint that state a legal conclusion, no response is required.

220.    As a result of Javice's and Amar's conduct, JPMC sustained losses and seeks rescission, restitution, or damages in an amount to be determined at trial.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 220 of the Complaint.  For the portions of paragraph 220 that state a legal conclusion, no response is required.

## COUNT VI
### (Aiding and Abetting Fraud)

221.    JPM hereby incorporates paragraphs 1 through 220 by reference, as if set forth fully herein.

**ANSWER:**  Ms. Javice repeats her responses to paragraphs 1 through 220 and incorporates them herein by reference.

222.    As set forth above, Javice and Amar aided and abetted one another and Frank in making intentionally and knowingly false representations and warranties concerning Frank and its business.

**ANSWER:**  Ms. Javice denies the allegations and characterizations in paragraph 222 of the Complaint.  For the portions of paragraph 222 that state a legal conclusion, no response is required.

223.    Javice and Amar engaged in this conduct with actual knowledge that the representations that they made and caused Frank to make to JPMC were false and misleading.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 223 of the Complaint.  For the portions of paragraph 223 that state a legal conclusion, no response is required.

224.    Javice's and Amar's conduct was intended to, and did in fact, induce JPMC to buy Frank at an inflated price and on terms favorable to Frank's investors, including Javice and Amar. Each of Javice and Amar provided substantial assistance in furtherance of the scheme to defraud JPMC, including by misrepresenting and concealing Frank's actual customer account list.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 224 of the Complaint.  For the portions of paragraph 224 of the Complaint that state a legal conclusion, no response is required.

225.    JPMC reasonably and justifiably relied on the information Javice and Amar provided and the misrepresentations they caused Frank to make when JPMC purchased Frank at an inflated price not supported by Frank's actual performance and customer base.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 225 of the Complaint.  For the portions of paragraph 225 of the Complaint that state a legal conclusion, no response is required.  The Merger Agreement speaks for itself.

226.    As a result of this reliance, JPMC sustained losses and seeks rescission, restitution, or damages in an amount to be determined at trial.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 226 of the Complaint.  For the portions of paragraph 226 of the Complaint that state a legal conclusion, no response is required.

### COUNT VII
### (Unjust Enrichment)

227.    JPMC hereby incorporates paragraphs 1 through 226 by reference, as if set forth fully herein.

**ANSWER:**   Ms. Javice repeats her responses to paragraphs 1 through 226 and incorporates them herein by reference.

228.    As set forth above, Javice and Amar made and caused Frank to make numerous false representations and warranties concerning Frank's actual customer account list and other business operations.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 228 of the Complaint.  For the portions of paragraph 228 of the Complaint that state a legal conclusion, no response is required.

229.    Javice and Amar made these misrepresentations and caused Frank to make these misrepresentations to JPMC with knowledge of their falsity, with the intent to induce JPMC to buy Frank at an inflated price and on terms favorable to Frank's investors, including Javice and Amar.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 229 of the Complaint.  For the portions of paragraph 229 of the Complaint that state a legal conclusion, no response is required.

230.    JPMC reasonably and justifiably relied on the information Javice and Amar provided and the misrepresentations Javice and Amar made when JPMC purchased the Company for the artificially inflated purchase price of $175 million.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 230 of the Complaint.  For the portions of paragraph 230 of the Complaint that state a legal conclusion, no response is required.  Moreover, the Merger Agreement speaks for itself.

231.    Javice and Amar were each unjustly enriched by receiving proceeds of the sale, directly or indirectly, that JPMC was induced to enter through fraud and misconduct. Together, Javice and Amar received a total of approximately $26 million (account for the approximately

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 231 of the Complaint, except she admits that Plaintiff withheld a portion of her merger consideration.  She is without knowledge or information sufficient to form a belief as to the precise merger consideration that Mr. Amar received.  For the portions of paragraph 231 of the Complaint that state a legal conclusion, no response is required.

232.    Javice directed that portions of the merger proceeds that would have been payable directly to her instead be paid to the Javice Trusts for tax planning reasons. The Javice Trusts are alter egos of Javice and, on information and belief, do not serve any purpose other than to hold merger proceeds derived from Javice's fraud.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 232 of the Complaint, except she admits that portions of the merger proceeds are held in trusts.  For the portions of paragraph 232 of the Complaint that state a legal conclusion, no response is required.

233.    As a result of Defendants' conduct, JPMC suffered losses and seeks rescission, restitution, or damages in an amount to be determined at trial.

**ANSWER:**   Ms. Javice denies the allegations and characterizations in paragraph 233 of the Complaint.  For the portions of paragraph 233 of the Complaint that state a legal conclusion, no response is required.

## PLAINTIFF'S PRAYER FOR RELIEF

Ms. Javice denies that Plaintiff is entitled to the requested relief, or any relief, against her, and Ms. Javice requests that the Court dismiss all claims against her with prejudice and order such further relief as the Court deems just and proper.

## AFFIRMATIVE DEFENSES

Ms. Javice asserts the following affirmative defenses as to each claim alleged in the Complaint, without assuming the burden of proof or persuasion where such burden falls on Plaintiff.  Ms. Javice reserves the right to supplement, amend, modify, and/or withdraw her defenses as discovery progresses or as justice may require.  She reserves the right to add any affirmative defenses asserted by any other defendant in this case or in a related case.  Without limitation, Ms. Javice reserves the right to assert any additional defenses or third-party claims not asserted herein of which she becomes aware through discovery or investigation.

### First Affirmative Defense
### (Failure To State A Claim)

Plaintiff's claims are barred, in whole or in part, because the Complaint fails to state a claim upon which relief may be granted.

### Second Affirmative Defense
**(Merger Agreement and Related Governing Documents)**

Plaintiff's claims are barred, in whole or in part, by the terms of the Merger Agreement and any governing documents.

### Third Affirmative Defense
**(Merger Agreement and Related Governing Documents)**

Plaintiff is not entitled to the relief it seeks under the Merger Agreement or under any governing document.

### Fourth Affirmative Defense
**(No Personal Liability)**

The Merger Agreement and other applicable documents do not provide Plaintiff with the rights or means of recovering the damages it seeks, in whole or in part, from Ms. Javice.

### Fifth Affirmative Defense
**(Lack of Causation)**

Any alleged injury of damages suffered by Plaintiff was caused in whole or in part by the acts or omissions of others for whose conduct Ms. Javice was not responsible, were the result of pre-existing or intervening or superseding events, factors, occurrences, or conditions, which were not caused by Ms. Javice and for which she is not liable, and were not proximately caused by any acts or omissions by her.

### Sixth Affirmative Defense
**(Plaintiff's Own Conduct)**

Plaintiff's claims are barred, in whole or in part, because any alleged injuries that Plaintiff allegedly suffered were caused by its own conduct.

## Seventh Affirmative Defense
### (No False Statements)

Plaintiff's claims are barred, in whole or in part, by the Complaint's failure to identify any false or misleading statement by Ms. Javice.

## Eighth Affirmative Defense
### (No Scienter)

Plaintiff's claims are barred, in whole or in part, because Ms. Javice did not know, was not reckless in not knowing, and could not have known any alleged untruths or omissions in the alleged false and misleading statements.

## Ninth Affirmative Defense
### (No Materiality)

Plaintiff's claims are barred, in whole or in part, because any alleged false or misleading statements were not material.

## Tenth Affirmative Defense
### (Unclean Hands)

Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands, as further set forth in Ms. Javice's Counterclaims.

## Eleventh Affirmative Defense
### (Failure To Mitigate)

Plaintiff's claims, or recovery thereon, are barred, in whole or in part, because and/or to the extent that Plaintiff failed to mitigate its alleged damages.

### Twelfth Affirmative Defense
**(No Damages)**

Plaintiff's claims are barred, in whole or in part, because it has suffered no injury or damages, and/or there has been no damage in any amount, manner or at all by reason of any act alleged against Ms. Javice in the Complaint.

### Thirteenth Affirmative Defense
**(Speculative Damages)**

Plaintiff's claims are barred, in whole or in part, because its purported damages are unduly speculative.

### Fourteenth Affirmative Defense
**(Unenforceable Penalty)**

Plaintiff's claims are barred, in whole or in part, because the damages it seeks would constitute an unenforceable penalty.

### Fifteenth Affirmative Defense
**(Setoff and Recoupment)**

Plaintiff's claims are barred, in whole or in part, by the doctrines of setoff and recoupment.

### Sixteenth Affirmative Defense
**(Unjust Enrichment)**

Plaintiff is seeking to recover more than Plaintiff could be entitled to recover in this action, and Plaintiff seeks an award of judgment that would unjustly enrich it.

## COUNTERCLAIMS

For her Counterclaims, Defendant/Counterclaim-Plaintiff Charlie Javice states and alleges against Plaintiff/Counterclaim-Defendant JPMC as follows.

## NATURE OF THE COUNTERCLAIMS

1.      Two days after Charlie Javice filed a lawsuit against JPMC and its parent JPMorgan Chase & Company ("JPMorgan") in the Delaware Court of Chancery asserting her contractual right to advancement against the companies, and after a long back-room campaign by JPMC and JPMorgan insiders against her, JPMC sued Ms. Javice for securities fraud.  JPMC has alleged that this case is about Ms. Javice's decision to "lie" in order to "induce JPMC to purchase Frank for $175 million." It is not. Following the maxim that "the best defense is a good offense," this lawsuit is the culmination of a massive "CYA" effort by those responsible inside JPMC to shift the blame for a failed and now-regretted acquisition to someone they view as an easy target: its young female founder.  But JPMC's core claims in this lawsuit are even more implausible than they are meritless, and Ms. Javice brings these counterclaims to hold JPMC accountable for its unlawful conduct against her.

2.      JPMorgan Chase Bank, d/b/a Chase, is the consumer and commercial banking division of JPMorgan, and operates nearly 5,000 branches across the United States serving an estimated fifty percent of U.S. households.  JPMorgan Chase & Company, JPMC's parent, is one of the oldest financial institutions in the United States, and is widely understood to be one of the largest banks in the world, with over 250,000 employees, $3.7 trillion in total assets, and operations in investment banking, asset management, private banking, private wealth management, credit card services, and consumer banking and lending.

3.      Starting in 2020, JPMorgan—led by its household-name Chief Executive Officer, Jamie Dimon—embarked on an aggressive campaign to acquire fintech companies to fend off competition from Big Tech.   As acknowledged in a recent earnings call, Mr. Dimon's strategy of "[e]volving [JPMorgan's] business strategy" and "spending money to make money" is well

known and has been met with past success.[8] As part of that strategy, in the summer of 2021, JPMorgan, and Mr. Dimon personally, set their sights on TAPD, Inc., d/b/a Frank ("Frank"), a financial education platform founded by Ms. Javice that had quickly become a leading resource and a trusted brand for many students and their families who were looking to pursue and afford higher education.

4.      JPMorgan has long struggled to acquire a meaningful customer base in the student demographic.  JPMorgan has also committed to deploy thirty billion dollars by the end of 2025 to address "key drivers of the racial wealth divide."  Frank offered JPMorgan an in-road to the student market, with its young and lower-income audience just beginning to build personal banking relationships, and it drew an audience that would better enable JPMorgan to meet its equity commitment.  JPMC's investment thesis for Frank's acquisition was simple: with Frank, JPMC would reach and appeal to a new, diverse student audience and deepen its relationships with students; and by offering Frank as a service to account holders, JPMC would accelerate Frank's growth and better attract and retain its existing customers.

5.      After learning that a banking competitor was pursuing a potential acquisition of Frank, Mr. Dimon personally told Ms. Javice in July 2021 that he thought JPMorgan should "get the deal done" with Frank.  So that's what Mr. Dimon's team did.  JPMC offered a competitive $175 million to purchase Frank, plus an additional $20 million retention package for Ms. Javice, making her among the youngest Managing Directors in the bank's history at the age of 29.  And as JPMC admits in its Complaint, and as Mr. Dimon recently told investors, JPMC purchased Frank only after conducting "extensive due diligence" into the company using a "centralized team"

---

[8]  Tr., JPMorgan Chase & Company, Q4 2022 Earnings Call  (January 13, 2023).

consisting of scores of sophisticated and experienced professionals to vet the potential investment.[9]
At the end of this diligence process, JPMC, a highly sophisticated and well-resourced entity, signed
a merger agreement that did not contain any representation or warranty concerning Frank's
customer base and also expressly disclaimed reliance on any extra-contractual statements.

6.      The core issue here is, as one analyst recently probed on a public earnings call about
JPMC's fumbling of the Frank acquisition: "as it relates to the Frank acquisition that's been in the
news, I'm just wondering what that says about the financial discipline for the 15 deals that you
pursued, . . . it's really a question about financial discipline. . . . And ultimately who is accountable
for all these 15 different deals?  And when you're having investments going across business lines,
which is a strength of you guys, but who is ultimately accountable when these investments don't
go the way you want to?  And, Jamie, you recognized a couple years ago at Investor Day, you said,
look, sometimes you're going to waste money as you're innovating and you're growing.  But
ultimately who is accountable when an investment doesn't go right, like the Frank deal...?"[10]

7.      This is a question that JPMC executives pursuing Mr. Dimon's vision for Frank did
not want to answer. No one wanted to be held accountable.  And so after the Department of
Education implemented changes to the Free Application for Federal Student Aid ("FAFSA®"),
posing challenges for the future of JPMC's investment, and after their woeful mismanagement of
the Frank integration process, they needed someone else to point the finger at.  And they found
that person in Ms. Javice: an outsider whose youth and lack of institutional longevity made her an
easy target.

---

[9]   Tr., JPMorgan Chase & Company, Q4 2022 Earnings Call  (January 13, 2023).

[10]   Tr., JPMorgan Chase & Company, Q4 2022 Earnings Call  (January 13, 2023).

8.      JPMC now says that, despite its extensive diligence and professional bona fides, it failed to uncover a key misrepresentation that Ms. Javice told its executives about Frank during diligence, and that it only later discovered that Frank only had around 300,000 registered account holders, rather than the 4.25 million users that Ms. Javice had represented.  But this is simply implausible given the public information and market comparables available to JPMC, and the detailed information it obtained during diligence.

9.      Despite a surprisingly vitriolic press campaign against Ms. Javice personally in the immediate wake of JPMC's Complaint, one reporter recently expressed well-founded skepticism by asking: "How could one of the most powerful and sophisticated companies in the world fall for such an alleged scam?"  The answer: it couldn't have.  And didn't.  JPMC knew exactly what it was getting when it bought Frank.

10.     Even a cursory look at publicly available data makes JPMC's allegation that it was led to believe Frank had 4.25 million registered account holders implausible.  This allegation falters quickly when one looks at the value of comparable companies that do have that number of registered users and the market-share that this number of registered student accounts would have implied—both of which would call the purchase price that JPMC paid for Frank into stark question. That number of registered account holders would also be close to impossible given the limited number of employees and marketing spend that Frank represented, which would both have needed to be many multiples of Frank's numbers to support such a larger enterprise.

11.     Further, in the months leading up to the acquisition, Frank's website publicly touted that the company had helped over 350,000 people access financial aid, at the same time as Twitter simultaneously referenced the more than 4.25 million students that Frank had "engaged" and that "trust" Frank for help with the financial aid process.  It defies credulity that JPMC would not have

noticed and asked about both metrics.  And these numbers were, in fact, easily reconcilable.  Frank first launched its business with a relatively limited product offering focusing on its Easy FAFSA® tool—which allowed students to directly file for financial aid through Frank and necessitated entry of student information to complete—but, as the company grew, it expanded its offerings to include thousands of pages of free website content concerning access to education and financial literacy.  This content increasingly attracted users to visit the website to use these resources, even if they did not then fill out the Easy FAFSA® application.  And access to this broader group of young, diverse users who trusted Frank as a content provider and frequented its site and offerings is exactly what JPMC wanted to, and did, acquire.

12.    JMPC's acquisition of Frank did not go as planned.  But this was no fault of Ms. Javice's.  Her new supervisors, who referred to Ms. Javice as a "shiny new toy," woefully mismanaged the integration and failed to understand JPMC's initial investment thesis.  At the same time, JPMC failed to fully acknowledge the regulatory environment in which Frank operated, and developed a business plan that Ms. Javice reasonably believed—and, on information and belief, the Department of Education later confirmed—might violate the stringent federal regulations and privacy laws governing the use of Frank's student-user data.  JPMC executives unsurprisingly did not want to hear Ms. Javice's repeated warnings that the new business development plan would not only fail, but was potentially unlawful, and doubled-down on their campaign of retaliation against Ms. Javice.

13.    JPMC embarked on a series of pretextual internal investigations initially premised on invented irregularities in Ms. Javice's spending account.  That investigation ultimately turned up nothing.  JPMC also investigated Ms. Javice for alleged violations of JPMC policies after she

engaged in the very relationship-building activities upon which she had built Frank, and for alleged informational breaches, before it honed in on accusations of fraud.

14.     On September 13, 2021—one day before the first vesting date of her $20 million retention award under her Employment Agreement—JPMC put Ms. Javice's head on the chopping block and devised a way to save themselves more than $28 million in the process:  they put her on administrative leave pending the results of the latest internal investigation and cut off all her access to documents and emails pertaining to Frank.  Then, on November 4, JPMC terminated Ms. Javice for cause, alleging that she misled it in the acquisition of Frank.  JPMC now seeks to unwind the deal that once formed a central pillar in its expansive growth strategy.

15.     The central basis for JPMC's fraud claims against Ms. Javice are that she falsely represented to JPMC that "more than 4.25 million students had created Frank accounts to begin applying for federal student aid using Frank's application tool."  (Compl. ¶  1.)  Coupled with an aggressive media campaign and the refusal to honor its contractual advancement and indemnity obligations to fund Ms. Javice's defense to the pretextual investigations and litigations that it has devised, JPMC appears to be waging a three-fronted war against Ms. Javice personally that is designed to make her cave.

16.     In the process of doing so, JPMC has run roughshod over its promises under two contracts with Ms. Javice: her employment contract and a side-letter to the Merger Agreement.  Both provide Ms. Javice with considerable incentive compensation provided she remain at JPMC or leave under friendly circumstances.

17.     Specifically, Ms. Javice and JPMC are parties to JPMC's Offer and Retention Agreement, executed August 4, 2021 (the "Employment Agreement").  In the Employment Agreement, JPMC promised to pay Ms. Javice a cash retention bonus in an aggregate amount of

twenty million dollars (the "<u>Retention Award</u>"), "in recognition of" her "value" to the enterprise and JPMC.  The Retention Award was to vest over three dates: the fourteenth of September in 2022, 2023, and 2024, which are the first three anniversaries of the consummation of the merger contemplated by the Merger Agreement.  The Retention Award payments are subject to Ms. Javice's continued employment through each applicable vesting date. The Employment Agreement further provided that Ms. Javice would forfeit any remaining unvested portion of the Retention Award if JPMC terminated her employment for Cause, as the contract defines it.

18.     Ms. Javice and JPMC are also parties to a Payment Direction Agreement, dated as of August 8, 2021.  In the Payment Direction Agreement, Ms. Javice agreed to an equity holdout; she did not receive her full merger consideration at the time of the merger's closing.  Instead, JPMC agreed to pay Ms. Javice a "<u>Retained Amount</u>" of approximately $7.9 million dollars either a) two years after the closing of the merger; or b) within fifteen days of termination by JPMC without Cause, or by Ms. Javice for Good Reason.  The Payment Direction Agreement incorporates the Employment Agreement's definition of Cause.

19.     When Ms. Javice agreed to the "Cause" terms of the Employment Agreement and the Retention Award, she could not have expected that JPMC would seek to manufacture Cause as a pretext to deny her the payment she would be owed if she were terminated without Cause. JPMC engaged in unfair, arbitrary, and unreasonable conduct in order to prevent Ms. Javice from receiving the benefit of her bargain.

20.     To date, JPMC has not paid the Retention Award that was due on September 14, 2022, and it has not returned the Retained Amount.  It has instead attempted to clawback $162,500 that Ms. Javice received in incentive compensation, canceled any restricted stock units she

received, and then filed a public lawsuit perpetuating its myths about Ms. Javice's conduct and the reasons for Frank's decline.

21.     JPMC cannot prove its outlandish claims, and Ms. Javice is confident she will prevail in this litigation.  In the meantime, however, JPMC has compromised her reputation and wrongfully withheld $20 million in retention payments and approximately $7.9 million in an equity hold out from the Merger Agreement.  Though Frank remains a viable investment—there is no reason that it cannot still be a profitable asset for JPMC—Ms. Javice has been damaged by JPMC's conduct and brings these Counterclaims to redress the wrongs she has suffered.

## THE PARTIES

22.     Defendant/Counterclaim-Plaintiff Charlie Javice is a natural person who resides in Miami, Florida.  She was the Chief Executive Officer of TAPD, Inc., d/b/a Frank, prior to that entity's acquisition by JPMC on September 14, 2021.  She was  employed as a Managing Director at JPMC from September 14, 2021 until November 4, 2022.

23.     Plaintiff/Counterclaim-Defendant JPMorgan Chase Bank is a National Association with a principal place of business at 1111 Polaris Parkway Columbus, OH 43240.  JPMC is the subsidiary of JPMorgan.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1367 and 28 U.S.C. § 1332.

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).  Venue is also proper in this Court pursuant to the Payment Direction Agreement, which incorporates by reference, *mutatis mutandis*, Article 9 of the Merger Agreement, including Section 9.10(a), which provides for exclusive jurisdiction in the courts of the State of Delaware, or any federal court within the State of Delaware.

## FACTUAL BACKGROUND

### I.   Frank

26.    Frank was a financial education platform that was launched by Ms. Javice in April 2017.  It focused on expanding young, lower-income and working people's access to college and vocational schools, college financial resources, and the tools for financial wellness.  Frank's original offering focused on streamlining the process for students and prospective students to access and complete the FAFSA® using a tool called "Easy FAFSA®," which enabled students to enter several data fields that the tool would use to auto-populate the remainder of the onerous application.

27.    Frank swiftly engaged a diverse student audience looking to access financial aid, pursue higher education, and prepare for and maintain financial success.  Frank's Easy FAFSA® tool paved the way to higher education for many students.  Over time, Frank expanded its offerings and tested a number of new products, content and tools—including a "Classfinder" tool, where Frank had an agreement with a well-known education technology company to develop a consumer website for students to enroll in college courses offered by a college consortium of over 400 colleges and universities.  Frank's leaders envisioned a platform that would empower students for the next thirty years of their lives, through services addressing college searches and career pathways, access to work-study programs, a student loan repayment program, and more.

28.    By January 2021, Frank had grown from an "Easy FAFSA®" guide to a full financial education platform providing users free access to a wide array of content, tools, and personalized assistance related to higher education pathways and financial literacy.  While the FAFSA® assistance provided by Frank retained popularity, its free content and other offerings had expanded far beyond that and enabled the platform to reach a far broader audience.

29.     Indeed, from 2018 to 2020, Frank proudly touted the approximately 300,000 students that Frank had helped to obtain financial aid.  By January 2021—six months before JPMC purchased Frank—Frank's website stated publicly that "We've helped over 350,000 people access financial aid resources."  At the same time, in recognition of the fact that Frank's offerings had expanded beyond the Easy FAFSA® application tool, Frank's website and Twitter publicly proclaimed that since its inception more than 4.25 million students "trust" and "chose" Frank as a financial aid platform.

30.     Frank tracked its growth in two ways.  First, Frank tracked its "user signups," referring to users who had provided Frank with certain contact information, either through filling out a FAFSA® application on Frank's site or by creating a user account.  Second, as Frank grew it began also to track its website "users," meaning unique visitors who interacted with or landed on the site.  This was a valuable metric for Frank to begin tracking because, as Frank's business model evolved, Frank was no longer simply a FAFSA® application tool.  Instead, it was becoming a leading website offering free financial advice and content to students and their families, well beyond those who chose to use the application tool.  As such, and because Frank was a free website, the number of users that visited the site to view its content, even without signing up, was a highly relevant growth metric.  Indeed, and as would be expected, only a portion of Frank's website users started FAFSA® forms.

31.     Though Ms. Javice was at the heart of the startup's conception and growth, she was not the only one at the helm.  Frank's investors included highly sophisticated individuals and entities in student services, tech, and finance, and Frank operated through formal governance processes with a committed and diligent board of directors.  From 2017 until the company's acquisition in 2021, Frank's board materials referred to and documented FAFSA® account

growth, customer acquisition cost, and user metrics, allowing directors and observers to assess the results of Frank's new initiatives and projects in a fulsome matter.

## II.     JPMC's Diligence Of Frank

32.     By the end of 2020, Frank had serious suitors seeking to partner with the company or acquire it outright.  To aid in that process, LionTree Advisors, LLC ("LionTree") and Frank prepared a lengthy pitch deck (the "Management Presentation") and a core set of documents— drawn primarily from those used in the diligence process from its fundraising rounds—to upload to diligence data rooms.

33.     JPMC was first alerted to Frank in spring 2021 by one of Frank's seed investors and board members, who emailed Noah Wintroub—JPMorgan's Global Chairman—that this was a company worth looking at.  Mr. Wintroub swiftly passed this tip along to Leslie Wims Morris, JPMC's Head of Corporate Development and a seasoned investment professional who was integrally involved in the diligence process.  By summer 2021, JPMC—suspecting that one of its banking competitors was eyeing a potential acquisition of Frank—quickly and aggressively pursued an acquisition of Frank.  Interest in Frank came directly from the top: the Chief Executive Officer of JPMorgan, Jamie Dimon, and Co-Chief Executive Officer of JPMC, Jennifer Piepszak, were both very eager to get the deal done.

34.     JPMC's investment thesis for Frank was simple:  JPMC had long struggled to acquire a meaningful customer base from the student demographic, including diverse and minority students, and to inspire young people's brand loyalty.  Frank offered an in-road to this market, with its young and lower-income audience just beginning to build personal banking relationships. Additionally, Frank's customer acquisition channel was appealing: Frank's low average cost to acquire new customers would reduce the expense for JPMC to acquire new customers at scale.  As Ms. Piepszak later emphasized, Frank's value to the JPMorgan organization would be realized

long-term: "We want to build lifelong relationships with our customers . . . . Frank offers a unique opportunity for deeper engagement with students.  Together, we'll be able to expand our capabilities for students and their families, helping them financially prepare for college and other major moments in their future."

35.    Equally clear was what Frank's strategic value to JPMC did *not* include:  all parties understood that JPMC could not monetize historical FAFSA® data.  There are a range of privacy and consumer protection laws and regulations that restrict the use of student data generated from the FAFSA®.  This meant that JPMC could acquire Frank to gain access to *future* student users and to better serve their current customers; JPMC was not buying a list of Frank's historical users or their information for direct marketing or otherwise.

36.    Indeed, Frank's valuation reflected the fact that the company was not simply selling the data of past registered users—such assets are not worth anywhere close to $175 million, are available elsewhere for much cheaper, and are not where Frank's worth lay.  By the same token, had JPMC intended to purchase Frank to directly monetize what it believed were over four million current registered account-holders, then JPMC's offer price would have had to have been many multiples of $175 million to reflect that strategic acquisition value.

37.    Instead, the strategic value of Frank to JPMC lay somewhere in the middle:  in access to a new student audience—meaning new website content visitors to Chase.com—who, thanks to Frank, would now view Chase as a trusted resource for all manner of content related to student college planning and financial needs.  That same number of users (or more) would presumably continue to visit and use the Frank content and resources in the future once hosted within JPMC's broader website and app, thus driving an entirely new and largely untapped demographic to JPMC under the auspices of Frank brand recognition and opening the door to long-

term banking and services relationships with these potential customers outside the student aid platform.  And this intended use was accurately reflected in JPMC's bid valuation.

38.     Diligence began in early July 2021.  During the first diligence session, Mr. Dimon met with Ms. Javice to express considerable excitement at the prospect of the deal.  He shared his vision of how Frank would fit into the institution's "next generation" strategy, and how an acquisition would be well timed for the bank's plans to open eight hundred branches near college campuses in the following couple of years.  He further expressed that his team had struggled to understand and reach students and had pursued mistaken strategies in the past, including bundling students with subprime customers.  In short, he was eager to buy Frank.  Wanting to close around the start of the school year and before the start of the college application season, he told Ms. Piepszak that she had the cash and balance sheet to make it happen.  So she did.

39.     The diligence process was split into three phases over the course of several weeks: (1) regulatory diligence that occurred before JPMC submitted its bid for the company, ensuring that JPMC could engage in content, tools, and services relating to financial aid; (2) confirmatory diligence, designed for JPMC to review Frank's core business metrics, financials, commercial contracts, and governance procedures and records to confirm to JPMC the soundness of the acquisition price and evaluate any risks associated with Frank; and (3) business strategy and integration diligence, designed to help JPMC to budget the business, support operations, and facilitate a transition of personnel and property after the acquisition.

40.     During the diligence process, many documents were accessible through an electronic data room.  JPMC's diligence questions were extensive and comprised more than 1,300 separate requests that were meticulously tracked in a diligence tracker that, where appropriate, cross-referenced to documents in the data room.  In addition, JPMC executives participated in

several additional diligence sessions with Ms. Javice and other Frank executives. These sessions were routinely attended by dozens of people.

41. Ms. Javice participated in the diligence meetings, but so did multiple professional entities and representatives. For legal advice, Frank was represented by in-house counsel as well as by outside counsel from the international law firm Sidley Austin LLP. LionTree, a highly reputable investment banking firm, advised Frank on the financial aspects of the transaction and interfaced directly with JPMC in populating the diligence tracker. JPMC, meanwhile, was represented by another international law firm, Dechert LLP. And internally, JPMC mobilized a team of dozens of individuals who participated in or supported its diligence process.

42. A large part of the initial diligence focused on Frank's key metrics and product offerings, and on regulatory and legal diligence to confirm that JPMC could successfully navigate the integration of this highly regulated company into its existing business. Frank's and JPMC's outside counsel, along with a JPMC senior executive and two managing directors in compliance, convened to discuss the regulations surrounding FAFSA®. The parties discussed that Frank was not monetizing FAFSA® in any way, and if Frank were to attempt to do so, it could no longer assist students in filing FAFSA® forms. They also discussed that Frank and any potential acquirer would not be monetizing the data of Frank's existing users who had filed the FAFSA® form.

43. On July 13, 2021, following the completion of regulatory diligence, Ms. Wims Morris delivered JPMC's bid to Frank: $175 million in an all-cash transaction, as well as a $20 million retention package for Ms. Javice to ensure her continued leadership of Frank at JPMC after the acquisition.

44.     On July 16, 2021, Frank signed the binding letter of intent and entered into an exclusivity or "no shop" period that prohibited Frank from seeking or agreeing to offers from other buyers.

45.     As the parties continued with confirmatory diligence, Ms. Javice walked JPMC through the various stages where a user would or would not submit information to Frank.  Frank even performed product demonstrations and provided video recordings of its site and tools, showing JPMC personnel and representatives where, how, and when a Frank user would provide personal information.

46.     In the Management Presentation that was discussed at the July 7 meeting, Frank represented that it had over 4.25 million cumulative users since launching its first product in April 2017, as clearly depicted in the included chart against annual marketing spend:



47.     In one meeting, a JPMC team member asked Ms. Javice to explain why the press and Frank website both referred to approximately 350,000 students, whereas the Management Presentation touted 4.25 million students.  Ms. Javice explained that the 350,000 figure had represented cumulative users who had filed FAFSA® with Frank, whereas the 4.25 million figure

represented cumulative website users who viewed website content pertaining to FAFSA®.  It is for this reason that Frank's website accurately stated in 2021 "we've helped more than 350,000 people access financial aid assistance" at the same time as Twitter postings lauded that "we've engaged over 4 million students on how to pay for college," and "[o]ver 4 million students trust Frank to help navigate financial aid."

48.     The distinction was also discernible from Frank's numbers.  For example, Frank represented in diligence, in documents in the data room, and its balance sheet that its total marketing spend from 2017 through 2020 was around $2.25 million.  Frank also repeatedly indicated that the cost of acquiring a registered user of a Frank FAFSA® account was around five dollars.  For example, a slide in the Management Presentation says prominently: "In 2020, Frank's cost per FAFSA® account was $4.45, driven mostly by word of mouth."



### A Product Students Love to Share

In 2020, Frank's cost per FAFSA® account was $4.45, driven mostly by word-of-mouth

**2020 Users**

4.3%

95.7%

• Paid Users  • Non-Paid Users

**Student Acquisition Channels**

**Unpaid Channels**
- Organic search
- Direct search
- Email / text
- Earned media
- Partners

**Paid Channels**
- Paid search (Google, Bing)
- Remarketing

Frank acquired 1.4mm Students in 2020 primarily through non-paid channels

Note: *$4.45 represents the blended estimate over time for FAFSA® accounts via paid channels benefited by organic / brand help

F R A N K .   36

49.     Easy arithmetic shows that if Frank spent approximately $5 per account to acquire 4.25 million registered accounts (as JPMC now incredulously contends) it would have spent more than $21 million on marketing.  That figure would have been obviously inconsistent with the

numerous diligence documents that quoted Frank's marketing spend as only $2.25 million.  By contrast, a total marketing spend of approximately $2.25 million divided by an average FAFSA® account acquisition cost of around $5 equals approximately 450,000 registered FAFSA® accounts—right in line with Frank's public marketing.  But JPMC didn't even have to perform this simple calculation to reveal the true number of registered FAFSA® accounts on Frank.  This information was also readily apparent from the face of the diligence materials, which repeatedly referenced "the ~500k students who filed FAFSA®  with Frank."

50.    It should therefore have been unsurprising that Frank had approximately 4.25 million users drawn from the diverse demographic group that JPMC sought to access who utilized and visited the website's free FAFSA®  resources, and within that group had a much lower number of registered users who had signed up for FAFSA® accounts.  And, indeed, it wasn't surprising at all.  JPMC understood all of this before purchasing Frank.

51.    This understanding was evident in JPMC's $175 million bid for the company.  Had Frank truly captured in excess of four million registered student accounts (as JPMC now alleges it believed), this would have indicated a leading market share and called for a valuation, based on easily identifiable market comparables, that would have exceeded many multiples of the offer price.

52.    On or about August 1, 2021, towards the end of the diligence period, Ms. Wims Morris made a late-stage request:  that Frank produce its user data so that JPMC could verify that Frank's users would indeed be a materially different and accretive demographic to JPMC's existing customer base, and thereby confirm JPMC's fundamental investment thesis for Frank.

53.    The deal parties' attorneys got on the phone.  Frank's outside attorneys discussed this request with both JPMC representatives and legal counsel for JPMC, and explained to JPMC

why it could not be fulfilled as initially asked.  Numerous privacy laws and federal regulations limit the permissible uses and sharing of FAFSA® application data and personally identifiable information ("PII"), and could be violated by fulfilling JPMC's request that Frank turn over its unfiltered user lists to JPMC.

54.     Accordingly, JPMC, Frank, and their representatives explored various alternative options to fulfill the request for validation and attribute analysis.  Ms. Javice suggested that she provide the JPMC team with temporary "read-only" access credentials to Frank's accounts to view and validate user information directly.  Ms. Wims Morris declined this offer and then modified her request.

55.     Ms. Wims Morris instead asked that Frank provide synthetic data on the 4.26 million users to a third-party vendor, Acxiom, which JPMC frequently used for similar purposes. Acxiom would validate and analyze this data (which would be engineered to mirror the real Frank data in all important attributes by using synthetic data processes) and report the conclusions back to the JPMC diligence team.

56.     Synthetic data "may be thought of as 'fake' data created from 'real' data."[11]  It provides a solution to data projects that involve sensitive or private information, and is often used to provide organizations with deeper insights into consumer behavior.  By definition, to be useful the goal is that the synthetic data looks as realistic as possible in order to accurately mirror the attributes of the underlying real data population.

57.     While many lay people may not be familiar with synthetic data as an accepted and known solution for sharing the characteristics of restricted data, JPMC certainly is.  JPMorgan is

---

[11]     Steven M. Bellovin et. al., *Privacy and Synthetic Datasets*, 22 Stan. Tech. L. Rev. 1, 21 (2019).

a leader in the space with a dedicated team focused exclusively on synthetic data.  Customer data analytics is a core pillar of the JPMorgan initiative, and its team frequently conducts synthetic data projects and analyses to produce customer data insights.[12]  Indeed, JPMorgan's website explains synthetic data with some attractive visual graphics:

58.     After learning that Frank's head of engineering was not equipped to complete this project in-house, Frank engaged the services of a data science professor, a PhD and Associate Professor at a research university, to conduct a synthetic data project to facilitate the data exercise.

59.     Consistent with this expectation, JPMC drafted an agreement for Acxiom to validate Frank's customer data that expressly prohibited Frank from sending Acxiom its real data set containing PII of its student users.

60.     The project was accomplished quickly at JPMC's insistence—over a couple of days and nights just prior to the signing of the Merger Agreement—with the help of the data science professor.  Frank provided Acxiom with the synthetic data file, and Acxiom performed its analysis, which it provided to JPMC, which was satisfied.  Following the completion of its services, Acxiom confirmed it had destroyed the underlying data as the contract required.

III.     **The Merger Agreement and Pre-Closing Period**

61.     The parties signed the Merger Agreement on August 8, 2021.

62.     In the Merger Agreement, JPMC agreed to an approximately $25 million retention plan, $20 million of which went to Ms. Javice, and $3 million was to be awarded to Frank's Chief Growth Officer Olivier Amar and the remainder to other team members.

63.     In the Employment Agreement, JPMC promised to pay Ms. Javice the Retention Award, "in recognition of" her "value" to the enterprise and JPMC.  The Retention Award is to vest over three dates: the fourteenth of September in 2022, 2023, and 2024, which are the first three anniversaries of the consummation of the merger contemplated by the Merger Agreement. The Employment Agreement provides that Ms. Javice was to receive five million dollars ($5,000,000) on the first two vesting dates, and the remaining ten million ($10,000,000) on the final date.

64.     The Retention Award payments are subject to:

(i) you [Ms. Javice] devoting your full business time and attention to the performance of your duties and services hereunder, (ii) your continued employment through each applicable vesting date (as set forth below) and (iii) your continuous compliance with the Firm's Code of Conduct (other than immaterial and inadvertent violations) through each applicable vesting date[.]

65.     The Employment Agreement further provides that Ms. Javice would forfeit any remaining unvested portion of the Retention Award if JPMC terminated her employment for Cause, as the contract defines it.

66.     Conversely, if JPMC terminated Ms. Javice's employment without Cause or if she resigned in a "Good Reason Separation" (as defined by the Employment Agreement), then the Employment Agreement continues to obligate JPMC to pay the awards on the set vesting schedule, as if she remained employed, subject to Ms. Javice's execution of a release.

67.     The Employment Agreement states, "[p]rior to terminating your employment for Cause pursuant to (i) above, the Firm will provide you notice detailing the basis for the alleged performance deficiencies and providing you a reasonable opportunity to cure such deficiencies."

68.     Separately, in the Payment Direction Agreement, Ms. Javice agreed to an equity holdout; she did not receive her full merger consideration at the time of the merger's closing. Instead, JPMC agreed to pay Ms. Javice a Retained Amount of approximately 7.9 million dollars ($7,900,000) either a) two years after the closing of the merger; or b) within fifteen days of termination by JPMC without Cause, or by Ms. Javice for Good Reason.  The Payment Direction Agreement incorporates the Employment Agreement's Cause definition.

69.     In the Merger Agreement, Frank made certain representations and warranties to JPMC, the "Purchaser."  The Merger Agreement does not contain any representation or warranty concerning the number of Frank users or user accounts.

70.     No "Related Document," as that term is defined in the Merger Agreement, contains a representation and warranty of the number of Frank users or user accounts.

71.     Frank's representation and warranties are contained in Article 3 of the Merger Agreement, and, to a lesser extent, in Related Documents.

72.     In Section 4(c) of the Merger Agreement, JPMC, as "Purchaser," and its merger sub, "specifically disclaim" that in entering the Merger Agreement, they relied on any representations or warranties outside of Article 3 or a limited set of related documents.  Referring to Frank as "the Company," the Merger Agreement states:

> Other than the specific representations and warranties expressly set forth in Article 3 and the Related Documents, Purchaser and Merger Sub specifically disclaim that they are relying upon or have relied upon any such other representations or warranties that may have been made by any Person, and acknowledge and agree that each Seller, the Company Group and their Affiliates has specifically disclaimed and does hereby specifically disclaim, and shall not have or be subject to any liability for reliance on, any such other representation or warranty made by any Person.

73.     In Section 9.3, JPMC further agreed:

> This Agreement, including the Exhibits and Schedules hereto, the Confidentiality Agreement and the Related Documents, contain the entire understanding of the parties hereto with respect to the subject matter contained herein and therein. This Agreement supersedes all prior and contemporaneous agreements, arrangements, contracts, discussions, negotiations, undertakings and understandings (including any letters of intent or term sheets), whether written or oral, among the parties with respect to such subject matter (other than, for the avoidance of doubt, the Confidentiality Agreement and the Related Documents) or any prior course of dealings.

74.     Pursuant to the terms of the Merger Agreement, JPMC also purchased representation and warranty insurance, which JPMC "deems sufficient to cover all claims or other Actions arising from any breach of any representation or warranty set forth in this Agreement," with the exception of "Fraud."

75.     The parties specifically defined "Fraud" in the Merger Agreement to refer only to knowing and intentional misrepresentation of a material fact, "committed with scienter," in the making of representations or warranties set forth in Article 3 of the Merger Agreement and in Related Documents.

76.     The merger closed on September 14, 2021.  JPMC announced the merger publicly the following week.

## IV.     Ms. Javice's Employment at JPMC

77.     Pursuant to the Merger Agreement, JPMC promised to employ Ms. Javice as Managing Director – Head of Student Solutions at a $300,000 annual salary with an incentive compensation package with an initial annual target of $250,000.  In this role, Ms. Javice would work to "deliver on" Frank's growth plans, facilitate its transition and integration into JPMC, and take on other projects designed to focus on the student customer base.

78.     In October 2021, the integration team sent emails to Frank's users who had signed up for Frank email communications.  The purpose of the contact was to inform those users of changes to Frank's user policy.  With the list of Frank's email contacts, a marketing automation specialist sent a few hundred thousand emails regarding changes to the privacy policy— approximately the same number of registered account-holders that Frank had represented in its diligence materials.  JPMC tracked the deliverability of these emails.  On the integration tracker, the integration and the legal team checked off this task as completed.  Ms. Javice's supervisors knew that JPMC did not send 4.26 million emails.

79.     Overall, despite early successes, the integration did not go smoothly.  Around this time, Ms. Javice's supervisor, Sonali Divilek, shared with Ms. Javice that the goal for Frank was that it would email existing users to sell them Chase College financial products, including checking and credit card accounts.  Additionally, Ms. Divilek wanted Frank's student FAFSA® dashboard

to display JPMC advertising.  She informed Ms. Javice of a specific target: Frank was to obtain a certain number of new college checking accounts for Chase.

80.     Immediately upon hearing of these new targets and plans, Ms. Javice objected.  She told her supervisor that she believed that the plan would unlawfully monetize FAFSA® data and the FAFSA® filing process, and, in any event, that the target numbers were unrealistic.  Ms. Javice requested that her supervisor seek a legal opinion on the matter.  Ms. Javice asked for a legal memorandum assessing the business plan, and told her supervisor that she wanted to see the memorandum before she would instruct her team to proceed with the new plan.

81.     Ms. Javice never received the memorandum.

82.     In November 2021, during a telephone conference call, Ms. Javice alerted members of JPMC's legal team to the regulations that she understood to be at issue.  Following this call, Ms. Javice shared with certain members of the integration team that she had been shown a business proposal that she believed required JPMC and Frank to do unlawful activities, and that JPMC and Frank could not use the FAFSA® data or dashboard for marketing or advertising campaigns for financial products and services.  Ms. Javice further explained why she believed the checking account target was unrealistic, even if it were not unlawful.

83.     Ms. Javice not only objected to the activity that she believed would be illegal, but also shared the view that JPMC's plan to monetize Frank was a bait and switch: Frank had built a reliable brand that had gained the trust of millions, and now JPMC would assume Frank's voice to lure the students to credit cards and personal loans, rather than to the long-term financial wellness that Frank preached.  The legal department admonished Ms. Javice for sharing this view, and warned her never to express such sentiments again in writing.

84.     By the end of November, Ms. Javice escalated her concerns to the CEO of JPMC, Ms. Piepszak, who agreed to meet with Ms. Javice to discuss the issues.   Ms. Javice was temporarily assuaged; she believed that the meeting went well, as Ms. Piepszak said that she understood the problems and Frank would not need to move forward with the flawed business plan.

85.     Yet this did not cure the problems, and Ms. Javice began to experience retaliation from supervisors for being perceived to have gone above their heads and blown the whistle on their activities.  Ms. Javice reported the supervisor's retaliatory actions to JPMC management and human resources.  Ms. Javice continued to report the actions periodically during her employment at JPMC.  Ms. Javice specifically stated that her supervisor was actively undermining her in order to blame Ms. Javice for the failings of the flawed business model and integration failures.

86.     In April 2022, JPMC began a series of retaliatory and pretextual investigations of Ms. Javice.  The investigations focused on petty accusations, regarding, for example, whether Ms. Javice inappropriately used her expense account to cover her stay at a hotel where she traveled to a business conference—an expense that JPMC approved in advance of the trip.  The investigators challenged Ms. Javice's payment for a team working lunch, among other legitimate expenses.

87.     JPMC also investigated Ms. Javice for alleged violations of JPMC policies due to her engaging in the very relationship-building activities upon which she had built Frank, which were central to JPMC's vision of Ms. Javice's continued role post-acquisition.  As a result of JPMC's interference, the partners who accounted for a significant portion of Frank's business and were a motivating factor of the JPMC acquisition did not renew or continue their business with Frank.

88.     The investigations concluded with no findings that Ms. Javice breached applicable policies.

## V.     The Regulatory Environment Dampens Frank's Prospects and JPMC Retaliates Against Ms. Javice

89.     In the summer of 2022, upon information and belief, representatives of the Department of Education had a discussion with JPMC representatives.

90.     Upon information and belief, the Department of Education confirmed to JPMC certain of the legal concerns that Ms. Javice had raised and discussed certain regulatory restrictions on the use of Frank's data.

91.     Later that week, the JPMC legal department advised the consumer bank division to curtail certain, but not all, of its marketing plans.  Ms. Javice expressed concerns to Ms. Divilek that this was not a sufficient response to the Department of Education's warning.  Ms. Divilek brushed them aside.  Instead, she informed Ms. Javice that JPMC would proceed with the marketing campaign to a randomized selection of emails.  Ms. Javice objected to this plan because she continued to believe it was unlawful; she also expressed that it would not yield business returns given it was a stale list and students had likely already graduated and changed their emails.

92.     In mid-July 2022, JPMC sent at least a couple hundred thousand emails as part of a JPMC marketing campaign, thereby engaging in the very conduct about which Ms. Javice had warned it.

93.     Around the same time, on July 10, 2022, long after Frank was integrated into JPMC, the Department of Education announced that it was planning to require two-factor authentication for students to submit their FAFSA® applications.  Frank's financial aid tool had relied on being able to populate easily or "auto fill" the applicant's FAFSA® form application, and therefore this

change potentially threatened the usability of Frank's financial aid tool—as a third-party submitter, Frank could not verify the student's identity on two devices.

94.     Ms. Javice learned that the Department of Education was planning to implement two-factor authentication at the same time that JPMC learned of the planned change.

95.     In response to this news, Ms. Javice's supervisor abruptly decided to shut down the FAFSA® tool rather than to explore more fully the extent of any threat to its usability or any possible technological changes to the tool that could present a work-around of the new two-factor authentication requirement.

96.     Around one week after the July 10 announcement by the Department of Education, JPMC requested that Ms. Javice turn over all her emails.  Ms. Javice learned that someone on the integration team had accused her of misleading JPMC during the merger negotiations by failing to disclose this just-announced change to FAFSA® that Ms. Javice had no reason to know about until it was announced.

97.     On September 13, 2022—one day before the first five million dollars of Ms. Javice's Retention Award vested—JPMC placed Ms. Javice on administrative leave.

**VI.    JPMC Terminates Ms. Javice and Files Its Lawsuit**

98.     On Friday, November 4, 2022, JPMC terminated Ms. Javice's employment, purportedly for Cause as outlined in its "Termination Letter."  JPMC's asserted bases for Ms. Javice's termination are all meritless.

99.     JPMC, in furtherance of its retaliation against Ms. Javice, then sought to clawback prior compensation from her.

100.    On November 22, 2022, JPMC sent Ms. Javice a clawback letter, revisiting the grounds for termination cited in the Termination Letter, and demanding "immediate repayment" of $162,500 that Ms. Javice previously received in cash.  The clawback letter further cancels

restrictive stock unit awards that already vested and that have a total estimated value of approximately $162,500.

101.    The clawback letter invokes a "clawback, recapture" provision of the Employment Agreement (the "Clawback Provision") in which JPMC reserves the right "in its sole discretion to cancel up to 100% of [Ms. Javice's] Retention Award or any Target Bonus paid" to Ms. Javice, and to recover from Ms. Javice "an amount equal to the portion of the Retention Award or any Target Bonus paid" to Ms. Javice, if JPMC determines "in its sole discretion" that: Ms. Javice "engaged in conduct detrimental to" JPMC "insofar as it causes material financial or reputational harm to [JPMC] or its business activities"; the bonus payments made to Ms. Javice "were based on materially inaccurate performance metrics," regardless of whether Ms. Javice was responsible for the inaccuracy; the award "was based on a material misrepresentation by" Ms. Javice; Ms. Javice's employment was terminated for Cause; Ms. Javice "committed a fraudulent act or engaged in knowing and willful misconduct related to [Ms. Javice's] employment that is materially injurious to the interests of [JPMC] or its relationship with a customer, client, or an employee"; or, Ms. Javice violated certain confidentiality, non-compete, or non-solicit agreements.

102.    Ms. Javice never received any Retention Award, but the clawback letter declares that she has no right to receive it, even to the extent part of the Retention Award has already vested.

103.    The clawback letter is another attempt to intimidate and retaliate against Ms. Javice. It reflects not only that JMPC has concocted invalid bases for Cause in order to blame her for its own confused business strategy, but also that JPMC is determined to continue to threaten and harass her even after her employment.

104.    On December 22, 2022—only after Ms. Javice initiated litigation against JPMC for refusing to honor its contractual commitments to advance her legal fees required to defend against

its retaliatory and pretextual investigations—JPMC initiated this action against Ms. Javice, repeating the same alleged and baseless accusations as in its Termination Letter.

105.    Fed with those falsities, the national media picked up a sensational story and ran with it.  Ms. Javice's name and her face have been plastered around the figurative public square beside humiliating headlines like "'Fake It 'Til You Make It': Meet Charlie Javice, the Startup Founder Who Fooled JP Morgan," and "The New Elizabeth Holmes? Forbes 30-Under-30 Winner Duped JP Morgan into Buying 'Amazon for Higher Education' Startup for $175 Million by Making Up Millions of Fake Users to Bolster Credibility, Lawsuit Claims."  The stories attack her credibility, challenge comments she made as an undergraduate, pry into her parents' finances, and suggest that Ms. Javice is and has always been just what JPMC wants the world to believe: someone capable of pulling off a tremendous dupe of the world's biggest bank.

106.    Ms. Javice is only thirty years old.  The damage wrought by JPMC's falsehoods is likely to be life-long.

## FIRST CLAIM FOR RELIEF
### (Declaratory Relief)

107.    Ms. Javice incorporates by reference each and every allegation set forth above as if they were set forth fully herein.

108.    An actual, present and justiciable controversy has arisen between Ms. Javice and JPMC by virtue of the November 4, 2022 termination and Termination Letter, wherein JPMC purported to terminate Ms. Javice for Cause under the Employment Agreement, thereby intending to force Ms. Javice to forfeit the unvested portion of her Retention Award and the withheld consideration subject to the Payment Direction Agreement.

109.    Ms. Javice disputes that any Cause existed to terminate her, and disputes that JPMC had any valid basis to terminate her for Cause.

110.    To resolve this controversy, Ms. Javice seeks a declaration that:

a.      Ms. Javice was improperly terminated under the Employment Agreement;

b.      The Termination Letter is null and void;

c.      JPMC had and has no basis to terminate Ms. Javice for Cause;

d.      JPMC terminated Ms. Javice's employment without Cause;

e.      Ms. Javice is entitled to the full value of her Retention Award, as she has been terminated involuntarily, and the Retention Award's vesting schedule remains intact;

f.      Ms. Javice is entitled to the full value of her equity holdout under the Payment Direction Agreement because JPMC terminated her employment without Cause;

g.      Ms. Javice did not engage in any activity that warrants or warranted the cancellation, recapture and recovery of her incentive compensation payments under the Clawback Provision;

h.      Because JPMC terminated Ms. Javice's employment without Cause and none of the conditions of the Clawback Provision were met, Ms. Javice is not obligated to return $162,500, or any other compensation, to JPMC; and

i.      Ms. Javice retains her restricted stock units and any other equity interest in JPMC, and JPMC's cancellation of such shares was invalid.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract—Employment Agreement)

111.    Ms. Javice incorporates each and every allegation set forth above as if they were fully set forth herein.

94

112.     Ms. Javice and JPMC are parties to the Employment Agreement, which is a valid and enforceable contract.

113.     Under the Employment Agreement, JPMC is obligated to pay Ms. Javice five million dollars ($5,000,000), subject to any tax withholding, no later than thirty calendar days after September 14, 2022, unless she was terminated for Cause.

114.     JPMC has breached the Employment Agreement because JPMC did not pay Ms. Javice this sum within thirty days, has not paid her this sum to date, and had no valid basis to terminate her for Cause.

115.     Ms. Javice was not validly terminated for Cause on or prior to the Retention Award's first vesting date of September 14, 2022.

116.     Ms. Javice was also due salary and equity benefits under the Employment Agreement.

117.     Ms. Javice substantially performed the contract, or was excused from doing so, because of JPMC's actions.

118.     JPMC's breaches of the Employment Agreement proximately and directly caused monetary damages to Ms. Javice in the amount to be determined at trial, including but not limited to, the full value of the Retention Award that was due to her within thirty days of September 14, 2022, plus interest, and the value of the salary and benefits due under the Employment Agreement.

**THIRD CLAIM FOR RELIEF**
**(Breach of Contract—Payment Direction Agreement)**

119.     Ms. Javice incorporates each and every allegation set forth above as if they were fully set forth herein.

120.     Ms. Javice and JPMC are parties to the Payment Direction Agreement, which is a valid and enforceable contract.

121.     Under the Payment Direction Agreement, a portion of Ms. Javice's merger consideration, known as the "Retained Amount," is either to be paid within fifteen days of the second anniversary of the closing of the merger, or is to be paid within fifteen days following termination of employment "[i]f your employment with Parent or an affiliate of Parent terminates after the Effective Time but at any time prior to when the Retained Amount is earned and paid in accordance with Section B (i) by Parent or an affiliate of Parent without 'Cause' . . . or (ii) by you for 'Good Reason' (as defined in the Employment Agreement)."

122.     This Retained Amount is approximately 7.9 million dollars ($7,900,000).

123.     JPMC terminated Ms. Javice's employment without valid Cause on November 4, 2022, which is prior to the second anniversary of the closing of the merger, which will occur on September 14, 2023.

124.      JPMC was obligated to return the Retained Amount to Ms. Javice within fifteen days of November 4, 2022.

125.     JPMC did not return the Retained Amount within fifteen days of November 4, 2022, and it continues to withhold the Retained Amount.

126.     Ms. Javice had substantially performed the contract, or was excused from doing so because of JPMC's actions.

127.     By not returning Ms. Javice's Retained Amount pursuant to the requirements of the Payment Direction Agreement, JPMC is in breach of contract.

128.     JPMC's breaches of the Payment Direction Agreement proximately and directly caused monetary damages to Ms. Javice in the amount to be determined at trial, including but not limited to, the full value of the Retained Amount that was due to her within fifteen days of November 4, 2022, plus interest.

## FOURTH CLAIM FOR RELIEF
### (Breach of the Implied Covenant of Good Faith and Fair Dealing—Employment Agreement)

129.    Ms. Javice incorporates each and every allegation set forth above as if they were fully set forth herein.

130.    The Employment Agreement is silent as to whether JPMC is permitted to manufacture a bad-faith, sham, pretextual termination for Cause in order to cause Ms. Javice to forfeit the Retention Award and other compensation that would otherwise be owed to her.  Had the parties sought to negotiate the issue, JPMC and Ms. Javice would have agreed that JPMC was not permitted to use a sham, pretextual investigation and bad-faith manufacturing of grounds for a purported termination for Cause.

131.    JPMC initiated a sham investigation the day before the first vesting date in order to prevent Ms. Javice from fulfilling her job duties at the time of the first vesting date, and to search for or manufacture Cause to terminate her where none otherwise would have existed.  With its sham investigation, JPMC willfully prevented and interfered with Ms. Javice's performance of the Employment Agreement.

132.    Under the Employment Agreement, JPMC was to pay Ms. Javice five million dollars ($5,000,000), subject to any tax withholding, no later than thirty calendar days after September 14, 2022.

133.    Ms. Javice was also due salary and equity benefits under the Employment Agreement.

134.    JPMC's actions unfairly interfered with Ms. Javice's receipt of the Employment Agreement's benefits and prevented Ms. Javice from obtaining the benefit of her bargain under the Employment Agreement.

135.     Under the Employment Agreement, Ms. Javice did not reasonably expect JPMC's conduct, including its sham, pretextual investigation and bad-faith manufacturing of grounds for a purported termination for Cause.

136.     Ms. Javice had substantially performed the contract, or was excused from doing so, because of JPMC's actions.

137.     Accordingly, JPMC breached the Employment Agreement's implied covenant of good faith and fair dealing by acting in bad faith to deny her the benefits of that contract.

### FIFTH CLAIM FOR RELIEF
**(Breach of the Implied Covenant of Good Faith and Fair Dealing—Payment Direction Agreement)**

138.     Ms. Javice incorporates each and every allegation set forth above as if they were fully set forth herein.

139.     Under the Merger Agreement and Payment Direction Agreement, a portion of Ms. Javice's share, known as the "Retained Amount," is either to be paid within fifteen days of the second anniversary of the closing of the merger, or is to be paid within fifteen days following termination of employment "[i]f your employment with Parent or an affiliate of Parent terminates after the Effective Time but at any time prior to when the Retained Amount is earned and paid in accordance with Section B (i) by Parent or an affiliate of Parent without 'Cause' . . . or (ii) by you for 'Good Reason' (as defined in the Employment Agreement)."

140.     This Retained Amount is approximately 7.9 million dollars ($7,900,000).

141.     The Payment Direction Agreement is silent as to whether JPMC is permitted to manufacture a bad-faith, sham, pretextual termination for Cause in order to cause Ms. Javice to forfeit the Retained Amount.  Had the parties sought to negotiate the issue, JPMC and Ms. Javice would have agreed that JPMC was not permitted to manufacture a bad-faith, sham, pretextual termination for Cause in order to cause Ms. Javice to forfeit the Retained Amount.

142.     JPMC undertook a sham investigation in order to prevent Ms. Javice from fulfilling her job duties at the time of the first vesting date, and to search for or manufacture Cause to terminate her where none otherwise would have existed.  With its sham investigation, JPMC willfully prevented and interfered with Ms. Javice's performance of the Employment Agreement and the Payment Direction Agreement.

143.     JPMC's actions unfairly interfered with Ms. Javice's receipt of the Payment Direction Agreement's benefits and prevented Ms. Javice from obtaining the benefit of her bargain under the Payment Direction Agreement.

144.     Ms. Javice did not reasonably expect JPMC's conduct, including its sham, pretextual investigation and bad-faith manufacturing of ground for a purported termination for Cause.

145.     Accordingly, JPMC breached the Payment Direction Agreement's implied covenant of good faith and fair dealing.

## SIXTH CLAIM FOR RELIEF
### (Retaliatory Action in Violation of N.Y. Lab. Law § 740)

146.     Ms. Javice incorporates each and every allegation set forth above as if they were fully set forth herein.

147.     Many if not all of the events described occurred in New York, New York.

148.     Ms. Javice's Employment Agreement required her to travel to JPMC's New York office for up to ten business days a month.

149.     Under these terms, from the date of the start of her employment at JPMC (September 20, 2021) until the end of the 2021 calendar year, Ms. Javice spent an estimated 40 days working in New York City.  In 2022, until she was placed on administrative leave in September, she spent an estimated 51 days working in New York City.

150.     Ms. Javice worked almost exclusively under the supervision of and with JPMC employees who were based in JPMC's New York office.

151.     Ms. Javice was an employee of JPMC under the definition of NY Labor Law section 740(1)(a).  JPMC was her employer under section 740(1)(b).

152.     Ms. Javice reasonably believed that JPMC's post-acquisition business plans for Frank, which JPMC began to describe and demand after the acquisition, required unlawful activities.   Specifically, Ms. Javice believed that JPMC's business plan—using personally identifiable information and other data collected in connection with students' process for filing FAFSA® forms in order to contact students who did not opt in to share data with Chase or receive emails from Chase and to advertise checking accounts and credit cards, among other Chase financial products—would violate the Higher Education Act's restrictions on use of FAFSA® data, as well as other privacy laws, in addition to consumer protection laws that prohibited uses of minors' data for selling credit cards and financial products to minors.  Ms. Javice objected to the activity, policy or practice of JPMC, and she subsequently notified JPMC personnel, including the legal department and the JPMC CEO, of her concerns and beliefs.

153.     JPMC took retaliatory action or actions against Ms. Javice because she objected to or refused to participate in an activity, policy or practice of JPMC that she reasonably believed was in violation of law, rule or regulations.

154.     The retaliatory actions include, without limitation: Ms. Javice's discharge; JPMC's threat of discharge or penalty; JPMC's suspension of Ms. Javice's employment; JPMC's persistent interference with Frank's operations and Ms. Javice's duties; JPMC's harassing internal investigations of Ms. Javice; JPMC's failure to pay Ms. Javice in full in accordance with its contractual obligations; JPMC's clawback letter; and JPMC's threats to disparage Ms. Javice to

potential business partners or take other actions that would adversely impact her current or future employment.

155.    Accordingly, JPMC violated New York's prohibition on retaliatory action by employers.

156.    The violation was also willful, malicious, or wanton.

## DEMAND FOR JURY TRIAL

Ms. Javice requests a jury trial on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Counterclaim Plaintiff seeks an Order providing declaratory and other relief as follows:

(1) A declaration as set forth in paragraph 110;

(2) Damages in the amount of the vested portion of the Retention Award;

(3) Damages in the amount of the full value of the Retained Amount;

(4) Damages in the amount of all of Ms. Javice's guaranteed compensation pursuant to the Retention Award because she was not terminated for Cause and is thus entitled to the additional amounts that would be due to vest on September 14, 2023 and September 14, 2024;

(5) Damages sufficient to compensate Ms. Javice for all lost wages, benefits, and other renumeration under NY Lab. Law § 740(5);

(6) Punitive damages because JPMC's violation of NY Labor Law section 740 was willful, malicious, or wanton;

(7) Reasonable attorneys' fees and costs for this action as allowed by law;

(8) Pre-judgment and post-judgment interest; and

(9) Such other and further relief that the Court deems just and proper.

OF COUNSEL:

Alex Spiro
Maaren A. Shah
JP Kernisan
QUINN EMANUEL URQUHART & SULLIVAN,
LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
alexspiro@quinnemanuel.com
maarenshah@quinnemanuel.com
jpkernisan@quinnemanuel.com

DATED:  February 27, 2023

  /s/ Michael A. Barlow
Michael A. Barlow (#3928)
Samuel D. Cordle (#6717)
ABRAMS & BAYLISS LLP
20 Montchanin Drive, Suite 200
Wilmington, Delaware 19807
(302) 778-1000
barlow@abramsbayliss.com
cordle@abramsbayliss.com

*Attorneys for Defendant / Counterclaim
Plaintiff Charlie Javice*