## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JPMORGAN CHASE BANK, N.A.,    )
    )
        Plaintiff,    )
    )
      v.    )
    )
CHARLIE JAVICE, OLIVIER AMAR,    )
CHARLIE JAVICE, in her capacity as Trustee    )
of CHARLIE JAVICE 2021 IRREVOCABLE    )    C.A. No. 22-01621-MN
TRUST #1, CHARLIE JAVICE, in her capacity    )
as Trustee of CHARLIE JAVICE 2021    )
IRREVOCABLE TRUST #2, and CHARLIE    )
JAVICE in her capacity as Trustee of CHARLIE    )
JAVICE 2021 IRREVOCABLE TRUST #3,    )
    )
        Defendants.    )

## ANSWERING BRIEF IN OPPOSITION TO
## DEFENDANT OLIVIER AMAR'S MOTION TO DISMISS

OF COUNSEL:

William M. Regan
Allison M. Wuertz
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000

POTTER ANDERSON & CORROON LLP
Peter J. Walsh, Jr. (#2437)
Michael A. Pittenger (#3212)
Jonathan A. Choa (#5319)
Carla M. Jones (#6046)
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
mpittenger@potteranderson.com
pwalsh@potteranderson.com
jchoa@potteranderson.com
cjones@potteranderson.com

Dated March 29, 2023

*Attorneys for JPMorgan Chase Bank, N.A.*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. III

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 3

I.   JPMC'S COMPLAINT PLEADS A FEDERAL SECURITIES FRAUD CLAIMS AGAINST AMAR UNDER SECTION 10(B) AND ALL THREE PRONGS OF RULE 10B-5 ...................................... 8

    A.   Amar Is a "Maker" of the False Statements Made to JPMC in the Fake Customer List and the Merger Agreement. .......................................................................... 8

    B.   Amar's Miscellaneous Arguments Attacking Individual Allegations in Isolation and Out of Context Have No Merit ........................................................................ 11

    C.   Amar Ignores JPMC's Claims Under Rule 10b-5(a) and 10b-5(c). .................... 15

II.  AMAR'S ASSERTION THAT JPMC'S SECTION 20(A) CLAIM DOES NOT ALLEGE HIS CULPABLE PARTICIPATION IN A $175 MILLION FRAUD IS FRIVOLOUS ............................... 16

I.   THE COMPLAINT PLEADS THE ELEMENTS OF ALL FIVE COMMON LAW CLAIMS ............... 17

    A.   The Complaint Pleads Fraud Within the Contract. ............................................. 18

    B.   The Complaint Pleads All Elements of Fraudulent Concealment. ....................... 19

    C.   The Complaint Pleads All Elements of Conspiracy and Aiding and Abetting..... 19

    D.   The Complaint Pleads All Elements of Unjust Enrichment. ................................ 20

CONCLUSION ................................................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*ABRY Partners V, L.P. v. F & W Acquisition*, LLC,
    891 A.2d 1032 (Del. Ch. 2006).................................................................................13, 18

*In re Advance Auto Parts, Inc. Sec. Litig.*,
    2020 WL 599543 (D. Del. Feb. 7, 2020) ..................................................................8

*In re Advanta Corp. Sec. Litig.*,
    180 F.3d 525 (3d Cir. 1999).....................................................................................12

*Anvil Holding Corp. v. Iron Acquisition Co.*,
    2013 WL 2249655 (Del. Ch. May 17, 2013) ..........................................................19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................................6

*Aviation W. Charters, LLC v. Freer*,
    2015 WL 5138285 (Del. Super. Ct. July 2, 2015) ..................................................18

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................................6

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)....................................................................................7

*Cal. Pub. Emps. Ret. Sys. v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004)......................................................................................7

*In re Digital Island Sec. Litig.*,
    223 F. Supp. 2d 546 (D. Del. 2002).........................................................................17

*Duncan v. Vantage Corp.*,
    2019 WL 1349497 (D. Del. Mar. 26, 2019) .............................................................6

*Glickenhaus & Co. v. Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015) .....................................................................................9

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)......................................................................................7

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)...................................................................................................1

*Lincoln Nat. Life Ins. Co. v. Snyder*,
    722 F. Supp. 2d 546 (D. Del. 2010).........................................................................15

*Lorenzo v. SEC,*
    139 S. Ct. 1094 (2019) ........................................................................................................2, 16

*In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.,*
    2011 WL 3444199 (D.N.J. Aug. 8, 2011) .................................................................11, 12

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.,*
    854 A.2d 121 (Del. Ch. 2004) ..............................................................................................19

*Online Healthnow, Inc. v. CIP OCL Invs., LLC,*
    2021 WL 3557857 (Del. Ch. Aug. 12, 2021) ...................................................................18

*Pension Benefit Guar. Corp. v. White Consol. Indus. Inc.,*
    998 F.2d 1192 (3d Cir. 1993) ...............................................................................................8

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.,*
    311 F.3d 198 (3d Cir. 2002) .........................................................................................7, 15

*S'holder Representative Servs. LLC v. RSI Holdco, LLC,*
    2019 WL 2207452 (Del. Ch. May 22, 2019) ...................................................................20

*TransDigm Inc. v. Alcoa Glob. Fasteners, Inc.,*
    2013 WL 2326881 (Del. Ch. May 29, 2013) ...................................................................19

*Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.,*
    176 F. Supp. 3d 387 (D. Del. 2016) ....................................................................................10

*U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.,*
    839 F.3d 242 (3d Cir. 2016) ..................................................................................................7

*U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC,*
    812 F.3d 294 (3d Cir. 2016) ................................................................................................15

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.,*
    2017 WL 1658822 (D.N.J. Apr. 28, 2017) ........................................................................11

*Wilkerson v. New Media Tech. Charter Sch. Inc.,*
    522 F.3d 315 (3d Cir. 2008) ..................................................................................................7

*Wind Point Partners VII-A, L.P. v. Insight Equity A.P. X Co., LLC,*
    2020 WL 5054791 (Del. Super. Ct. Aug. 17, 2020) ........................................................19

*Zazalli v. Alexander Partners, LLC,*
    2013 WL 5416871 (D. Del. Sept. 25, 2013) .....................................................................11

## **Statute**

17 C.F.R. § 240.10b-5 ............................................................................................ *passim*

15 U.S.C. 78t(a) ................................................................................................................17

**Federal Rules**

Fed. R. Civ. P. 12(b)(6) .............................................................................. *passim*

Fed. R. Civ. P. 12(f) ........................................................................................8

Fed. R. Civ. P. 9(b) ...................................................................................... *passim*

## <u>PRELIMINARY STATEMENT</u>

Using facts taken directly from dozens of contemporaneous emails, text messages, management presentations, and other corporate documents personally authored by Defendants, the Complaint in this case affirmatively demonstrates that Charlie Javice and Olivier Amar worked together to create the Fake Customer List, caused Frank to make false representations and warranties in the August 8, 2021 Merger Agreement, used the Fake Customer List and Merger Agreement representations to fraudulently induce JPMC to purchase their company for $175 million, and actively concealed their misconduct.[1]  The Court should deny Amar's Rule 12(b)(6) motion to dismiss because the Complaint easily satisfies the pleading requirements of Rule 8, Rule 9(b), and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").[2]

Amar attacks the Complaint in three principal ways.  <u>*First*</u>, Amar asserts that, for purposes of JPMC's claim under SEC Rule 10b-5(b), the Complaint does not adequately allege that he was the "maker" of the false statements contained in the Fake Customer List and the Merger Agreement.  Wrong.  Under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), Amar is fully responsible for the Fake Customer List – the Complaint alleges facts showing that Javice and Amar hatched their plan together in the "orange jumpsuit" conversation with Frank's Director of Engineering; that Javice reached out to the Data Science Professor while Amar simultaneously contracted with third-party marketing firm ASL Marketing, Inc. ("ASL") with the common intent to mislead JPMC in its acquisition; that Amar pressured ASL to provide its data three days prior to signing because "we have limited time with

---

[1]       Defined terms in this memorandum are taken from JPMC's Complaint.  ECF No. 1.

[2]       Amar's co-conspirator Javice responded with an answer and recognized that JPMC pled all seven causes of action with particularity sufficient to satisfy the PLSRA and Rule 9(b).

this data scientist;" and that Javice and Amar actively concealed their use of the Fake Customer List, including providing JPMC with the ASL List Amar obtained as if it was real Frank user data. Moreover, Amar is a "maker" of the false Merger Agreement representations. A corporate entity such as Frank can only act through its executives, and, as the Complaint alleges, Javice and Amar were the senior-most officers at Frank, controlled all aspects of Frank's business, and were Frank's "Knowledge" persons for more than two dozen representations and warranties in the Merger Agreement, including a representation that Frank had not engaged in Fraud. Nothing more is required at this stage of the litigation to show that Amar is a "maker" of the false representations that induced the fraudulent Frank transaction.

Notably, Amar's motion to dismiss addresses only JPMC's false statement claim under Rule 10b-5(b); he does not respond to JPMC's claims for "scheme liability" under Rule 10b-5(a) and Rule 10b-5(c). Those claims create liability for deceptive conduct without regard to whether a defendant was the "maker" of a false representation. *See Lorenzo v. SEC*, 139 S. Ct. 1094 (2019). Those claims are sufficiently stated, unopposed, and must proceed to discovery.

<u>Second</u>, Amar argues that it is "damning" to JPMC's claim that the ASL List arrived too late to be used to induce JPMC to enter into the Frank transaction. This quasi-causation argument fails on multiple levels. For example, it ignores the allegations in the Complaint showing that Amar was intimately involved with the Fake Customer List from inception through cover-up. In addition, for purposes of 10b-5(b), the fact that Amar was reaching out to ASL for information to give to the Data Science Professor establishes that the "no Fraud" representation in Section 3.5(b) of the Merger Agreement was misleading by omission. And, far from "damning" JPMC's claim, Amar's work with ASL is an act in furtherance of a fraud that creates liability for fraudulent concealment, conspiracy, aiding and abetting, and unjust enrichment.

*Finally*, Amar baselessly argues that all seven causes of action in the Complaint should be dismissed due to a lack of particularity.  According to Amar, the Complaint alleges only that he attended "one meeting," "legitimately acquired a data set," and "became a dutiful and valuable employee at JPMC after the Merger."  Pretending that allegations do not exist and mischaracterizing a pleading are not grounds for a Rule 12(b)(6) motion.  The Complaint spells out Amar's personal involvement in the scheme to defraud JPMC in exhaustive detail from start to finish, and for that reason the Court should deny the motion in its entirety.

## STATEMENT OF FACTS

Charlie Javice and Olivier Amar were the senior management team at Frank, a company focused on helping students navigate the college financial aid process.  Compl., ¶ 2, 28-30.  Together, they "controlled all aspects of Frank's business and decision-making."  *Id.*, ¶ 31.

In the summer of 2021, JPMC and Frank began discussing a potential merger.  *Id.*, ¶ 3.  In a "management presentation" provided to JPMC, Frank represented that it was a valuable acquisition candidate because it had 4.25 million student customer accounts.  *Id.*, ¶ 59.  Similarly, documents placed in the Acquisition Data Room indicated that Frank worked with 4.265 million students who had started a FAFSA, with more than 2.1 million students fully completing the FAFSA through Frank.  *Id.*, ¶ 4.

JPMC attempted to verify in due diligence Frank's claim of more than 4 million students, and specifically requested that Frank provide a complete list of customer accounts with first names, last names, dates of birth, phone numbers, mailing addresses, and email addresses.  *Id.*, ¶ 5.  JPMC identified this as a "critical" diligence request.  *Id.*, ¶ 6.  The problem for Javice and Amar was that Frank did not have more than 4 million customer accounts; it had fewer than

300,000.  *Id.* at ¶¶ 1, 8, 23.  So Javice and Amar hatched a fraud to deceive JPMC and induce it to purchase Frank for $175 million.  *Id.*, ¶¶ 15, 23, 124, 131.

Javice and Amar jointly approached Frank's Director of Engineering on August 2, 2021.  *Id.*, ¶¶ 74-75.  At that meeting, "Javice and Amar asked the Director of Engineering to help them create a synthetic [fake] list of customer data."  *Id.*, ¶ 75.  The Director of Engineering objected, and Javice, with Amar present, said that she did not believe anyone would end up in an "orange jumpsuit" as a result of the plan.  *Id.*  Despite this attempted assurance, the Director of Engineering "told Javice and Amar that he would not perform the task [of creating a Fake Customer List] and only would send them the file containing Frank's actual users."  *Id.*, ¶ 76.

From there, Javice and Amar put their fraud on parallel tracks, given that time was of the essence – if they did not provide an immediate response to JPMC's diligence request, JPMC might walk away from the transaction.  So Javice reached out to the Data Science Professor and together they created the Fake Customer List that was presented to Acxiom, the third-party vendor who verified that the list appeared to contain the data fields requested by JPMC.  *Id.*, ¶¶ 9-11, 69-72.  "At the exact same time," Amar took actions in furtherance of the conspiracy by separately reaching out to ASL Marketing, Inc. ("ASL") to purchase a list of 4.5 million students for $105,000.  *Id.*, ¶ 12.  The Complaint quotes an email from Amar, where he initially described the purpose of his request to "append [ASL's] data elements" to Frank's house file, admitted to knowing about the work being performed by the Data Science Professor, admitted that he was working with Javice on the same project, and pressured ASL to provide the data in time to respond to JPMC's diligence request.  Compl., ¶¶ 134, 138 ("**We're** rushed on this . . . .  If we can't close this today, we will move forward with another vendor as **we have limited time with this data scientist and time is ticking**.") (emphasis added).

The ASL List arrived too late to present in response to JPMC's diligence request, but, as explained below, "Javice and Amar later used the ASL List to further deceive JPMC and cover their tracks after the Frank acquisition." *Id.*, ¶ 12.

The parties signed the Merger Agreement on August 8, 2021. *Id.*, ¶ 15. Javice and Amar, as the company's senior-most executives, caused Frank to make numerous representations and warranties in the contract, including a "no Fraud" representation in Section 3.5(b) – "[t]o the knowledge of [Frank], there has been no Fraud with respect to any member of the Company Group that involves any of the management or other employees . . . or any claim or allegation regarding any of the foregoing." *Id.*, ¶ 119. Javice and Amar also caused Frank to represent that they had operated the business in compliance with law, that they had operated the business in the ordinary course, that they had disclosed to JPMC all material contracts involving more than $50,000, and that they were not aware of any misuse of Frank's trade secrets. *Id.*, ¶¶ 118-132 (citing Merger Agreement §§ 3.5(b), 3.6(a), 3.6(b), 3.7, 3.13, 3.16(h) and 5.1).

The Merger Agreement specifically identified Javice and Amar as two of the three "Knowledge" persons for the company, meaning the individuals whose personal knowledge would be deemed Frank's corporate knowledge for purposes of more than two dozen representations and warranties (including the "no Fraud" representation in Section 3.5(b)). *See id.*, ¶ 117. Frank was represented in the deal by Sidley Austin LLP, a major international law firm with expertise in merger transactions. *See* D.I. 16., Ex. 1 (Merger Agreement), § 9.7.[3] It is unlikely that Sidley Austin would have permitted Frank to sign the Merger Agreement without showing the representations and warranties to each Knowledge person and requiring that each

---

[3]     As Amar acknowledges, the Court can consider the contents of the Merger Agreement on this Rule 12(b)(6) motion because it is incorporated by reference into the Complaint.

Knowledge person affirmatively confirm that the representations and warranties, including the "no Fraud" representation in Section 3.5(b), were in fact 100% true and correct.

At closing, Javice and the trusts she controls received approximately $21 million in merger proceeds, with another $7 million in merger proceeds and $20 million in retention bonus if Javice remained a JPMC employee in good standing one year after the closing.  Compl., ¶¶ 28-29.  Amar received $5 million in merger proceeds and a $3 million retention bonus.  *Id.*, ¶ 30.

After the closing, Javice and Amar became JPMC employees.  JPMC soon sought to market its products and services to Frank's customers and requested that Javice and Amar provide Frank's customer list.  *Id.*, 164.  Amar lied in response to this request, claiming that he could not provide the list because Frank's engineers were "bogged down in fixing a critical issue in processing financial aid applications."  *Id.*, ¶¶ 167-68.  Three weeks later, Frank provided JPMC with Amar's ASL List, which as noted was purchased from a third-party and did not contain any actual Frank users.  *Id.*, ¶¶ 169-72.  The test marketing campaign led JPMC to investigate and ultimately file the claims at issue in this litigation.  *Id.*, ¶¶ 178-80.

## ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6), a complaint must (a) allege a short and plain statement showing that the plaintiff is entitled to relief, and (b) give the defendant fair notice of the basis for the claims.  *Duncan v. Vantage Corp.*, 2019 WL 1349497, at *3 (D. Del. Mar. 26, 2019) (Noreika, J.) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007)).  A court must accept well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff.  *Id.*  A 12(b)(6) motion must be denied if the complaint sets forth any plausible claim for relief.  *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  The plausibility standard is met if the complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  A

plaintiff must provide only "enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element." *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotations omitted). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997).

Where, as here, the complaint alleges fraudulent misrepresentations under federal and state law, the complaint also must satisfy the particularity requirements of the PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252-53, 280 (3d Cir. 2009) (applying the PSLRA and Rule 9(b) and finding sufficient particularity in federal securities fraud claim); *U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 256 (3d Cir. 2016) (finding a fraud claim sufficiently particularized under Rule 9(b)). The particularity rules are not burdensome – a plaintiff need not include "every material detail of the fraud" and, instead, must only "inject[] precision and some measure of substantiation." Mov. Br. at 5 (citing *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002)).

The particularity rules require that the plaintiff plead "the who, what, when, where and how: the first paragraph of any newspaper story." *Id.* (quoting *Cal. Pub. Emps. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004)). Here, the "first paragraph of [the] newspaper story" is satisfied – in its Complaint, JPMC spells out the fraud in detailed allegations supported by citations to specific emails and documents:

> **Who?**  The Complaint alleges that Frank's two senior-most executives – Chief Executive Officer Charlie Javice and Chief Growth Officer Olivier Amar – caused their company Frank to make knowingly false representations to JPMC. *See, e.g.*, Compl., ¶¶ 8, 12, 28, 30-31.

**What?**  The Complaint provides citations to and quotes from the exact representations and warranties that are alleged to be false and misleading.  *See, e.g.*, *id.*, ¶¶ 118-31.

**Where?**  The Complaint alleges that the false and misleading statements that Javice and Amar caused Frank to make are contained in the Fake Customer List and in the Merger Agreement.  *See, e.g.*, *id.*, ¶¶ 7, 11, 117-118.

**When?**  The Complaint alleges that the representations were false at signing (August 8, 2021) and at closing (September 8, 2021).  *See, e.g.*, *id.*, ¶¶ 120, 122, 124, 128.

**Why?**  The Complaint alleges that Javice and Amar engaged in their scheme to induce JPMC to pay $175 million for Frank, $26 million of which they kept for themselves.  *See, e.g.*, *id.*, ¶¶ 23, 28-30.

**How?**  The Complaint alleges that, after Frank's in-house engineer declined to aid in their scam, Javice and Amar engaged in a divide and conquer strategy – Javice worked with the Data Science Professor to create the Fake Customer List, Amar simultaneously reached out to obtain the ASL List.  Both took acts in furtherance of their fraudulent scheme to induce JPMC to purchase Frank.  Javice finished first so they used her list to induce the transaction, and then they later used Amar's ASL List to prevent JPMC from discovering the initial fraud.  *See, e.g.*, *id.*, ¶¶ 8, 12, 15, 17-18, 23, 43, 75-76, 133-142, 158, 171-172.

Nothing more is required at the pleading stage; this case should proceed to discovery and trial.[4]

## I.   JPMC'S COMPLAINT PLEADS A FEDERAL SECURITIES FRAUD CLAIMS AGAINST AMAR UNDER SECTION 10(B) AND ALL THREE PRONGS OF RULE 10B-5.

### A.   Amar Is a "Maker" of the False Statements Made to JPMC in the Fake Customer List and the Merger Agreement.

Amar first argues that the Complaint fails to identify any false statement that can be

attributed to him in his personal or individual capacity and, for that reason, that he cannot be

---

[4]      Amar correctly observes that in, in deciding a Rule 12(b)(6) motion, the Court must consider only the allegations contained in the Complaint, its exhibits, and matters of public record.  *See* Amar Mov. Br. at 1, n.1 (citing *Pension Benefit Guar. Corp. v. White Consol. Indus. Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993)).  Nonetheless, Amar improperly injects into the record unsupported (and false) factual assertions concerning his actions.  *See* Amar Mov. Br. at 3 n.2, 11 nn.4-5.  Burying improper factual assertions made in support of a 12(b)(6) motion in footnotes does not make those assertions proper.  *See In re Advance Auto Parts, Inc. Sec. Litig.*, 2020 WL 599543, at *1 (D. Del. Feb. 7, 2020).  The Court should strike Amar's unsupported factual assertions pursuant to Rule 12(f) as impertinent matter.

liable under Section 10(b) and Rule 10b-5(b).  Mov. Br. at 7.  Although he couches his argument in terms of particularity and does not cite or mention the Supreme Court's decision in *Janus Capital*, this is essentially a "maker" argument – only individuals with "ultimately authority" over the contents and dissemination of a corporate statement can be liable as makers of false statements under Rule 10b-5(b).  The argument fails because the Complaint alleges ample detail showing that, for purposes of Rule 10b-5(b), Amar is a "maker" of (a) the Fake Customer List, and (b) Frank's representations and warranties in the Merger Agreement.[5]

With respect to the statements in the Fake Customer List, both Javice and Amar were on the initial call with Frank's Director of Engineering in August 2021.  Compl., ¶ 75.  On that call, they asked the Director of Engineering to use synthetic data techniques to create a list of fake customers.  *Id.*, ¶ 75.  The Director of Engineering declined to help Javice and Amar create fake data after asking whether it was legal.  *Id.*, ¶¶ 75-76.  Javice responded that she did not believe anyone would "end up in an 'orange jumpsuit'" as a result of the fake data project.  *Id.*, ¶ 75.

Immediately after that call, Amar solicited a list of 4.5 million college-aged students from ASL while Javice worked with the Data Science Professor to create synthetic data.  *Id.*, ¶¶ 78-98, 133-42.  As detailed in the Complaint, Amar corresponded numerous times with ASL between August 2 and August 5 to obtain a list of information belonging to 4.5 million college-aged students.  *Id.*, ¶¶ 134-42.  Critically, during his exchange with ASL, he threatened to terminate the work with ASL and try another vendor because ASL was moving too slowly and, as Amar noted to ASL, "we have limited time with this data scientist and time is ticking."  *Id.* at 138.  This is a critical email – Amar did not write "**Javice** has limited time with this data scientist and

---

[5]     Javice is a "maker" of the same false statements.  *See Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 427 (7th Cir. 2015) ("Nothing in *Janus* precludes a single statement from having multiple makers.").

I have no idea what they are working on," he wrote "**we** have limited time with this data scientist and time is ticking." *Id.* The Complaint explains in exhaustive email-by-email detail that the data scientist used synthetic data techniques to create the Fake Customer List; that the Fake Customer List was presented to JPMC to induce the transaction; and that the data scientist was paid bonus money and altered his invoices so as to conceal the misconduct. *See id.*, ¶¶ , 9-12, 73-108.

With respect to the false representations and warranties in the Merger Agreement, the Complaint alleges that Amar was the No. 2 executive officer at Frank, that he and Javice together controlled all aspects of Frank's business, that Amar was a Knowledge person for more than two dozen representations and warranties in the Merger Agreement, that Amar knew those representations and warranties were false when made, and that Amar received more than $5 million in merger proceeds. Compl., ¶¶ 30-31, 117-31. Amar was no stranger to the Merger Agreement – as a condition to JPMC's obligation to close, Section 2.4(c)(iv) required that Amar and Frank's other officers provide broad releases of liability to JPMC and Frank, while Section 5.8 required that Amar formally resign from his position as Chief Growth Officer. *See* D.I. 16., Ex. 1 (Merger Agreement).

All of these facts, the balance of the more than 120 references to Amar in the Complaint, and the reasonable inferences drawn in favor of JPMC, are more than sufficient to state a claim under the PSLRA and Rule 9(b) that Amar is a "maker" of the false statements contained in both the Fake Customer List and in the Merger Agreement. *See Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 176 F. Supp. 3d 387, 393-94 (D. Del. 2016) (finding that individual officers were "makers" of corporation's fraudulent statements used to induce merger transaction for purposes of Rule 10b-5(b) claim); *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,

2017 WL 1658822, at *12 (D.N.J. Apr. 28, 2017) (holding that a 10b-5(b) complaint adequately alleged that individual directors were "makers" of corporate statements that referenced board member actions); *Zazalli v. Alexander Partners, LLC*, 2013 WL 5416871, at *7 (D. Del. Sept. 25, 2013) (holding that defendants were makers of statements in subscription agreement for 10b-5(b) purposes where complaint provided indicia that defendants adopted statements as their own); *In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*, 2011 WL 3444199 (D.N.J. Aug. 8, 2011) (finding corporate statements made within the scope of an individual officer's duties attributable to him because "a corporation can act only through its employees and agents").

### B.     Amar's Miscellaneous Arguments Attacking Individual Allegations in Isolation and Out of Context Have No Merit.

Amar argues that the Court should dismiss the Complaint because "JPMC pleads only seven factual allegations specific to Mr. Amar to allege that he knowingly 'caused' Frank to make those [false] representations *in the Merger Agreement*." Mov. Br. at 8 (emphasis in the original).[6] This argument fails at a macro-level because: (i) there is no numeric threshold as to how many allegations provide sufficient particularity for purposes of the PLSRA and Rule 9; (ii) there are more than 120 references to Amar's conduct in the Complaint; (iii) Amar is accountable for *both* the Fake Customer List and the Merger Agreement representations; (iv) Amar repeatedly mischaracterizes the Complaint or ignores its allegations; and (v) Amar improperly examines individual facts in isolation and never addresses the totality of the Complaint's allegations concerning his personal conduct and knowledge.  Nonetheless, in the interest of completeness, JPMC addresses each issue raised in Amar's "only seven facts"

---

[6]     Amar unhelpfully leaves it to JPMC and the Court to unpack his brief and guess which specific elements of JPMC's federal securities law claims he is challenging with the "only seven facts" argument.  *See* Mov Br. at 13, n.7 (noting that "the same reasons" go to the maker issue, falsity, scienter, reliance, and causation).

argument.

**Fact 1** – Amar argues that his position as Frank's second-most senior executive is insufficient to show that he made false statements.  Mov. Br. at 8-9.  As shown above in Section I.A, however, senior executives often are held liable under Rule 10b-5(b) for making false statements nominally attributable to their corporate employers.  Mixing apples and oranges, Amar cites case law discussing scienter in an effort to establish that he is not a maker.  To be sure, courts have held that an individual's status as a senior executive, standing alone, is insufficient to plead an individual's knowledge.  *See, e.g.*, *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999); *In re Merck & Co.*, 2011 WL 3444199, at *26.  But the Complaint here alleges that Amar knew the Fake Customer List and the Merger Agreement representations and warranties (including the "no Fraud" representation in Section 3.5(b)) were false based on far more than just his position as Chief Growth Officer.  Amar's scienter is based on, among other things, his knowledge of Frank's actual customer account numbers, his participation in the "orange jumpsuit" meeting, the work that he and Javice did with the Data Science Professor, his procurement of the ASL List, and his use of the ASL List in the cover-up.

**Fact 2** – Amar argues that his status as a "Knowledge" person is not relevant because Section 1.2(b) of the Merger Agreement somehow absolves him of liability.  Mov. Br. at 9-10.  Section 1.2(b) provides that "the phrase 'to the Company's Knowledge' and phrases of similar import or effect are used herein to qualify and limit the scope of any representation or warranty in which they appear and are not affirmations of any Person's 'superior knowledge' that the representation or warranty in which they are used is true."  *See* D.I. 16., Ex. 1 (Merger Agreement), § 1.2(b).  From this provision, Amar overreaches.

JPMC is not arguing, and need not establish, that Amar had "superior knowledge" to other individuals.  Instead, JPMC is rightly alleging that Amar's contractual designation as a Knowledge

12

person and his specific involvement with, and awareness of, fraudulent actions render certain representations and warranties in the Merger Agreement false.  Stated differently, Section 1.2 provides that when JPMC seeks to establish the falsity of knowledge-qualified representations and warranties, it can point to facts known by the Knowledge persons (Javice and Amar).  Facts known by other employees at Frank, in contrast, would not suffice.  Finally, Amar's assertion that Section 1.2(b) absolves him of liability for knowingly false statements in the Merger Agreement is contrary to Delaware law.  *See ABRY Partners V, L.P. v. F & W Acquisition*, LLC, 891 A.2d 1032, 1064 (Del. Ch. 2006) ("To the extent that the Stock Purchase Agreement purports to limit the Seller's exposure for its own conscious participation in the communication of lies to the Buyer, it is invalid under the public policy of this State.  That is, I find that the public policy of this State will not permit the Seller to insulate itself from the possibility that the sale would be rescinded if the Buyer can show either:  1) that the Seller knew that the Company's contractual representations and warranties were false; or 2) that the Seller itself lied to the Buyer about a contractual representation and warranty.").

**Fact 3** – Amar argues that his purchase of the ASL List is meaningless because the Complaint does not allege facts showing that the purchase was outside the ordinary course of business.  Mov. Br. at 10-11.  This argument goes to one issue – the representation in Section 3.6(a) of the Merger Agreement that Frank "conducted its business . . . in the ordinary course of business consistent with past practice."  Compl., ¶¶ 121-122.  The argument fails because the Complaint alleges that Frank did not in the ordinary course and in its past practice contract with professors and third-party marketing firms to create and obtain fake customer lists, which is plausible where those false lists are used for an acquisition and represented as Frank's users.  *Id.* The Court must accept that allegation to be true for purposes of a Rule 12(b)(6) motion.

**Fact 4/Fact 7** – Amar makes the same argument twice – that the ASL List arrived too late for him and Javice to use to induce JPMC to enter into the Frank transaction. Mov. Br. at 11, 13. According to Amar, this causation argument is "damning" – how could he have fraudulently induced JPMC to enter into the transaction if his attempt to defraud JPMC via the ASL List did not actually succeed? This argument again does not hold up in light of the allegations in the Complaint. Amar and Javice initiated the fraudulent scheme when they approached the Director of Engineering. Then, Amar participated in the fraudulent scheme by securing the ASL List ("we have limited time with this data scientist"), and Amar facilitated the cover-up by providing the ASL List so that Frank could pass it off as its actual customer list post-Merger. Compl., ¶¶ 133-142, 164-68. Thus, the Complaint – with all allegations taken as true and inferences drawn in JPMC's favor – alleges that from start to finish Amar was an active participant in the scheme to defraud JPMC.

Moreover, Amar's efforts to acquire the ASL List to give to the Data Science Professor affirmatively establish JPMC's 10b-5(b) claim. Amar caused Frank to represent in Section 3.5(b) of the Merger Agreement that he was not aware of any Fraud involving management. D.I. 16., Ex. 1 (Merger Agreement), § 3.5(b). Amar's actions in relation to his conversation with Frank's Director of Engineering and the ASL list render this representation misleading by omission – Amar could not truthfully make this representation while omitting that he had worked hard to quickly acquire the ASL list for the purpose of providing it to JPMC, either for the due diligence exercise or after the merger, in order to perpetuate the lies about Frank's actual customer base. Compl., ¶¶ 132-42, 164-68.

**Fact 5** – Amar argues that the Court should dismiss the Complaint because "large sections" refer only to actions and statements by Javice without mentioning Amar. Mov. Br. at

14

12.  The Court should summarily reject this nonsensical argument, particularly in light of Amar's own words to ASL – "we have limited time with this data scientist and time is ticking."  Compl., ¶ 138.  Amar may have been the No. 2 executive, but he was equally involved with Javice in all aspects of the fraud in this case.

**Fact 6** – Amar argues that his attendance at the "orange jumpsuit" meeting is not significant because he did not say much.  Mov. Br. at 12-13.  This argument illustrates a problem pervading Amar's entire moving brief – he conflates different legal principles and pertinent inquires in an attempt to craft a seemingly plausible argument.  Under Rule 9(b), a plaintiff must plead the "who, what, where, when, and how" of the **fraud**.  *See U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016); *Lincoln Nat. Life Ins. Co. v. Snyder*, 722 F. Supp. 2d 546, 561 (D. Del. 2010).  The allegations regarding the meeting with the Director of Engineering meet this standard comfortably, identifying the who (Javice, Amar, and the Director of Engineering), what (a meeting concerning the creation of synthetic data), where (virtually via Zoom), when (August 2 or 3, 2021), and how (using synthetic user data in connection with a diligence exercise).  That the Complaint does not provide a verbatim transcript from the Zoom meeting is of no moment – Rule 9(b) does not demand that a plaintiff plead "every material detail," but rather only provide "some measure of substantiation."  *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d at 216 (cited in Mov. Br. at 5).

### C.    Amar Ignores JPMC's Claims Under Rule 10b-5(a) and 10b-5(c).

All of Amar's "only seven facts" arguments are aimed at JPMC's claim under SEC Rule 10b-5(b), which provides that it is "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F. R. § 240.10b-5.  Amar repeatedly argues that "JPMC does not plead factual allegations to

15

support its claim that Amar made any materially false or misleading statement or omission." *Id.* at 13.[7] And Amar cites only false statement case law. *See, e.g.*, Mov. Br. at 7.

But Amar ignores entirely JPMC's claims under subsections (a) and (c) of Rule 10b-5, which make it "unlawful for any person . . . (a) [t]o employ any device, scheme, or artifice to defraud" or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5. *See Lorenzo*, 139 S. Ct. 1094, 1104 (2019) (holding that a defendant can be held liable under Rule 10b-5(a) and Rule 10b-5(c) for participating in a scheme to provide knowingly false information to a securities purchaser even where the defendant was not the maker of the statement under *Janus* for purposes of Rule 10b-5(b)). By not opposing the 10b-5(a) and (c) claims, Amar concedes that they are well pled and must proceed to discovery. *See* Compl., ¶ 188, 192, 194.

## II. AMAR'S ASSERTION THAT JPMC'S SECTION 20(A) CLAIM DOES NOT ALLEGE HIS CULPABLE PARTICIPATION IN A $175 MILLION FRAUD IS FRIVOLOUS.

In his motion, Amar poses a stunning rhetorical question – "In what 'meaningful sense' was [he] a culpable participant" in Frank's allegedly false representations and warranties in the Merger Agreement? Mov. Br. at 15. It is difficult to fathom how Amar could have reviewed the Complaint in this case and then actually ask that question.

Section 20(a) of the Securities Exchange Act provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

---

[7]     Amar also ignores that fraudulent concealment, unjust enrichment, conspiracy and aiding and abetting do not require that Amar have personally made a false statement.

15 U.S.C. 78t(a).  To plead a claim under Section 20(a), a plaintiff must allege:  (1) a primary

violation; (2) that the defendant controlled the primary violator; and (3) that the defendant was a

culpable participant in the fraud.  *See, e.g.*, *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546,

560 (D. Del. 2002).  Amar argues only that the Complaint fails to plead with particularity the

third element, namely that Mr. Amar was in some meaningful sense a culpable participant in the

fraud perpetrated by Frank.  Mov. Br. at 14.  But the Complaint is replete with allegations

showing that Amar played a leading role in every aspect of the Fraud from its inception in the

"orange jumpsuit" meeting, to his efforts to acquire the ASL List to give to the Data Science

Professor, to falsely representing in the Merger Agreement that he had no knowledge of prior

Fraud, to the post-merger cover-up, to Amar's receipt of $5 million in merger proceeds.  It is

hard to imagine a complaint that alleges a fraudster's participation in a way that is more

meaningful or culpable.  The Complaint here pleads all facts necessary to show Amar's liability

as a control person under Section 20(a) of the Exchange Act.

I.   **THE COMPLAINT PLEADS THE ELEMENTS OF ALL FIVE COMMON LAW CLAIMS.**

Amar makes what can at best be described as a half-hearted pass at moving to dismiss

JPMC's claims for fraud within the contract, fraudulent concealment, conspiracy to commit

fraud, aiding and abetting fraud, and unjust enrichment.  *See* Mov. Br. at 15-20.  In lieu of

analyzing the claims on an individualized or element-by-element basis, Amar lumps five discrete

Delaware law causes of action together, contending that "all require similar elements" including

either a "fraudulent or wrongful act by Mr. Amar or knowledge of a fraud by Mr. Amar."  *Id.* at

16.  From there, Amar argues that the common law claims should be dismissed because the

Complaint does not allege that he is responsible for making the false statements in the Merger

Agreement or that he engaged in *any* wrongful conduct at *any* point in time.  *Id.* at 16-20.  The

Court should reject Amar's arguments on the common law claims because (a) they are contrary

to settled Delaware law, and (b) they once again completely ignore the more than 120 actual allegations in the Complaint that specify Amar's misconduct in exhaustive detail.

### A.     The Complaint Pleads Fraud Within the Contract.

Amar argues that the Complaint does not allege facts showing he "contributed to the negotiations of the Merger Agreement," and thus he cannot be held liable for the false representations contained in that contract. *See* Mov. Br. at 16.  Under settled Delaware law, however, a seller cannot absolve himself of liability for making (or for causing his company to make) knowingly false statements because they were made in a merger agreement.  *See ABRY Partners V*, 891 A.2d at 1035-36 ("The public policy against fraud is a strong and venerable one that is largely founded on the societal consensus that lying is wrong . . . when a seller intentionally misrepresents a fact embodied in a contract—that is, when a seller lies—public policy will not permit a contractual provision to limit the remedy of the buyer . . . ."); *Online Healthnow, Inc. v. CIP OCL Invs., LLC*, 2021 WL 3557857, at *20 (Del. Ch. Aug. 12, 2021) (finding that Delaware public policy will not permit sellers to escape liability for fraudulent statements made by a corporation in a merger agreement where the sellers knew the representations were false); *Aviation W. Charters, LLC v. Freer*, 2015 WL 5138285, at *5 (Del. Super. Ct. July 2, 2015) (noting that "[i]t is well-settled law that officers and directors may be liable for tortious misconduct even though they were acting on behalf of the business.").

There is no reasonable debate that the Complaint here pleads the elements of fraud within the contract as against Amar:  he was the No. 2 senior executive and controlled Frank together with Javice; he was a Knowledge person in the Merger Agreement including for the "no Fraud" representation in Section 3.5(b); the Merger Agreement falsely represented (among other things) that Javice and Amar operated the business in the ordinary course and in compliance with law and disclosed to JPMC all Material Contracts; he actively participated in the effort to create and

then conceal the use of a list of more than 4 million fake customers; and he personally received

more than $5 million in merger proceeds.  Compl., ¶¶ 30, 116-32, 198.

### B.       The Complaint Pleads All Elements of Fraudulent Concealment.

Amar correctly observes that fraudulent concealment requires that a "defendant took

some action affirmative in nature designed or intended to prevent, and which does prevent, the

discovery of facts giving rise to the fraud claim . . . .".  Mov. Br. at 16 (quoting *Metro Commc'n*

*Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 150 (Del. Ch. 2004).  Somehow,

Amar concludes that the Complaint here does not allege these elements.  *Id.*  That argument does

not pass the smell test – the core claim alleged on every single page of the Complaint is that

JPMC requested a list of Frank's actual customers, but Amar and Javice took steps that were

intended to, and which did in fact, prevent JPMC from timely discovering the truth – Frank had

fewer than 300,000 customers and not more than 4 million.  Compl., ¶ 183.  The allegations

easily state a claim for fraudulent concealment.  *See Anvil Holding Corp. v. Iron Acquisition Co.,*

2013 WL 2249655, at *6-7 (Del. Ch. May 17, 2013) (denying motion to dismiss where seller

defendants knew the corporation was making false representations and actively concealed

information from the buyer showing those representations to be false); *TransDigm Inc. v. Alcoa*

*Glob. Fasteners, Inc.*, 2013 WL 2326881, at *9 (Del. Ch. May 29, 2013) (declining to dismiss

fraudulent concealment claim despite anti-reliance clause); *Wind Point Partners VII-A, L.P. v.*

*Insight Equity A.P. X Co., LLC*, 2020 WL 5054791, at *17 (Del. Super. Ct. Aug. 17, 2020)

("Because of the alleged affirmative actions to conceal in addition to the omitted representation,

the alleged conduct constitutes an omission that is not barred by the anti-reliance language.").

### C.       The Complaint Pleads All Elements of Conspiracy and Aiding and Abetting.

Similarly, Amar notes that, under Delaware law, conspiracy to commit fraud requires an

unlawful act done in furtherance of the conspiracy, while aiding and abetting requires knowledge

and substantial assistance.  Mov. Br. at 16.  Once again, Amar concludes that these causes of action should be dismissed solely by ignoring the Complaint.  With respect to acts done in furtherance of the conspiracy, knowledge, and substantial assistance, the Complaint alleges, among other things:  that Amar and Javice reached out to Frank's Director of Engineering in the "orange jumpsuit" meeting, that Amar purchased the ASL List while noting "we have limited time with this data scientist and time is ticking," and that Frank used the ASL List to prevent JPMC from discovering the truth after the deal closed.  Compl., ¶¶ 30, 75, 138, 204.

###### D.   The Complaint Pleads All Elements of Unjust Enrichment.

Finally, Amar argues that unjust enrichment requires the absence of justification and a remedy provided by law, and that this cause of action nonetheless should be dismissed because the Complaint does not allege that he engaged in misconduct.  Mov. Br. at 16.  This argument is wrong on Delaware law and, yet again, utterly disregards the 120+ allegations in the Complaint identifying Amar's misdeeds with particularity.  On the law, the unjust enrichment claim survives, regardless of whether the wrongdoing here was committed by Javice or Amar because Amar himself was enriched.  *See S'holder Representative Servs. LLC v. RSI Holdco, LLC*, 2019 WL 2207452, at *6 (Del. Ch. May 22, 2019) (stating that a claim is properly pled where the complaint alleges that the merger arose from wrongdoing and that the defendant has been unjustly enriched thereby).  On the facts, as repeatedly noted, the Complaint sets forth Amar's personal wrongdoing at length, and he was unjustly enriched with $5 million in merger proceeds. Compl., ¶¶ 30, 133-142.  Nothing more is required.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny Amar's motion to dismiss.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

William M. Regan                          By:  */s/ Jonathan A. Choa*
Allison M. Wuertz                               Peter J. Walsh, Jr. (#2437)
HOGAN LOVELLS US LLP                            Michael A. Pittenger (#3212)
390 Madison Avenue                              Jonathan A. Choa (#5319)
New York, NY 10017                              Carla M. Jones (#6046)
(212) 918-3000                                  Hercules Plaza
                                                P.O. Box 951
                                                Wilmington, DE 19899
                                                (302) 984-6000
                                                mpittenger@potteranderson.com
Dated March 20, 2023                            pwalsh@potteranderson.com
                                                jchoa@potteranderson.com
                                                cjones@potteranderson.com

                                          *Attorneys for JPMorgan Chase Bank, N.A.*