IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JPMORGAN CHASE BANK, N.A.,<br><br>*Plaintiff,*<br><br>v.<br><br>CHARLIE JAVICE, et al.<br><br>*Defendant.* | Case No. 1:22-cv-01621-JDW |

### MEMORANDUM

Olivier Amar moves to dismiss the Complaint in this case as it pertains to him because he says JP Morgan Chase, N.A. ("JPMC") doesn't plead that he made a material misstatement to defraud JPMC. We must have read different complaints. The Complaint satisfies the pleading requirements, so I won't dismiss the claims against Mr. Amar.

I.   BACKGROUND

A.   Facts

Charlie Javice founded TAPD, Inc., which did business as "Frank," in 2017. Frank operates a service that helps students apply for financial aid. In March 2017, Ms. Javice hired Mr. Amar as the Executive Vice President Of Marketing And Acquisition of a Frank affiliate. A year later, Ms. Javice promoted Mr. Amar to Frank's Chief Growth Officer. In that capacity, Mr. Amar served as Frank's second-highest ranking executive.

In July 2021, the Parties began negotiating JPMC's acquisition of Frank. Mr. Amar was present for at least some of the negotiations, but Ms. Javice served as Frank's main

point of contact and negotiator. During the negotiations, Ms. Javice represented that more than 4.25 million users had created accounts on Frank, which meant that Frank had access to their email addresses and other personal information. JPMC requested a list of those users, including their personal information, as part of its due diligence.

There was only one problem with JPMC's request: Frank didn't have nearly 4.25 million users; it had less than 300,000. So Ms. Javice and Mr. Amar asked Frank's Director Of Engineering to create a fake customer list that would pass muster with the third party consulting agency performing due diligence for JPMC. The Director Of Engineering refused, despite Ms. Javice's assurance that nobody would end up in an "orange jumpsuit."

Unable to rely on their in house team, Ms. Javice and Mr. Amar resorted to two outside options. Ms. Javice contacted a data science professor, who used synthetic data techniques to create a list of over 4.25 million fake Frank users (the "Professor's List"). At the same time, Mr. Amar purchased a list of 4.5 million students from ASL Marketing, Inc. (the "ASL List"), a company that collects student data, for $105,000. Because the ASL List was a large file, it took a long time to send and download, so Ms. Javice sent JPMC the Professor's List without incorporating ASL's data, and Mr. Amar held onto the ASL List.

After due diligence, JPMC purchased Frank. The Parties signed a Merger Agreement ("MA") on August 8, 2021. Under the MA, JPMC paid $175 million to acquire Frank. Mr. Amar received approximately $5 million as part of the deal. He also became a JPMC employee, with the possibility of earning a $3 million retention bonus.

The MA defined Frank's "knowledge" at the time of the merger as "the actual knowledge" of three indiviuals: Ms. Javice; Mr. Amar; and Frank's General Counsel. In the MA, Frank made several representations and warranties based on that knowledge. For example, Section 3.5(b) states that "[t]o the knowledge of [Frank], there has been no Fraud with respect to any member of the Company Group that involves any of the management or other employees of any member of the Company Group or any claim or allegation regarding any of the foregoing." Additionally, Section 3.13 represents that Frank has, to its knowledge, disclosed all payments owed to or by Frank in excess of $50,000. However, Mr. Amar knew that wasn't true because Frank hadn't disclosed several large payments Frank owed for creating its various fake customer lists, including $105,000 it owed to ASL.

In January 2022, JPMC asked Mr. Amar for Frank's user list so its marketing team could begin testing a marketing campaign targted at Frank's customers. Because the Professor's List used fake information, they couldn't use it. So Mr. Amar responded that the engineering team was "bogged down in fixing a crucial issue in processing financial aid applications." (D.I. 1 at ¶ 167.) That was a lie, but it bought Frank some time. Eventually, Mr. Amar sent JPMC the ASL list.

The marketing campaign failed. The poor user engagement rate led JPMC to investigate Frank, and the investigation uncovered Ms. Javice and Mr. Amar's purchases of the Professor's List and ASL List, and their lies about the size of Frank's user base. JPMC fired Ms. Javice and Mr. Amar, and this suit followed.

B.   **Procedural History**

JPMC filed its Complaint alleging violations of Section 10, Rule 10-b, and Section 20(a) of the Securities Exchange Act, fraud within the contract, fraudulent concealment, conspiracy to commit fraud, aiding and abetting fraud, and unjust enrichment, on December 22, 2022. (D.I. 1.) Mr. Amar filed a Motion To Dismiss For Failure To State A Claim on March 1, 2023.

II.  **LEGAL STANDARD**

A district court may dismiss a complaint for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). Rather than require detailed pleadings, the "Rules demand only a short and plain statement of the claim showing that the pleader is entitled to relief[.]" *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (quotation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (same). In determining whether a claim is plausible, the court must "draw on its judicial experience and common sense." *Id.* at 786-87 (same). First, the court must identify the elements needed to set forth a particular claim. *Id.* at 787. Second, the court should identify conclusory allegations, such as legal conclusions, that are not entitled to the presumption of truth. *Id.* Third, with respect to well-pleaded factual allegations, the court should accept those allegations as true and "determine whether they plausibly give rise to an entitlement to relief." *Id.* (quotation omitted). The court must "construe those truths

in the light most favorable to the plaintiff, and then draw all reasonable inferences from them." *Id.* at 790 (citation omitted).

In securities fraud cases, Federal Rule Of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA") "impose independent, threshold pleading requirements that, if not met, support dismissal apart from Rule 12(b)(6)." *In re Rockefeller Ctr. Props., Inc, Sec. Litig.*, 311 F.3d 198, 224 (3d Cir. 2002). To plead fraud claims, a complaint must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Under that standard, the complaint must describe the time, place, and contents of the false representations or omissions, as well as the identity of the person making the statement and the basis for the statement's falsity." *City of Warren Police and Fire Ret. Sys. v. Prudential Fin. Inc.*, 70 F.4th, 668, 680 (3d Cir. 2023) (citations omitted). Additionally, the PSLRA requires that complaints based on the Securities Exchange Act must plead "each statement alleged to have been misleading" and to "specify the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

## III. DISCUSSION

The Complaint satisfies the pleading requirements of Rule 9(b) and the PSLRA. It identifies Mr. Amar as someone who committed fraud. It says that he did so by making false statements in the MA for the purpose of defrauding JPMC during its acquisition of Frank. It provides factual evidence, gleaned from emails and text messages between Mr. Amar and others, that prove those statements were false. It also pleads factual allegations

5

regarding Mr. Amar's fraudulent conduct both before and after those statements. The heightened pleading standard for fraud doesn't require any more.

### A. Securities Exchange Act Claims

#### 1. Section 10(b) claims

Section 10(b) of the Securities Exchange Act makes it illegal for a person "[t]o use or employ, . . . any manipulative or deceptive device or contrivance in contravention of" an SEC rule. 15 U.S.C. § 78j(b). Pursuant to Section 10(b), the SEC's Rule 10b-5 makes it unlawful "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or decieit upon any person." 17 C.F.R. § 240.10b-5(a)-(c). Although there is "considerable overlap among the subsections of the Rule and related provisions of the securities laws," and all three subsections apply to false or misleading statements, only Rule 10b-5(b) requires that a defendant be the maker of the relevant mistatement. *See Lorenzo v. SEC*, 139 S. Ct. 1094, 1101-02 (2019). Therefore, I address subsection (b) and subsections (a) and (c) separately.

##### a. Rule 10b-5(a) and (c)

Mr. Amar didn't directly challenge JPMC's claims under Rules 10b-5(a) and (c). However, he did move to dismiss the Complaint in its entirety, and some of his arguments are relevant to whether I should dismiss those claims. Therefore, even though I could find

that Mr. Amar conceded that these claims should survive, I'll address his substantive arguments.

JPMC satisfies the pleading requirements for claims under Rules 10-b5(a) and (c) because the Complaint specifies how Mr. Amar employed a scheme and engaged in multiple acts to defraud. The meaning of "scheme" under Rule 10b-5(a) is "a project, plan, or program of something to be done." *Lorenzo*, 139 S. Ct. 1101 (cleaned up, citations omitted). An "act" under Subsection (c) is "a doing" or a "thing done." *Id.* (same). The Complaint lays out how Mr. Amar and Ms. Javice discussed falsifying user data with Frank's Director Of Engineering and then conspired to seek outside help to create a fake user list. Although Ms. Javice and Mr. Amar pursued separate paths, with one contacting the data science professor and the other contacting ASL, the Complaint asserts those were two aspects of a single plan. It provides evidence of the connection between the two acts in the form of Mr. Amar's emails, in which he asked ASL to hurry up because he and Ms. Javice "have limited time with this data scientist and time is ticking." (D.I. 1 at ¶ 138.) Those facts indicate that Mr. Amar and Ms. Javice devised a plan to defraud JPMC and took multiple actions in furtherance of it.

Mr. Amar's only argument is that JPMC doesn't allege he engaged in any fraudulent conduct. I suggest he go back and read the Complaint in its entirety. Mr. Amar focuses only on the MA itself and the isolated communications between Ms. Javice and the data science professor. Although it's true JPMC doesn't plead that Mr. Amar contacted the data

7

science professor, the Complaint still connects him to that scheme. The Complaint contains myriad facts that show Mr. Amar knew of the the plan to trick JPMC into thinking Frank had over 4.25 million users, and that he took acts in furtherance of that plan. Mr. Amar's assertions to the contrary have no merit.

### b. Rule 10b-5(b)

Unlike Rules 10b-5(a) and (c), to state a claim under Rule 10b-5(b) the plaintiff must show that the defendant made a false or misleading statement or omission. A person makes a statement if they have "ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inv. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Under the PSLRA, plaintiffs must specify the role each defendant played in making a misstatement or omission. *Winer Family Trust v. Queen*, 503 F.3d 319, 335-36 (3d Cir. 2007). The evidnece that someone is a statement's maker may be "implicit from surrounding circumstances." *Janus*, 564 U.S. at 142. A statement can have multiple makers. *See Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 176 F. Supp.3d 387, 394 (D. Del. 2016) (quoting *Clickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 427 (7th Cir. 2015)).

The MA lists Mr. Amar as someone whose knowledge is equivalent to Frank's knowledge and makes certain warranties regarding that knowledge, including whether Frank knew of any fraud committed during the negotiation of the acquisition or had outstanding payments over $50,000. Based on Mr. Amar's position at the company,  his

8

control and input regarding Frank's business dealings, and the factual allegations concerning his participation in the fraud with Ms. Javice, it is implicit in the Complaint that he had control over his inclusion as a knowledge person in the MA, and of the warranties his personal knowledge was used to support. Mr. Amar was the second most senior person at Frank. Through his role he had significant decision making power at Frank. He was involved in some of the due diligence discussions and negotiations regarding JPMC's acquisition of Frank. He discussed falsifying user data with Ms. Javice on several occasions. He and Ms. Javice conspired to seek outside help, and he procured a fake list of users. Taken together and viewed in the light most favorable to JPMC, these allegations state a claim at least for implicitly making false statements.

### 2.     Section 20(a) claims

Section 20(a) of the Securities Exchange Act makes a "person who, directly or indirectly, controls any person liable under any provision of [the Act] . . . liable jointly and severally with and to the same extent as such controlled person . . . ." 15 U.S.C. 78t(a). Therefore, Section 20(a) imposes liability on persons who control businesses that violate Section 10(b) and Rule 10b-5. *City of Warren*, 70 F.4th at 679. However, a control person is only liable under Section 20(a) to the extent they were a "culpable participant" in the acts constituting the underlying securities violation. *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484-85 (3d Cir. 2013).

JPMC pleads that Frank committed securities fraud, that Mr. Amar was a control person, and that he meaningfully engaged in culpable conduct. Mr. Amar only challenges whether any of the allegations show he was a culpable participant in the fraud. They do, for all the reasons I have already given. The facts in the Complaint establish that Mr. Amar was an "culpable confederate" in the fraud. *Straub v. Vaisman & Co., Inc.*, 540 F.2d 591, 596 (3d Cir. 1976).

### B. Common Law Claims

All of JPMC's common law fraud claims satisfy the requirements of Rule 9(b). I've already found that JPMC sufficiently pleads that Mr. Amar made false statements in the MA, and that his participation in the scheme to create a fake list, along with his status as the number two executive with decision making power at Frank, is sufficient to show knowledge of the fraud. I won't rehash those issue below, but I'll walk through the elements of the various claims to show that JPMC met its burden.

#### 1. Fraud within the contract, conspiracy, and aiding and abetting

A fraud claim under Delaware law requires: (1) the defendant's false representation; (2) knowledge or belief the representation was false, or reckless indifference to the truth; (3) intent to induce action or inaction; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damages as a result of reliance. *Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000). Fraud claims can be based on false representations in a contract. *Phoenix Equity Grp. LLC v. BPG Justison P2 LLC*, No. 5008-

10

VCL, 2010 WL 1223619 (Del. Ch. Mar. 25, 2010) (citing *Abry Partners V, LLP v. F & W Acquisition LLC*, 891 A.2d 1032, 1040-45 (Del. Ch. 2006)). To plead a conspiracy to commit fraud, a plaintiff must show an agreement between two or more persons and an unlawful act done in furtherance of the conspiracy, as well as damages. *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149-50 (Del. 1987). In contrast, the elements of aiding and abetting fraud include the underlying tortious conduct, knowledge, and substantial assistance. *AmeriMark Interactive, LLC v. AmeriMark Holdings, LLC*, No. N21C-12-175 MMJ CCLD, 2022 WL 16642020 (Del. Super. Nov. 3, 2022) (citations omitted).

JPMC pleads every element of these claims. The Complaint states with particularity that Mr. Amar made false warranties and statements in the MA, that those misstatements were intended to induce JPMC to purchase Frank, that JPMC did so in reliance upon them, and that JPMC incurred damages. Even if JPMC didn't plead that Mr. Amar made those false statements, it did plead that Mr. Amar entered an agreement with Ms. Javice to commit the fraud, had knowledge of it, and substantially assisted it. The Complaint also alleges that Mr. Amar attempted to cover up the fraud post-merger, which strengthens these claims.

### 2. Fraudulent concealment

Fraudulent concealement requires showing "that a defendant took some action affirmative in nature designed or intended to prevent, and which does prevent, the discovery of acts giving rise to the fraud claim, some artiface to prevent knowledge of the

11

facts or some representation intended to exclude suspicion and prevent inquiry." *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs., Inc.*, 854 A.2d 121, 150 (Del Ch. 2004) (quotations omitted). The relevant action must be something "more than mere silence." *Wiggs v. Summit Midstream Partners, LLC*, No. 7801-VCN, 2013 WL 1286180 at *11 (Del. Ch. Mar. 28, 2013). The plaintiff must show the defendant intended to deceive it, and reliance on the deception to its detriment. *Metro Comm'cn*, 854 A.2d at 150.

The Complaint says that Mr. Amar attempted to convince Frank's Director Of Engineering to create a fake user list, solicitied and purchased the ASL List, and caused Frank to represent that no fraud was committed by any Frank executive during the negotiation of the MA. Those acts were meant to prevent suspicion of Frank's fraud, and they had that effect. JPMC relied on the assertions in the MA when it signed the contract. Those facts state a claim for fraudulent concealment under Delaware law.

Mr. Amar's post-merger conduct also supports a claim for fraudulent concealment. When JPMC asked for Frank's user list to test its marketing campaign, Mr. Amar told a series of lies to prevent JPMC from learning that he and Ms. Amar had defrauded it. Eventually, he sent JPMC the ASL List to stop it from discovering the fraud. And JPMC relied on that list to prepare a marketing campaign. Therefore, the Complaint states a claim for fraudulent concealment based on actions before and after it signed the MA.

### 3. **Unjust Enrichment**

"Unjust enrichment is the unjust retention of a benefit to the loss of another. . . ." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (quotations omitted). To state a claim for unjust enrichment, a plaintiff must show: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) an absence of a remedy provided by law." *Id.* When a contract governs the parties' relationship, that usually means there's a remedy at law. *S'holder Representative Servs. LLC v. RSI Holdco, LLC*, No. 2018-0517-KSJM, 2019 WL 2207452 at *6 (Del. Ch. May 22, 2019) (citation omitted). However, when the contract is a product of fraud, unjust enrichment claims can proceed. *Id.*

JPMC pleads that it paid Mr. Amar $5 million as part of the merger, and that the merger occurred as a result of fraud. Under Delaware law, that's sufficient to state a claim for unjust enrichment. So I won't dismiss that claim.

### C. Motions To Lift The Stay

During the pendency of this Motion, both JPMC and Ms. Javice filed motions to partially lift the PSLRA's discovery stay pursuant to 15 U.S.C. 78u-4(b)(3)(B). Now that I've resolved Mr. Amar's Motion, the stay is no longer in effect, so those Motions are moot.

## IV. CONCLUSION

The Complaint might state facts that make Ms. Javice more involved in the fraud and more culpable than Mr. Amar, but that doesn't exonerate Mr. Amar. Even under the heightened pleading standard for securities fraud, the Complaint asserts myriad factual

13

allegations that place Mr. Amar at the center of the fraud, and show that he made materially false statements to JPMC. I will deny his Motion. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

Date:  July 13, 2023