# **<u>Exhibit A</u>**

Approved:

MICAH F. FERGENSON / DINA MCLEOD
Assistant United States Attorneys

Before:      THE HONORABLE ROBERT W. LEHRBURGER
             United States Magistrate Judge
             Southern District of New York

- - - - - - - - - - - - - - - x

**23 MAG 2638**

UNITED STATES OF AMERICA            :      **SEALED COMPLAINT**

         - v. -                     :      Violations of 18 U.S.C. §§ 1343, 1344,
                                           1349, & 2; 15 U.S.C. §§ 645(a), 78j(b)
CHARLIE JAVICE,                     :      & 78ff; and 17 C.F.R § 240.10b-5.

                 Defendant.         :      COUNTY OF OFFENSE:
                                           NEW YORK
                                    :

- - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

      JEREMY ROSENMAN, being duly sworn, deposes and says that he is a Special Agent
with the United States Attorney's Office for the Southern District of New York and charges as
follows:

**COUNT ONE**
**(Conspiracy to Commit Wire and Bank Fraud)**

      1.     From at least in or about June 2021 through at least in or about November 2022, in
the Southern District of New York and elsewhere, CHARLIE JAVICE, the defendant, and others
known and unknown, willfully and knowingly combined, conspired, confederated, and agreed
together and with each other to commit wire fraud, in violation of Title 18, United States Code,
Section 1343, and bank fraud, in violation of Title 18, United States Code, Section 1344.

      2.     It was a part and an object of the conspiracy that CHARLIE JAVICE, the defendant,
and others known and unknown, knowingly having devised and intending to devise a scheme and
artifice to defraud, and for obtaining money and property by means of false and fraudulent
pretenses, representations, and promises, would and did transmit and caused to be transmitted by
means of wire, radio, and television communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, which
affected a financial institution, in violation of Title 18, United States Code, Section 1343, to wit
JAVICE and others engaged in a scheme to obtain money from J.P. Morgan Chase ("JPMC"), a
bank headquartered in New York, New York, by submitting false statements and representations
about her company TAPD, Inc., d/b/a Frank ("Frank") to JPMC, in order to induce JPMC to

acquire Frank for approximately $175 million, and in furtherance thereof, JAVICE transmitted and caused to be transmitted electronic communications and monetary transfers to and from the Southern District of New York.

3.      It was further a part and an object of the conspiracy that CHARLIE JAVICE, the defendant, and others known and unknown, knowingly would and did execute a scheme and artifice to defraud a financial institution as defined in Title 18, United States Code, Section 20, to wit, JPMC, and to obtain monies, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344, to wit, JAVICE submitted false statements and representations about Frank to JPMC in order to fraudulently induce JPMC to acquire Frank for approximately $175 million.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Wire Fraud)

4.      From at least in or about June 2021 through at least in or about November 2022, in the Southern District of New York and elsewhere, CHARLIE JAVICE, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, which affected a financial institution, to wit, JAVICE engaged in a scheme to obtain money from JPMC, by submitting false statements and representations about Frank to JPMC, in order to induce JPMC to acquire Frank for approximately $175 million, and in furtherance thereof, JAVICE transmitted and caused to be transmitted electronic communications and monetary transfers to and from the Southern District of New York.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Bank Fraud)

5.      From at least in or about June 2021 through at least in or about November 2022, in the Southern District of New York and elsewhere, CHARLIE JAVICE, the defendant, knowingly executed, and attempted to execute, a scheme and artifice to defraud a financial institution as defined in Title 18, United States Code, Section 20, to wit, JPMC, and to obtain monies, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations and promises, to wit, JAVICE engaged in a scheme to obtain money from JPMC, by submitting false statements and representations about Frank to JPMC, in order to induce JPMC to acquire Frank for approximately $175 million.

(Title 18, United States Code, Sections 1344 and 2.)

**COUNT FOUR**
**(Securities Fraud)**

6.     From at least in or about June 2021 through at least in or about November 2022, in the Southern District of New York, and elsewhere, CHARLIE JAVICE, the defendant, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.l0b-5, by (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to wit, JAVICE engaged in a scheme to obtain money from JPMC, by submitting false statements and representations about Frank to JPMC, in order to induce JPMC to acquire the equity shares, options, and warrants of Frank for approximately $175 million, a substantial proportion of which were held by JAVICE.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

7.     I am a Special Agent with the United States Attorney's Office for the Southern District of New York and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law enforcement agents, witnesses, and others, as well as my examination of report and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

**Overview of the Fraudulent Conduct**

8.     In 2021, CHARLIE JAVICE, the defendant, engaged in a calculated scheme to falsely and dramatically inflate the number of customers at her company, Frank, in order to fraudulently induce JPMC to acquire Frank for $175 million.

9.     In or about 2017, CHARLIE JAVICE, the defendant, founded Frank, a for-profit company that offered an online platform designed to simplify the process of filling out the Free Application for Federal Student Aid ("FAFSA"). FAFSA is a federal government form, available free of charge, that students use to apply for financial aid for college or graduate school. JAVICE was Frank's CEO.

10.     In or about 2021, CHARLIE JAVICE, the defendant, began to pursue the sale of Frank to a larger financial institution. Two major banks expressed interest and began acquisition processes with Frank. JAVICE represented repeatedly to those banks that Frank had 4.25 million customers or "users." JAVICE explicitly defined "users"—to both banks—as individuals who had signed up for an account with Frank and for whom Frank therefore had at least four identified categories of data (*i.e.*, first name, last name, email address, and phone number). In fact, Frank had less than 300,000 users.

11.     When JPMC sought to verify the number of Frank's users and the amount of data collected about them—information that was critical to JPMC's decision to move forward with the acquisition process—CHARLIE JAVICE, the defendant, fabricated a data set. To do this, JAVICE approached a data scientist and hired him to create an artificially generated data set (a so-called synthetic data set). Then, JAVICE provided that synthetic data set to an agreed-upon third-party vendor in an effort to confirm to JPMC that the data set had over 4.25 million rows, consistent with JAVICE's misrepresentations. Through this process, JAVICE caused the third-party vendor to convey to JPMC that the data set had over 4.25 million rows.

12.     In reliance on JAVICE's fraudulent representations about Frank's users, JPMC agreed to purchase Frank for $175 million. As part of the deal, JPMC hired JAVICE and other Frank employees. JAVICE received over $21 million for selling her equity stake in Frank and, per the terms of the deal, was to be paid another $20 million as a retention bonus.

13.     Unbeknownst to JPMC, at or about the same time that CHARLIE JAVICE, the defendant, was creating the fabricated data set, JAVICE and a co-conspirator not named herein ("CC-1") sought to purchase, on the open market, *real* data for over 4.25 million college students to cover up their lies. JAVICE and CC-1 succeeded in purchasing a data set of 4.5 million students for $105,000, but it did not contain all the data fields that JAVICE had represented to JPMC were maintained by Frank. JAVICE then purchased an additional set of data on the open market, in order to augment the data set of 4.5 million users. After JPMC acquired Frank, JPMC employees asked JAVICE and CC-1 to provide the data set of Frank users so that JPMC could begin a marketing campaign to those users. In response, JAVICE provided what was supposedly Frank's user data. In fact, JAVICE provided the data she and CC-1 had purchased on the open market, at a small fraction of the price that JPMC paid to acquire Frank and its purported users.

14.     After an investigation by JPMC, JPMC terminated JAVICE for cause in or about November 2022.

### **Relevant Persons and Entities**

15.     Frank was a for-profit company that offered an online platform or tool designed to simplify the process of filling out the Free Application for Federal Student Aid ("FAFSA"). FAFSA is a federal government form, available free of charge, that students use to apply for financial aid for college or graduate school. Based on my review of an archived snapshot of Frank's website in or about July 2021, a portion of which is depicted below, I know that Frank claimed that the ability to "apply for aid in under 7 minutes" was one of the reasons "[w]hy 4.25 million

students choose Frank."



16.    CHARLIE JAVICE, the defendant, founded Frank in or about 2017, approximately four years after graduating from a finance-focused undergraduate program. JAVICE received various accolades in connection with her role as founder of Frank, such as being selected to the 2019 Forbes "30 Under 30" list in the category "Big Money." JAVICE served as the CEO of Frank until its acquisition by JPMC in or about September 2021.

17.    JPMC is a major financial institution headquartered in New York City. JPMC's deposits are insured by the FDIC.

**JAVICE's Misrepresentations About Frank's "Users" to a Different Bank in June 2021**

18.    Based on my review of documents obtained from JPMC, another major bank ("Bank-2"), and from a Manhattan-based investment bank hired by Frank to assist in its acquisition ("Investment Firm-1"), I have learned that, in or about June 2021, prior to the acquisition process with JPMC, Frank began an acquisition process with Bank-2. During that acquisition process, CHARLIE JAVICE, the defendant, supplied the same definition of "user" that she later gave to JPMC. Specifically, I have learned the following, in substance and in part:

a.    In or about June 2021, Bank-2 began an acquisition process with Frank.  During that process, JAVICE represented to Bank-2 that Frank had 4.25 million users. At multiple times in the acquisition process with Bank-2, JAVICE defined "users" as individuals who had signed up for an account with Frank and for whom Frank had collected four particular data points (first name, last name, email, and phone number).

b.    For example, on or about June 28, 2021, JAVICE sent an email to an Investment Firm-1 employee ("Investment Firm Employee-1"). JAVICE provided additional information about retention (*i.e.*, how many Frank users returned to use the platform). In that email, JAVICE referred several times to Frank's "users," writing "This shows when we bring back users to log back into an account (new user data is on new users that we provided monthly prior)."

c.    JAVICE attached to the email an Excel spreadsheet which also contained reference to Frank's users (specifically, "Returning Users" and "New Users"). Also attached was a Word

document entitled "Retention Definitions." Under the heading "Definition," was "User Signup: validated first name, last name, email, phone number, OTP."[1] As described below, this was the same definition of "user" that JAVICE later gave to JPMC.

       d.   Ultimately, on or about July 14, 2021, Bank-2 informed JAVICE that it would not proceed further with the acquisition.

### JAVICE's Misrepresentations to JPMC About Frank's "Users"

       19.   Based on my review of JPMC records and interviews with witnesses at JPMC, I have learned that CHARLIE JAVICE, the defendant, repeatedly falsely represented to JPMC employees—in oral statements, in electronic communications, in PowerPoint presentations, and in data room documents—that Frank had over 4 million users or customers. The fraudulent representations made by JAVICE while pitching Frank as an acquisition target for JPMC include those described below.

       a.   Frank was first brought to the attention of an executive at JPMC who manages acquisitions and strategic partnerships ("Executive-1") in or about March 2021. Frank was an appealing acquisition target for JPMC due to the marketing potential of Frank's large—according to JAVICE—customer base, which consisted of young and diverse students.

       b.   On or about July 2, 2021, JAVICE emailed JPMC executives, including Executive-1, "overview materials" for Frank. In the body of the email, JAVICE included "a few highlights." The highlights in the email body indicated, among other things, and under the heading "Growth," that Frank had "5.6M [*i.e.*, million] active households in the US and . . . will end the year with close to 10M families." The attached materials included an 18-page pdf of a PowerPoint presentation regarding Frank (the "July 2 Pitch Deck"). The July 2 Pitch Deck repeatedly represented, falsely, that Frank had 4.25 million users.

       i.   For example, the July 2 Pitch Deck represented that there were 4.25 million "Frank Students & Growing," as depicted below.

---

[1] Based on my review of records from JPMC and Bank-2, "OTP" (one-time password) refers to the process of verifying an account by sending a code to a given email account or phone, which is then supplied back to the requesting website.



ii.  As another example, the July 2 Pitch Deck represented that Frank's "users" consisted of "4.25mm Students," as depicted below.



iii.  Similarly, the July 2 Pitch Deck represented that Frank's "Growth" included "1.4mm new Students in 2020" alone. That slide is depicted in relevant part below:

7



c.  On or about July 6, 2021, Frank opened its data room to various employees of JPMC working on the potential acquisition.

d.  The following day, on or about July 7, 2021, JAVICE presented to JPMC. At the July 7, 2021 meeting, JAVICE delivered a management presentation to JPMC's representatives, which was accompanied by a 60-page PowerPoint deck (the "July 7 Pitch Deck").

   i.  As with the July 2 Pitch Deck, the July 7 Pitch Deck repeatedly represented, falsely, that Frank had 4.25 million customers.

   ii.  Further, the July 7 Pitch Deck specifically referenced Frank's purported 4.25 million student users on a slide titled "Frank Thesis: Distribution is the Power in Fintech," which is depicted below.

   iii.  I know from experience and publicly available information that financial professionals commonly refer to the reasons why a particular investment makes sense or is likely to be profitable as a "thesis" or "investment thesis." I also believe, based on the context of the slide, that the slide title's use of "distribution" was a reference to marketing effectiveness.

   iv.  The "Frank Thesis" slide, in particular, claimed that Frank's "strategic value . . . derived from" several points. These points included Frank's "powerful distribution and relationships with Students that would take a company hundreds of millions of dollars and many years to replicate." The slide also included a bullet emphasizing the value of Frank's data. The

8

bullet stated: "**Meaningful Data:** We know more about our Students than any lender, college, or employer year over year."

> v. In larger print, the "Frank Thesis" slide stated: "4.25 million Students trust Frank for all their money needs – adding more financial products now has minimal execution risk and is much less expensive."

e. At or about the same time, JPMC employees began reviewing the documents in Frank's data room. For example, on or about July 8, 2021, a JPMC employee emailed other JPMC employees a spreadsheet that JAVICE uploaded, or caused to be uploaded, to Frank's data room (the "Spreadsheet"). The subject of the email was "User Breakdown." The JPMC employee wrote: "See attached. They ended 2020 with ~5mm users and expect to end 2021 with ~8mm. Currently on 5.4mm so they have some work to do to hit that target . . . ." I have reviewed the Spreadsheet and observed the following, among other things.

> i. The Spreadsheet includes several columns tracking data related to Frank's "users."

> ii. One column is titled "All New Users." The column appears to show the new users that Frank added each month, beginning in March 2017 and continuing through at least June 2021.[2] As shown in the "All New Users" column, the "Grand Total to Date" number of Frank users was represented to be 5,424,449, through June 2021.

> iii. Several adjacent columns purport to break down the new users in each month by various metrics. In particular, several columns purport to break down the number of new Frank users according to how they were acquired (*i.e.*, which marketing channel resulted in the user acquisition). And several other columns purport to break down the number of new Frank users according to which Frank product is purportedly being used—namely, the columns titled "FAFSA In Process," "Scholarships," "Classfinder," "Aid Appeal," and "Financial Education & College Costs."

> iv. Notably, as shown in the "FAFSA In Process" column, the total number of students who had used Frank's FAFSA tool to complete, or at least partially complete, a FAFSA was represented to be 4,265,085—*i.e.*, slightly more than 4.25 million, which is the number of student users that JAVICE claimed Frank had.

f. On or about July 9, 2021—which was a Friday, and one day after the Spreadsheet was circulated internally at JPMC—a JPMC employee emailed the investment advisors representing JAVICE to thank them for a discussion the night prior, to update them on next steps, and to request due diligence meetings.

g. As requested by JPMC, diligence meetings were held the following Monday and Tuesday—on or about July 12 and 13, 2021. Based on my conversations with certain JPMC employees who attended those meetings, and as reflected in contemporaneous notes taken by a JPMC employee in connection with those meetings, JAVICE made clear in the July 12 diligence

---

[2] The number of new users in the months from July 2021 through December 2021 are identified as "Projections."

session what the 4.25-million-users statistic—repeatedly touted in the July 2 Pitch Deck, the July 7 Pitch Deck, and in JAVICE's oral representations—signified. As memorialized in the detailed notes, JAVICE stated in substance and in part that Frank had 4.25 million "[c]umulative users" and a "[u]ser is one who" has provided to Frank his or her "first name, last name, email, [and] phone number."

      h.   After representing to JPMC that Frank had 4,265,085 users, JAVICE directed a JPMC executive ("Executive-2") to the Spreadsheet to further support her claim. Specifically, JAVICE wrote to the JPMC executive, in substance and in part: "[P]lease refer to the data room document 3.1.4 [the Spreadsheet] on user breakdown. The data provided for the analysis is coming from FAFSA in progress point of entry. Other products are not included in the scope of this analysis . . . ."

      20.   In sum, as set forth above, JAVICE repeatedly represented to JPMC, falsely, that Frank had over 4 million users, that approximately 4.265 million of those users had (at least) started using Frank's FAFSA tool, and that Frank maintained (at least) those users' first name, last name, email, and phone number.

## JPMC's Request for Validation of Frank's Users

      21.   Based on my review of records obtained from JPMC, and my interviews of Executive-1 and Executive-2, I have learned that, in early August 2021, JPMC informed CHARLIE JAVICE, the defendant, that in order to close the deal, JPMC would need to validate the number of Frank users, and the quality of data about those users.  Representatives of JPMC had numerous communications with JAVICE, both oral and written, in which they detailed the precise information sought by JPMC.  Specifically, I have learned the following, in substance and in part:

      a.   A crucial question for JPMC was the number of Frank users and the quality of the data associated with those users (*i.e.*, how much data and what kind of data had Frank collected about those users).

      b.   Executive-1 made clear to JAVICE that validating the number of users and the quality of user data was the primary obstacle to signing the deal.

      c.   JAVICE resisted JPMC's initial attempts to validate the number of users and quality of the data, claiming that she was prevented from sharing that information due to Frank's terms of service with its users. JAVICE ultimately agreed to proceed with the data validation process through the use of a third-party database marketing company ("Vendor-1")—that is, Frank would send the data to Vendor-1 for validation, not directly to JPMC.

      d.   On or about August 1, 2021, Executive-1 sent an email to JAVICE (the "August 1 Email"), with the subject line containing "key data questions." Executive-1 wrote, "Hi Charlie, Per our discussion . . . . How many customer accounts have 100% of the below data?  How many customer accounts have partial information?  Of partial records, what % include each data field below?  Validate the integrity of each of the variables to the degree reasonable." The August 1

Email contained a table of various categories of data, including, for example, student email address, year of school, and marital status. A portion of the table is depicted below:

How many customer accounts have 100% of the below data?
How many customer accounts have partial information? Of partial records, what % include each data field below?
Validate the integrity of each of the variables to the degree reasonable (e.g., data and email fields are captured in the appropriate formats)

| Section | Variable |
| --- | --- |
| Popup | STUDENT_FIRST_NAME |
| | STUDENT_LAST_NAME |
| | STUDENT_EMAIL |
| | STUDENT_PHONE_NUM |
| Personal | STUDENT_HOME_ADDR |
| | STUDENT_HOME_ADDR_APT |
| | STUDENT_BIRTHDAY |
| | APPLICATION_YEAR |
| Account Flow | STUDENT_MAJR_INTRST |
| My Degree | YEAR_OF_SCHOOL |
| | DEGREE_LEVEL |
| | WILL_HAVE_BACHELORS_CY |

e.  On or about August 2, 2021, Executive-2, along with another JPMC employee, spoke via Zoom to JAVICE about the data validation requirements.  On that phone call, Executive-2 explained that there were approximately 20 data fields for which JPMC required validation. Executive-2 and JAVICE discussed in detail the data fields needing validation. JAVICE proposed using a unique identifier (*i.e.*, a unique value in lieu of the actual information) for certain data fields, including name, email address, home address, and date of birth.

f.  On or about August 3, 2021, after internal discussions at JPMC, Executive-2 emailed JAVICE, writing, "We've had some questions come up on the approach we discussed last night re: Unique ID for PII [personal identifying information]." Executive-2 asked JAVICE whether she was available for a call to discuss. JAVICE responded in the affirmative. On the ensuing phone call, Executive-2 told JAVICE that a unique identifier could be used only for email address and home address.

g.  Later that day, Executive-2 sent JAVICE an email with a template for the data validation report that JPMC sought from Frank (the "Template Report"). Executive-2 wrote, in part, "Per our convo— here is the .xls [spreadsheet] we worked through y[ester]day." The Template Report—which sought validation from Frank of "how many UNIQUE customer accounts exist?" and "Of those records, what % include each data field below?"—is depicted below:

11

| Data Variable Validation Request Details | | |
| --- | --- | --- |
| How many UNIQUE customer accounts exist? | XXX | |
| Of those records, what % include each data field below? | | |
| | | |
| **Variable** | **% Captured** | **Comments** |
| STUDENT_FIRST_NAME | X% | |
| STUDENT_LAST_NAME | X% | |
| STUDENT_EMAIL | X% | Provided as Unique ID |
| STUDENT_PHONE_NUM | X% | |
| STUDENT_HOME_ADDR | X% | |
| STUDENT_HOME_ADDR_APT | X% | Provided as Unique ID |
| STUDENT_BIRTHDAY | X% | |
| STUDENT_MAJR_INTRST | X% | Data limited due to application logic |
| YEAR_OF_SCHOOL | X% | |
| DEGREE_LEVEL | X% | |
| CITY_OF_HIGH_SCHOOL | X% | |
| STUDENT_IS_MARRIED | X% | |
| HAS_CHILDREN | X% | |
| MILITARY_STATUS | X% | Data limited due to application logic |
| PARENT_NUM_CHILDREN_FIN_SUPP | X% | Data limited due to application logic |
| STUDENT_COMPLETED_TAX_RETURN | X% | Data limited due to application logic |
| STUDENT_EARNINGS_WORKING | X% | Data limited due to application logic |
| STUDENT_SPOUSE_EARNINGS_WORKING | X% | Data limited due to application logic |
| STUDENT_CASH_ASSETS | X% | |
| NET_WORTH_STUDENT_INVESTMENTS | X% | Data limited due to application logic |
| IS_US_CITIZEN | X% | |
| STUDENT_ADJUSTED_GROSS_INCOME | X% | |
| NUMBER_OF_SCHOOLS_TO_SEND_FAFSA | X% | |

## JAVICE and CC-1's Request to Frank's Director of Engineering

22.     Based on my review of records obtained from JPMC, and my interview of Frank's Director of Engineering ("Engineer-1"),[3] I have learned that, on or about August 1, 2021—the same day that Executive-1 sent CHARLIE JAVICE, the defendant, the August 1 Email seeking additional information about Frank's user data—JAVICE asked Engineer-1 to take the much smaller set of actual Frank data and create a larger, synthetic data set. After raising concerns about the legality of the request, Engineer-1 declined. Specifically, I have learned the following, in substance and in part:

a.     Engineer-1 is a computer engineer and oversaw Frank's back-end computer infrastructure (*e.g.*, the company's servers).

b.     On or about August 1, 2021, JAVICE texted Engineer-1, stating, in substance, that she needed help and would like to speak with Engineer-1. JAVICE then spoke to Engineer-1 by phone.

c.     On the ensuing call, JAVICE told Engineer-1 that she wanted his help to generate a synthetic data set. Specifically, JAVICE told Engineer-1 that she wanted him to use a smaller Frank data set and generate a larger set with the same properties as the original data set. Engineer-1 was not comfortable with the request, but he responded that he would look into it.

---

[3] Like most of Frank's employees, Engineer-1 moved to JPMC when Frank was acquired. Engineer-1 remains an employee of JPMC.

d.   On or about August 1, 2021, JAVICE sent an email to Engineer-1 and CC-1 with the subject line "User data provided." The email read, "This is the data provided to JPM historically pulled from a mix of google, mix panel, and samples of the database from [another Frank engineer]." Attached to the email was an Excel spreadsheet, which indicated—in a tab titled "FAFSA in Process"—that the total number of Frank users who had at least started a FAFSA was 4,265,085. Based on my interview with Engineer-1 and a Slack[4] conversation, detailed below, in which, following JAVICE's email, Engineer-1 shared the much smaller number of Frank users with JAVICE, I know that the representation that 4,265,085 Frank users had started a FAFSA is false.

e.   On or about August 2, 2021, in advance of a second conversation with Engineer-1, JAVICE sent Engineer-1 an email with the subject heading "Data set." That email contained a link for a website that explained how "to generate synthetic data that is similar to the actual data in terms of statistics and demographics."

f.   On or about August 2, 2021, Engineer-1 took part in a videocall with JAVICE and CC-1. During the call, CC-1 explained, in substance and part, that CC-1 and JAVICE wanted Engineer-1 to assist in generating an artificial, synthetic data set. In particular, CC-1 and JAVICE asked Engineer-1 to supplement a list of Frank's website visitors with additional data fields containing synthetic data.

g.   Engineer-1 was uncomfortable with the request and stated, in sum and substance, "I don't want to do anything illegal." JAVICE and CC-1 claimed to Engineer-1 that it was legal. JAVICE stated to Engineer-1, in sum and substance, "We don't want to end up in orange jumpsuits." Engineer-1 declined the request from JAVICE and CC-1.

h.   After Engineer-1 declined the request, and while Engineer-1 was still on the videocall, JAVICE and CC-1 spoke to each other about obtaining data, like phone numbers, from an external source.

i.   On or about August 2, 2021, at approximately 3:45 p.m., JAVICE emailed Engineer-1 and asked him to "provide me access to the customer data as we need to complete the analysis and I'd like to be able to contribute." Approximately two hours later, Engineer-1 emailed JAVICE a link which provided direct access to the database with user data (the "Access Link Email"). At approximately the same time, Engineer-1 provided JAVICE the password to the user database in a Slack communication.

j.   JAVICE and Engineer-1 then engaged in a Slack chat, set forth in relevant part below. Notably, in this chat, Engineer-1 apprised JAVICE of the precise number of Frank users.

**JAVICE**:      in it!

**JAVICE**:      where would I see the file!

**Engineer-1**:   hold on! Uploading the file!

---

[4] Slack is a messaging platform frequently used by companies and organizations for workplace communication.

**JAVICE**:     🙂

\* \* \*

**JAVICE**:     I only see 142k rows . . is this only completed files vs in progress?

**Engineer-1**:     yes 2checking

**JAVICE**:     I need all started even if its just a first name

**Engineer-1**:     so the number 142K is correct, it's all applications at least started

**Engineer-1**:     2018 apps:  29068
2019 apps:  82608
2020 apps:  23315
2021 apps:  7471

**JAVICE**:     ok.  So nothing in gravity forms or scholarships.  thats the only data capture?

**Engineer-1**:     the only filter I applied was removing the test applications with a http://withfrank.org|withfrank.org email address

**JAVICE**:     kk

**Engineer-1**:     so I can count users who don't have an application

**JAVICE**:     yep

**Engineer-1**:     but since they don't have a FAFSA application, they will not be useful for you

**JAVICE**:     theyll be helpful for everything

**JAVICE**:     im looking to have everything in one place

**JAVICE**:     other thing I did see was college list . . can we add that or double check the variable?

**Engineer-1**:     it's in there as "*college_choices" column*

**Engineer-1**:     so if I count users with no fafsa applications, we get ~293192 records

**JAVICE**:     Exactly

14

**JAVICE**:      Thx

23.     Based on the above Slack conversation, and my interview with Engineer-1, I know that Engineer-1 directly informed CHARLIE JAVICE, the defendant, that Frank had approximately 142,000 users who had at least started a FAFSA and a total of 293,192 users (including those who had signed up for a Frank account, but had not started a FAFSA).

## JAVICE Hires a Data Scientist to Create a Synthetic User Data Set

24.     Based on my review of records obtained from JPMC, my interview of a data scientist and professor ("Scientist-1"), as well as records obtained from Scientist-1, I have learned that, on August 2, 2021—shortly after Engineer-1 had declined the request to create a synthetic data set—CHARLIE JAVICE, the defendant, contacted Scientist-1 and asked him to create the synthetic data set. In JAVICE's communications with Scientist-1, she falsely represented that the data she provided to Scientist-1 was a random sample of a much larger database of Frank users. In fact, the data JAVICE provided to Scientist-1 represented every Frank user who had started a FAFSA. Specifically, I have learned the following, in substance and in part:

a.      On or about August 2, 2021, JAVICE, texted Scientist-1. She wrote, in sum and substance, "I'm in an urgent pinch and wondering if u still do consulting work and have time?" Scientist-1 responded affirmatively and proposed speaking by phone the next morning.

b.      On or about August 3, 2021, JAVICE spoke with Scientist-1 by phone. JAVICE told Scientist-1, in sum and substance, that she had a database of approximately 4 million people and wanted to create a database of anonymized data that mirrored the statistical properties of the original database (the "Synthetic Data Set"). In a subsequent conversation, in response to a question from Scientist-1, JAVICE stated she could not talk about why the Synthetic Data Set was needed.

c.      Also on or about August 3, 2021, JAVICE forwarded to Scientist-1 the Access Link Email sent to her by Engineer-1. JAVICE wrote, "here is the link. will share credentials offline." Based on Scientist-1's communications with JAVICE, Scientist-1 understood that the data available via the Access Link Email—a data set of approximately 142,000 people—was a random sample of a larger database which contained data for approximately 4 million people. In fact, that data represented every Frank user who had at least started a FAFSA.

d.      JAVICE provided the specifications for the Synthetic Data Set and told Scientist-1 that he had only approximately three days to create it.

e.      Throughout the day on August 4, 2021, JAVICE and Scientist-1 corresponded about creating the Synthetic Data Set. That same day, JAVICE wrote to Executive-1 and two other JPMC employees, in part, "I'm currently wrapping up the data . . . will aim to get the data over to you before speaking with the team this afternoon."

f.      Later that same day, JAVICE sent an email to Executive-1 and Executive-2 with the subject heading "Draft Internal data counts." In the body of the email, JAVICE wrote, "See

below. Happy to chat." Attached was a version of the Template Report, now filled in with values. A portion of report attached by JAVICE is depicted below.

**Data Variable Validation Request Details**

| How many UNIQUE customer accounts exist? | 4,265,085 |
|---|---|
| Of those records, what % include each data field below? | |

| Variable | % Captured | Comments | Count |
|---|---|---|---|
| STUDENT_FIRST_NAME | 100.00% | | 4,265,085 |
| STUDENT_LAST_NAME | 100.00% | | 4,265,085 |
| STUDENT_EMAIL | 100.00% | Provided as Unique ID | 4,265,085 |
| STUDENT_PHONE_NUM | 100.00% | | 4,265,085 |
| STUDENT_HOME_ADDR | 90.21% | Provided as Unique ID | 3,847,533 |
| STUDENT_BIRTHDAY | 90.21% | | 3,847,533 |
| STUDENT_MAJR_INTRST | 48.98% | Data limited due to application addition (added major field in 2019) | 2,088,875 |
| YEAR_OF_SCHOOL | 93.00% | | 3,966,529 |
| DEGREE_LEVEL | 93.00% | | 3,966,529 |
| CITY_OF_HIGH_SCHOOL | 82.99% | | 3,539,731 |
| STUDENT_IS_MARRIED | 81.33% | | 3,468,936 |
| HAS_CHILDREN | 81.33% | | 3,468,936 |

g.   As is reflected in the attached report, the response given by JAVICE to the question "How many UNIQUE customer accounts exist?" is 4,265,085. In addition, JAVICE made further specific representations as to the total number of Frank customer accounts that contained certain types of data. For example, JAVICE represented to JPMC that 3,847,533 unique customer accounts contained data for the student's "birthday."

**Vendor-1 Validates the Synthetic Data Set**

25.   Based on my review of records from JPMC, my interview of Scientist-1, as well as records obtained from Scientist-1, I have learned that shortly after Scientist-1, at the direction of CHARLIE JAVICE, the defendant, sent the Synthetic Data Set to Vendor-1, Vendor-1 sent a completed validation report to JPMC, indicating that Frank had 4,265,085 customer accounts. Specifically, I have learned the following, in substance and in part:

a.   On or about August 5, 2021, Scientist-1 emailed JAVICE and confirmed that he had successfully uploaded the Synthetic Data Set to Vendor-1's server.

b.   Later that day, JAVICE emailed Executive-2 a confirmation from Vendor-1 of the uploaded data set and wrote, "Done."

26.   Based on my review of records obtained from Vendor-1 and my interview of a representative of Vendor-1, I have learned the following, in substance and in part:

a.   Vendor-1 is a company that manages data used for marketing purposes.

b.   In early August 2021, Executive-2 asked Vendor-1 to validate data from Frank. Although Executive-2 made the initial request, Frank executed its own processing agreement with Vendor-1.

16

c.   Neither Frank nor JPMC asked Vendor-1 to verify the authenticity or accuracy of data in the Synthetic Data Set, but instead retained Vendor-1 to count the number of records and verify the percentage of the submitted data fields that were populated with data.

d.   On or about August 5, 2021, a Vendor-1 employee emailed the completed data validation report to JAVICE, and asked for her approval to release the report to JPMC.  JAVICE responded, "I am authorizing you to release the report.  Please do not share additional background."

e.   The Vendor-1 employee replied, "The report has been sent to JPMC." The report submitted by Vendor-1 to JPMC stated, in substance and in part, that Frank had 4,265,085 unique customer accounts.

## JAVICE Directs Scientist-1 to Amend His Invoices

27.   Based on my review of records obtained from JPMC, I have learned that, shortly after the completion of the Synthetic Data Scientist, Scientist-1 sent CHARLIE JAVICE, the defendant, a detailed and itemized invoice which contained references to the generation of artificial data. JAVICE then directed Scientist-1 to send a new invoice which removed those specific references and instead contained a general one-line description of the services provided. Specifically, I have learned the following, set forth in substance and in part:

a.   On or about August 5, 2021, Scientist-1 emailed JAVICE, stating in part, "Attached is my invoice."

b.   The attached invoice, a portion of which is depicted below, contained itemized descriptions of the work Scientist-1 had performed at JAVICE's direction, including "college major generation," and "filling in missing states." The total billed amount was $13,300.

| Date | Time In | Time Out | # Hours | Type | Description |
|---|---|---|---|---|---|
| 8/3/2021 | 14:15 | 15:05 | 0.833 | Data Science Services | Orientation video meeting with Charlie |
| 8/3/2021 | 15:30 | 17:30 | 2.000 | Data Science Services | generating features for projects 2-5 |
| 8/3/2021 | 20:55 | 21:10 | 0.250 | Data Science Services | college major generation |
| 8/3/2021 | 21:45 | 0:20 | 2.583 | Data Science Services | generation of all features except for the financials, zip code lookup fillin |
| 8/4/2021 | 9:15 | 13:05 | 3.833 | Data Science Services | first names, last names, emails, phone numbers, looking into whitepages, unique IDs |
| 8/4/2021 | 13:30 | 19:15 | 5.750 | Data Science Services | group II variables (tax return, financials) + zoom meeting for checkin |
| 8/4/2021 | 19:45 | 1:10 | 5.417 | Data Science Services | college codes and filling in missing states, recoding variables, double checking spreadsheet, on zoom chat |
| 8/5/2021 | 8:30 | 10:00 | 1.500 | Data Science Services | meeting to check over file, phone number validation, file uploading |
| | | | | | |
| | | | | | |
| Total Hours: | 22.17 | | | | |
| Hourly Rate: | $600 | | | | |
| Wage Subtotal: | $13,300.00 | | | | |

c.   JAVICE responded to Scientist-1 that same day, "Can you send the invoice back at $18k and just one line item for data analysis?"

d.   Scientist-1 replied, "Wow. Thank you. Here is the new invoice." Attached to this email was a new invoice, now for $18,000, with the previous specific descriptions removed and replaced by the one-line description, "Data science services."

## JAVICE Purchases Student Data on the Open Market

28.   Almost immediately, CHARLIE JAVICE, the defendant, began efforts to cover up her misrepresentation about Frank's purported 4.25 million student users by purchasing data for millions of students on the open market. In or about August 2021, JAVICE contacted three different companies—using CC-1 and Scientist-1 as intermediaries—that offer data sets of college students for sale. First, CC-1 paid $105,000 to a particular vendor ("Vendor-2") in exchange for a data set of 4.5 million college students (the "Vendor-2 Data Set"). Then, because the Vendor-2 Data Set did not have all the data fields JAVICE had represented Frank maintained, JAVICE attempted to purchase additional data sets that could be used to supplement the Vendor-2 Data Set. At JAVICE's direction, Scientist-1 discussed purchasing data from Vendor-1, but ultimately purchased a supplemental data set from another vendor ("Vendor-3").

### *CC-1 Purchases an Incomplete Student Data Set from Vendor-2*

29.   Based on my review of email communications involving CC-1 and Vendor-2, I have learned the following, in substance and in part, about CC-1's purchase of the Vendor-2 Data Set:

a.   On or about August 2, 2021—one day after Executive-1 sent CHARLIE JAVICE, the defendant, the August 1 Email seeking additional information about Frank's user data—CC-1 contacted Vendor-2 regarding the purchase of a data set.  At CC-1's request, a sales manager at Vendor-2 (the "Vendor-2 Manager") emailed CC-1 a summary of a call between them, writing: "You expressed an interest [in] having [Vendor-2] append data elements to your house file. As mentioned we do not have phone numbers. You also inquired about our postal and email databases."  The Vendor-2 Manager's email went on to provide further details about Vendor-2's data files and the prices for purchasing them.  CC-1 then forwarded this email to CHARLIE JAVICE, the defendant, without comment. Later that day, on or about August 2, 2021, after a scheduled call with the Vendor-2 Manager, CC-1 replied to the same email chain with the Vendor-2 Manager and asked, "if we were looking at buying your list of students currently in college, how much would it cost?"

b.   Following further discussions with Vendor-2 representatives, and the testing of a data sample, on or about August 5, 2021, CC-1—working with JAVICE, who authorized the payment on her credit card—paid Vendor-2 $105,500 to obtain a data file of approximately 4.5 million college students. Based on my review of a report from Vendor-2, Vendor-2 provided two data lists to CC-1—one with email addresses, and one without email addresses.  The data list with email addresses had approximately 2,460,489 college students.  The data list without email addresses had approximately 2,039,511 college students.  Thus, the total number of records purchased was exactly 4.5 million.

     c.   On or about August 5, 2021, Vendor-2 sent emails to CC-1 containing hyperlinks from which the purchased data files could be downloaded. CC-1 forwarded those emails to JAVICE, without comment.

*JAVICE Seeks to Supplement the Vendor-2 Data Set*

     30.   Based on my review of records from JPMC, Vendor-1, and Vendor-3, and my interview of Scientist-1, I have learned that, after purchasing the Vendor-2 Data Set, CHARLIE JAVICE, the defendant, sought supplemental data sets to fill in the gaps in the Vendor-2 Data Set. To assist with this project, JAVICE retained Scientist-1, who communicated with potential data vendors on JAVICE's behalf. JAVICE told Scientist-1, in substance and in part, that the data supplementation project was to enhance Frank's preexisting customer list.  At JAVICE's direction, Scientist-1 contacted both Vendor-1 and Vendor-3. Ultimately, Scientist-1 purchased additional data from Vendor-3 and also paid Vendor-3 to append that additional data to the Vendor-2 Data Set, on behalf of JAVICE. Specifically, as set forth below in sum and substance, I have learned the following:

     a.   On or about August 6, 2021—one day after JAVICE and CC-1 purchased the Vendor-2 Data Set—JAVICE discussed the augmentation project with Scientist-1 over email. Scientist-1 wrote to JAVICE stating that Scientist-1 was "thinking about scope" and reaching out to "a few businesses that do this." Scientist-1 asked for "an estimate of the # of names/addresses you wish to match to phone numbers"—whether it was "[t]en thousand, a hundred thousand, [or] a million." JAVICE responded that the "[n]umber would be over 1M."

     b.   Thereafter, Scientist-1 contacted Vendor-1 about the data supplementation project. While JAVICE ultimately did not use Vendor-1 for this project, as described below, JAVICE falsely told Scientist-1 and Vendor-1 that the purpose of this additional data was to augment Frank's own customer data list (rather than the Vendor-2 Data Set).

     i.   On or about August 10, 2021, a Vendor-1 employee emailed Scientist-1 stating, "Thank you for contacting [Vendor-1]. You'd mentioned, 'I'm looking to lookup public phone numbers using names and addresses for 1-2 million people. We are willing to sign a private contract for the scope of this job.' We'd love to hear more. What company is this for, please?" Scientist-1 responded, "I'm a consultant for the company Frank (https://withfrank.org/)."

     ii.   When Scientist-1 stated that he needed provide the purpose of the project to Vendor-1, JAVICE responded falsely, "We are augmenting our contacts to be able to merge our old data with new data." In fact, JAVICE was seeking to supplement the Vendor-2 Data Set that she and CC-1 had purchased days earlier.

     iii.   Similarly, on or about August 17, 2021, JAVICE provided the details of her request to another representative of Vendor-1, copying Scientist-1. She again falsely represented that the data purchased from Vendor-2 was Frank's own customer data set, writing:

     As discussed, we are looking to do the following analysis:

Frank will provide a first name, last name, full address and emails **for Frank students**. In return, we would receive the DOB, email and phone you have on file for these customer (we only require one for each data field requested) This will enable Frank simply to match records internally on our side. We do not need [Vendor-1] to do the match.

(emphasis added).

c.   While communicating with Vendor-1, Scientist-1 was also in discussions with Vendor-3.  With Scientist-1 acting as intermediary, JAVICE purchased millions of records of data from Vendor-3 and paid Vendor-3 to append that data to the Vendor-2 Data Set, as described in substance and in part below:

i.   After Scientist-1 began discussions with Vendor-3 on or about August 10, 2021, Scientist-1 and JAVICE discussed over email the requirement of a non-disclosure agreement and the purpose of the data request. JAVICE wrote to Scientist-1, "If they can send an NDA back/something so that we know anything provided will be destroyed after would be great." Scientist-1 replied, "I asked them for that stipulation in their NDA. Now the salesman is asking for the purpose of our project in order to make a quote. I can say 'we can't disclose, make a quote anyway' or I can say something plain like 'reconciliation of a customer database for due diligence' or something like that. Can you let me know what you're comfortable with?" JAVICE responded, "Data augmentation – 'enrich your contacts' is the right one."

ii.   On or about August 12, 2021, Scientist-1 emailed JAVICE, "The sales guy just called me and told me he will throw in email address[es] for free but admits their email database is not too accurate and it's something [they're] fixing now. Their phone database is supposedly very accurate as they've been at it for 40yr." JAVICE responded, "Perfect. I'm ok if not crazy accurate. Something better than nothing."

iii.   The next day, on or about August 13, 2021, Scientist-1 emailed JAVICE with an update regarding Scientist-1's efforts to assess the accuracy of Vendor-3's data. JAVICE responded, "Try running a set from the csv[5] I sent in the Dropbox." In a later email to Scientist-1 that same day, JAVICE confirmed, "I would want any data on a record – phone email or DOB is valuable.  Let's hope we only pay for [it] if phone or email is returned."

iv.   On or about August 16, 2021, Scientist-1 asked JAVICE, "How time sensitive is this project?"  She responded, "Would love this all cleaned up by the 25th if that works." In a follow-up email on the same day, JAVICE told Scientist-1 that the "Green light is there – we just may need another provider to supplement it.  I'm signing this agreement."

v.   On or about August 19, 2021, JAVICE executed the contract with Vendor-3 on behalf of Frank.

---

[5] A CSV ("comma-separated values") file is a text file format frequently used to upload data to a database.

   d. Ultimately, JAVICE purchased millions of records from Vendor-3 and paid Vendor-3 to append those records to the Vendor-2 Data Set.

### JPMC Acquires Frank and Pays Millions of Dollars to JAVICE

  31. Based on my review of JPMC records, I have learned the following, in substance and in part:

   a. On or about August 4, 2021, CHARLIE JAVICE, the defendant, executed an employment and retention agreement with JPMC, which I have reviewed. As part of her employment at JPMC, JAVICE was to receive an annual salary of $300,000, a target annual incentive bonus of $250,000 for 2021, and a retention bonus of $20 million. The $20 million retention bonus would be paid as follows: $5 million would vest one calendar year after the close of the merger, $5 million would vest two calendar years after the close of the merger, and the remaining $10 million would vest three calendar years after the close of the merger. The retention bonus was contingent on, among other things, JAVICE not being terminated for cause.

   b. On or about August 8, 2021, JPMC (through a wholly owned subsidiary vehicle) and Frank executed a merger agreement, which provided, in substance and in part, that JPMC would pay, at closing, $175 million to acquire Frank, including all outstanding equity, options, and warrants.

   c. On or about September 14, 2021, the merger closed. JAVICE, and two trusts for which she is a beneficiary, received approximately $21 million from the merger.[6]  This amount was separate and apart from the salary, incentive bonuses, and retention bonuses that JAVICE was to be paid by JPMC.

### The Fraud Continues Post-Acquisition

  32. Based on my review of JPMC records, including email correspondence provided by JPMC, I have learned that, after the acquisition of Frank by JPMC in or about September 2021, CHARLIE JAVICE, the defendant, provided JPMC with certain data files that were presented as Frank's customer data.  In fact, those data files contained the data that JAVICE had previously purchased from Vendor-2 and Vendor-3 in or about August 2021. Specifically, I have learned the following, in substance and in part:

   a. On or about January 6, 2022, a marketing executive at JPMC (the "Marketing Executive") sent an email to CC-1 with the subject line "Initial Frank User Data Transfer."  This email chain continued through late January and is described below.

    i. In the initial January 6 email, the Marketing Executive requested Frank user data and set forth which data fields to include, as follows:

---

[6] An additional trust for which JAVICE is the beneficiary was due approximately $7 million from the merger, but per the terms of the merger agreement, JPMC ultimately did not pay this amount.

- *The file should be a simple formatted CSV file with the following fields:*
  - Student Name (First/Last)
  - Student Email Address
  - Student Home Address
  - Student Mailing Address
  - Student DOB
  - Student SSN

ii.      In the initial email, the Marketing Executive requested that the file be transferred by January 10, 2022. Later that day, CC-1 responded that CC-1 was "not sure we'll make Monday's deadline" because the Frank engineering team was "bogged down in fixing a critical issue in processing financial aid applications."

iii.      The JPMC marketing team thereafter followed up with CC-1 multiple times. In response to a follow-up email on or about January 18, 2022, CC-1 replied: "Copying Charlie [JAVICE] to this email as she'd got the data ready for transfer.   I'll let you both take it from here." JAVICE then replied: "This will not be coming from me and have our data person on it."

iv.      Eventually, on or about January 21, 2022, an engineer working with the Frank team at JPMC ("Engineer-2"), who was copied into the email chain by JAVICE, transferred a marketing file with data from the Frank team ("Marketing File-1"). Engineer-1 noted that he had merely "uploaded the file that Charlie's [*i.e.*, JAVICE's] team provided."

v.      The same day, a member of JPMC's marketing team responded to Engineer-2 and JAVICE, confirming receipt, and writing: "I can also confirm that there are 1,048,575 records, plus the header row. One observation—1,048,576 rows (total including header) is the maximum # of rows allowed in Microsoft Excel—can we be sure that this is just a coincidence, or maybe there is some data truncation after that row?"

vi.      Based on my own review of Marketing File-1 and the Vendor Data Set-2, I have learned that Marketing File-1 is a subset of the Vendor-2 Data Set—that is, the data that CC-1 and JAVICE purchased for $105,000 at the time of JPMC's data diligence.

vii.      Engineer-2 responded on or about January 24, 2022, stating that he would "look into the issues with first file we sent."  Engineer-2 also explained that he was providing an additional file: "The [Frank] marketing team wanted me to upload another file for you which I uploaded as ["Marketing File-2"]. From what I understand, this file is additive to the previous file. These are our FAFSA application specific users." Marketing File-2 contained data for approximately 135,000 individuals.

viii.      After the JPMC marketing team asked questions about discrepancies between Marketing Files-1 and -2, and the absence of any dates of birth or social security numbers, Engineer-2 forwarded the email chain "internally" to members of the Frank team in an attempt to understand and address the apparent issues with the data files.  Engineer-2 wrote that Marketing File-2 had been "created by [Engineer-1], cleaned by [Frank] Marketing," and had come "[f]rom

ou[r] FAFSA application database."  As to Marketing File-1, Engineer-2 explained that he was "not sure about the source of the data" for those approximately 1 million records.

    ix. As noted above, the source of that data was the Vendor-2 Data Set purchased by CC-1 and JAVICE.

   b. Materials from JPMC show that JAVICE sent numerous other purported user data files to JPMC.  Among those other data files sent to JPMC by JAVICE were files containing data from the Vendor-2 Data Set that had been supplemented with the data purchased from Vendor-3.

   33. Based on my review of JPMC records and conversations with JPMC representatives, I have learned that, after an internal investigation, JPMC terminated JAVICE for cause on or about November 4, 2022.

   WHEREFORE, I respectfully request that a warrant be issued for the arrest of CHARLIE JAVICE, the defendant, and that she be arrested and imprisoned or bailed, as the case may be.

S/ by the Court with permission

JEREMY ROSENMAN
Special Agent
United States Attorney's Office
Southern District of New York

Sworn to me through the transmission
of this Affidavit by reliable electronic means,
pursuant to Federal Rules of Criminal Procedure
41(d)(3) and 4.1, this
March 31, 2023

THE HONORABLE ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

# **Exhibit B**

N661JAVC

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                          23 Cr. 251 (AKH)

 5    CHARLIE JAVICE,

 6                  Defendant.              Conference
      ------------------------------x
 7
                                            New York, N.Y.
 8                                          June 6, 2023
                                            10:41 a.m.
 9

10    Before:

11                   HON. ALVIN K. HELLERSTEIN,

12                                          District Judge

13
                          APPEARANCES
14
      DAMIAN WILLIAMS
15         United States Attorney for the
           Southern District of New York
16    BY:  MICAH F. FERGENSON, ESQ.
           DINA McLEOD, ESQ.
17         Assistant United States Attorney

18    QUINN EMANUEL URQUHART & SULLIVAN, LLP
           Attorneys for Defendant
19    BY:  ALEX SPIRO, ESQ.
           MAAREN A. SHAH, ESQ.
20         SAMUEL P. NITZE, ESQ.

21

22

23

24

25
```

N661JAVC

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your

3     appearances for the record.

4          MR. FERGENSON:  Good morning, your Honor.  Micah

5     Fergenson and Dina McLeod for the government.

6          THE COURT:  The rule is you will address me seated but

7     take off your mask when you're speaking.  Good morning,

8     Mr. Fergenson.  Good morning, Ms. McLeod.

9          MR. SPIRO:  Good morning, your Honor.  This is Alex

10    Spiro.  I'm joined by Maaren Shah and Sam Nitze on behalf of

11    our client, Charlie Javice.

12         THE COURT:  And good morning, Ms. Javice.

13         THE DEFENDANT:  Good morning.

14         THE COURT:  Mr. Fergenson, tell me about the case.

15         MR. FERGENSON:  Yes, your Honor.

16         So your Honor, it's a fraud case, as described in the

17    complaint, and the indictment.  It concerns the defendant's

18    lies in connection with the sale of a company she founded named

19    Frank.

20         THE COURT:  Frank?

21         MR. FERGENSON:  Yes, your Honor.  That was the name of

22    the company.

23         THE COURT:  F-R-A-N-K?

24         MR. FERGENSON:  Yes.

25         THE COURT:  What does that company do?

N661JAVC

1        MR. FERGENSON:  Your Honor, it was a for-profit

2    company that assisted students in financial aid for college or

3    graduate school.  In particular, it had a tool that helped them

4    fill out a federal form called a FAFSA that allows students to

5    apply for government aid.

6        THE COURT:  Spell it.

7        MR. FERGENSON:  F-A-F-S-A.

8        THE COURT:  What were the nature of the lies?

9        MR. FERGENSON:  The principal misrepresentation, your

10   Honor, was that her company had acquired over 4 million

11   customers, meaning prospective students who had signed up for

12   an account on Frank's website and thereby provided certain data

13   ── first name, last name, email address, phone number.  In

14   reality, your Honor, Frank had, at most, less than 300,000

15   customers.

16       THE COURT:  What was the materiality of that?

17       MR. FERGENSON:  Your Honor, it was central to the sale

18   of the company, and in fact, these misrepresentations were made

19   to two banks.  The ultimate winner, so to speak, of the

20   acquisition was JPMorgan Chase, which paid $175 million, and it

21   paid that large sum, your Honor, because it believed that Frank

22   had been an extremely successful startup in the student sector,

23   which was particularly appealing to financial institutions,

24   particularly ones that are trying to acquire new customers

25   early in their life, just to put it colloquially, your Honor.

N661JAVC

1          THE COURT:  So in other words, the assets in the

2     business —— namely, the accounts of students —— were something.

3          MR. FERGENSON:  Correct, your Honor.

4          THE COURT:  That is why JPMorgan was induced to pay a

5     lot more for the company than it was worth.

6          MR. FERGENSON:  Correct, your Honor.

7          THE COURT:  So this is our first meeting, is it?

8          MR. FERGENSON:  Yes, your Honor.

9          THE COURT:  What kind of discovery do you have and

10    what's the plan?  Before you do that, is there a *Brady* order in

11    the case?

12         MR. FERGENSON:  There was, your Honor.  The defendant

13    was previously arraigned before the magistrate, who entered a

14    Rule 5(f) order.

15         THE COURT:  Thank you.

16         MR. FERGENSON:  So the discovery —— we actually handed

17    the defense a hard drive today, containing all or, if not all,

18    the vast majority of the Rule 16 discovery in our possession

19    presently.

20          To give your Honor, you know, a couple reference

21    points for the size of the discovery, the data is about 90

22    gigabytes, and to put it in a less technical way, it's about

23    106,000 files.  This primarily consists of subpoena returns

24    from about 30 different parties, third parties.  It also

25    includes three warrants related to cellphones.  One of the

N661JAVC

1    cellphone warrants was for the cellphone that Ms. Javice had on

2    her at her arrest.  We have not yet accessed the cellphone.  We

3    haven't cracked into the cellphone, your Honor.  But once we

4    do, we will provide a full copy to Ms. Javice.

5            THE COURT:  What prevents you from getting in?

6            MR. FERGENSON:  It is a —— as your Honor may be

7    familiar from other cases, unless the defendant provides the

8    pass code, we have to use various forensic tools to break into

9    the phone, to access its contents, and sometimes that can take

10   many months.

11           THE COURT:  But you can do it.

12           MR. FERGENSON:  We can do it, your Honor.  Often we

13   can do it, but not always, I should say.

14           THE COURT:  Have you asked Mr. Spiro if his client

15   will consent?  Is it worth saving time?

16           MR. FERGENSON:  We have not, your Honor, but we would

17   certainly be open to it.

18           THE COURT:  Would you consider that, Mr. Spiro?

19           MR. SPIRO:  They have not brought that to my

20   attention, your Honor.  I hear it now, and so I will take it

21   under consideration and speak with the government.  Thank you.

22           THE COURT:  Okay.

23           MR. FERGENSON:  It also includes —— just in terms of

24   the warrants, your Honor, there was also an asset seizure

25   warrant for bank accounts.  And that's the extent of the

N661JAVC

 1   warrants in the case.

 2             THE COURT:  Apart from the cellphone, has all

 3   discovery been made?

 4             MR. FERGENSON:  Yes, your Honor, and as we continue to

 5   receive additional records, which we expect to, we will

 6   continue to produce those on a rolling basis.

 7             THE COURT:  Where would you expect to get other

 8   records from?

 9             MR. FERGENSON:  Your Honor, I can say that the

10   government's investigation is ongoing, and as we receive

11   additional materials, we will be providing them to the defense.

12             THE COURT:  Do you expect to receive additional

13   materials?

14             MR. FERGENSON:  We do, your Honor.

15             THE COURT:  By when should we all feel confident that

16   you have produced everything you're going to produce?

17             MR. FERGENSON:  I'm sorry, your Honor?

18             THE COURT:  By when should we feel confident that

19   you'll have produced everything you will be producing?

20             MR. FERGENSON:  I can —— I think I can fairly

21   represent to your Honor that we have produced the vast bulk, if

22   not all, of what we have currently in our possession.  As we

23   come into possession of additional materials, we'll promptly

24   produce them.

25             THE COURT:  You didn't hear me.  By when do you

N661JAVC

```
 1   believe you will have produced everything you're going to
 2   produce?
 3            Can you hear me?
 4            MR. FERGENSON:  Yes, your Honor.  I apologize.  I was
 5   just conferring with my co-counsel for a moment.
 6            So to answer your question, I don't expect we would
 7   make anything comparable to the size of the production we made
 8   right now.  And I don't mean to be evasive.
 9            THE COURT:  You can't give me a date.
10            MR. FERGENSON:  Well, it's just often the case, your
11   Honor, that we may receive additional returns to a subpoena ──
12            THE COURT:  Anything is possible.  What's the
13   likelihood?
14            MR. FERGENSON:  I think, your Honor, within the next
15   45 days, we will produce any additional subpoena returns.  I
16   just don't want to mislead the Court or the defense.  To the
17   extent additional materials come in, we will provide them
18   promptly.
19            THE COURT:  I have to set a next date.
20            MR. FERGENSON:  Yes, your Honor, and I'm happy to turn
21   to that, but the government would respectfully request that the
22   Court set a motions date.  We discussed this with defense
23   counsel.
24            THE COURT:  They're not going to be able to make
25   motions until you finish your production.
```

N661JAVC

1          MR. FERGENSON:  Well, your Honor, I think what we

2     would propose and what defense has requested is that the Court

3     set another conference in about 45 days.  I would also advise

4     the Court that the government's prepared to set a trial date

5     today.  We're available in October.  The government's ready to

6     try the case.

7          THE COURT:  We'll set a trial date when we're all

8     ready, then I'll set it quickly.

9          MR. FERGENSON:  Understood, your Honor.  In that

10     event, your Honor, it might make sense to set a date for 45

11     days out to come back.  That's what the defense requested.

12          THE COURT:  How much do you need, Mr. Spiro?

13          MR. SPIRO:  That's fine, your Honor.  We had discussed

14     — and obviously it depends on the Court's schedule.  Some date

15     in the middle of July, perhaps July 14th, but of course your

16     Honor can pick the date.

17          THE DEPUTY CLERK:  July 13th at 9:45.

18          MR. SPIRO:  That's fine with the defense.

19          MR. FERGENSON:  That's fine, your Honor.  Thank you.

20          THE COURT:  Motion?

21          MR. FERGENSON:  Yes, your Honor.  The government moves

22     to exclude time so that the defense can review discovery and

23     assess any potential motions.

24          THE COURT:  Without objection?

25          MR. SPIRO:  Your Honor, we state an objection as to

N661JAVC

1    any waiver of speedy trial at arraignments and we're not

2    consenting to time in this case, and we defer to the Court's ——

3            THE COURT:  Take off your mask, please, Mr. Spiro.

4            MR. SPIRO:  Yes.  Your Honor, we did not waive speedy

5    trial time or agree to any of the government's requests at

6    arraignment, and we're maintaining that position, so when the

7    Court says is that on consent, that's why I piped up.

8            MR. FERGENSON:  Your Honor, we would then request to

9    set a trial date in October.

10           THE COURT:  How long will the trial take?

11           MR. FERGENSON:  The government estimates eight to ten

12   trial days, your Honor.

13           THE COURT:  October 16th for trial.

14           MR. SPIRO:  Your Honor, if I could be heard on that.

15   I was conferring with my client and counsel, and the defense

16   would prefer, because we have a lot of investigation to do ——

17   we will waive time for this time period if the Court will allow

18   us ——

19           THE COURT:  That's so nice of you, Mr. Spiro.

20           MR. SPIRO:  And we're hoping that on the 45 days out,

21   if the Court will keep the July 13th status date, we can then

22   set a trial date where we can be sure that we can be ready and

23   have time to check schedules and what have you.

24           THE COURT:  Are you planning on filing motions?

25           MR. SPIRO:  We will be filing motions.  Of course

N661JAVC

1   we've got to go through the discovery, and we just received it

2   today.

3           THE COURT:  So do you agree to exclude time until

4   July 13th?

5           MR. SPIRO:  Yes, your Honor.

6           THE COURT:  So ordered.  July 13, 9:45.  I expect at

7   that time, Mr. Spiro, that you will declare what motions you'll

8   be making and you and the government will present me with a

9   motion schedule —

10          MR. SPIRO:  Understood, your Honor.  Thank you.

11          THE COURT:  — briefing schedule.  Okay.  Thank you.

12          MR. FERGENSON:  Thank you, your Honor.

13                          o0o

14

15

16

17

18

19

20

21

22

23

24

25

# **Exhibit C**

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

CHARLIE JAVICE, and
OLIVIER AMAR,

Defendants.

**SUPERSEDING INDICTMENT**

S1 23 Cr. 251 (AKH)

## COUNT ONE
### (Conspiracy to Commit Wire Fraud and Bank Fraud)

The Grand Jury charges:

1. From at least in or about June 2021 through at least in or about November 2022, in the Southern District of New York and elsewhere, CHARLIE JAVICE and OLIVIER AMAR, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343, and bank fraud, in violation of Title 18, United States Code, Section 1344.

2. It was a part and an object of the conspiracy that CHARLIE JAVICE and OLIVIER AMAR, the defendants, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, which affected a financial institution, in violation of Title 18, United States Code, Section 1343, to wit, JAVICE and AMAR agreed to engage in a scheme to defraud by submitting

false and fraudulent statements and representations about TAPD, Inc., d/b/a Frank ("Frank") and its user data, among other things, to potential acquiring companies, including to J.P. Morgan Chase ("JPMC"), a bank headquartered in New York, New York, and to at least one other bank ("Bank-1"), in order to defraud those companies out of millions of dollars—consisting of the acquisition price, as well as salary, bonus and other compensation paid to JAVICE and AMAR as retained employees at the eventual acquiring company, JPMC—and in furtherance of such scheme, JAVICE and AMAR transmitted and caused to be transmitted electronic communications and monetary transfers to and from the Southern District of New York.

3.      It was further a part and an object of the conspiracy that CHARLIE JAVICE and OLIVIER AMAR, the defendants, and others known and unknown, knowingly would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, as that term is defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344, to wit, JAVICE and AMAR engaged in a scheme to defraud by submitting false and fraudulent statements and representations about Frank and its user data, among other things, to potential acquiring companies, including to JPMC and Bank-1, in order to defraud those companies out of millions of dollars—consisting of the acquisition price, as well as salary, bonus and other compensation paid to JAVICE and AMAR as retained employees at the eventual acquiring company, JPMC.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
**(Wire Fraud)**

The Grand Jury further charges:

4.     From at least in or about June 2021 through at least in or about November 2022, in the Southern District of New York and elsewhere, CHARLIE JAVICE and OLIVIER AMAR, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, which affected a financial institution, to wit, JAVICE and AMAR engaged in a scheme to defraud by submitting false and fraudulent statements and representations about Frank and its user data, among other things, to potential acquiring companies, including to JPMC and Bank-1, in order to defraud those companies out of millions of dollars—consisting of the acquisition price, as well as salary, bonus and other compensation paid to JAVICE and AMAR as retained employees at the eventual acquiring company, JPMC— and in furtherance of such scheme, JAVICE and AMAR transmitted and caused to be transmitted electronic communications and monetary transfers to and from the Southern District of New York.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
**(Bank Fraud)**

The Grand Jury further charges:

5.     From at least in or about June 2021 through at least in or about November 2022, in the Southern District of New York and elsewhere, CHARLIE JAVICE and OLIVIER AMAR, the defendants, knowingly executed, and attempted to execute, a scheme and artifice to defraud a

3

financial institution, as that term is defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations and promises, to wit, JAVICE and AMAR engaged in a scheme to defraud by submitting false and fraudulent statements and representations about Frank and its user data, among other things, to potential acquiring companies, including to JPMC and Bank-1, in order to defraud those companies out of millions of dollars—consisting of the acquisition price, as well as salary, bonus and other compensation paid to JAVICE and AMAR as retained employees at the eventual acquiring company, JPMC.

(Title 18, United States Code, Sections 1344 and 2.)

## COUNT FOUR
### (Securities Fraud)

The Grand Jury further charges:

6.      From at least in or about June 2021 through at least in or about November 2022, in the Southern District of New York, and elsewhere, CHARLIE JAVICE and OLIVIER AMAR, the defendants, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and of a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security registered on a national securities exchange and any security not so registered, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of material fact and omitting to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; and (c) engaging in an act, practice and course of business which operated and would operate as a fraud and deceit upon a person, to

4

wit, JAVICE and AMAR engaged in a scheme to defraud by submitting false statements and representations about Frank and its user data, among other things, to potential acquiring companies, including to JPMC and to Bank-1, in connection with the acquisition of the equity shares, options, and warrants of Frank.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATIONS

7.     As a result of committing the offenses alleged in Counts One through Three of this Indictment, CHARLIE JAVICE and OLIVIER AMAR, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any and all property constituting, or derived from, proceeds the defendants obtained directly or indirectly, as a result of the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses, and the following specific property:

a.     All monies, assets, and funds contained in Fidelity Brokerage Services LLC, account Z23 548090, held in the name of Charlie Javice, seized by the Government on or about April 14, 2023;

b.     $959,643.98 of the monies, assets, and funds formerly on deposit at City National Bank, account 210032347;

c.     $2,056,256.39 of the monies, assets, and funds formerly on deposit at Wells Fargo Bank, NA, account 1573700687, held in the name of BX5 LLC, seized by the Government on or about April 14, 2023; and

All monies, assets, and funds contained in Interactive Brokers LLC, account U6819438, held in the name of Olivier Amar, seized by the Government on or about April 14, 2023(collectively, (a)-(d) (the "Specific Property").

8.      As a result of committing the offense alleged in Count Four of this Indictment, CHARLIE JAVICE and OLIVIER AMAR, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense and, and the Specific Property.

**Substitute Assets Provision**

9.      If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred or sold to, or deposited with, a third person;

        c.      has been placed beyond the jurisdiction of the Court;

        d.      has been substantially diminished in value; or

        e.      has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981 and 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON
7/12/23

Damian Williams
DAMIAN WILLIAMS
United States Attorney

7

# **Exhibit D**

N7DDJAVC

 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  UNITED STATES OF AMERICA,

 4            v.                          23 Cr. 251 (AKH)

 5  CHARLIE JAVICE AND
    OLIVIER AMAR,
 6
                                          Conference
 7            Defendants.

 8  ------------------------------x

 9                                        New York, N.Y.
                                          July 13, 2023
10                                        10:45 a.m.

11
    Before:
12
                      HON. ALVIN K. HELLERSTEIN,
13
                                          U.S. District Judge
14
                             APPEARANCES
15
    DAMIAN WILLIAMS
16       United States Attorney for the
         Southern District of New York
17  DINA MCLEOD
    MICAH FESTA FERGENSON
18       Assistant United States Attorney

19  ALEXANDER B. SPIRO
         Attorneys for Defendant Charlie Javice
20
    SEAN BUCKLEY
21  STEVE KOBRE
         Attorneys for Defendant Olivier Amar
22

23

24

25

N7DDJAVC

1        (Case called)

2        THE DEPUTY CLERK:  Counsel, please state your

3   appearances for the record, and remain seated

4        THE COURT:  Remove your mask when you speak.

5        MR. FERGENSON:  Good morning, your Honor.  Micah

6   Fergenson and Dina McLeod for the government.

7        THE COURT:  Good morning.

8        MR. SPIRO:  Good morning, your Honor.  Alex Spiro.

9   I'm joined by my colleagues Maaren Shah and Sam Nitze on behalf

10  of Ms. Javice.

11       THE COURT:  Good morning.

12       MR. BUCKLEY:  Good morning, your Honor.  Sean Buckley

13  and Steve Kobre on behalf of Mr. Amar, who joins us at counsel

14  table.

15       THE COURT:  Good morning.

16       Who is Mr. Kobre?  How do you do.

17       Is Tai Hyun Park and Jan Philip Kernisan here?  Are

18  they on this case?

19       MR. SPIRO:  They are not, your Honor.

20       THE COURT:  Okay.  So what are we doing now,

21  Ms. McLeod?

22       MR. FERGENSON:  Yes, your Honor.  So I think the first

23  order of business is to arraign both defendants on the

24  superseding indictment; and then on scheduling, your Honor, the

25  plan at the first conference had been to set a motion schedule

N7DDJAVC

1   today.  Given the addition of the new defendant, we understand

2   that the defense is going to ask for, you know, some additional

3   time to come back and set a motion schedule in 45 or 60 days,

4   your Honor.

5          And, lastly, I just note that at the Court's

6   convenience, as we noted at the first conference, the

7   government is ready to set a trial date.

8          THE COURT:  Fine.  Let's arraign the two defendants.

9          THE DEPUTY CLERK:  Where is Charlie Javice?  I'm

10  sorry.  I should have remembered.

11         You are Charlie Javice?

12         DEFENDANT JAVICE:  I am.

13         THE COURT:  Please stand.  Remove your mask.

14         THE DEPUTY CLERK:  Have you seen a copy of the

15  indictment?

16         DEFENDANT JAVICE:  I have.

17         THE DEPUTY CLERK:  Have you discussed it with your

18  attorney?

19         DEFENDANT JAVICE:  I have.

20         THE DEPUTY CLERK:  Would you like me to read it to

21  you?

22         DEFENDANT JAVICE:  No, thank you.

23         THE DEPUTY CLERK:  How do you plead?

24         DEFENDANT JAVICE:  Not guilty.

25         THE COURT:  A plea of not guilty will be entered on

1   behalf of Ms. Javice.

2           How do you pronounce Javice?

3           DEFENDANT JAVICE:  Javice, your Honor.

4           THE COURT:  Javice.  Thank you.

5           THE DEPUTY CLERK:  Mr. Amar.  You are Olivier Amar?

6           DEFENDANT AMAR:  Correct.

7           THE COURT:  Have you seen a copy of the indictment?

8           DEFENDANT AMAR:  I have.

9           THE DEPUTY CLERK:  Have you discussed it with your

10  attorney?

11          DEFENDANT AMAR:  I have.

12          THE DEPUTY CLERK:  Would you like me to read it to

13  you?

14          DEFENDANT AMAR:  No, thank you.

15          THE DEPUTY CLERK:  How do you plead?

16          DEFENDANT AMAR:  Not guilty.

17          THE COURT:  A plea of not guilty will be entered on

18  behalf of Mr. Amar.

19          So, again, both defendants plead not guilty.

20          Mr. Fergenson, please tell me more about the case.

21  There's not much in the indictment.

22          MR. FERGENSON:  Yes, your Honor.

23          So the case relates to the acquisition of a company

24  called Frank.  Frank was a start up fintech company that sought

25  to help students apply for financial aid for college or

N7DDJAVC

1    graduate school.  Ms. Javice was the CEO and founder of Frank.

2    Mr. Amar was the chief growth officer, effectively the number

3    two at the company.

4           In 2021, the defendants sought to put their company on

5    the market for an acquisition.  They pitched to a variety of

6    potential acquiring companies, including two major banks.  The

7    bank that ultimately acquired Frank was JPMorgan Chase.  A

8    material part of that deal, your Honor, was the number of

9    customers or the number of account sign-ups that Frank had.

10          The defendants lead Chase and others to believe that

11   Frank had over four million customer sign-ups.  In reality, the

12   number was far less, around 300,000.  Eventually, and, you

13   know, your Honor, there's a very detailed complaint that has

14   additional facts, but at a high level, eventually, JPMC found

15   out about the fraud, terminated the defendants.  And that's why

16   we're here today.

17          THE COURT:  But there was no acquisition?

18          MR. FERGENSON:  There actually was an acquisition,

19   your Honor.  I apologize if I skimmed over that.  Chase

20   acquired Frank for $175 million.

21          THE COURT:  Was Frank an audited company?

22          MR. FERGENSON:  It was not, your Honor.  I mean, it

23   was not a publicly traded company.  It was a start up.

24          THE COURT:  Did it have Certified Public Accountants

25   doing audits?

N7DDJAVC

1          MR. FERGENSON:  I'm not certain of that, your Honor,

2     but it may well have.

3          THE COURT:  It's curious to me how this kind of set of

4     facts could continue through an acquisition --

5          MR. FERGENSON:  Yes, your Honor.

6          THE COURT:  -- understanding the due diligence Chase

7     and Chase's lawyers, and Chase's investment bankers, and the

8     accounting that was done at Frank.

9          MR. FERGENSON:  Yes.  And perhaps to provide a little

10    more context on that, your Honor, in the course of the due

11    diligence on the deal, JPMorgan sent the defendants a data

12    validation request.  So they said, you've told us you have all

13    this data from your account sign-ups, these, you know, over

14    four million people.  We want to verify that, that you actually

15    have this data.

16          And in response, the defendants created a fake data

17    set.  So a giant -- essentially, a giant Excel spreadsheet that

18    had over four million rows, and lots of purported data.  But it

19    was all fake.  And they sent that to a -- you know, a data

20    company, essentially, that was going to perform the diligence

21    to check that they had, in fact, had data in the rows and

22    columns, as they had represented.  And that's what they did,

23    because it, in fact, was filled in as was represented, even

24    though it was all fake.  The data validation company, this

25    third party, said, yeah, they have data filled in these rows.

1        And then, I think the second point, your Honor, is

2   that the defendants immediately sought to start the cover up as

3   well.  So they actually went -- they knew that eventually

4   Chase, since they had been acquired and become a part of it,

5   would ask them for the customer data list, and they wouldn't be

6   able to send them a completely fake list, so they went and

7   purchased, on the open market, college student data.  And they

8   bought a list of over four million college students, and when

9   Chase eventually went and asked them, okay, send your student

10  data list, they sent this student list that they had bought on

11  the open market.

12       And the way Chase I think ultimately identified the

13  fraud, and what lead them to start sort of investigating the

14  issue, there were a few things, but one of the important events

15  was they sent this list that they had bought on the open

16  market -- and they bought it for $100,000, your Honor.  A lot

17  less than 175 million.  And when Chase -- they sent that to

18  Chase.  When Chase did a test run of a marketing campaign, so

19  they sent an email, marketing email to about 400,000 of the

20  students on this list.  The response was horrible.  A lot of

21  the emails were old and didn't work.  Almost nobody clicked

22  through to it.  And it was completely unexpected.

23       I mean, it basically essentially, from their view, was

24  if not worthless, worth a lot less than what they had expected.

25       THE COURT:  This was discovered after the acquisition?

N7DDJAVC

1          MR. FERGENSON:  That's correct, your Honor.  It took

2     several months, and then there was an investigation.

3          THE COURT:  There was a fraud, and they uncovered the

4     fraud.

5          MR. FERGENSON:  Correct, your Honor.

6          THE COURT:  All right.  So what are we going to do

7     now?  You want a delay of how much time?

8          MR. FERGENSON:  I'll defer to the defense.  We

9     understand that they were --

10          THE COURT:  Have you made your discovery?

11          MR. FERGENSON:  Yes, your Honor.  So we have produced

12     the Rule 16 in our possession today.  We made a large initial

13     production at the time of the first -- the initial conference,

14     your Honor, and we made a second substantial production

15     recently.  And those have been to Ms. Javice's counsel.

16          Mr. Amar's counsel has not -- given he just got

17     indicted yesterday, he does not yet have that discovery, but I

18     think certainly within the next two weeks, we will get him a

19     copy of all the Rule 16 in our possession, your Honor.

20          MR. SPIRO:  Your Honor, this is Alex Spiro.  May I

21     respond briefly?

22          THE COURT:  You may.

23          MR. SPIRO:  Your Honor asked a question in the

24     government's recitation, that some of it was a bit puzzling, or

25     raising a question with your Honor, and it sort of goes to

N7DDJAVC

1    that, and a little bit of what the government is representing,

2    and representing about discovery.

3            The reality is the government is just regurgitating to

4    the Court JPMorgan's civil lawsuit against my client.  That's

5    actually all it was.  They haven't received --

6            THE COURT:  Mr. Spiro, you don't have to worry about

7    your client -- the government has the obligation to prove its

8    case.  I'm asking what they intend to prove.

9            MR. SPIRO:  I understand, but I'm going to get to the

10   discovery issue.  We don't have currently, in discussion, we

11   don't have any of JPMorgan's -- essentially, any of their

12   internal communications amongst themselves about the

13   accusation.  They sent us some discovery, told us it should be

14   substantially completed within 45 days.  They told the Court

15   what they said in recitation, which I have an obligation I

16   think in a public forum to respond to.  They don't actually

17   have, according to them, the internal communications of the

18   JPMorgan side of this yet.  They haven't provided them to us.

19   And we believe that they will be exculpatory.

20           So I want the Court to understand that, and understand

21   that's where we are in discovery.  The way the discovery

22   happened, and since we are --

23           THE COURT:  Let me interrupt --

24           MR. SPIRO:  Sure.

25           THE COURT:  -- and ask Mr. Fergenson about that.

N7DDJAVC

1          Are you intending to produce that information?

2          MR. FERGENSON:  Yes, your Honor.

3          So we have produced, I think, from JPMC, well over

4   100,000 documents just from that one party.  We understand

5   they're continuing to make rolling productions.  As we receive

6   them, we will also produce them as Rule 16 discovery, your

7   Honor.

8          I think Mr. Spiro may be slightly confused about the

9   way Rule 16 works, which is the government provides the Rule 16

10  materials in its possession.  We can't produce things we have

11  not received.

12         MR. SPIRO:  Your Honor, may I be heard further on the

13  discovery issue?

14         THE COURT:  You may.

15         MR. SPIRO:  I'm not confused about Rule 16.  This case

16  has proceeded differently than other cases, because rather than

17  a grand jury subpoena, the production of documents, an

18  assessment -- an independent assessment by the government, and

19  then a decision to charge, JPMorgan simply provided what they

20  wanted to provide to the government.

21         And so my point to the Court is this is a different

22  set of discovery issues than what we thought existed at the

23  time.

24         THE COURT:  I understand what you want.

25         Let me ask this:  Can you, under the Rules, issue a

1    trial subpoena to JPMorgan to produce, well, the things you say

2    you want to have?

3            MR. SPIRO:  We can prepare one immediately for your

4    Honor, yes.

5            THE COURT:  Would there be any objection to doing

6    that, Mr. Fergenson?

7            MR. FERGENSON:  Your Honor, I think we would have to

8    assess whether it would comply with the requirements of Rule

9    17, but I think maybe just one further --

10           THE COURT:  It would be ahead of the trial, but for

11   purposes of use in a trial.  I can see the relevance of that

12   information.  Did JPMorgan rely on this information, from your

13   point -- from your account, reliance is suggested, but there

14   may be items in the correspondence that show differently.

15           I think it would be a good idea, but -- unless you

16   issue the subpoena --

17           MR. FERGENSON:  Well, your Honor, so when I mentioned

18   the rolling productions we're expecting to receive, we expect

19   those to also include additional internal JPMC communications.

20           THE COURT:  Do they have a compulsion to deliver -- is

21   there a grand jury subpoena --

22           MR. FERGENSON:  Yes.  Yes, your Honor.

23           THE COURT:  So in complying with a subpoena.

24           MR. FERGENSON:  Correct.

25           THE COURT:  All right.  It doesn't seem to me a

1    third-party subpoena is necessary, Mr. Spiro, but this is

2    information obtained by the government to the extent it exists

3    in the files of Chase Manhattan, Morgan Chase, and produced to

4    you.

5        When do you think all your production will be

6    finished, Mr. Fergenson?

7        MR. FERGENSON:  Do you mean when we expect to produce

8    the discovery we currently have?

9        THE COURT:  You have to give a terminal date to Chase

10   to get everything going.  You can't let them just, at their

11   leisure --

12       MR. FERGENSON:  Understood, your Honor.

13       Look, our understanding is they're diligently

14   responding to the subpoena that produced hundreds of thousands

15   of documents, and there are hundreds of thousands of documents

16   to review in total in this.

17       It's a bit of an unusual situation where JPMorgan

18   acquired this company entirely, and so the documents responsive

19   to, you know, the topic of its acquisition are voluminous.  But

20   our understanding is they are diligently responding.  They've

21   made several productions, including many substantial

22   productions.

23       I just wanted to also note --

24       THE COURT:  I think you should obtain a date from

25   them, and let Mr. Spiro, and Mr. Amar's counsel, and me know

N7DDJAVC

1    that.

2           MR. FERGENSON:  Understood, your Honor.  We'll do

3    that.

4           THE COURT:  How much time do you need now, Mr. Spiro?

5           MR. SPIRO:  I don't want to revisit the Groundhog Day

6    of last time, but I just need the discovery, and then we can --

7    so it's sort of circular to me that your Honor had, the last

8    time we were here, asked other pointed questions to the

9    government about the time.  Your Honor just did it again.

10          THE COURT:  How about I say to you 30 days from now.

11          MR. SPIRO:  If 30 days from now is going to move this

12   ball further down the field, so we can get the relevant

13   discovery, not what we've been provided, absolutely happy to

14   come back in 30 days.

15          THE COURT:  I don't know that you'll be entitled to

16   all of the discovery you would be in a civil case, but I'd like

17   the government to discharge its obligations under Rule 16

18   promptly, not at a leisurely pace.

19          So we'll have a status conference in 30 days to find

20   out where you stand.

21          MR. SPIRO:  Thank you, your Honor.

22          THE COURT:  At that time, I will fix dates for

23   motions.

24          MR. FERGENSON:  Understood, your Honor.  And I know

25   Mr. Amar's counsel recently joined the case, but as long as

N7DDJAVC

1    they are okay with 30 days to set the motion schedule as well,

2    that is fine for the government.

3         THE COURT:  Nothing's going to happen in 30 days

4    except I'm going to know if there's more production or not.

5         MR. FERGENSON:  Understood, your Honor.

6         THE COURT:  And hopefully there will be some more

7    production.

8         MR. FERGENSON:  Understood.

9         THE COURT:  Is 30 days okay, Mr. Kobre?  Mr. Buckley?

10        MR. BUCKLEY:  Yes, your Honor.  For a status

11   conference?

12        THE COURT:  Yes.

13        MR. BUCKLEY:  That's fine.  Thank you.

14        THE COURT:  Is there a *Brady* order in the case?

15        MS. MCLEOD:  Actually, there is one for Javice, but

16   there is not one for --

17        THE COURT:  Take your mask off.

18        MS. MCLEOD:  Sorry, your Honor.

19        There is one for Ms. Javice, but not for Mr. Amar.  So

20   it makes sense to --

21        THE COURT:  The government knows its obligations under

22   *Brady*, what could happen in terms of trying the case if you

23   don't comply with *Brady*.

24        MR. FERGENSON:  Yes, your Honor.

25        THE COURT:  Okay.  We'll put in such an order.

N7DDJAVC

1          MR. FERGENSON:  Thank you, your Honor.

2          THE COURT:  Is there anything else you want to bring

3  to my attention, Mr. Spiro?

4          MR. SPIRO:  No, your Honor.  Thank you.

5          THE COURT:  Mr. Buckley?

6          MR. BUCKLEY:  No, your Honor.  Thank you.

7          THE COURT:  Okay.  So I'll fix a date 30 days from

8  now.

9          THE DEPUTY CLERK:  August 15 at 11:00.

10          THE COURT:  August 15 at 11:00.

11          Any motion?

12          MR. FERGENSON:  Yes, your Honor.  The government moves

13  to exclude time under the Speedy Trial Act in the interests of

14  justice, so that the government can produce Rule 16 discovery

15  to Mr. Amar's counsel, and they can continue to -- and both

16  defendants can continue to assess any motions.

17          THE COURT:  Without objection, folks?

18          MR. SPIRO:  No, your Honor.

19          MR. BUCKLEY:  No objection, your Honor.

20          THE COURT:  So ordered.

21          Is there anything else you want to bring to my

22  attention?

23          MR. FERGENSON:  No.  Thank you, your Honor.

24          THE COURT:  We'll see you in 30 days.

25          (Adjourned)

# **Exhibit E**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                                                                   :
SECURITIES AND EXCHANGE COMMISSION,                                :
                                                                   :
                                     Plaintiff,                    :
                                                                   :
                                                                   :          23-cv-2795 (LJL)
                       -v-                                         :
                                                                   :          OPINION AND ORDER
CHARLIE JAVICE,                                                    :
                                                                   :
                                     Defendant.                    :
                                                                   :
------------------------------------------------------------------ X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED:__6/20/2023__

LEWIS J. LIMAN, United States District Judge:

The United States of America (the "Government") moves for an order permitting it to

intervene pursuant to Federal Rule of Civil Procedure 24, and to stay the matter until the

conclusion of a parallel criminal case pending in this District, *United States v. Charlie Javice*,

Case No. 23-cr-251 (AKH). Dkt. No. 19.

For the following reasons, the motion to intervene is granted and the motion to stay the

matter is granted.

## BACKGROUND

### I.      The Allegations of the SEC's Complaint

The United States Securities and Exchange Commission ("SEC") charges Defendant

Charlie Javice ("Defendant" or "Javice") with violating Section 17(a) of the Securities Act of

1933 ("Securities Act"), 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of

1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

Dkt. No. 1. The charges grow out of an alleged scheme to falsely inflate the number of

customers at Javice's company, TAPD, Inc. or Frank ("Frank"), in order to fraudulently induce

JPMorgan Chase Bank, N.A. ("JPMC") to acquire Frank for $175 million. *Id.* ¶ 1.

Javice founded Frank in 2017, ostensibly as a trusted online source to help students navigate every aspect of the college financial aid process and to provide students a tool to expedite completion of the Free Application for Federal Student Aid ("FAFSA"). *Id.* ¶ 16. In early 2021, a Frank board member approached JPMC about a possible acquisition of Frank. *Id.* ¶ 32. In July 2021, Frank represented to JPMC through, *inter alia*, pitch deck materials approved by Javice, documents in Frank's data room, and statements from Javice, that it had approximately 4.25 million customers. *Id.* ¶¶ 1, 32–38, 43. According to the complaint, however, Frank did not have 4.25 million student customers or their identifying information, but only had identifying information for only about 300,000 students. *Id.* ¶¶ 2, 42. During initial due diligence and follow-up requests, Javice allegedly enlisted the help of a data science professor to use "synthetic data" to supply the missing users for validation prior to the signing of the merger agreement. *Id.* ¶¶ 58–67. Javice then allegedly purchased data from two "data compilers" to generate a list of 4.5 million students with identifying information. *Id.* ¶¶ 73–83. In short, the SEC's complaint alleges that Javice (1) hid the fact that Frank had identifying data for only about 300,000 students; and (2) fabricated data to falsely support Javice's representations. *Id.* ¶ 2.

## II.   The Criminal Indictment

The Government filed its criminal complaint against Javice under seal on March 31, 2023, which was unsealed and publicly released on April 4, 2023, the day after Javice's arrest and the same day the complaint in this case was filed. Dkt. No. 30-9; *see also United States v. Javice*, Case No. 23-cr-251, Dkt. No. 1. On May 18, 2023, based on the same alleged misconduct in the SEC's complaint, a grand jury sitting in this Court indicted Javice on charges of conspiracy to commit wire fraud and bank fraud in violation of 18 U.S.C. § 1349; wire fraud in violation of 18 U.S.C. §§ 2, 1343; bank fraud in violation of 18 U.S.C. §§ 2, 1344; and

securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 140.10b-5. *See generally* Dkt. No. 30-8; *see also United States v. Javice*, Case No. 23-cr-251, Dkt. No. 18. The case is currently pending before the Honorable Judge Alvin K. Hellerstein.

On June 6, 2023, Judge Hellerstein held an initial pretrial conference. The Government, in its reply brief, has represented that it provided a "voluminous Rule 16 discovery to the defense." Dkt. No. 32 at 2. In particular, at the initial pretrial conference, the Government gave defense counsel a hard drive with "about 90 gigabytes" of data containing "about 106,000 files." Dkt. No. 32-1 at 4. Those files consisted mainly of "subpoena returns from about 30 different third parties." *Id*. It also includes "three warrants related to cellphones," *id*., and "an asset seizure warrant for bank accounts," *id*. at 4–5. The Government stated that it has "produced the vast bulk, if not all," of what it currently had in its possession. *Id*. at 5. It also represented that its investigation was ongoing and that as it received additional materials, it would provide them to the defense. *Id.* at 4, 6. That discovery was provided one day prior to the filing of Javice's opposition brief on this motion. Javice's opposition brief makes no mention of these materials.

The parties sparred over the trial date and the Speedy Trial Act, 18 U.S.C. § 3161 *et seq*. The Government stated that it was prepared to set a trial date and indicated it would be available and ready to try the case in October 2023. *Id.* at 8. Judge Hellerstein set a conference date for July 13, 2023, after the defense asked for a conference date in the middle of July. *Id.* But after Javice objected to the Government's request to exclude time under the Speedy Trial Act until the date of the conference, the Government requested a trial date in October 2023. *Id.* at 9. Judge Hellerstein granted that request and scheduled trial to begin on October 16, 2023. *Id.* Javice then relented, stating that she had "a lot of investigation to do," and asked to keep the July 13

status conference date with a trial date to be set then, and agreed to the exclusion of time under the Speedy Trial Act. *Id.* at 9–10. Thus, at Javice's request, no date for trial was set, and the next conference in the criminal case is scheduled for July 13, 2023.

## PROCEDURAL HISTORY

The SEC filed its complaint in this case on April 4, 2023. Dkt. No. 1. On May 12, 2023, the Court issued a notice of initial pretrial conference for June 7, 2023. Dkt. No. 13. On May 24, 2023, within a week after the filing of the indictment and before any initial pretrial conference in this case was held, the Government filed this motion to intervene and to stay discovery, along with a memorandum of law in support of the motion. Dkt. Nos. 19–20. On May 25, 2023, the Court issued an order adjourning *sine die* the initial pretrial conference scheduled for June 7, 2023 and scheduled oral argument on this motion. Dkt. No. 21. That same day, the Court issued an order granting the letter motion of Javice for an extension of time to answer until after the Court ruled on the Government's motion. Dkt. No. 23. On June 2, 2023, the SEC filed a letter seeking to adjourn the deadline for responding to Javice's request for the production of documents to 21 days after the Court's ruling on the stay motion, indicating that it took no position on the stay motion, and advising the Court of its intention to continue its investigation with respect to uncharged parties. Dkt. No. 25. Javice submitted a letter response in opposition to the SEC's motion that same day. Dkt. No. 26. On June 7, 2023, Javice filed a memorandum of law and declaration in opposition to the stay motion. Dkt. No. 29. The government filed its reply brief in support of the stay motion on June 12, 2023. Dkt. No. 32. The Court heard oral argument on June 15, 2023. Minute Entry (June 8, 2023).

## DISCUSSION

The Government seeks to intervene for the purpose of requesting a stay of discovery in this action until the conclusion of the criminal case. Dkt. No. 19. It argues that the Court should

4

stay this action because, were it to proceed in advance of the criminal case, it would impair and impede the Government's ability to protect its interest in the enforcement of the federal criminal law. Dkt. No. 20 at 5. It claims, *inter alia*, that allowing discovery to go forward in this civil case would result in asymmetric discovery because Defendant would be able to use civil discovery mechanisms to circumvent the restrictions on discovery in the criminal matter, while the SEC would be unable to use those same mechanisms due to Defendant's likely assertion of her Fifth Amendment rights. *Id.* at 12. The SEC takes no position on the stay motion. Dkt. No. 25 at 1. Javice does not oppose the Government's intervention for the limited purpose of seeking a stay, but opposes the motion for a stay and, in the alternative, argues that any stay should be limited to the taking of deposition testimony and that document discovery should be permitted to proceed. Dkt. No. 29 at 1 n.2, 9.

I.      **Motion to Intervene**

Rule 24(a) of the Federal Rules of Civil Procedure provides for intervention as a right when the party seeking to intervene "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest." Fed. R. Civ. P 24(a)(2). Rule 24(b) authorizes permissive intervention when the applicant "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). In exercising its discretion under Rule 24(b), a court "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

This Court and others have addressed similar motions. *See, e.g.*, *SEC v. Shah*, 2022 WL 17551937, at *1 (S.D.N.Y. Dec. 9, 2022); *SEC v. Calabrigo*, 2022 WL 4752427, at *3 (S.D.N.Y. Sept. 30, 2022); *SEC v. Shkreli*, 2016 WL 1122029, at *2–3 (E.D.N.Y. Mar. 22, 2016); *SEC v.*

*Treadway*, 2005 WL 713826, at *2 (S.D.N.Y. Mar. 30, 2005). The Government is entitled to

intervene under Rule 24(a), and will be permitted to intervene under Rule 24(b), for purposes of

seeking a stay. *See Treadway*, 2005 WL 713826, at *2 ("Whether couching the decision in terms

of mandatory or permissive intervention or simply referring to Rule 24 without specifying the

subsection on which they rely, courts in this Circuit have routinely allowed federal or state

prosecutors to intervene in civil litigation in order to seek a stay of discovery.") (citing cases).

The Government has "a discernible interest in intervening in order to prevent discovery in the

civil case from being used to circumvent the more limited scope of discovery in the criminal

matter." *SEC v. Chestman*, 861 F.2d 49, 50 (2d Cir. 1988); *see also SEC v. Abraaj Inv. Mgmt.

Ltd.*, 2019 WL 6498282, at *1 (S.D.N.Y. Dec. 3, 2019) (same); *SEC v. Blaszczak*, 2018 WL

301091, at *1 (S.D.N.Y. Jan. 3, 2018) (same); *SEC v. Downe*, 1993 WL 22126, at *11 (S.D.N.Y.

Jan 26, 1993) ("It is well-established that the United States Attorney may intervene in a federal

civil action to seek a stay of discovery when there is a parallel criminal proceeding, which is

anticipated or already underway, that involves common questions of law or fact."). In addition,

"there are significant overlaps between the SEC complaint and the indictment in the criminal

case" and "[b]oth actions share a great number of common legal and factual questions, which

militates strongly in favor of permissive intervention." *Shkreli*, 2016 WL 1122029, at *3. The

motion to intervene is granted.

## II.     Motion to Stay

"A total stay of civil discovery pending the outcome of related criminal proceedings . . .

is an extraordinary remedy." *In re Par Pharm., Inc. Sec. Litig.*, 133 F.R.D. 12, 13 (S.D.N.Y

1990). Nonetheless, "[a] district court may stay civil proceedings when related criminal

proceedings are imminent or pending, and it will sometimes be prudential to do so." *Louis

Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 98 (2d Cir. 2012). The factors to consider in

deciding whether to grant a stay are familiar. The Second Circuit has instructed courts to consider:

> 1) the extent to which the issues in the criminal case overlap with those presented in the civil case; 2) the status of the case, including whether the defendants have been indicted; 3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay; 4) the private interests of and burden on the defendants; 5) the interests of the courts; and 6) the public interest.

*Id.* at 99 (quoting *Trustees of Plumbers & Pipefitters Nat. Pension Fund v. Transworld Mech.*, *Inc.*, 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995)).

The parties do not dispute that the first two factors favor a stay. For the first factor, as the Government puts it, "the SEC Case arises from the same conduct and circumstances that underlie the Criminal Case and litigation of the SEC Case will necessarily involve the same facts, documents, and witnesses relevant to the criminal trial." Dkt. No. 20 at 2. Javice agrees. *See* Dkt. No. 29 at 2 ("The actions are based on precisely the same alleged misconduct—that Ms. Javice somehow fraudulently induced JPMorgan Chase Bank, N.A. . . . to acquire Ms. Javice's student loan company, TAPD, Inc. d/b/a Frank . . . , for $175 million."). "Courts have consistently recognized [the overlap of the issues] as a particularly significant factor." *Shkreli*, 2016 WL 1122029, at *4.

The SEC's complaint alleges that, in 2021, Javice engaged in a scheme to defraud JPMC into purchasing Frank for $175 million through false representations about the number of customers that Frank had collected. Dkt. No. 1 ¶¶ 1–2. In particular, Javice misrepresented the number of customers with identity information that Frank possessed. *Id.* ¶ 2. She represented that Frank had gathered identity information for 4.25 million customers, whereas Frank in fact had identifying data for only about 300,000 students. *Id.* ¶¶ 1–2. The complaint alleges that "[t]o ensure that JPMC went forward with the transaction, Javice embarked on a fraudulent

scheme to (1) hide the fact that Frank had identifying data for only about 300,000 students; and (2) fabricate data to falsely support Javice's claims." *Id.* ¶ 2.

 The indictment in the criminal case charges Javice with the identical conduct. It charges that Javice "engaged in a scheme to defraud by submitting false and fraudulent representations about . . . Frank . . . and its user data, among other things, to potential acquiring companies, including to [JPMC] . . . and to at least one other bank . . . , in order to defraud those companies out of millions of dollars—consisting of the acquisition price, as well as salary, bonus and other compensation paid to JAVICE as a retained employee at the eventual acquiring company." *Id.*; *see also id.* ¶¶ 3–6 (same).

 The two filings not only allege the same scheme, but also use much of the same language. JPMC is the victim of Javice's alleged scheme in both the SEC's complaint and the Government's indictment. *Compare* Dkt. No 20-2 ¶ 2 (indictment describing the relevant scheme as one to "defraud . . . the eventual acquiring company, JPMC"), *with* Dkt. No. 1 ¶ 2. The indictment cites the relevant time period for the alleged scheme as "in or about June 2021 through at least in or about November 2022." Dkt. No. 20-2 ¶ 1. The complaint repeatedly cites dates within this period in relation to the alleged scheme. *See generally* Dkt. No. 1 ¶¶ 37–92. Both the complaint and the indictment reference the same false representations underlying the alleged scheme. *Compare* Dkt. No. 20-2 ¶ 2 (indictment alleging that "Javice engaged in a scheme to defraud by submitting false and fraudulent statements and representations about [Frank] and its user data"), *with* Dkt. No. 1 ¶ 38 (SEC complaint discussing Javice confirming "the false statements in the data room and the substance of her public statements about the size and nature of Frank's 'users': she claimed that Frank had 4.25 million users").

The second factor also favors a stay.  Javice was arrested on the criminal complaint on April 3, 2023, the day before the SEC complaint was filed, and she has since been indicted.  *See* Dkt. No. 20-2 (indicating that Javice was indicted on May 18, 2023).  The criminal case is moving forward, albeit—at Javice's request—not as quickly as the Government was prepared to proceed.  As the Court has previously put it, "the risk of two parallel proceedings addressing identical issues is no longer speculative; a criminal case is in process."  *Calabrigo*, 2022 WL 4752427, at *4.  Although "[c]ivil cases frequently move at a slow pace in federal court[,] the Speedy Trial Act and a defendant's constitutional right to a speedy trial mean that criminal cases proceed with relative alacrity."  *Id.*

The third factor is the private interest of the plaintiff—in this case, the SEC—in proceeding expeditiously.  This factor is neutral as the SEC has taken no position on this motion.  *See Calabrigo*, 2022 WL 4752427, at *5; *Abraaj*, 2019 WL 6498282, at *2 ("As '[t]he SEC has taken no position on the Government's request . . . the Court thus need not consider its interests.'" (quoting *Blaszczak*, 2018 WL 301091, at *2)).

The parties dispute whether the fourth factor supports a stay.  This factor asks the court to evaluate "the private interests of and burden on the defendants."  *Louis Vuitton Malletier S.A.*, 676 F.3d at 99 (citation omitted).  A defendant charged in parallel civil and criminal cases has competing interests.  On the one hand, the continued prosecution of the civil case presents her "with the dilemma of making potential incriminating admissions during discovery or asserting [her] Fifth Amendment rights, on the basis of which the civil jury can draw an adverse inference."  *Treadway*, 2005 WL 713826, at *4.  On the other hand, the very pendency of the civil case can present "an economic burden" and a "cloud" on the defendant's career and personal life.  *Id.*

9

Javice argues that this factor favors her. She contends that the Government's "***mere unproven allegations*** already have severely prejudiced [her], and any delay to [her] defense ***exponentially increases*** the prejudice to her" and that "time is of the essence." Dkt. No. 29 at 13 (bolding and emphasis in original). She cites that her assets have been seized, that she is currently unemployed, and that the pendency of this action "continues to cloud her future career prospects and her personal life." *Id.* at 14. She also argues that she has been prejudiced because "the Government now wants to ensure that [she] is precluded from mounting a defense in the criminal case." *Id.* Finally, she argues that an indeterminate stay of discovery "increases the likelihood that witnesses will forget critical information, [that] witnesses will not be available for depositions or trial, and that exculpatory documents critical to [her] defense may be lost or destroyed." *Id.* at 15. The Government counters that "a stay of discovery will not prejudice any party," Dkt. No. 20 at 9, and that "the fairness, efficiency, and public good resulting from a stay of discovery outweighs the defendant's preference," *id.* at 1.

Javice's argument that the fourth factor favors her are without merit. The fourth factor is neutral. The position that Javice has taken in the criminal case undermines her argument that "time is of the essence." Dkt. No. 29 at 13. If she had an interest in adjudicating the claims against her as quickly as possible, she had that opportunity. She was offered a trial date in October 2023, just four months away. That date is far sooner than any date that would be available in this case. She nonetheless declined that trial date, understandably asking for more time to investigate and waiving her right to a speedy trial. Dkt. No. 32-1 at 9–11. The cloud that currently resides over her head would not be lifted even if this Court were able to give her a speedier trial on the charges brought by the SEC. She would still face the potential

consequences of the Government's indictment—criminal charges, with the prospect of imprisonment, and not just penalties and injunctive relief.

Javice expresses the fear that, if a stay were granted, she "would be forced to start all over again in this action following the conclusion of the criminal action." Dkt. No. 29 at 17. On the presumption that all criminal defendants are entitled to enjoy—that she is innocent—and that she will be found not guilty, she argues that a stay of civil discovery will necessarily delay her ability to completely clear her name. There are two responses to that point. First, any delay in the ultimate resolution of all of the governmental cases against Javice is at least partially of her own manufacture. The Government is ready for trial in the criminal case. Were Javice to try that case on the Government's preferred schedule, it would be concluded before this case—in the ordinary course—would have made much progress. Second, and equally important, Javice is wrong to suggest that after the criminal case is concluded, she will have to start at square one. In the criminal case, she has been given 90 gigabytes of data containing approximately 106,000 files consisting primarily of subpoena returns from about 30 different third parties. Dkt. No. 32-1 at 4. The Government and the SEC have represented that the Rule 16 discovery in the criminal case will include all of the documents that the SEC collected from third parties during its investigative phase—the third-party documents in the SEC investigative file will be produced to the Government under its access request and, in turn, produced by the Government to Javice under Rule 16. Dkt. No. 33. The SEC has also represented that it will not object to Javice's use in the civil litigation of documents obtained in the criminal case provided that Javice obtains relief from any applicable protective order and complies with any civil discovery obligations concerning such materials. *Id.*

The only information from the investigative file that Javice will not have is SEC work product materials to which she would not necessarily have a right even if discovery in this case went forward, a small amount of correspondence with the third parties, and copies of administrative subpoenas that can be easily and quickly produced in this case once the criminal case ends and the stay is lifted.  And, while in this case, Javice will have a right to serve Rule 45 requests for documents that are not in the SEC file, any such subpoenas would not be appropriately served until after Javice has reviewed the documents she has obtained from the SEC file—a process that will not be hindered by a stay—to determine what, if anything, is missing and needs to be provided.  *See Fishon v. Peloton Interactive, Inc.*, 336 F.R.D. 67, 69 (S.D.N.Y. 2020) ("[I]f documents are available from a party, it has been thought preferable to have them obtained pursuant to Rule 34 rather than subpoenaing them from a non-party witness [pursuant to Rule 45]." (citation omitted)).

Javice's argument that memories will fade and evidence will be lost if a stay is granted is a makeweight.  The events in this case are alleged to have occurred form June 2021 to November 2022.  The SEC and the Government allege that the victims were defrauded of more than one hundred million dollars.  In addition to the SEC case and the pending criminal case, there is a private civil case that presumably will ensure that documents in the possession of third parties will be preserved.  If relevant witnesses are not called in the criminal case and their testimony preserved through examination and cross-examination in trial, there is no reason to believe that the very pendency of the criminal case will not ensure that their memories remain fresh—at least until depositions are taken.  There is little to no risk of memories fading or documents being lost or destroyed.

The only "interest" of Javice's that will be undermined by a stay is her interest in being able to use the existence of this case, and the tools of civil discovery that it makes available, to obtain discovery to which she would not otherwise have the right in order to defend herself and clear her name in her criminal case. She thus argues that she "is requesting to proceed with discovery in a parallel civil proceeding so she can gain swift and immediate access to the evidence she needs to disprove these allegations" from the Government. Dkt. No. 29 at 11. No doubt Javice would be better off in the criminal case were discovery to proceed in the civil case. But her interest in using the tools of civil discovery to advantage her in the criminal case is not one which the law recognizes; Javice does not have a right to use the tools of civil discovery for the purpose of defending herself in the criminal case. *See Calabrigo*, 2022 WL 4752427, at *5 ("[W]hen the purpose of a discovery request is to gather information for use in proceedings other than the pending suit, discovery properly is denied." (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 n.17 (1978))). The rules of criminal discovery exist for her to protect herself in the criminal case. Javice thus is not "prejudiced" by her inability to use the tools of civil discovery to advantage her in the criminal case. Had the SEC not sued Javice, she would not have had the tools of civil discovery available to her. A stay of discovery in this case puts her in no different position, reliant on the rules of criminal discovery to protect herself in a criminal case.[1]

---

[1] Javice notes that the SEC has indicated that it intends to continue its administrative investigation into other persons. Dkt. No. 29 at 1, 8, 14. That point does not undermine the Government's argument for a stay. The SEC has indicated that it intends to use administrative subpoenas to continue its investigation regardless whether the Court grants a stay. Dkt No. 25 at 2. A stay of the civil case will not prejudice Javice in this respect in the criminal case. At oral argument and in its filings, the SEC represented that it will make factual materials from its continued investigation available to the Government, and the Government has represented that, to the extent the material is discoverable in the criminal case, it will make the material available to Javice. *See also* Dkt. No. 30. With respect to the civil case, any argument that Javice could

The fifth factor favors a stay.  Judicial efficiency will be promoted by a stay.  "As many courts in similar circumstances have noted, '[t]he [c]riminal [c]ase will resolve issues of fact common to the civil case and may reduce the number of issues to be decided in subsequent proceedings in this case.'"  *Abraaj*, 2019 WL 6498282, at *3 (quoting *Blaszczak*, 2018 WL 301091, at *3).  To be sure, that may mainly be true if the issues were subsequently decided adversely to Javice, and Javice is entitled here to a presumption of innocence.  But if Javice is convicted, the jury's findings likely would be entitled to collateral estoppel effect.  *See Parklane Hosiery v. Shore*, 439 U.S. 322, 332 (1979) (providing for offensive collateral estoppel when the defendant had every incentive to litigate fully and vigorously).  And even if she is not convicted, proceedings in the criminal case will no doubt be helpful in clarifying the issues between the parties and more quickly bringing this case to conclusion.

Finally, the sixth factor favors a stay.  "It is, of course 'in the public interest to prevent circumvention of the limitations on discovery in . . . criminal proceedings.'"  *Abraaj*, 2019 WL 6498282, at *3 (quoting *Blaszczak*, 2018 WL 301091, at *3) (internal quotation marks omitted).  "A stay is therefore 'often necessary where liberal discovery rules will allow a litigant to undermine, or gain an unfair advantage in, a potential criminal prosecution which parallels the subject matter of the civil action.'"  *Id*. (quoting *Downe*, 1993 WL 22126, at *12).  Although Javice contends that the public has an interest in a "fair, open, and expeditious civil legal proceeding," Dkt. No. 29 at 18 (bolding and emphasis omitted) and in "seeing this action promptly resolved," *id*. at 19, that interest is not limited to the resolution of the civil action.  It also applies to the resolution of the criminal action, which must take place in a manner that

_____

make that, absent the stay, the SEC is improperly circumventing the Federal Rules of Civil Procedure by the use of administrative means, Javice will be able to make those arguments after the stay is lifted.

14

respects the rules of criminal procedure applicable to all other criminal defendants. A stay is necessary to protect the integrity of those rules.

Defendant's remaining argument focuses on the extent to which a stay in this case should apply. Javice asks that if the Court is inclined to entertain a stay, that it "exercise its judicial discretion to impose only a limited stay of fact depositions pending resolution of the criminal case, rather than putting on hold all discovery." Dkt. No. 29 at 23–24 (bolding and emphasis omitted). Javice thus asks that she be permitted to conduct immediate document discovery. *Id*. at 24. Her argument does not have enough force to overcome the Government's countervailing arguments. Discovery in civil cases is broad and occurs early in the proceeding. The parties generally may seek discovery after they confer as required by Rule 26(f). *See Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 326 (S.D.N.Y. 2005); *see also* Fed. R. Civ. P. 26(d)(1). Further, the parties are permitted significant latitude in their discovery requests, as they may "obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense involved in the pending litigation." *Sullivan v. StratMar Sys., Inc*., 276 F.R.D. 17, 19 (D. Conn. 2011); *see also* Fed. R. Civ. P. 26(b)(1). "Relevance" under Rule 26(b)(1) of the Federal Rules of Civil Procedure has been construed broadly to include "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc*, 437 U.S. at 351. Finally, "the scope of relevance under Rule 26 is broader than under the Federal Rules of Evidence. Thus, parties can obtain information in discovery that is not necessarily admissible at trial." *Kaiser Aluminum Warrick, LLC v. U.S Magnesium, LLC.*, 2023 WL 2024620, at *1 (S.D.N.Y. Feb. 15, 2023).

The rules of document subpoenas are significantly narrower in keeping with the distinctive features of a criminal case. The subpoena duces tecum, or the subpoena compelling

the production of physical evidence, issued pursuant to Federal Rule of Criminal Procedure 17, "was not intended to provide a means of discovery for criminal cases." *United States v. Nixon*, 418 U.S. 683, 698 (1974); *see also United States v. Goldstein*, 2023 WL 3662971, at *2 (E.D.N.Y. May 25, 2023) (noting that "although *Nixon* did not determine the propriety of a Rule 17(c) subpoena issued by a defendant to a third party, most lower courts have embraced the standard announced in *Nixon* as applicable to this circumstance"); *cf. United States v. Tucker*, 249 F.R.D. 58, 66 (S.D.N.Y. 2008), *as amended* (Feb. 20, 2008) (stating that "Rule 17(c) subpoenas are not to be used as broad discovery devices, but must be reasonably targeted to ensure the production of material evidence"). Rather, "its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials." *Nixon*, 418 U.S. at 698. The standards for justifying such a subpoena are more rigorous than that in civil cases: "In order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'" *Id*. at 699–700; *see also United States v. Fernandes*, 115 F. Supp. 3d 375, 380 (W.D.N.Y. 2015) (denying request when it constituted a mere "fishing expedition" that "may ultimately lead to the disclosure of information that could be used on cross-examination for impeachment"). Further, unlike Rule 26 subpoenas, the scope of Rule 17 subpoenas does not exceed the boundaries of the Federal Rules of Evidence, as the subpoena must meet the requirement of "admissibility." *Id.* at 700; *see also*

*United States v. Ashley*, 162 F.R.D. 265, 267 (E.D.N.Y. 1995) (denying subpoena because of lack of showing that documents would be admissible at trial).

In this case, permitting document discovery to go forward would not significantly advance the civil litigation. As previously indicated, Javice will have access to a vast amount of material usable in the civil case through the means of Rule 16 discovery in the criminal case. That discovery will include virtually all of the SEC's investigative file. And it will include documents from at least 30 different third parties. She has not made a convincing case that she needs more document discovery to be prepared to move quickly in this case when the criminal case is resolved and the stay is lifted. Further, the Government has indicated that it is prepared to try the criminal case soon; any additional delay will be of Javice's own making. Javice has made no showing that there is significant data that she would obtain from a Rule 45 subpoena to which she does not already have access or will soon have access through the criminal case. Under these circumstances, the only effect of the Court allowing Javice to proceed in this case with document discovery would be to circumvent the limits of discovery in the criminal case before Judge Hellerstein.

# CONCLUSION

The Government's motion to intervene and stay discovery is GRANTED.

The SEC's motion to adjourn the deadline for its responses to Javice's requests for the production of documents is DENIED AS MOOT.

The Clerk of Court is respectfully directed to close Dkt. Nos. 19, 25.


SO ORDERED.


Dated: June 20, 2023
      New York, New York

                                LEWIS J. LIMAN
                         United States District Judge

# **Exhibit F**

**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
**Tejal D. Shah**
**Lindsay S. Moilanen**
**Daniel Loss**
**Wesley Wintermyer**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, New York 10004**
**(212) 336-5571 (Loss)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** : | |
| Plaintiff, : | **AMENDED COMPLAINT** |
| v. : | **23 Civ. 2795 (LJL)** |
| **CHARLIE JAVICE and OLIVIER AMAR,** : | **JURY TRIAL DEMANDED** |
| Defendants, : | |
| -and- : | |
| **CHARLIE JAVICE, in her capacity as Trustee for the CHARLIE JAVICE 2021 IRREVOCABLE TRUST #1, and CHARLIE JAVICE 2021 IRREVOCABLE TRUST #2,** : | |
| Relief Defendants : | |

-------------------------------------------------------- x

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Charlie Javice ("Javice") and Olivier Amar ("Amar") (collectively, "Defendants"),

and Javice in her capacity as Trustee for Relief Defendants Charlie Javice 2021 Irrevocable Trust

#1 and Charlie Javice 2021 Irrevocable Trust #2 (collectively, "Relief Defendants") alleges as

follows:

## SUMMARY

1.       In the summer of 2021, Javice sold the company she founded, Frank,[1] for $175 million to JPMorgan Chase Bank, N.A. ("JPMC").  Through the deal, JPMC was eager to acquire the identity information of Frank's supposed 4.25 million customers or "users"— purportedly students looking to finance their educations—that Javice repeatedly claimed Frank had collected.  JPMC had been seeking to expand its market share for financial services and products to the largely untapped student segment of the population and hoped to use Frank's customer information to target those prospects.

2.       But, as both Defendants knew, Frank did not have 4.25 million student customers or their identifying information.  Javice, as Frank's CEO, and Amar, as the company's Chief Growth Officer, understood that Frank's user data was a significant asset that JPMC wanted, and that JPMC would not pursue an acquisition if it knew the truth:  that Frank in fact had identifying data for only about 300,000 students.  Therefore, to ensure that JPMC went forward with the transaction, Defendants embarked on a fraudulent scheme to (1) hide the fact that Frank had identifying data for only about 300,000 students; and (2) fabricate data to conceal the falsity of Javice's claims.

3.       Prior to the acquisition (which was documented as a merger), Javice repeatedly touted—at times with Amar's knowledge—that Frank had 4.25 million users, and explained in meetings with JPMC employees that those 4.25 million users were students who had provided their first name, last name, email address, and phone number to Frank.  When JPMC asked to review the customer data, Javice paid a university professor to create fake data appearing to represent 4.25 million customers.  Javice then provided that list of 4.25 million data entries to a

---

[1]       The legal name for the company was TAPD, Inc. "Frank" was a doing-business-as alias.

2

third-party validator, who in turn reported to JPMC that the data contained 4.25 million unique customer accounts with a first name, last name, email address, and phone number.

4.      In need of an alternative in case the university professor did not come through, and aware that JPMC would have access to Frank's real and much more limited student data after the close of the acquisition, Defendants began an effort to create a list of real names that could be falsely passed off as Frank's customers.  To that end, Amar arranged for Frank to pay $105,000 to a third party data compiler for a one-time use of its college student data.  Javice also arranged for Frank to pay $75,000 to a different data compiler to augment the list Amar bought with email and phone number data.

5.      But, after the merger when JPMC used those sham lists to test a marketing campaign by sending emails to a sample of who it thought were Frank's customers, its campaign reached few of the intended recipients, and the marketing email was opened by only a small fraction of those it did reach.

6.      JPMC conducted an internal investigation through which it learned that Frank did not, in fact, have a list of 4.25 million legitimate users and that Defendants had engaged in a months-long scheme to fabricate the data that they knew JPMC was paying $175 million to acquire.

## **VIOLATIONS**

7.      By virtue of the foregoing conduct and as alleged further herein, Defendants Javice and Amar have violated Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

8.      Defendant Javice further violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

9.      Pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendant Amar aided and abetted Javice's violations of Section 17(a)(1) and 17(a)(3) of the Securities Act and Section 10(b) of the Exchange Act, and Rules 10b-5(a) and 10b-5(c) thereunder.

10.      Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions and courses of business set forth in this Complaint, or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

11.      The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], seeking a final judgment:  (a) permanently enjoining Defendants from engaging in the acts, practices and courses of business alleged against them herein; (b) ordering Defendants to disgorge all ill-gotten gains and to pay prejudgment interest on those amounts pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Defendants from acting as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; (e) ordering Relief Defendants to pay, jointly and severally with Javice, all ill-

gotten gains by which they were unjustly enriched, with prejudgment interest, pursuant to

Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5)

and 78u(d)(7)]; and (f) ordering such other and further relief the Court may deem just and

proper.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15. U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15. U.S .C. § 78aa].

13.     Defendants, directly and indirectly, have made use of the means or

instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities

exchange, in connection with the transactions, acts, practices, or courses of business alleged

herein.

14.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)],

and Exchange Act Section 27 [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions and

courses of business alleged in this Complaint occurred within this District, including that

employees of JPMC involved in the Frank acquisition worked from JPMC's Manhattan offices,

Frank was represented in the acquisition negotiations by investment bankers located in

Manhattan, and negotiations over the terms of the acquisition, including at least two in-person

meetings took place in this District.

## DEFENDANTS

15.     **Javice**, age 31, resides in Miami Beach, Florida.  At all times relevant here,

Javice was the founder, CEO and a stockholder of TAPD, Inc., a for-profit company,

incorporated in Delaware in 2013, which began doing business as "Frank" in 2017.  As founder

and CEO, at all relevant times, Javice was the public face of Frank, and was the chief negotiator

on behalf of Frank in its acquisition discussions with JPMC.  Javice signed the merger agreement

with JPMC on behalf of TAPD, Inc.  At the time of Frank's acquisition, Javice controlled 8

million shares of TAPD, Inc. common stock and 2.5 million common stock warrants.  She

received approximately $9.7 million directly in proceeds from the merger, and millions more

indirectly, through the amounts JPMC paid to the Relief Defendants for Javice's benefit.  As part

of the acquisition, JPMC appointed Javice to a managing director position at JPMC and gave her

an employment agreement that included a $20 million retention bonus.

16.     **Amar**, age 49, resides in Port Washington, New York.  At all times relevant here,

Amar was Frank's Chief Growth Officer, with responsibility for, among other things, user

metrics and growth strategies.  At the time of Frank's acquisition, Amar held approximately 7

million shares of TAPD, Inc.  He received approximately $5 million in proceeds from the

merger.  As part of the acquisition, Amar became a JPMC employee and received an

employment agreement that included a $3 million retention bonus.

## **RELIEF DEFENDANTS**

17.     **Charlie Javice 2021 Irrevocable Trust #1** ("Javice Trust 1") is a Nevada trust

for which Javice acts as Trustee.  Javice formed the Javice Trust 1 in September 2021.  Pursuant

to the merger agreement by which JPMC acquired Frank (the "Merger Agreement"), JPMC

directed $4,700,000.11 of the merger consideration (minus amounts charged as selling expenses

and amounts escrowed as holdbacks) to Javice Trust 1.

18.     **Charlie Javice 2021 Irrevocable Trust #2** ("Javice Trust 2") is a Nevada trust

for which Javice acts as Trustee.  Javice formed the Javice Trust 2 in September 2021.  Pursuant

to the Merger Agreement, JPMC directed $6,999,999.96 of the merger consideration (minus

amounts charged as selling expenses and amounts escrowed as holdbacks) to Javice Trust 2.[2]

## RELEVANT ENTITIES

19.     **Frank** was the doing-business-as name of TAPD, Inc., a Delaware corporation, with its principal place of business in New York, New York.  Javice founded Frank in 2017.  Javice sought to make Frank a trusted online source to help students navigate every aspect of the college financial aid process.  Frank offered students a tool to expedite completion of the Free Application for Federal Student Aid ("FAFSA"), a time-consuming task required of students seeking federal grants and loans.  As it grew, Frank also provided students with information on scholarships, financial aid appeals, and college courses.[3]

20.     **JPMC** is a large financial institution, headquartered in Columbus, Ohio.  It acquired Frank in a merger transaction for $175 million in mid-September 2021.

21.     **Investment Bank** is a boutique investment and merchant bank that Javice hired to help Frank find additional investors or to identify a possible acquirer and advise it on any resulting transaction.  Javice was the primary source for the information that Frank's Investment Bank provided to potential investors and acquirers, while Amar also supplied certain data, including information regarding Frank's users and website visitors.

---

[2]     Charlie Javice 2021 Irrevocable Trust #3 ("Javice Trust 3") (also a Nevada trust for which Javice acts as Trustee), was similarly set to receive merger proceeds pursuant to the Merger Agreement.  However, all of the $7,133,805.83 consideration to be paid to the Javice Trust 3 was held in escrow and has not been paid out to Javice Trust 3.

[3]     JPMC ceased operating the Frank website in January 2023.

## FACTS

22.      By 2021, Frank had grown to an online resource for college students and prospective college students across the country.

23.      Frank's primary offering was its automated tool for quick completion and submission of the FAFSA, which attracted students looking for financial aid to finance their educations.  Frank claimed that its automated tool allowed students to complete the FAFSA in a fraction of the time that it typically took to enter the required data manually.

24.      By 2021, Frank had expanded into other areas of interest to these students.  It offered information on available scholarships, resources for pursuing financial aid appeals, and a market place for online college courses offered by third parties.

25.      In presentations Frank made to potential acquirers in 2021, the company claimed that it was "the trusted financial coach for students" and that its mission was "helping [students] navigate finances from A-Z."

26.      In 2021, Frank's website claimed that "4.25 million students choose Frank."

### *Frank's Efforts to Sell Itself*

27.      Since inception, Frank had financed its operations and growth primarily through money raised in private placements of its common and preferred stock.

28.      On January 25, 2021, Frank's General Counsel (the "General Counsel"), signed an engagement letter with the Investment Bank on behalf of Frank (the "IB Agreement"). Pursuant to that agreement, the Investment Bank was to act as Frank's "exclusive financial advisor" in connection with any possible transaction by which Frank would merge with or sell itself to a third party.

29.     Under the terms of the IB Agreement, Frank agreed that it would be "solely responsible for the accuracy and completeness of the Offering Materials and represents and warrants that the Offering Materials will not contain any untrue statement of a material fact or omit to state a material fact required to be stated . . . or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading."

30.     Javice read and approved the IB Agreement.

31.     Over the next few months, Investment Bank employees worked with Javice, Amar, and the General Counsel to create pitch decks describing Frank's products and market reach (including data related to the number of users), its financials and anticipated growth, potential new product offerings, and the status and pipeline of its contracts with third-parties for cross-marketing partnerships.  As stated in these decks, which Javice and Amar received, Frank had "4.25mm Students and Growing."

32.     The Investment Bank also worked with Javice, Amar, and the General Counsel to populate a virtual data room with Frank data purporting to support the information in the pitch decks; the data room would be opened to prospective acquirers for their review.

33.     Javice reviewed and approved all pitch decks sent to potential acquirers.

34.     By May 2021, Frank had entered into acquisition negotiations with one financial institution, and Javice presented a pitch deck to that institution touting that there were "4.25mm Frank Students & Growing."  The large financial institution considered acquiring Frank in order to market its financial products to what it believed was Frank's user base of 4.25 million students; ultimately, however, the financial institution decided not to acquire Frank.

35.     In early 2021, a Frank board member approached JPMC about a possible acquisition of Frank.  At this time, JPMC was focused on growing its market share of student

customers and was interested in the leads that Frank offered in that market segment given its touted engagement with over 4 million college-age or college-ready students.

36.     Frank's pitch deck, provided in early July 2021 to JPMC and approved by Javice, included a slide that represented that Frank had "4.25mm Students and Growing." The 4.25 million student figure was repeated on five additional slides in the pitch deck.

37.     After JPMC signed a non-disclosure agreement with Frank, Frank and the Investment Bank opened Frank's data room to JPMC on July 6, 2021.

38.     Several documents concerning customer data were uploaded to the data room with Javice's approval and Amar's knowledge. One such document was a spreadsheet that included a column labeled "FAFSA in Process" purporting to show 4,265,085 customers who had started to fill out a FAFSA form using Frank's online tool. The spreadsheet showed that 2.1 million students had fully completed a FAFSA through Frank.

39.     In later meetings, Javice explained that to begin the FAFSA process through Frank, a user would first open an account and submit his or her name, email address, and phone number.

40.     On July 12 and July 13, 2021, JPMC employees met in Manhattan with Frank representatives, including Javice and, remotely for a portion of the July 12 meeting, Amar, to discuss the information in the data room and to gain a better understanding of Frank's products and customer base. During both all-day meetings, Javice fielded most of the questions on behalf of Frank.

41.     At those meetings, Javice knowingly or recklessly confirmed the false statements in the data room and the substance of her public statements about the size and nature of Frank's "users": she claimed that Frank had 4.25 million users.

10

42.     As Javice defined it at those meetings, a "user" was a Frank website visitor who created a Frank account by submitting their first name, last name, email address, and phone number to Frank.  Javice differentiated "user" from "visitor," explaining that Frank had more than 35 million visitors to its website, but that those visitors would be counted as "users" only when they submitted their name, email, and phone number information.

43.     The kinds of identifying information that had purportedly been provided by Frank users were valuable to JPMC in its efforts to market to and attract new customers in the student population because it would allow JPMC to target those students already familiar with Frank and its financial aid services with marketing materials about JPMC's broader array of financial products and services.

44.     Defendants understood that the student identifying information that Javice claimed Frank had collected, in meetings as well as in documents uploaded to the data room, was important to JPMC.

45.     As Defendants knew or recklessly disregarded, the approximately 4.25 million user number was false.  In fact, Frank had the name, email address, and phone number information for only a fraction—approximately 300,000—of those students.

46.     Javice presented the false number of users to JPMC repeatedly in multiple due diligence meetings and calls.

47.     On July 14, 2021, JPMC submitted a non-binding indication of interest to acquire Frank's outstanding stock for $175 million, subject to confirmatory due diligence.  Frank agreed to grant JPMC a 14-day period of exclusivity, during which JPMC conducted additional due diligence, including additional in-person meetings on July 19 and July 20, 2021.

48.     As part of its due diligence and follow-up requests, JPMC asked Javice to provide a list of Frank's customer accounts that included the identifying information Javice had represented Frank possessed.  Javice attempted to dodge requests for specific details to support her "user" claims, citing privacy concerns over sharing such personal identifying information with a third party.  But JPMC insisted.

49.     In an August 1, 2021 email, a JPMC employee asked Javice:  "How many customer accounts have 100% of the below data?," referring to first names, last names, dates of birth, phone numbers, mailing addresses, email addresses, and other variables.  The email also requested the following information:  "How many customer accounts have partial information?  Of partial records, what % include each data field below?  Validate the integrity of each of the variables to the degree reasonable (e.g., data and email fields are captured in the appropriate formats)."

50.     Within minutes of receiving that email, Javice forwarded it to Amar.  Javice then sent Amar a WhatsApp message, stating:  "Need to talk about a data pull and strategy."  Javice quickly followed that up with another WhatsApp message:  "Ur gonna need to block off ur day."

51.     Later on August 1, 2021, JPMC sent Javice an email stressing that its data questions were "critical confirmatory due diligence requests" that were "conditions to closing the transaction."

### *Defendants Arranged to Provide Fabricated Data to JPMC to Support Javice's False User Representations*

52.     With the exclusivity period at an end, JPMC and Frank worked to resolve the conflict between JPMC's desire to verify Frank's user claims and Frank's stated privacy concerns.

53.     JPMC proposed and Javice accepted the use of a third-party validator (the "Validator").  Pursuant to a data services and non-disclosure agreement with the Validator, Frank would provide the Validator with "up to 4 million records of customer data," without certain personal identifiable information, and the Validator would "validate the coverage of the attribute data" and "then provide a written report regarding the coverage of the attribute data" to JPMC without disclosing any of the actual data Frank supplied.  Specifically, the validation report would report to JPMC "[h]ow many UNIQUE customer accounts exist."

54.     Defendants recognized that they would have to fabricate data to supply to the Validator to hide the fact that Frank actually had identifying information for only a fraction of the approximately 4.25 million users that Javice had claimed.  Defendants agreed that they should ask Frank's Director of Engineering (the "Engineering Director") to supply the missing users by creating "synthetic data" of the users' existence and identifying information.

55.     On August 1, 2021, Javice emailed Amar and the Engineering Director a spreadsheet that purported to show that Frank had 4,265,085 website visitors with a "FAFSA in Process."  As Javice noted in her cover email, this was the "data provided to JPM."  The spreadsheet contained certain general demographic data regarding these visitors on a cumulative basis, such as their geographic location and degree interest.  However, the spreadsheet did not contain their names, email addresses, phone numbers, or other identifying information.

56.     Later on August 1, 2021, Amar sent Javice a WhatsApp message stating that he would send her "the files [she] need[ed]."  In message a few minutes later, Javice asked if Amar knew "how many records" were within the files.  Amar responded that there were "over 100k in one of them," which was a far cry from the approximately 4.25 million users represented to JPMC.

13

57.     Early on August 2, 2021, Javice emailed the Engineering Director a link to a website that described how to "generate synthetic data that is similar to the actual data in terms of statistics and demographics."

58.     Javice and Amar held a videoconference call with the Engineering Director later on August 2, 2021.  Amar explained to the Engineering Director that he and Javice wanted him to take the information that Frank had available on 4.265 million visitors and use synthetic data techniques to generate identifying information (e.g., names, email address, and phone numbers) for those visitors, using the same demographics present in the real data (e.g., geographic location and degree interest).

59.     Previously, in connection with due diligence meetings with JPMC attended by the Engineering Director, Javice had directed the Engineering Director not to discuss Frank's user metrics in terms of actual numbers with JPMC.

60.     During the August 2, 2021 call with Defendants, the Engineering Director was uneasy with their request.  Fearing that the synthetic data mimicking actual user data that they were asking him to create might be used to attract investors, the Engineering Director asked Defendants whether creating such synthetic data was legal.  Javice assured him that it was and responded that no one would end up in "orange jumpsuits."

61.     The Engineering Director refused to comply with Defendants' request to create synthetic data.  Instead, on August 2, 2021, the Engineering Director forwarded Javice a link to the data of Frank's actual users for whom it had identifying information.  As the Engineering Director explained to Javice in a separate message, over Slack, the data showed "142K" individuals who had "applications at least started."  Javice directed the Engineering Director also to "count users who don[']t have an application."  The Engineering Director responded:  "if [I]

14

count users with no fafsa applications, we get ~293192 records." Javice responded: "Exactly."

62.     While corresponding with the Engineering Director over Slack regarding these data counts, Javice messaged Amar on WhatsApp saying that the Engineering Director's spreadsheet "is only 142k rows which can't be right[.]  We've spent too much $ for emails or first names[.]"  Seconds later, Amar responded:  "No, it makes sense[.]  I think[.]"

63.     Unable to obtain the fabricated data from the Engineering Director, Javice and Amar discussed options for external parties from whom they could obtain data.  On August 2, 2021, Javice sent Amar WhatsApp messages containing links to three websites related to retrieving personal identification information on individuals.  Javice also asked Amar to inform her when he "g[o]t a hold of" Data Compiler 1, a marketing company that boasts "the most comprehensive, accurate and responsive data of high school students, college students, and young adults available anywhere."

64.     Later that day, Amar informed Javice that he had reached out to Data Compiler 1.  Amar also wrote, over WhatsApp, that he would "research [additional options] to see if they can take data dumps."  Javice responded:  "[Y]ep.  At this point whoever is quickest to onboard."

65.     Also on August 2, 2021, Javice reached out to a data science professor at a local university whom she had met in college (the "Data Science Professor").  The next day, Javice and the Data Science Professor had a call "to walk through all the data."  Within fifteen minutes of that call, Javice sent Amar a WhatsApp message saying:  "I found my genius.  He says it will take him an hour[.]"  Amar responded:  "Great."

66.     On August 3, 2021, Javice provided the Data Science Professor with the list of approximately 142,000 individuals, which she had obtained from the Engineering Director.  Javice retained the Data Science Professor to use "synthetic data" to create 4.265 million

customer names, email addresses, phone numbers, and varying amounts of other identifying information requested by JPMC.

67. Thereafter, in a series of messages, Javice guided the Data Science Professor in creating a list of fake user data, answering questions from him about how the data should look.

68. For example, Javice confirmed that the Data Science Professor would "sample first name and last name independently and then ensure none of the sampled names are real."

69. For address information, Javice and the Data Science Professor agreed that while real addresses would not be used, street names would match actual street names located in the state for that address.

70. The Data Science Professor warned that because the information he was supplying indicated that many of the "students" were living, and attending high school and college in the same town and state, it "would look fishy" if someone "were to audit it."

71. When the Data Science Professor advised that it would be difficult to create real-looking email addresses, Javice suggested that he instead insert a "unique ID." Unique IDs are commonly used to share sensitive real information by replacing the real data with a unique, and random, alphanumeric string. But Javice was suggesting their use to conceal the obviously fake data, and to create the misimpression that real, but sensitive, data was being protected.

72. On August 4, 2021, Javice provided the Data Science Professor with a draft data validation "report [that they] would need to make sure matches" to the data that the Data Science Professor was working to generate. The report was already preloaded with counts showing that Frank had 4,265,085 unique customer accounts with a first name, last name, email address, and phone number.

73. On August 5, 2021, the Data Science Professor finished generating a list of exactly 4,265,085 "user" accounts with a first name, last name, email address (provided as a Unique ID), and phone number, along with varying amounts of other identifying information.

74. Also on August 5, 2021, Javice informed Amar via WhatsApp that the Data Science Professor had "[f]inished [the] data" earlier that morning. Amar asked, "How'[d] it go?," and Javice responded that the Data Science Professor "did a fantastic job. Truly. We powered through together." Amar responded, "Nice."

75. That same day, Javice directed the Data Science Professor to submit his list of 4.265 million synthetically-generated users to the Validator.

76. After its review of the data, the Validator advised Javice in an August 5, 2021 email that it had validated that certain fields were "populated versus null/blank." The Validator attached its "Validation" report that reflected that 100% of the 4,265,085 entries it reviewed had data in the first name, last name, email address, and phone fields.

77. Javice authorized the Validator to release the report to JPMC, but asked that it "not share additional background" with JPMC.

78. After the report was delivered to JPMC, Javice requested that the Validator delete the data that Frank had provided through the Data Science Professor.

79. With their fabricated data now successfully "validated," Javice paid the Data Science Professor for his services. On August 5, 2021, and in response to his invoice for $13,300, which detailed the work he performed creating the synthetic data, Javice told the Data Science Professor to send back an invoice for $18,000, giving him a bonus. To avoid creating written evidence of the fabrication, Javice also requested that the Data Science Professor prepare a new invoice containing "just one line item for data analysis."

*In Anticipation of JPMC's Access to the Data Post-merger, Defendants Bought Data to Cover Up their Earlier Deceptions*

80.     On August 8, 2021, JPMC and Frank entered into the definitive Merger Agreement and set the closing date for September 14, 2021.  Javice signed the Merger Agreement on behalf of TAPD, Inc., as its CEO.  Pursuant to the Merger Agreement, JPMC acquired all of Frank's outstanding common and preferred stock for total consideration of $175 million, and Defendants and others from Frank were offered positions with JPMC post-merger.  Javice was entitled to a $20 million retention bonus, and Amar was entitled to a $3 million retention bonus.

81.     Javice's employment offer, which she signed on August 4, 2021, stated that performance indicators of her new job would include "expand[ing] [Frank's] engaged customer user base of 4.25 MM households to 10MM+ households over the next three years."

82.     Defendants anticipated that, after the closing, JPMC would soon ask for unrestricted access to Frank's purported list of 4.25 million users.  Recognizing that their scheme would immediately be unmasked if they delivered the data that the Data Science Professor had fabricated, Defendants scrambled to buy data from data providers that at least consisted of real students, even if those students never had a connection to Frank.

83.     To that end, as noted above, even before the Merger Agreement was signed, Amar reached out to Data Compiler 1 at the direction of Javice.  Amar sent the following inquiry to Data Compiler 1 on the morning of August 2, 2021:  "We're looking to augment the marketing data we have to complete the picture.  Would love to speak to someone soon."

84.     Later on August 2, 2021, Amar asked Data Compiler 1 how much it would cost to buy its "list of students currently in college."  Data Compiler 1 responded by recommending that Frank "licens[e] the database for annual use as opposed to renting the data for a one-time use."

18

Amar spoke to Data Compiler 1 over the phone and kept Javice informed of his conversations with them.

85.     On the morning of August 3, 2021, Javice asked Amar over WhatsApp, "Where are we with [Data Compiler 1]?" Amar responded that "they're getting back to me today with numbers and a sample." Later that day, Javice sent Amar the following WhatsApp message: "I need the data today." Amar responded that Data Compiler 1 could provide "the 3m at 5 cents," which would cost approximately $150,000. Javice responded: "Do it." Javice signed a credit card order form authorizing Frank to make a maximum $150,000 order from Data Compiler 1. Amar provided the signed order form to Data Compiler 1.

86.     Also on August 3, 2021, Amar informed Javice via WhatsApp that Data Compiler 1 was sending a "100K test and then we can move on the 3M." Javice responded: "They don't have more? Need 4.5M." Amar explained that Data Compiler 1 could provide up to seven million records, but that "[o]nly 3M will have emails." Javice responded: "[T]hat['s] fine. [A]ddresses are good[,] or phone #[.]"

87.     Later on August 3, 2021, Javice executed a "Data Rental Agreement" between Frank and Data Compiler 1 ("Data Rental Agreement 1"). Amar was listed as Frank's primary contact. The agreement specified that Data Compiler 1 would send Frank a "random select[ion] of 100,000 records with email (where available)," for the stated purpose of "internal matching" by Frank, for the price of $4,500.

88.     Early on August 5, 2021, Amar pressed Data Compiler 1 to "prepare the lists of 4.5m (2.8m with emails and 1.7m without) as well as confirm pricing" by 3:30 p.m. that day. He noted that Frank was "rushed" and that if they could not "close this today, we will have to move forward with another vendor as we have limited time with this data scientist and time is ticking."

19

Amar was referring to the desire to share information provided by Data Compiler 1 with the Data Science Professor to incorporate in the Data Science Professor's then-ongoing work.

89.     That same day, Javice pressed Amar to call and email Data Compiler 1, as it was "seriously urgent" to get the data.  Amar responded that he had "spoke[n] to them," would have a meeting with them at 3:30 p.m. that day, and had "told them [he] wanted [the data] ready by then."

90.     After Data Compiler 1 informed Amar that it could provide him with the data that day (August 5, 2021), it asked him if he wanted to increase the number of records without emails, as the "exact count for the email addresses is 2,460,489," which was 339,511 short of Amar's 2,800,000 goal.  Amar confirmed that was his preference, as he wanted the "tot[al]s to be 4.5m."  Within minutes, Amar informed Javice over WhatsApp:  "You'll have 4.5m users today. Just closed it[.]  2.3 cents per user.  [$]105k price."  Javice responded:  "[P]e[r]fect."

91.     Later on August 5, 2021, Javice executed a second Data Rental Agreement between Frank and Data Compiler 1 ("Data Rental Agreement 2").  Amar was listed as Frank's primary contact.  The agreement specified that Data Compiler 1 would send Frank data from its "File Years: 2017 – 2021," for the stated purpose of "internal use" by Frank, for the price of $105,000.

92.     Javice approved the payment of $105,000 for Data Compiler 1's list of 4.5 million students.

93.     On August 5, 2021, Data Compiler 1 emailed Amar links to access data on 4.5 million students broken into two lists of data:  one contained data on approximately 2,460,489 students, including their email addresses; the other contained data on approximately 2,039,511 students, but did not include their email addresses.  Neither list included telephone numbers.

Amar forwarded the links to these lists to Javice.

94.     Early on August 6, 2021, Javice asked Amar to ask Data Compiler 1 "for the exact row count across every data attribute from all the files they sent over" for the following attributes: "1. First Name. 2. Last Name. 3. Email. 4. Address." In response to Amar's request, Data Compiler 1 confirmed that both files had "100% of name and address" data populated, but only the "email file" of 2,460,489 students had "100% of email" also populated. Amar sent this information to Javice.

95.     After Javice learned from Amar that Data Compiler 1's list would not include phone numbers, on August 6, 2021, Javice texted the Data Science Professor. She wrote: "Weird question – if I have names, emails, physical address for contacts – can we augment the data with phone numbers from white pages database?" The Data Science Professor agreed to work on the issue and asked her to send him a test batch of data files to which the phone numbers would be appended.

96.     On August 10, 2021, the Data Science Professor contacted Data Compiler 2. Data Compiler 2 is a public records aggregator. At Javice's direction, the Data Science Professor informed Data Compiler 2 that the data sought would be used to "enrich . . . contacts."

97.     Javice sent the Data Science Professor the Data Compiler 1 student data that Amar had sent her. On August 23, 2021, the Data Science Professor sent the Data Compiler 1 data to Data Compiler 2 and asked that they identify matching phone numbers and email addresses associated with that data.

98.     Data Compiler 2 was able to provide email addresses for less than half of the students in Data Compiler 1's data. On August 29, 2021, Javice instructed Data Compiler 2 to run the student information through their database with just the address information from the

Data Compiler 1 list in an effort to increase the email hits, essentially instructing Data Compiler 2 to provide email addresses found for any person located at the provided address, whether the student or not (the "household email data").

99.     Javice's proposed search parameters increased the number of emails retrieved. On September 9, 2021, Data Compiler 2 emailed Javice and the Data Science Professor data containing approximately 1.9 million email addresses for the approximately 4.5 million student records obtained from Data Compiler 1.

100.    Frank paid Data Compiler 2 $75,000 for its data.

101.    With the data bought from Data Compiler 1 and Data Compiler 2 combined, Defendants now had a list of approximately 4.5 million students with identifying information. Because Frank, through its own business, had attracted only 300,000 students who provided their email, phone number, and other personal identifying information, few (if any) on the lists Javice and Amar had caused Frank to purchase represented students who had actually interacted with Frank.

***JPMC Discovered Javice's Fraudulent Scheme***

102.    The acquisition closed on September 14, 2021, and Defendants, along with a few other Frank employees, became employees of JPMC.

103.    By January 2022, Defendants were still working on the Frank product as JPMC employees.

104.    In January 2022, JPMC sought to begin the cross-marketing of JPMC's financial products to Frank's users.

105.    On January 6, 2022, a team of JPMC employees asked Amar for the "Frank user data" that Javice had told JPMC that Frank possessed, and which had supposedly been validated

by the Validator. Amar responded that Frank's engineering team was "presently bogged down in fixing a critical issue in processing financial aid applications" and would not be able to meet JPMC's requested four-day "deadline as a result."

106. In a separate email, not including Amar or Javice, JPMC employees asked an engineering employee working on the Frank product "what the tech issue is with Frank" and whether it was "reported somewhere." The engineering employee forwarded these questions to Frank's Engineering Director, who was now also a JPMC employee. None of the employees responded by identifying any tech issues.

107. On January 14, 2022, Amar held a videoconference call with the Engineering Director to discuss JPMC's request for Frank's user data.

108. Over WhatsApp, Amar contemporaneously informed Javice that he was "in with [the Engineering Director] now." Javice instructed Amar to "tell [the Engineering Director] to start with [F]rank files first for data requested," which she clarified were "[t]he fafsa ones." Amar informed Javice that the Engineering Director "says he never touched the [Data Compiler 1] list," referring to the data lists that Frank procured from Data Compiler 1 for $105,000. Javice responded: "[I] know[.]" Amar then suggested that the Data Science Professor "will have to do the [Data Compiler 1] list."

109. Later on January 14, 2022, Amar informed Javice that the FAFSA list, pulled by the Engineering Director, contained "140063 FAFSA users with the 5 parameters." Javice asked Amar to put the file into an Excel spreadsheet. She later added: "We'll send it all to [the Data Science Professor] to clean and send as one file" together with the data obtained from Data Compiler 1.

23

110.     On January 21, 2022, Javice directed an engineering employee working on the Frank product to provide JPMC's marketing team with the data Amar had bought from Data Compiler 1.  The engineering employee did so and, in a later email internal to the Frank group (including Defendants), confessed that he was "not sure about the source of the data" that he had sent JPMC's marketing team.  Neither Javice nor Amar revealed to JPMC the actual source of the data that the engineering employee had provided.

111.     Later, in early February 2022, Javice sent the marketing team an edited version of the combined Data Compiler 1 list with the data obtained from Data Compiler 2, which included the household email data (the "Augmented List").  Despite knowing that both lists had been bought from commercial data aggregators and did not represent actual Frank users, Javice told no one on JPMC's marketing team that the Augmented List contained data that came from anywhere other than Frank.

112.     In July 2022, JPMC's marketing team sampled 400,000 names from the Augmented List to launch a test email marketing JPMC's financial services to what it thought were Frank users.  Of the emails sent to the sample, only 28% of the emails were confirmed delivered to an operational email address, and just 1.1% of those were opened by the recipient. Both statistics were far below the typical delivery success rates experienced by JPMC for its email campaigns.

113.     JPMC conducted an internal investigation regarding the poor results from the email marketing campaign.  Because Frank's historic emails and data had been transferred to JPMC as part of the merger, JPMC discovered Javice's conversations with the Data Science Professor about creating synthetic data to provide to the Validator and the Data Compiler 1 list that Amar had purchased.

114.     As a result of that investigation, JPMC learned that Frank did not have any list of 4.25 million legitimate users with the identifying information Javice had represented it possessed, and that Defendants had engaged in a months-long scheme to fabricate the data that Defendants knew JPMC was paying $175 million to acquire.

## FIRST CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act
### (Javice)

115.     The Commission realleges and incorporates by reference herein each and every allegation in paragraphs 1–8 and 10–114.

116.     Javice, directly or indirectly, singly or in concert with others, and in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (3) knowingly, recklessly, or negligently has engaged in one or more transactions, practices or courses of business which operated or would operate as a fraud or deceit upon a purchaser.

117.     By virtue of the foregoing, Javice, directly or indirectly, has violated, and unless restrained and enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Sections 17(a)(1) and 17(a)(3)
### (Amar)

118.     The Commission realleges and incorporates by reference herein each and every

25

allegation in paragraphs 1–7 and 9–114.

119.    As alleged above, Javice violated Sections 17(a)(1) and 17(a)(3) of the Securities

Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)].

120.    Amar knowingly or recklessly provided substantial assistance to Javice with

respect to her violations of Securities Act Sections 17(a)(1) and 17(a)(3) [15 U.S.C. §§ 77q(a)(1)

and 77q(a)(3)].

121.    By reason of the foregoing, Amar is liable pursuant to Securities Act Section

15(b) [15 U.S.C. § 77o(b)] for aiding and abetting Javice's violations of Securities Act Sections

17(a)(1)( and 17(a)(3) [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)], and, unless restrained and

enjoined, will again aid and abet these violations.

### THIRD CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Javice)

122.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1–8 and 10–114.

123.    Javice, directly or indirectly, singly or in concert with others, and in connection

with the purchase or sale of a security, used the means or instrumentalities of interstate

commerce or of the mails or of a facility of a national securities exchange (1) to knowingly or

recklessly employ one or more devices, schemes, or artifices to defraud; (2) to knowingly or

recklessly make one or more untrue statements of a material fact or to omit to state one or more

material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and (3) to knowingly or recklessly engage in one

or more acts, practices, or courses of business which operated or would operate as a fraud or

deceit upon others.

124. By virtue of the foregoing, Javice violated, and unless restrained and enjoined, will continue violating, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### FOURTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c) Thereunder**
**(Amar)**

125. The Commission realleges and incorporates by reference herein each and every allegation in paragraphs 1–7 and 9–114.

126. As alleged above, Javice violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)].

127. Amar knowingly or recklessly provided substantial assistance to Javice with respect to her violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)].

128. By reason of the foregoing, Amar is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Javice's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)], and, unless restrained and enjoined, will again aid and abet these violations.

### FIFTH CLAIM FOR RELIEF
**Violations of Sections 17(a)(1) and (3) of the Securities Act**
**(Amar)**

129. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1–7, 10–38, 40, 43–45, and 47–114.

130.    Amar, directly or indirectly, singly or in concert with others, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails in the offer or sale of securities, knowingly or recklessly has employed one or more devices, schemes or artifices to defraud; and knowingly, recklessly, or negligently has engaged in one or more transactions, practices or courses of business which operated or would operate as a fraud or deceit upon a purchaser.

131.    By virtue of the foregoing, Amar directly or indirectly, violated, and unless restrained and enjoined, will continue violating, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)].

## SIXTH CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder (Amar)

132.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1–7, 10–38, 40, 43-45, and 47-114.

133.    Amar directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, used the means or instrumentalities of interstate commerce or of the mails or of a facility of a national securities exchange to knowingly or recklessly employ devices, schemes, or artifices to defraud; and to knowingly or recklessly engage in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

134.    By virtue of the foregoing, Amar violated, and unless restrained and enjoined, will continue violating, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)].

## SEVENTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Relief Defendants Javice Trust 1 and Javice Trust 2)

135.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1–114.

136.    Javice Trust 1 and Javice Trust 2 each received proceeds from JPMC pursuant to the Merger Agreement.

137.    Neither Javice Trust 1 nor Javice Trust 2 has any legitimate claim to those ill-gotten gains.

138.    Javice Trust 1 and Javice Trust 2 each obtained the funds under circumstances in which it is not just, equitable, or conscionable for any of them to retain the funds.

139.    Javice Trust 1 and Javice Trust 2 each has therefore been unjustly enriched.

## PRAYER FOR RELIEF

**WHEREFORE,** the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Javice, and her agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S .C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R.§ 240.10b-5];

### II.

Permanently restraining and enjoining Amar, and his agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice

of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S .C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R.§ 240.10b-5];

## III.

Ordering Defendants to disgorge all ill-gotten gains she received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations, pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)];

## IV.

Ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## V.

Permanently prohibiting Javice and Amar from acting as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## VI.

Ordering Relief Defendants Javice Trust 1 and Javice Trust 2 to pay, jointly and severally with Javice, all ill-gotten gains by which each of them was unjustly enriched, with prejudgment interest, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; and

## VII.

Granting such other and further relief as this Court deems just and appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this

case be tried to a jury.

Dated: New York, New York
       July 12, 2023

/s/ Antonia M. Apps
ANTONIA M. APPS
REGIONAL DIRECTOR
Tejal D. Shah
Lindsay S. Moilanen
Daniel Loss
Wesley Wintermyer, *pro hac vice*
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-5571 (Loss)
lossd@sec.gov

# **Exhibit G**

From: JP Kernisan <jpkernisan@quinnemanuel.com>

**Date:** May 21, 2023 at 8:35:27 PM EDT
**To:** "Regan, William M." <william.regan@hoganlovells.com>, "Walsh, Jr. Peter J." <pwalsh@potteranderson.com>,
"Pittenger, Michael A." <mpittenger@potteranderson.com>, "Wuertz, Allison M" <allison.wuertz@hoganlovells.com>
**Cc:** Alex Spiro <alexspiro@quinnemanuel.com>, Maaren Shah <maarenshah@quinnemanuel.com>, "Barlow, Michael A"
<barlow@abramsbayliss.com>
**Subject: JPMorgan Chase Bank, N.A. v. Javice et al., D. Del. C.A. No. 22-1621-MN**


[EXTERNAL]
Counsel:
We are writing to seek your position as to whether you would agree to open full discovery in the above-referenced
matter.
On April 6, in response to several of our requests that JPMC preserve documents from sites, accounts, and platforms
maintained with certain JPMC and/or Frank vendors, you asked if Ms. Javice would "agree to the opening of full
discovery." Before we had an opportunity to respond, on April 7, you filed a motion to partially lift the PSLRA stay in
order to obtain discovery relating to, inter alia, Ms. Javice's transfers of funds from Chase. Ms. Javice opposed this
motion primarily on the grounds that we believe the discovery sought was improper and premature judgment
discovery. JPMC's motion remains pending before the court.
Ms. Javice is willing to agree to the opening of full discovery. If you agree, we will withdraw our pending opposition,
subject to a stipulation that Ms. Javice and JPMC each reserve all rights to object to specific discovery requests.
Would you please let us know as soon as possible, and no later than close of business on Tuesday, your position on
lifting the stay and proceeding with full discovery?

As stated above, Ms. Javice reserves all rights to oppose any particular discovery requests; further, she reserves all rights
in connection with the applicability of the PSLRA stay.

Thanks,

JP

JP Kernisan | Partner | Quinn Emanuel Urquhart & Sullivan, LLP

# **<u>Exhibit H</u>**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE
COMMISSION,

               *Plaintiff*,

    vs.

CHARLIE JAVICE,

            *Defendant*.

Case No. 1:23-cv-02795 (LJL)

**DEFENDANT CHARLIE JAVICE'S OPPOSITION TO THE GOVERNMENT'S**
**APPLICATION TO INTERVENE AND FOR A STAY OF DISCOVERY**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ................................................................................................2

    A.    The SEC and Government Conducted a Parallel Investigation and Filed Two Separate But Coordinated Cases Against Ms. Javice .....................................2

    B.    The SEC and the Government are Acting as Taxpayer-Funded Agents of JPMC ............................................................................................................3

    C.    SEC Initially Proposes Ambitious Discovery Schedule, Backtracking to Deprive Ms. Javice of Evidence Critical to Her Defense, While Continuing to Investigate ........................................................................................................6

ARGUMENT ........................................................................................................................8

    A.    The Government Has Not Met Its Burden to Establish Any Justifiable Basis For a Stay ...........................................................................................9

        1.    Overlapping Issues and Mere Fact of Indictment Do Not Warrant a Stay .............................................................................................10

        2.    Ms. Javice Would Be Directly and Severely Prejudiced by Any Delay in the Litigation of This Action and There is No Prejudice to the SEC or Government of Proceeding ......................................13

        3.    A Stay of Discovery Will Waste Judicial Resources and Impose Unnecessary Burdens on this Court ........................................16

        4.    The Public Interest Favors Prompt Resolution of the SEC's Case ............17

    B.    Any Stay in this Case Should Apply Only to Depositions of Fact Witnesses, Not to Document Discovery .............................................................19

CONCLUSION ....................................................................................................................21

## TABLE OF AUTHORITIES

**Cases**

*Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*,
    No. CV 14-3053-MWF (AFMx), 2018 WL 11242039 (C.D. Cal. Apr. 6, 2018) .................. 18

*England Sports Network, LP v. Alley Interactive, LLC*,
    No. 22-cv-10024-ADB, 2023 WL 2140474 (D. Mass. Feb. 21, 2023) .................................. 15

*In re Scrap Metal Antitrust Litig.*,
    No. 1:02-CV-0844, 2002 WL 31988168 (N.D. Ohio Nov. 7, 2002)...................................... 20

*Keating v. Office of Thrift Supervision*,
    45 F.3d 322 (9th Cir. 1995) .................................................................................................. 19

*Louis Vuitton Malletier S.A. v. LY USA, Inc.*,
    676 F.3d 83 (2d Cir. 2012)................................................................................................ 9, 10

*Nosik v. Singe*,
    40 F.3d 592 (2d. Cir. 1994).................................................................................................. 11

*SEC v. Balwani*,
    No. 5:18-cv-01603-EJD, 2019 WL 2491963 (N.D. Cal. June 14, 2019) ......................... 17, 18

*SEC v. Blaszczak*,
    No. 17-cv-3919 (AJN), 2018 WL 301091 (S.D.N.Y. Jan. 3, 2018) ...................................... 14

*SEC v. Chakrapani*,
    No. 09 Civ. 325(RJS), 2010 WL 2605819 (S.D.N.Y. June 29, 2010)........ 9, 10, 16, 17, 20, 21

*SEC v. Credit Bancorp*,
    738 F. Supp. 2d 376 (S.D.N.Y. 2010).................................................................................. 11

*SEC v. Curshen*,
    No. 11-20561-JLK, 2012 WL 12864338 (S.D. Fla. May 25, 2012)...................................... 13

*SEC v. Dresser Indus., Inc.*,
    628 F.2d 1368 (D.C. Cir. 1980) .......................................................................................... 16

*SEC v. Fraser*,
    No. CV-09-00443-PHX-GMS, 2009 WL 1531854 (D. Ariz. June 1, 2009)................... 12, 15

*SEC v. Gilbertson*,
    No. 16-cv-3779 (DWF/HB), 2017 WL 5172313 (D. Minn. May 12, 2017) ......................... 20

*SEC v. Jones*,
    No. 04 Civ. 4385(RWS), 2005 WL 2837462, (S.D.N.Y. Oct. 28, 2005) ......................... 13, 14

*SEC v. Kanodia*,
    153 F. Supp. 3d 478 (D. Mass. 2015) .............................................................. 17, 20

*SEC v. O'Neill*,
    98 F. Supp. 3d 219 (D. Mass. 2015) ................................................. 1, 11, 18, 19

*SEC v. Oakford Corp.*,
    181 F.R.D. 269 (S.D.N.Y. 1998) ..................................................................... 12, 19

*SEC v. Saad*,
    229 F.R.D. 90 (S.D.N.Y. 2005) ............................................................ 9, 13, 14, 20

*SEC v. Saad*,
    384 F. Supp. 2d 692 (S.D.N.Y. 2005).................................................................. 11

*SEC v. Sandifur*,
    No. C05-1631 C, 2006 WL 3692611 (W.D. Wash. Dec. 11, 2006)...................... 12

*SEC v. Zouvas*,
    No. CV-17-00427-PHX-SPL, 2018 WL 11241077 (D. Ariz. Oct. 5, 2018) ......... 15

*Sterling Nat. Bank v. A-1 Hotels Int'l, Inc.*,
    175 F. Supp. 2d 573 (S.D.N.Y. 2001).............................................................. 8, 9

*Travelers Cas. & Sur. Co. v. Vanderbilt Grp., LLC*,
    No. 01 CIV. 7927(DLC), 2002 WL 844345 (S.D.N.Y. May 2, 2002) ................ 16

*Trs. of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*,
    886 F. Supp. 1134 (S.D.N.Y. 1995)................................................................... 9

*Twenty First Century Corp. v. LaBianca*,
    801 F. Supp. 1007 (E.D.N.Y. 1992) .................................................................. 2

*United States v. Dist. Council of N.Y. City & Vicinity of United Bhd. of Carpenters & Joiners of Am.*,
    No. 0 Civ. 5722 (CSH), 1991 WL 243385 (S.D.N.Y. Nov. 8, 1991).................... 12

*United States v. Okatan*,
    728 F.3d 111 (2d Cir. 2013)............................................................................ 21

*Volmar Distribs., Inc. v. N.Y. Post Co.*,
    152 F.R.D. 36 (S.D.N.Y. 1993) ...................................................................... 10

*Weil v. Markowitz*,
    829 F.2d 166 (D.C. Cir. 1987) ....................................................................... 10

**Other Authorities**

8 Bus. & Com. Litig. Fed. Cts. § 92:36 (5th ed.)........................................................ 14

## INTRODUCTION

"If the government and the SEC choose to bring parallel civil and criminal cases close in time to each other, then each entity **must be prepared to go ahead with its case on a usual schedule**." *SEC v. O'Neill*, 98 F. Supp. 3d 219, 223-24 (D. Mass. 2015) (emphasis added). This is precisely the case here. After working in step with the U.S. Securities and Exchange Commission ("SEC") for months to conduct a parallel investigation and having orchestrated the coordinated filing of criminal and civil actions against Ms. Javice in this Court at the exact same time, the Government now seeks to intervene in this action to "stay discovery in the SEC Case until the conclusion of the parallel criminal case." Dkt. No. 20 at 1. In so doing, the Government makes no effort to conceal the fact that its application is expressly designed to gain advantage in the criminal action, and to enable the SEC and the Government to play hide-the-ball with Ms. Javice as she fights for her liberty and livelihood, while depriving her of a level playing field and her right to timely defend herself against **both** the SEC's **and** the Government's rashly filed claims. The SEC, while purporting to take no position on the Government's motion,[1] simultaneously has asked this Court to (i) extend the SEC's time to respond to Ms. Javice's first set of document requests; and (ii) permit the SEC to conduct a continuing investigation during the pendency of any stay. *See* Dkt. No. 25. This is nothing less than a coordinated governmental effort to deprive Ms. Javice of exculpatory evidence critical to her defense and necessary to exonerate her. This Court should deny the Government's motion to stay.[2]

---

[1] *See* Declaration of Sarah Heaton Concannon in Support of Defendant Charlie Javice's Opposition to the Government's Application to Intervene and For a Stay of Discovery ("Concannon Decl.") ¶ 4 & Ex. A (correspondence between the SEC's counsel and Ms. Javice's counsel) at 11.

[2] Ms. Javice disagrees with the Government's suggestion that Rule 24(a)(2) of the Federal Rules of Civil Procedure provides the Government with broad intervention as a matter of right, Dkt. No. 20 at 4-5, but Ms. Javice does not object to the Government's request to intervene

## FACTUAL BACKGROUND

**A.    The SEC and Government Conducted a Parallel Investigation and Filed Two Separate But Coordinated Cases Against Ms. Javice**

The SEC and the Government began investigating Ms. Javice no later than early 2023. After months of investigation, the SEC and the Government ultimately decided to bring two separate cases against Ms. Javice:  the SEC's civil enforcement action for purported violations of the federal securities laws, and the Government's criminal action for purported bank and wire fraud.  The actions are based on precisely the same alleged misconduct—that Ms. Javice somehow fraudulently induced JPMorgan Chase Bank, N.A. ("JPMC") (one of the largest and most sophisticated financial institutions in the world) to acquire Ms. Javice's student loan company, TAPD, Inc. d/b/a Frank ("Frank"), for $175 million.

The SEC and the Government announced their parallel actions with great public fanfare within hours of each other on April 4, 2023—the day *after* Ms. Javice's arrest and the unsealing of the Government's criminal complaint.  *See* Concannon Decl. ¶ 13 & Ex. B (SEC's Apr. 4, 2023 Press Release); Concannon Decl. ¶ 14 & Ex. C (Government's Apr. 4, 2023 Press Release). In other words, before Ms. Javice had any inkling that the SEC or the Government were investigating her, the Government already had filed a sealed criminal complaint and shared both the substance of that complaint and the date and time of Ms. Javice's anticipated arrest and unsealing with the SEC, so that the SEC could announce its action in a coordinated media push with the Government.  In its press release, the SEC expressly thanked the Government, stating, "[t]he SEC appreciates the assistance of the U.S. Attorney's Office for the Southern District of

---

in this action "for the **limited** purpose of moving to stay discovery," *id.* at 4 (quoting *Twenty First Century Corp. v. LaBianca*, 801 F. Supp. 1007, 1009 (E.D.N.Y. 1992)) (emphasis added).

New York, which announced a parallel, criminal investigation today, as well as the Federal Bureau of Investigation." Ex. B. The Government did not reciprocate. *See* Ex. C.

The SEC and the Government—not Ms. Javice—made the decision to file two separate actions. Having made that decision, the SEC and the Government must move forward with their cases, so that Ms. Javice may exercise her right to defend both matters expeditiously.

**B.      The SEC and the Government are Acting as Taxpayer-Funded Agents of JPMC**

The SEC and the Government's actions against Ms. Javice here are both astonishing and unique. These taxpayer-funded governmental agencies have unwittingly permitted themselves to be converted into agents of JPMC, "a leader in investment banking, commercial banking, financial transaction processing and asset management[,] ... serv[ing] millions of customers, predominantly in the U.S., and many of the world's most prominent corporate, institutional and government clients globally." *See* Concannon Decl. ¶ 15 & Ex. D (JPMC's "About Us" webpage) at 1. JPMC's ***private*** grievance against Ms. Javice, filed in the U.S. District Court for the District of Delaware on December 22, 2022 and still pending, *JPMorgan Chase Bank, N.A. v. Javice et. al.*, No. 1:22-cv-01621-MN (D. Del.), has somehow mushroomed into ***two separate governmental actions***. JPMC's extraordinary ability to convert the SEC and the Government into its personal trial counsel, litigating on its behalf to obtain alleged restitution and disgorgement for a ***single*** well-heeled institutional alleged victim, necessitates moving forward with both the SEC's and the Government's actions ***now***. Ms. Javice must be permitted to put to rest, for once and for all, JPMC's claims that she somehow defrauded it and put a stop to JPMC's exploitation of governmental and judicial resources on its personal behalf by timely obtaining final resolution in the SEC action, criminal action, and Delaware action.

On September 14, 2021, following several weeks of extensive due diligence, JPMC acquired Ms. Javice's company, Frank. *See* Dkt. No. 1 ¶ 72. Frank was designed as a tool for students to help expedite completion of the Free Application for Federal Student Aid, also known as "FAFSA" and ultimately offered a broader range of content and services to support students and families in navigating the path towards higher education. *See id.* ¶¶ 16, 20-22. JPMC hired Ms. Javice following the acquisition, appointing her to a managing director position and offering her a lucrative compensation and incentive package. *Id.* ¶ 13. But after Ms. Javice vocally objected to JPMC's suggestion to pivot toward an unethical and potentially illegal business strategy for Frank, and after unforeseen regulatory changes outside of Ms. Javice's control rendered Frank's core tool less effective (unexpectedly diminishing the value of JPMC's investment), JPMC suddenly needed, and found, a scapegoat in Ms. Javice. *See* Concannon Decl. ¶ 16 & Ex. E (Ms. Javice's Answer & Counterclaims in Case No. 122-cv-01621-MN (D. Del.)) at ¶¶ 1, 80-85, 91, 93-96, 103. JPMC began engaging in a series of pretextual investigations against Ms. Javice. Ex. E ¶¶ 86-88. Soon thereafter, JPMC cut off Ms. Javice's access to documents, her Frank email account, and all Frank and JPMC communication platforms on which she had previously conducted Frank business. *See id.* ¶¶ 14, 96. JPMC then unilaterally elected to shut down Frank and publicly blame Ms. Javice for JPMC's failures. *See id.* ¶¶ 1, 85, 95, 103.

On November 4, 2022, JPMC wrongfully terminated Ms. Javice's employment. *Id.* ¶ 98. On December 20, 2022, Ms. Javice filed an action against JPMC in Delaware Chancery Court due to JPMC's failure to honor its contractual commitment to advance Ms. Javice's legal fees to defend against JPMC's wrongful and pretextual actions. *See Javice v. JPMorgan Chase Bank, N.A. et al.*, C.A. No. 2022-1179-KSJM (Del. Ch.). Two days later, on December 22, 2022,

JPMC filed a retaliatory action against Ms. Javice in the U.S. District Court for the District of Delaware, asserting (among other baseless claims) two private causes of action against Ms. Javice for alleged violations of the federal securities laws.  *See* Concannon Decl. ¶ 17 & Ex. F (JPMC's Complaint in Case No. 122-cv-01621-MN (D. Del.)) at ¶¶ 186-201.  On May 8, 2023, the Delaware Chancery Court concluded that JPMC is legally obligated to cover certain of Ms. Javice's legal defense costs.  *See* Concannon Decl. ¶ 18 & Ex. G (May 8, 2023 Hr'g Tr. in Case No. 2022-1179-KSJM (Del. Ch.)) at 26.

Around the time of its private and retaliatory lawsuit, JPMC began working with the SEC and the Government to bring claims against Ms. Javice—co-opting taxpayer-funded governmental resources for its private gain.  Both the SEC and the Government have investigative files comprising—almost exclusively—cherry-picked third-party documents that were provided to them by JPMC.  In addition to coordinating with JPMC, the SEC and the Government also assisted each other by collaborating and sharing documents and information across the agencies.  Neither the SEC nor the Government sought or obtained documents or testimony from Ms. Javice directly before filing their actions against her.

The SEC's Complaint, filed on April 4, 2023 and announced publicly on the SEC's website, alleges that Ms. Javice defrauded JPMC by making misrepresentations about how many "users" Frank had to entice an acquisition by JPMC.  Dkt. No. 1 ¶¶ 1-7.  The Government's criminal complaint against Ms. Javice, filed under seal on March 31, 2023 and publicly released on April 4, 2023, and indictment, obtained on May 18, 2023, likewise allege that Ms. Javice "engaged in a scheme to defraud by submitting false and fraudulent statements and representations about TAPD, Inc., d/b/a Frank ... and its user data[.]"  *See* Concannon Decl. ¶ 19 & Ex. H (Criminal Indictment in Case No. 123-cr-00251-AKH (S.D.N.Y.)) ¶ 2; *see also*

Concannon Decl. ¶ 20 & Ex. I (Criminal Complaint in Case No. 123-cr-00251-AKH (S.D.N.Y.)). In their pleadings, the SEC and the Government mirror the unproven allegations set forth in JPMC's private litigation against Ms. Javice and cite and refer to the same selective set of documents on which JPMC relies. *See, e.g.*, Dkt. No. 1 ¶¶ 5, 22, 35, 43, 46, 49, 53, 59-65, 69, 72, 88, 91; Ex. I ¶¶ 18-19, 21-25, 27, 30-33 (confirming Government's criminal allegations against Ms. Javice rely heavily on "records" and "documents obtained from JPMC"); *see also* Ex. B (SEC press release thanking the Government for assisting the SEC's investigation).

### C. SEC Initially Proposes Ambitious Discovery Schedule, Backtracking to Deprive Ms. Javice of Evidence Critical to Her Defense, While Continuing to Investigate

From the inception of this case, the SEC has pursued an ambitious discovery and trial schedule, making clear its intent to immediately proceed to discovery, despite its awareness of the Government's parallel criminal action and JPMC's Delaware action. On May 19, 2023, the SEC and Ms. Javice's counsel met and conferred, at the SEC's request, concerning a Case Management Plan. During that call, the SEC proposed a brisk pre-trial schedule, which accepted nearly all of the default time periods set forth in this Court's template. *See* Dkt. No. 26-1; *see also* Concannon Decl. ¶ 5. The SEC also indicated that it would begin production of the investigative file on a rolling basis, on or around the date of the initially scheduled Rule 26 disclosures—June 21, 2023. *See* Dkt. No. 26-1. The SEC proposed that the parties *complete* fact discovery by October 5, 2023. *See id.* at 2-3.

On May 23, 2023, Ms. Javice agreed to the SEC's proposed Case Management Plan, memorializing the SEC's statements concerning the production of the investigative file. Dkt. No. 26-2; *see also* Concannon Decl. ¶ 6. Ms. Javice provided the SEC with a proposed Protective Order and served her first set of document requests, with a return date of June 22, 2023. Dkt. Nos. 26-3 & 26-4; *see also* Concannon Decl. ¶¶ 7-8; Ex. A at 14.

On May 24, 2023, the Government filed its application to intervene and stay discovery, Dkt. No. 19, in which the Government told this Court that the SEC "takes no position on the request for a stay." Dkt. No. 20 at 1, 9; *see also* Ex. A at 11 ("The SEC takes no position with regard to the stay of discovery requested by the Government[.]"). On May 30, 2023, the SEC asked Ms. Javice to agree to an extension of time for the SEC to serve its responses and objections to her first set of document requests from June 22, 2023 to "30 days following the Court's ruling on the stay motion." Ex. A at 8. Counsel to Ms. Javice responded that "[w]e cannot agree to th[at] proposal." *Id.* at 7. The SEC proposed a meet and confer to "see if we can try to resolve this without going to the Court." *Id.* at 6. On June 1, 2023, the parties met and conferred. Concannon Decl. ¶ 9. The SEC suggested that it would be willing to agree to production of "third-party documents" comprising most of the investigative file within 14 days of this Court's order on the Government's motion to stay. *See id.* ¶ 11. Counsel to Ms. Javice agreed to consider the SEC's proposal. *Id.* Shortly thereafter, counsel to Ms. Javice proposed a reasonable compromise—that if the SEC would agree to promptly produce "third-party documents in its possession, custody, or control," then Ms. Javice would agree that the SEC's responses to Ms. Javice's first set of document requests and additional document production could be completed within 14 days of any order by this Court on the Government's motion to stay. *Id.* ¶ 12; Ex. A at 3-4. The SEC rejected Ms. Javice's offer of compromise. Concannon Decl. ¶ 12; Ex. A at 3 ("We can't agree to that.").

On June 2, 2023, the SEC submitted a letter motion to this Court, seeking an extension of time to respond to Ms. Javice's first set of document requests and to begin producing responsive documents from June 22 to an unspecified date 21 days after this Court's order on the Government's stay motion. Dkt. No. 25. The SEC took the remarkable position that the mere

pendency of the Government's motion to stay should prevent it from having to take immediate steps to prepare to produce relevant and responsive documents within its possession, custody, or control upon an order of this Court denying the stay. *Id.* at 1-2. In that letter, the SEC also, for the first time, "advise[d]" the Court and Ms. Javice that "[a] stay of discovery in this action would not preclude the SEC from continuing its investigation" or "issuing investigative subpoenas for documents and testimony" regarding this case. *Id.* at 2. The SEC further informed this Court and Ms. Javice of its intention to ***withhold*** from Ms. Javice any documents obtained during the SEC's post-filing investigation until "the Court ultimately lifts any stay it may grant." *Id.* at 2-3. The SEC's professed intention to use its investigative powers—rather than the Federal Rules of Civil Procedure—to continue to gather evidence directly relevant to Ms. Javice's defense during the pendency of any stay while ***concealing*** that very evidence from Ms. Javice "is both highly unusual and an abuse of this Court's processes." *See* Dkt. 26 at 2-3. The SEC declares license to file an enforcement action against Ms. Javice, stay the action during the pendency of the parallel criminal action, and use its investigative subpoena powers and other tools in the SEC's arsenal to continue to gather evidence (including through subpoenas for documents and sworn testimony and witness interviews conducted under the specter of 18 U.S.C. § 1001), all without having to produce a ***single*** document, transcript, or interview note to Ms. Javice until the stay is lifted. As discussed below, this is the very definition of prejudice.

## ARGUMENT

This Court should deny the Government's motion and put a stop to the SEC's and the Government's coordinated gamesmanship and abuse of judicial process. The Government has not, and cannot, meet its burden of justifying the "extraordinary remedy" of a stay, since any stay of discovery is directly and severely prejudicial to Ms. Javice. *See Sterling Nat. Bank v. A-1 Hotels Int'l, Inc.*, 175 F. Supp. 2d 573, 577 (S.D.N.Y. 2001) (citation omitted). Nor is there

anything "extraordinary" about this case that requires a stay; the Government "can point to nothing that suggests that the dilemma [it] face[s] is more pointed or difficult than in any other case of parallel proceedings." *Id.* at 578. As Judge Rakoff has stated:

> The U.S. Attorney's argument, therefore, boils down in the end to its standard complaint that the defendants are getting a "special advantage" because, if they were only facing a criminal indictment, they would not be entitled to [discovery] at this time. But the defendants are **not just facing a criminal indictment**; they are also facing a **very serious SEC civil action**, and they are thus **fully entitled** to the timely discovery that federal law grants them in defending such an action.

*SEC v. Saad*, 229 F.R.D. 90, 92 (S.D.N.Y. 2005) (emphasis added). This Court should similarly hold. In the alternative, this Court should enter, at most, a **limited** stay of deposition discovery, permitting document discovery to begin immediately.

### A. The Government Has Not Met Its Burden to Establish Any Justifiable Basis For a Stay

The party "seeking a stay bears the burden of establishing its need." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 97 (2d Cir. 2012) (internal quotation marks and citation omitted). In deciding whether the government has met its burden to stay parallel SEC proceedings, district courts frequently rely on the following factors "as a rough guide":

> 1) the extent to which the issues in the criminal case overlap with those presented in the civil case;
> 2) the status of the case, including whether the defendants have been indicted;
> 3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay;
> 4) the private interests of and burden on the defendants;
> 5) the interests of the courts; and
> 6) the public interest.

*See id.* at 99 (quoting *Trs. of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995)); *see also SEC v. Chakrapani*, No. 09 Civ. 325(RJS), 2010 WL 2605819, at *10 (S.D.N.Y. June 29, 2010). These factors do not, however, replace this Court's studied judgment. *See Louis Vuitton*, 676 F.3d at 99 (cautioning against

application of "check list[s]" and "mechanical devices").  Nor does the weight of these factors, individually or in combination, ever *require* the district court to grant a stay.  *Id.* at 98 (holding that "the Constitution rarely, if ever, *requires* such a stay").  Prejudice is, by far, the most important factor.  *See Chakrapani*, 2010 WL 2605819, at \*10; *Volmar Distribs., Inc. v. N.Y. Post Co.*, 152 F.R.D. 36, 39 (S.D.N.Y. 1993) ("Balancing these factors is a case-by-case determination, with the basic goal being to *avoid prejudice*.") (emphasis added).

Here, the Government's request for a stay of discovery is "an extraordinary remedy appropriate for extraordinary circumstances."  *Weil v. Markowitz,* 829 F.2d 166, 174 n.17 (D.C. Cir. 1987).  The Government does not carry its burden.

### 1. Overlapping Issues and Mere Fact of Indictment Do Not Warrant a Stay

The Government argues "that the criminal and civil cases involve essentially identical facts and issues," and that Ms. Javice already has been indicted.  Dkt. No. 20 at 8.  In this unique case, both of these factors weigh *against* the imposition of a stay.

As detailed above, *both* the SEC's and the Government's action arise from the *same* evidence selectively cherry-picked and provided by JPMC to the SEC and the Government in furtherance of JPMC's effort to co-opt limited governmental resources in connection with its private vendetta against Ms. Javice.  JPMC—a private, well-resourced bank—appears to have been the *primary* (if not *sole*) source of materials supporting the SEC's and the Government's allegations.  Ms. Javice is entitled to expeditiously defend herself against both the SEC's and the Government's baseless claims, and to put the SEC's reliance on JPMC to the test in the SEC action by immediately receiving the entirety of the SEC's investigative file—which the SEC has stated is substantially comprised of third-party documents, *see* Concannon Decl. ¶ 10—and proceeding to fact depositions, expert discovery, summary judgment, and trial.  This is the rare

case where the Government and third parties have sole control of the majority of documentary evidence necessary to uncover the flaws in their allegations of fraud, and the *defendant* is requesting to proceed with discovery in a parallel civil proceeding so she can gain swift and immediate access to the evidence she needs to disprove those allegations. The fact that "[c]ivil discovery might reveal aspects of the government's criminal case or result in inconsistent statements if witnesses are questioned more than once," is a "risk[] that the government and the SEC run when they elect to pursue parallel investigations and prosecutions." *O'Neill*, 98 F. Supp. 3d at 224.

Moreover, "[n]othing in the Constitution" precludes this Court from permitting simultaneous litigation of the SEC's and the Government's contemporaneously-filed criminal and civil actions, even where they concern the same subject matter and an indictment has issued. *Nosik v. Singe*, 40 F.3d 592, 596 (2d. Cir. 1994); *SEC v. Credit Bancorp*, 738 F. Supp. 2d 376, 389 (S.D.N.Y. 2010) (holding that "no general federal constitutional, statutory, or common law rule bar[s] the simultaneous prosecution of separate civil and criminal actions by different federal agencies against the same defendant involving the same transactions") (citation omitted). Rather, the *presumption* is that this action and the criminal action should proceed in parallel and "in the normal course," and there is no reason that this Court needs to deprive Ms. Javice of her right to a timely defense of the SEC action, simply because some discovery in the SEC action also relates to the criminal action. *SEC v. Saad*, 384 F. Supp. 2d 692, 693 (S.D.N.Y. 2005).

Here, the Government's perfunctory and boilerplate arguments that "the Criminal Case and this case involve the same alleged fraudulent scheme … [and] virtually identical facts, witnesses, issues," and that Ms. Javice already has been indicted, Dkt. No. 20 at 8-9, are insufficient to meet the Government's "extraordinary burden" to support a stay. The

Government wholly fails to explain to this Court *why* mere overlap between its action and the SEC's action and the status of the criminal action actually matter to *this* case. *See United States v. Dist. Council of N.Y. City & Vicinity of United Bhd. of Carpenters & Joiners of Am.*, No. 0 Civ. 5722 (CSH), 1991 WL 243385, at *4 (S.D.N.Y. Nov. 8, 1991) (holding Government "must make a showing that special circumstances ... actually exist in the present case").

Thus, the mere fact that the SEC and the Government have elected—in their sole discretion—to simultaneously file parallel proceedings involving "essentially identical facts and issues," *see* Dkt. 20 at 9, does not justify a stay of discovery in the SEC action over Ms. Javice's vehement objection. *See SEC v. Fraser*, No. CV-09-00443-PHX-GMS, 2009 WL 1531854, at *3 (D. Ariz. June 1, 2009) ("The civil case, like the criminal case, asserts serious violations of the securities laws, and Defendants have a strong interest in being able to defend themselves against the SEC's allegations as quickly as possible."). Where, as here, "civil regulators … and the Government [have] used parallel proceedings to [their] advantage," this Court can and should exercise its discretion to deny a stay. *SEC v. Sandifur*, No. C05-1631 C, 2006 WL 3692611, at *2 (W.D. Wash. Dec. 11, 2006); *see also SEC v. Oakford Corp.*, 181 F.R.D. 269, 270 (S.D.N.Y. 1998) (observing that governmental agencies are quick to bring parallel proceedings, but "generally loathe to furnish discovery in the civil case until the criminal case is completed—for to do so would undercut the informational advantage enjoyed by the government in the criminal case"). As Judge Rakoff aptly stated in *Saad*:

> Although applications for a stay similar to the one here made by the U.S. Attorney are not uncommon in such "parallel proceedings" situations, they are not without their ***bizarre aspects***. It is ***bewildering enough*** that Congress has decreed that, even though someone facing the potentially ruinous financial penalties of an SEC civil complaint should be accorded substantial discovery in order to defend herself, the same defendant facing the even more severe penalties of a criminal action should barely receive any discovery at all. But it is stranger still that the U.S. Attorney's Office, having closely coordinated with the SEC in bringing

simultaneous civil and criminal actions against some *hapless defendant*, should then wish to be *relieved of the consequences* that will flow if the two actions proceed simultaneously.

229 F.R.D. at 91 (emphasis added).

> **2.      Ms. Javice Would Be Directly and Severely Prejudiced by Any Delay in the Litigation of This Action and There is No Prejudice to the SEC or Government of Proceeding**

In seemingly oblivious disregard to the consequences of its own actions, the Government remarkably asserts that "[a] stay of discovery will not prejudice any party," Dkt. No. 20 at 9, and that "the fairness, efficiency, and public good resulting from a stay of discovery outweighs the defendant's *preference*," *id.* at 1 (emphasis added).  Contrary to the Government's self-serving assertions, the SEC's and the Government's *mere unproven allegations* already have severely prejudiced Ms. Javice, and any delay to Ms. Javice's defense *exponentially increases* the prejudice to her.  Ms. Javice's life is on the line here, and time is of the essence.  The Government's application is not "routine[]."  *See id.* at 6.  It has grave consequences for Ms. Javice and her defense of this action.  This Court should "decline[] to resolve this intra-Government conflict by entering a stay at the expense of [Ms. Javice's] rights."  *See SEC v. Curshen*, No. 11-20561-JLK, 2012 WL 12864338, at *3 (S.D. Fla. May 25, 2012).

The SEC and the Government have alleged that Ms. Javice has committed serious violations of federal securities law and the criminal bank and wire fraud statutes.  They have called into question Ms. Javice's previously unblemished reputation and credibility.  Ms. Javice deserves a timely opportunity to clear her name through the full presentation of evidence.  *See, e.g.*, *SEC v. Jones*, No. 04 Civ. 4385(RWS), 2005 WL 2837462, at *2 (S.D.N.Y. Oct. 28, 2005) (denying United States' motion to intervene because, among other things, the defendant's "reputation and credibility have been called into question, and he deserves a timely opportunity to clear his name"); *see also, e.g.*, *SEC v. Blaszczak*, No. 17-cv-3919 (AJN), 2018 WL 301091,

at *2 (S.D.N.Y. Jan. 3, 2018) (recognizing "legitimate concerns" that a stay "will delay the Defendants' attempt to clear their names, ... could result in the loss of evidence, and [] will subject the Defendants to increased legal expenses"). Moreover, Ms. Javice's assets have been seized, she is currently unemployed, and the pendency of this SEC action continues to cloud her future career prospects and personal life. *See Jones*, 2005 WL 2837462, at *2 (collecting cases). Ms. Javice is entitled to seek and obtain discovery in this action now, lest—even after acquittal in the criminal action—she be forced to start completely over again in this action, only with the SEC's lower civil burden of proof and deck heavily stacked in the SEC's favor. *See, e.g.*, 8 Bus. & Com. Litig. Fed. Cts. § 92:36 (5th ed.) ("In light of the SEC's extensive investigative powers and pretrial preparation, and the lower burden of proof that applies in civil court proceedings, it can be difficult for defendants to prevail on substantive grounds."). Ms. Javice does not merely "prefer[]" moving forward with an expeditious defense to the SEC action. *See* Dkt. No. 20 at 1. Rather, Ms. Javice would be ***directly*** and ***severely prejudiced*** by a stay of discovery in this action.

Moreover, the SEC's recent correspondence to this Court has exposed the true objectives behind the Government's application. Having rushed to file parallel criminal and civil litigation against Ms. Javice based on nothing more than JPMC's say-so, the Government now wants to ensure that Ms. Javice is precluded from mounting a defense in the criminal case, while the SEC continues to clandestinely gather evidence relevant to Ms. Javice's defense and share that evidence with the Government, but ***not*** Ms. Javice. *See* Dkt. No. 25 at 2-3. This is undeniably prejudicial and should not be countenanced by this Court. The SEC alleges serious violations of federal securities law against Ms. Javice. She faces "potentially ruinous financial penalties." *Saad*, 229 F.R.D. at 91. Ms. Javice has an overwhelmingly "strong interest in being able to

defend [herself] against the SEC's allegations as quickly as possible." *Fraser*, 2009 WL 1531854, at \*3; *see also England Sports Network, LP v. Alley Interactive, LLC*, No. 22-cv-10024-ADB, 2023 WL 2140474, at \*4 (D. Mass. Feb. 21, 2023) (noting that because defendant "appears to want the civil case to move forward, ... [t]he Court sees no reason to override [defendant's] own evaluation of the prejudice that may result from the civil case proceeding").

Ms. Javice's defense of the SEC action also will be prejudiced by any indeterminate stay of discovery. The delay proposed by the Government—that no discovery in the SEC action commence until *after* conclusion of the criminal action—increases the likelihood that witnesses will forget critical information, witnesses will not be available for depositions or trial, and that exculpatory documents critical to Ms. Javice's defense may be lost or destroyed. *See, e.g.*, *SEC v. Zouvas*, No. CV-17-00427-PHX-SPL, 2018 WL 11241077, at \*4 (D. Ariz. Oct. 5, 2018) ("The SEC also argues that a stay would cause witnesses' memories to fade, and its evidentiary presentation will be less effective.").[3] The SEC has had months to build its case, working in tandem with JPMC and the Government. Ms. Javice has had no such opportunity. Ms. Javice is entitled under the Federal Rules of Civil Procedure to timely obtain documents and information relevant to the claims and defenses asserted in the SEC action. That some of that discovery may also be relevant to the criminal case has no bearing on the Government's application for a stay,

---

[3] Here, the SEC argues that Ms. Javice's objection to the stay is "based on speculation that documents in the SEC's possession may contain 'exculpatory' information critical to her defense of the SEC action." Dkt. No. 25 at 2. The SEC is wrong. Ms. Javice is not speculating; rather, Ms. Javice knows that the SEC's investigative file is largely comprised of documents provided to the SEC *by JPMC*. Ms. Javice is familiar with the contents of those documents from her tenure at JPMC and Frank—she has simply been deprived of her access to those documents through her wrongful termination by JPMC. *See* p. 4, *supra*; Ex. E ¶¶ 14, 96, 98. Counsel is therefore confident that those documents will provide evidence critical to Ms. Javice's defense. Yet the Government and the SEC are colluding to deprive Ms. Javice of access to their contents for as long as possible.

particularly where, as here, the SEC and the Government decided to file their cases at the same time, and the SEC professes to take no position on the Government's request for a stay.

Finally, "the strongest case for deferring civil proceedings until after completion of criminal proceedings" is where there is a serious risk of "undermin[ing] the [defendant's] Fifth Amendment privilege" by forcing the defendant to choose between asserting her Fifth Amendment rights or fully defending against the civil case.  *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1376 (D.C. Cir. 1980).  But Ms. Javice opposes the stay and is prepared to proceed. That is her constitutional right.

The Government does not offer any specific factual basis or argument providing this Court with grounds to ignore the "hardship, inequity, [and] injustice," that will clearly be inflicted upon Ms. Javice as a result of a stay of discovery in the SEC action, in favor of further loading the scales for the Government and allowing the SEC and the Government to deprive Ms. Javice of evidence to which she is entitled as a matter of law and under the Federal Rules of Civil Procedure to defend herself.  Thus, the overwhelming prejudice to Ms. Javice that would result from a stay of this action weighs heavily in favor of denying the stay.

### 3.       A Stay of Discovery Will Waste Judicial Resources and Impose Unnecessary Burdens on this Court

The Government's argument that "[c]onsiderations of judicial economy also weigh in favor of granting a stay of discovery," Dkt. No. 20 at 9-10, likewise fails.  Contrary to the Government's assertion, a stay would impose additional burdens on this Court and is antithetical to this Court's interest "in the expeditious resolution of cases."  *Chakrapani*, 2010 WL 2605819, at \*11 (quoting *Travelers Cas. & Sur. Co. v. Vanderbilt Grp., LLC*, No. 01 CIV. 7927(DLC), 2002 WL 844345, at \*4 (S.D.N.Y. May 2, 2002)).

The Government argues that "[i]ssues common to both cases can be resolved in the criminal proceeding, thereby simplifying the civil action," Dkt. No. 20 at 9-10, but this both assumes the outcome of the criminal action and turns the issue on its head. It is **far** more likely that the Government—which must prove its claims by a standard of proof "beyond a reasonable doubt"—will fail to meet its burden and that Ms. Javice will be acquitted. Or, "[i]t is possible that the Criminal Case could result in a mistrial leaving the Criminal Case unresolved and this case stayed with discovery open." *SEC v. Balwani*, No. 5:18-cv-01603-EJD, 2019 WL 2491963, at *3 (N.D. Cal. June 14, 2019). In any event, even if resolving the criminal action could streamline **some** issues in this action, this Court should "still be wary of abridging [Ms. Javice's] procedural and discovery rights in an effort to save resources and time." *Id.* (citing *SEC v. Kanodia*, 153 F. Supp. 3d 478, 483 (D. Mass. 2015)).

Simply put, the Government's position with regard to "judicial economy" here is both presumptuous and illogical. Absent anything other than a total victory for the Government, this Court and Ms. Javice would be forced to start all over again in this action following the conclusion of the criminal action, now with Ms. Javice belatedly having access to the tools afforded her under the Federal Rules of Civil Procedure. The Government's position will cause delay and interfere with judicial administration, this Court's ability to put in place a Case Management Plan, and "the just, speedy, and inexpensive determination of" this action. *See* Fed. R. Civ. P. 1; *Chakrapani*, 2010 WL 2605819 at *11.

### 4. The Public Interest Favors Prompt Resolution of the SEC's Case

The Government's final contention that the public has an interest in preventing Ms. Javice from obtaining documents to which she is entitled under the Federal Rules of Civil Procedure in the SEC action, merely because those documents might also enable her to prepare a defense in the criminal action, Dkt. No. 20 at 10-13, is similarly unavailing. Indeed, the

17

Government's assertion that it is somehow "improper[]" for a defendant whom two governmental agencies have chosen to simultaneously charge criminally and civilly to prepare her best possible defense, *id.* at 1, smacks of governmental hubris. Presumably, the public's interest is in safeguarding faith in the U.S. system of jurisprudence by ensuring that the presumption of innocence is maintained and that only those proven guilty beyond a reasonable doubt are convicted, not in further tilting the scales of justice in favor of the Government. *O'Neill*, 98 F. Supp. 3d at 224 ("[E]vidence supporting an indicted criminal case ought to be able to survive scrutiny, and the government should not be so invested in withholding information until disclosure is required—after all, the goal is a just resolution in both the civil and criminal cases, and there is no doubt that confidence in an outcome is highest where the evidence is known and can be tested.").

Moreover, the public has an interest in fair, open, and expeditious *civil* legal proceedings. *See Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, No. CV 14-3053-MWF (AFMx), 2018 WL 11242039, at *6 (C.D. Cal. Apr. 6, 2018). Ms. Javice, who is the victim of the Government's and the SEC's coordinated attacks, simply wants to play by the rules, avail herself of the privileges afforded to her by the Federal Rules of Civil Procedure, and put the baseless allegations of the criminal and civil actions behind her as quickly as possible. Again, the Government and the SEC—not Ms. Javice—chose when and how to file their parallel criminal and civil actions. "[T]o the extent that this is a problem, it is of [the Government's] own making. *Balwani*, 2019 WL 2491963, at *4.

The Government and the SEC each accompanied their actions against Ms. Javice with a public media campaign, asserting with governmental pomp and circumstance and gravitas, that Ms. Javice—a 31-year-old self-made entrepreneur—perpetrated a massive fraud against JPMC,

one of the largest and most well-established global financial firms. The SEC's and Government's media strategy contributed to substantial (and unfair) public coverage of this action, and has resulted in the public having an interest in seeing this action promptly resolved. *See, e.g.*, *Keating v. Office of Thrift Supervision*, 45 F.3d 322, 326 (9th Cir. 1995) (public interest in resolving a civil case is higher when it is the subject of an "inordinate amount of media attention"). The public has a strong interest—in the wake of a tsunami of media attention fomented by the SEC and the Government—in seeing this action promptly adjudicated.[4] Having created a media maelstrom, the SEC and the Government must now live with its consequences. *See*, *Oakford Corp.*, 181 F.R.D. at 273 (admonishing the SEC and noting that "[t]o use the federal courts as a forum for filing serious civil accusations that one has no intention of pursuing until a parallel criminal case is completed is *a misuse of the processes of these courts*") (emphasis added). The public has an interest in seeing discovery and this action proceed apace. *See O'Neill*, 98 F. Supp. 3d at 224.

### B. Any Stay in this Case Should Apply Only to Depositions of Fact Witnesses, Not to Document Discovery

For the reasons above, Ms. Javice objects to the entry of *any* stay of this action. But if this Court is inclined to entertain a stay, then it should exercise its judicial discretion to impose only a *limited* stay of fact depositions pending resolution of the criminal case, rather than putting

---

[4] The SEC's media power cannot be overstated. A recent "tweet" by the SEC about a litigated complaint obtained over *6.2 million* views, with Chair Gary Gensler's "re-tweet" gaining *5.4 million* views in just two days. *See* Tweet by SEC (June 5, 2023), available at https://twitter.com/SECGov/status/1665779371108335618; Tweet by Gary Gensler (June 5, 2023), available at https://twitter.com/GaryGensler/status/1665815051846950917. The SEC also uses "hashtags" and other promotional devices to ensure that its unproven allegations obtain the maximum level of attention. *See* Kurt Wolfe, Insight: #HereWeGoAgain – The SEC's Use of Hashtags Raises New Policy Questions, Bloomberg Law (June 28, 2019), available at https://news.bloomberglaw.com/securities-law/insight-herewegoagain-the-secs-use-of-hashtags-raises-new-policy-questions. The SEC does not remove press releases from its website, even after defendants are found not liable, nor does it update those press releases to restore the defendant's reputation.

on hold ***all*** discovery. *See Saad*, 229 F.R.D. at 91; *Kanodia*, 153 F. Supp. 3d at 483; *SEC v. Gilbertson*, No. 16-cv-3779 (DWF/HB), 2017 WL 5172313, at \*3 (D. Minn. May 12, 2017). This reasonable alternative would permit immediate document discovery—including timely production to Ms. Javice of any new documents added to the SEC's investigative file through its purported ongoing investigation—rather than endorsing the SEC's and the Government's attempts to conceal relevant evidence from Ms. Javice for as long as possible. And, this approach would alleviate at least some of the problems created by a full stay, by furthering judicial economy, reducing the prejudice to Ms. Javice, imposing only nominal costs of production on the SEC, and reaching an appropriate balance of competing interests. *See In re Scrap Metal Antitrust Litig.*, No. 1:02-CV-0844, 2002 WL 31988168, at \*7 (N.D. Ohio Nov. 7, 2002) (concluding that the Court "can take measures other than imposing a complete stay of discovery that would minimize the Government's concerns while, at the same time, allowing discovery to proceed" and denying stay).

Moreover, the Government's objections to anything less than a full stay of discovery are both speculative and unconvincing. The Government claims that a full discovery stay is necessary to prevent "asymmetrical discovery," should Ms. Javice assert her Fifth Amendment rights. Dkt. No. 20 at 4, 12-13. Setting aside the irony of this argument—since asymmetrical discovery is ***precisely*** what the Government is seeking to obtain here—Ms. Javice has "not yet invoked [her] Fifth Amendment privileges in connection with discovery." *Chakrapani*, 2010 WL 2605819, at \*11 & n.5 (assertion of Fifth Amendment privilege in answer did not support stay). Moreover, the Government's argument is ***irrelevant*** to the ***criminal*** case or any alleged prejudice to the Government. A defendant in a criminal case, by definition, ***always*** has the right

to invoke her Fifth Amendment privilege against self-incrimination without suffering an adverse inference at trial. *See United States v. Okatan*, 728 F.3d 111, 116 (2d Cir. 2013).

It also bears emphasis that should Ms. Javice assert her Constitutional privilege in the SEC case, any purported detriment would be to the ***SEC***, not the Government (and would have to be weighed against the SEC's entitlement to an adverse inference). But the SEC consistently has asserted neutrality with regard to the Government's motion for a stay. *Compare* Dkt. No. 20 at 1, 9 (asserting the SEC takes no position), *with* Dkt. 25 at 2 (writing to "advise" Court that the SEC will continue seeking third-party discovery regardless of whether a stay is granted). Accordingly, "there is no need for the government to intervene ... to vindicate interests that the SEC is fully capable of representing on its own." *Chakrapani*, 2010 WL 2605819, at \*11.

## CONCLUSION

For the foregoing reasons, Ms. Javice respectfully requests that this Court deny the Government's motion.

Dated: June 7, 2023                Respectfully submitted,

Alex Spiro
Sarah Heaton Concannon
Maaren A. Shah
JP Kernisan
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
alexspiro@quinnemanuel.com
sarahconcannon@quinnemanuel.com
maarenshah@quinnemanuel.com
jpkernisan@quinnemanuel.com

*Attorneys for Defendant Charlie Javice*

# **<u>Exhibit I</u>**



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
BROOKFIELD PLACE, 200 VESEY STREET, SUITE 400
NEW YORK, NY 10281-1022

June 8, 2023

**By ECF**

Hon. Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:     *SEC v. Charlie Javice et al.*, 23 Civ. 2795 (LJL)

Dear Judge Liman:

      Plaintiff Securities and Exchange Commission (the "Commission") respectfully submits this letter in response to defendant Charlie Javice's (i) June 2, 2023 letter opposing the Commission's request to extend the deadline to respond to Javice's document requests (Dkt. 26) and (ii) June 7, 2023 submission (Dkt. 29) opposing the motion by the United States Attorney's Office ("USAO") to stay discovery in this matter (the "Stay Motion"). While the Commission takes no position on the Stay Motion, the Commission writes to correct certain of Javice's statements regarding the Commission's continuing investigation of non-parties and communications with defense counsel.

      First, contrary to Javice's assertions, the Commission will not issue investigative subpoenas for the purpose of gathering evidence in this litigation, and to the extent the Commission obtains documents in its investigation of uncharged parties that are relevant to this litigation, it will produce such documents to Javice as required during civil discovery. Furthermore, to the extent that any such documents are shared with the USAO pursuant to its access request, the Commission will not seek to prevent their disclosure in the parallel criminal case.

      Second, Javice's assertion that the Commission is "hiding exculpatory evidence critical to [her] defense" and engaged in "gamesmanship" (Dkt. 26) by seeking to defer responses to the defendant's May 23, 2023 document requests until 21 days following the Court's ruling on the Stay Motion is meritless. By way of background, Javice submitted her May 23 document requests to the Commission with knowledge that the USAO was preparing to file the Stay Motion. She then requested an extension of time to answer the Complaint (which would have otherwise been due within days) until two weeks following a ruling on the Stay Motion, notwithstanding that a stay of discovery would not necessarily extend the deadline for her answer. After obtaining the Commission's consent to such an extension, Javice refused to agree to the same deadline for the Commission to respond to her document requests, notwithstanding that the timing of such responses could be impacted by the entry of any discovery stay and that the Court had already adjourned the Initial Pretrial Conference *sine die*.

Hon. Lewis J. Liman
June 8, 2023
Page 2

      Javice states that the Commission rejected her "reasonable compromise" (Dkt. 29 at 7) to promptly produce third-party documents but omits that she expressly conditioned such "compromise" on the "immediate" production of documents "regardless of whether the Court grants the USAO's motion to stay." The Commission did not believe it would be appropriate to respond to civil discovery requests during the pendency of the Stay Motion.[1] In any event, the Commission has undertaken to produce to the USAO, pursuant to its access request, all documents in the Commission's possession provided by third parties during the Commission's investigation as to Javice, with the understanding that the USAO may produce these documents to Javice to the extent required in the parallel criminal case. Accordingly, Javice's assertion that the Commission is "colluding to deprive Ms. Javice of access" to documents produced by third parties is baseless.[2]

                                        Respectfully submitted,

                                        /s/ Daniel Loss

                                        Daniel Loss
                                        Senior Trial Counsel

cc:      All counsel of record (by ECF)

---

[1] Indeed, just one day before demanding the "immediate" production of documents, defense counsel conceded that it would be inappropriate for the Commission to produce documents while the Stay Motion was pending. In the same conversation, defense counsel explained, in substance, that Javice's interest in obtaining documents from the Commission related to her need to defend herself in a private action pending in Delaware as well as the parallel criminal case. Defense counsel later claimed that the undersigned "misapprehended" this discussion.

[2] Javice also incorrectly states that the Commission's June 2, 2023 letter (Dkt. 25) made arguments regarding the reasons for her objection to the stay. (Dkt. 29 at 15 n. 3). Rather, the Commission's June 2, 2023 letter stated Javice's position with respect to the Commission's request to defer responses to the defendant's document requests until 21 days after a ruling on the Stay Motion.